LISA HILL FENNING (SBN 89238)
HARRY GARNER (SBN 254942)
ARNOLD & PORTER LLP
777 South Figueroa Street, 44th Floor
Los Angeles, California 90017
Telephone:    213.243.4000
Facsimile:    213.243.4199
Lisa.Fenning@aporter.com
Harry.Garner@aporter.com

*Proposed Counsel to the Debtor and Debtor-in-Possession*

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**LOS ANGELES DIVISION**

| | |
|---|---|
| In re<br><br>DOWNEY REGIONAL MEDICAL CENTER-HOSPITAL, INC., a California non-profit, public benefit corporation,<br><br>            Debtor.<br><br>Tax I.D. 95-1903935 | Case No.: 2:09-bk-34714<br><br>Chapter 11<br><br>**EMERGENCY APPLICATION OF DEBTOR FOR ORDER AUTHORIZING EMPLOYMENT OF HNB CAPITAL LLC AS INVESTMENT BANKER EFFECTIVE AS OF THE PETITION DATE; DECLARATION OF HOWARD BRAND**<br><br><u>HEARING</u><br>Date:    September __, 2009<br>Time:<br>Place:    Courtroom: 1475<br>           United States Bankruptcy Court<br>           255 E. Temple Street<br>           Los Angeles, CA 90012 |

**TABLE OF CONTENTS**

Page

I. JURISDICTION AND VENUE ....................................................................................... 2

II. PROCEDURAL STATUS .............................................................................................. 2

III. BACKGROUND ............................................................................................................. 2

    A. The Business of the Hospital .............................................................................. 2

    B. The Causes of the Bankruptcy Filing ................................................................. 3

IV. RELIEF REQUESTED ................................................................................................... 5

V. HNB CAPITAL'S BACKGROUND AND QUALIFICATIONS ................................... 5

VI. SCOPE OF SERVICES .................................................................................................. 8

VII. COMPENSATION ......................................................................................................... 9

VIII. LIMITATION OF LIABILITY AND INDEMNIFICATION ..................................... 11

IX. HNB'S DISINTERESTEDNESS .................................................................................. 12

X. BASIS FOR RELIEF .................................................................................................... 12

XI. REQUEST FOR EMERGENCY RELIEF .................................................................... 13

XII. CONCLUSION ............................................................................................................. 14

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Linquist & Craig Hotels and Resorts Inc.,*
  Case No. 04-12603 (Bankr. C.D. Cal. Oct. 19, 2004) ........................................................... 13

*In re Phoenix MC, Inc.,*
  Case No. 09-18372 (Bankr. C.D. Cal. April 27, 2009) .......................................................... 13

*In re Z Gallerie,*
  Case No. 09- 18400 (Bankr. C.D. Cal. April 10, 2009) ......................................................... 13

**STATUTES AND RULES**

11 U.S.C. § 327 .................................................................................................................... 12

11 U.S.C. § 327(a) ........................................................................................................... 1, 2, 12

11 U.S.C. § 328(a) ........................................................................................................ 10, 12, 13

11 U.S.C. § 330 .................................................................................................................... 10

11 U.S.C. § 504 .................................................................................................................... 11

11 U.S.C. § 101(14) .............................................................................................................. 12

11 U.S.C. § 1107(a) ................................................................................................................ 2

11 U.S.C. § 1108 ................................................................................................................... 2

28 U.S.C. § 157 .................................................................................................................... 2

28 U.S.C. § 157(b) ................................................................................................................ 2

28 U.S.C. § 1334 .................................................................................................................. 2

28 U.S.C. § 1408 .................................................................................................................. 2

28 U.S.C. § 1409 .................................................................................................................. 2

Fed. R. Bankr. P. 2014 ....................................................................................................... 1, 2

Fed. R. Bankr. P. 6003 ......................................................................................................... 13

Fed. R. Bankr. P. 6003(a) .................................................................................................. 1, 13

LBR 2014-1(b) .................................................................................................................. 1, 2

1  LBR 2016-2.................................................................................................................................... 10

2  LBR 2081-1(a)(12)......................................................................................................................... 1

3  LBR 9075-1(a) ............................................................................................................................... 1

4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

LA566938                                            -iii-

Downey Regional Medical Center-Hospital, Inc., the debtor and debtor-in-possession in the above captioned case (the "**Debtor**" or "**Hospital**"), hereby files this application (the "**Application**") for entry of an order pursuant to § 327(a) of title 11 of the United States Code (the "**Bankruptcy Code**"), Rule 2014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rule 2014-1(b) of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Central District of California (the "**Local Bankruptcy Rules**"), authorizing the employment and retention of HNB Capital LLC, whose business offices are located at 1732 Aviation Boulevard, Suite 223, Redondo Beach, California 90278 ("**HNB**"), as Debtor's investment banker in this chapter 11 case. Debtor seeks to employ HNB nunc pro tunc to September 14, 2009, with compensation to be paid on a fixed fee and percentage basis without a fee application being required. In support of this Application, Debtor relies upon and incorporates by reference the Declaration of Howard Brand (the "**Brand Declaration**"), a true and correct copy of which is attached hereto as Exhibit A.

Debtor requests, pursuant to Local Bankruptcy Rules 2081-1(a)(12) and 9075-1(a), that the Court enter an order approving this Application on less than 48 hours notice, upon timely notice to the Office of the United States Trustee ("**UST**"), creditors holding the twenty largest unsecured claims, Debtor's alleged secured creditors, and other parties in interest (collectively, the "**Interested Parties**").

Debtor's chapter 11 reorganization strategy is dependent upon immediate interim approval of certain postpetition financing, from which HNB is entitled to a success fee payable in part upon interim funding, in addition to a monthly retainer of $35,000 payable until closing of the final DIP Loan (as defined below). As described in more detail below, HNB's services are critical to the completion of the financing and ultimately its final approval. Debtor must retain HNB and obtain authority to pay the first installment of its success fee immediately in order to ensure that HNB will continue to provide necessary services, and that the proposed lender will close the anticipated financing. HNB is not willing to incur the significant costs and expenses of the continued negotiation and documentation of the financing without the Court's prior approval of its success fee. Debtor, therefore, requests that the Court waive the requirement of Federal Bankruptcy Rule 6003(a)

and enter an order granting this Application. A copy of this Application was served, concurrent with the filing hereof with the Court, on the Interested Parties by courier or overnight delivery.

In further support of this Application, Debtor, by and through its undersigned counsel, respectfully states as follows:

## I.    JURISDICTION AND VENUE

1.    This Court has jurisdiction to consider this Application under 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. § 157(b). Venue of these cases and this Application in this District is proper under 28 U.S.C. §§ 1408 and 1409. The statutory predicates for the relief requested herein are Bankruptcy Code § 327(a), Bankruptcy Rule 2014, and Local Bankruptcy Rule 2014-1(b).

## II.    PROCEDURAL STATUS

2.    On September 14, 2009 (the "**Petition Date**"), Debtor commenced a case (the "**Chapter 11 Case**") by filing a petition for relief under chapter 11 of the Bankruptcy Code.

3.    Debtor continues to operate its business and to manage its property as a debtor and debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in Debtor's Chapter 11 Case.

4.    No creditors' committee has been appointed in this Chapter 11 Case by the United States Trustee.

## III.    BACKGROUND

### A.    The Business of the Hospital

5.    The Hospital is a nonprofit general acute care and teaching hospital licensed for 199 beds located in Downey, California. The Hospital currently operates 181 staffed inpatient beds, including an intensive care unit, a neo-natal intensive care unit for newborns with special health issues, a birth center, and definitive observation units, besides general medical-surgical beds. It services approximately 14,000 inpatients per year in all services. The Hospital's average length of stay is less than 4 days on a very acute population, making it one of the most efficient in the state.

6.    The Hospital offers a wide variety of clinical services and provides virtually all clinical services of a major tertiary university hospital except for organ transplants. The Hospital

LA566938                                    -2-

has 11 operating rooms, and a very busy surgical practice. It offers same day surgeries, and specializes in open heart surgery, general surgery, orthopedic surgery, and neurosurgery. It operates on over 7,000 patients annually. The Hospital also has numerous specialty outpatient services, seeing over 80,000 outpatients annually, including non-invasive cardiology, radiology, endoscopy, and physical therapy.

7. The Hospital also has an emergency room of 22 beds. The emergency room is not designated as a trauma unit, but it is equipped for and services trauma patients who are regularly brought to the Hospital in extremis or who come in via transportation other than ambulance. The emergency room services over 50,000 patients annually. Therefore, at about 2,500 patients per bed annually, it is one of the busiest in the area. The emergency room is burdened because since 2001 there have been four major emergency rooms closed on the I-105 corridor, including Martin Luther King Hospital, leaving only three remaining general emergency rooms in the area including the Hospital.[1]

### B. The Causes of the Bankruptcy Filing

8. Although nominally profitable on an accrual basis, the Hospital has been forced to commence the Chapter 11 Case as a result of a liquidity crisis. This crisis has two primary causes. First, the Hospital has incurred substantial losses as a result of severe problems on the finance side of its business (now largely corrected) due to defective charge capture practices and software billing practices (the "**Charge Capture System Problems**") that resulted in the Hospital not collecting all the revenues to which it would be entitled. Second, the Hospital was incurring significant losses due problems with respect to its "capitation" arrangements (the "**Capitation Program**") with certain physician groups and health plans (the "**Capitation Program Problems**"). These losses were so severe that the Hospital concluded it had to terminate the Capitation Program to staunch the long-term hemorrhaging of cash, despite the short term cash flow interruption and claims that would result. The Hospital has taken steps to exit the Capitation Program and adopt a fee-for-service

---

[1] There is also a Kaiser Permanente Facility in the area, and although its emergency room is technically open to everyone, paramedic operators tend to take only Kaiser patients to this facility.

LA566938                                    -3-

1  model, but the exit costs are substantial.  The combination of the Charge Capture System and
2  Capitation Program Problems has left the Hospital with no cash reserves since March 2008.
3         9.    In essence, due to software and process failings, the Hospital's financial, billing and
4  collections systems had failed to capture charges which led to incomplete bills for a significant
5  portion of its services for nearly a decade, causing unrecoverable losses.  A cost-accounting
6  problem caused the misallocation of costs to the capitation contracts, resulting in the Hospital's
7  books showing a profit in capitation where none really existed.  These problems have been
8  investigated, diagnosed, and continue to be remedied under the direction of a new chief executive
9  officer, Kenneth Strople, who took the reins in 2007, Robert Fuller, the chief operating officer, and
10 consultant Richard Yardley, the acting chief financial officer.  Given sufficient time to operate
11 under a regime in which charges are properly captured, bills are complete when invoiced, and
12 financial reports provide reliable real-time information, the Hospital should be able to repay its
13 debts in full.
14        10.    However, demands by certain creditors for immediate payment–and for payment of
15 more than the Hospital believes it owes in some cases–prevented an orderly restructuring outside of
16 bankruptcy and forced this filing.  Much of the pressure has come from the physician groups who
17 have asserted claims in excess of $9 million against the Hospital related to the termination of the
18 capitation contracts.
19        11.    The exit from the Capitation Program created three distinct cash drains: (1) the tail of
20 claims for services provided 'out-of-network' by other hospitals and health care providers, (2) the
21 claims by the physician groups participating in the Capitation Program for risk-sharing profit splits,
22 much of which is disputed by the Hospital (the "**Risk Share Claims**"), and (3) the transitional loss
23 of cash occasioned by the change in business model out of capitation (where under the Hospital was
24 paid up front, before services were rendered) to fee-for service (where under the Hospital is paid in
25 arrears, typically up to 150 days following the rendering of services), some of which was eased by
26 the $8.8 million in advances by the insurers who participated in the program.  However, the
27 Hospital does not have the financial capacity to bridge the costs of exiting capitation within the time
28 frame being demanded by impacted parties.  In short, this reorganization filing has resulted from

demands made by parties who greatly benefitted from the Capitation Program while it was operational (the physicians), but who are now not patient enough to allow the Hospital to implement its new business model and return to financial stability before demanding payment.

12. The immediate problem that forced the Hospital to file this Case arose from an arbitration brought by one of the physician groups and the potential for the other two groups to follow suit. The physician groups are expected to assert claims for over $9 million.

13. Alliance Physicians Medical Group ("**Alliance**"), one of the physician groups, recently filed an arbitration in an attempt to collect their alleged 'risk share' profits from 2006 to 2008. In its arbitration, Alliance claimed it was owed up to $4.7 million or more. It sought to attach the Hospital's bank accounts in the fall of 2008. The arbitrator's award is imminent, and the Hospital believes that Alliance will seek immediate enforcement by attaching the Hospital's bank accounts.

14. The threat of attachments relating to the estimated $9 million of Risk Share Claims has scared off prospective lenders who would not want the loan proceeds intended for critically needed working capital to be diverted to paying historical disputed debts. Such a diversion of funds would shut down the Hospital. The automatic bankruptcy stay will protect the Hospital from the catastrophic interruption of its operations that would result from such an attachment.

**IV.    RELIEF REQUESTED**

15. By this Application, Debtor seeks entry of an order authorizing the employment and retention of HNB as Debtor's investment banker, <u>nunc pro tunc</u> as of the Petition Date, in accordance with the provisions of this Application, the Engagement Letter (as defined below), and the proposed order submitted herewith.

**V.    HNB CAPITAL'S BACKGROUND AND QUALIFICATIONS**

16. HNB is a financial advisory and investment banking firm with expertise in, among other things, obtaining financing for hospitals and other healthcare businesses, hospital turnarounds, and restructuring, both out-of-court and in chapter 11 proceedings. Since 2004, HNB and its principal and managing partner Howard Brand ("**Brand**") have focused almost exclusively on the field of healthcare finance. Since that time, HNB has been engaged as the financial consultant and

helped to provide the debt capital for Olympia Medical Center in Los Angeles, formerly known as Midway Hospital, when it acquired Midway from Tenet Healthcare in 2004. HNB and Brand continue to provide financial advisory services to Olympia. HNB also provided health care finance consulting services to Karykeion, Inc. d/b/a Community and Mission Hospital of Huntington Park in its Chapter 11 case pending in this district. HNB has also provided health care financing services to Sleepwell Laboratories LLC, a chain of medical sleep diagnostic centers.

17. In July 2009, HNB undertook to assist the Hospital in its efforts to obtain post-petition financing. The Hospital signed a consulting agreement with HNB on July 7, 2009 (the "**Engagement Letter**"). A true and correct copy of the Engagement Letter is attached hereto as Exhibit B.

18. For the Hospital, Brand has generally provided financial structuring plans and suggestions. Brand has also reviewed and analyzed various company business operations, plans and documents in order to determine what was possible for achieving a workable capital structure. The Hospital and Brand determined that the best course of action would be to obtain accounts receivables financing after the Hospital entered into bankruptcy.

19. Brand has business relationships with over twenty-five healthcare finance companies. Within this universe of healthcare lenders there is an **even more limited** universe of healthcare lenders who will consider lending to a company of the Hospital's size, and almost none that will consider lending in the shadow of a potential or actual bankruptcy filing. As part of HNB's efforts to obtain senior secured DIP financing for the Hospital on the basis of its accounts receivable, Brand contacted the following lenders that, in his experience, are the only lenders that are in the market offering receivables financing to medium-sized hospitals like Debtor:

  A. CapitalSource, Inc. ("**CapitalSource**");
  B. Healthcare Finance Group ("**HFG**");
  C. Gemino Healthcare Financing;
  D. Sun Healthcare;
  E. GE Healthcare Finance; and
  F. Presidential Healthcare.

LA566938  -6-

1  (collectively, the "**Lenders**").  Of those Lenders, the following had previously participated in or provided proposals for some of HNB's other healthcare financing consulting engagements: Capital Source, HFG, GE Healthcare Finance, Sun Healthcare and Presidential Healthcare.

20.  With respect to the Hospital, Brand provided each of the Lenders with business information that he had prepared and gathered from the Hospital, and then had multiple telephone conferences with them.  When HFG expressed a potential interest in financing Debtor, Brand conducted numerous follow-up conversations and personal meetings with HFG to explain the Hospital's situation and assist in both diligence efforts and negotiations between HFG and Debtor.  Brand's intensive efforts over a two-month period have resulted in the HFG proposal for DIP financing that has become the basis of the DIP Loan (as defined below).

21.  Except for HFG and CapitalSource, none of the Lenders was willing to make a proposal for the Hospital.  Before Brand's retention, CapitalSource had expressed an interest and had entered into a January 2009 term sheet with the Hospital.  However, it had failed to commit to any financing, despite diligence efforts from January to July.  By the time Brand was retained, the Hospital had reached the conclusion that CapitalSource would never commit.  In addition, by July, the threat of the Alliance attachment meant that a bankruptcy filing was likely to be needed to protect the Hospital's working capital.  CapitalSource made it known that it was not interested in providing DIP financing.  Since the parties were working on a short time frame, HNB and the Hospital decided to work with the only interested lender who they believed would move expeditiously to complete the DIP financing process and fund.  Therefore, HNB recommended HFG.

22.  In providing the Hospital with prepetition services pursuant to the Engagement Letter and other prepetition services, HNB worked closely with the Hospital's management and other professionals and has become familiar with its business, operations, debt structure, and related matters.  HNB has been deeply involved with the negotiations for a debtor in possession revolving loan for $15 million (the "**DIP Loan**") with HFG.  In the process, HNB has developed expertise regarding the Hospital's business that will aid it in providing effective and efficient services in this case.  The DIP Loan is still in process.  The full loan will not fund until all conditions precedent

have been satisfied and an order has been entered approving the final DIP Loan. Debtor has filed a motion to approve the DIP Loan on both an interim and final basis. HNB is expected to play a critical role in finalizing all the terms and conditions of the DIP Loan.

23. An experienced investment bank such as HNB fulfills a critical need that complements the services offered by Debtor's other restructuring professionals. Debtor requires the services of a capable and experienced investment banking firm such as HNB because, among other reasons, its resources and capabilities, together with its prepetition experience advising Debtor, are crucial to Debtor's success in this case.

## VI. SCOPE OF SERVICES

24. Debtor anticipates that during this Chapter 11 Case, HNB will render investment banking services to Debtor as described in the Engagement Letter. Pursuant to the Engagement Letter, HNB has agreed to advise Debtor in connection with Debtor's efforts to obtain debtor-in-possession financing and related matters. The specific services that HNB will provide to Debtor include, but are not limited to, the following:

    a.    Review of financial history

    b.    Evaluation of potential financial structures

    c.    Review Debtor business documents and operations

    d.    Review of expected collection analysis and static pool analysis

    e.    Review of financial projections and forecasts

    f.    Search for potential lenders

    g.    Providing information to potential lenders

    h.    Discussions with potential lenders

    i.    Participation in evaluating potential lender proposals

    j.    Participation in chosen lender negotiations

25. Debtor intends for HNB's services to complement, and not duplicate, the services to be rendered by any other professional retained in this case. HNB understands that Debtor has retained and may retain additional professionals during the term of the engagement and will work

LA566938     -8-

cooperatively with such professionals to integrate any respective work conducted by the professionals on behalf of Debtor.

**VII.   COMPENSATION**

26.   HNB's willingness to continue with its engagement to advise and assist Debtor is conditioned upon its ability to be retained in accordance with its customary terms and conditions of employment, as set forth in the Engagement Letter, and to be compensated for its services and reimbursed for its expenses in accordance with its customary billing practices.

27.   HNB's compensation structure, as set forth in the Engagement Letter, is comparable to compensation generally charged by investment bankers of similar stature for comparable engagements, both in and out of court, and reflects a fair balance between monthly fees and fees that are contingent on the consummation and closing of the transactions contemplated by the engagement.  It consists of a monthly retainer of $35,000 for the period from July 7, 2009 to the final approval and closing of the DIP Loan, payable at the beginning of every month, and a success fee of 1.25% of the full approved amount of the DIP Loan (the "**Success Fee**").  HNB has agreed that the Success Fee will be 50% payable upon funding of the initial advance under the DIP Loan, and 50% payable on the earlier of five business days after entry of the final order approving the DIP Loan or 30 days after entry of the interim order approving the DIP Loan, provided that a failure to obtain entry of the final DIP order by that date is not due to a default or breach of the DIP Loan agreements by HFG.

28.   HNB hereby seeks approval of its compensation for professional services rendered and reimbursement of expenses incurred in connection with this case, subject to the Court's approval and in compliance with applicable provisions of the Bankruptcy Code, the Local Rules, and any other applicable procedures and orders of the Court, and consistent with the proposed compensation set forth in the Engagement Letter (the "**Fee Structure**").  Because the Fee Structure consists in part of fixed monthly payments (due for the period from Petition Date through closing, expected to be less than 45 days) and a set percentage of the $15 million loan amount, no fee application should be required.

1    29.    The Fee Structure is consistent with and typical of compensation arrangements

2    entered into by HNB and other comparable firms in connection with the provision of similar

3    services under similar circumstances.

4    30.    HNB's strategic and financial expertise as well as its specialized healthcare financing

5    knowledge, financing skills, and restructuring capabilities, some or all of which may be required by

6    Debtor during the term of HNB's engagement, were all important factors in determining the Fee

7    Structure.  Debtor believes that the ultimate benefit of HNB's services cannot be measured by

8    reference to the number of hours to be expended by HNB's professionals in the performance of

9    such services.  Indeed, Debtor and HNB have agreed upon the Fee Structure in anticipation that a

10   substantial commitment of professional time and effort will be required of HNB and its

11   professionals in connection with this case and in light of the fact that (a) such commitment may

12   foreclose other opportunities for HNB and (b) the actual time and commitment required of HNB

13   and its professionals to perform its services under the Engagement Letter may vary substantially

14   from week to week and month to month, creating "peak load" issues for HNB.

15   31.    In determining the level of compensation to be paid to HNB and its reasonableness,

16   Debtor compared HNB's proposed fees with the range of investment banking fees in comparable

17   chapter 11 cases and other complex transactions.  In both instances, Debtor found HNB's proposed

18   fees to be reasonable.  Accordingly, HNB's engagement is appropriate under § 328(a) of the

19   Bankruptcy Code and HNB should be subject to review only pursuant to the standards set forth in

20   § 328(a) of the Bankruptcy Code rather than the standard of review set forth in § 330 of the

21   Bankruptcy Code.

22   32.    Consistent with its ordinary practice and the practice of investment bankers in other

23   chapter 11 cases whose fee arrangements are typically not hours-based, HNB does not maintain

24   contemporaneous time records or provide or conform to a schedule of hourly rates for its

25   professionals.  HNB will maintain records in support of any actual, necessary costs and expenses

26   incurred in connection with the rendering of its services in this case.  As HNB's compensation will

27   be calculated and paid based on certain transaction fees (in addition to monthly fees), HNB requests

28   that it not be required to file time records in accordance with Local Bankruptcy Rule 2016-2 and the

LA566938                                    -10-

United States Trustee Fee Guidelines.  Instead, notwithstanding that HNB does not charge for its services on an hourly basis, HNB will nonetheless maintain records (in summary format) of its post-petition services rendered for Debtor, including reasonably detailed descriptions of those services, the approximate time expended in providing those services on a daily basis, which will be made available to the U.S. Trustee and any committee appointed in the Chapter 11 Case.  Brand expects to be providing all of those services personally.

33.     HNB will not share or agree to share any compensation to be paid by Debtor in connection with services to be performed after the Petition Date with any other person in accordance with § 504 of the Bankruptcy Code.

34.     Debtor respectfully submits that the employment of HNB is in the best interests of Debtor, its creditors, and its estate.

**VIII.    LIMITATION OF LIABILITY AND INDEMNIFICATION**

35.     Section 6 of the Engagement Letter provides as a material part of the consideration for HNB to furnish its services, among other things, that in no event shall HNB or Howard Brand be liable to Debtor, whether in contract or in tort or under any other legal theory for lost profits or revenues, loss of use, or similar economic loss, or for any indirect, special, incidental, consequential or similar damages, arising out of or in connection with HNB or Howard Brand's performance or non-performance of the Engagement Letter.  Debtor has further agreed that it shall indemnify, defend and hold HNB and Howard Brand and their affiliates, and their respective directors, officers, agents, employees and each of their respective successors and assigns harmless from and against any and all liabilities, claims, suits, actions, demands, losses, damages, costs, expenses and attorneys' fees incurred by HNB or Howard Brand as a result of the above or as a result of Debtor's (or any of its affiliates, directors, officers, employees or agents) actions, inactions, statements, or omissions to state made to HNB or Howard Brand under the Engagement Letter. The Engagement Letter further provides that it is not a guarantee of loan approval, and that HNB and Howard Brand are working on a "best efforts" basis.

36.     This limitation of liability and indemnification provision is necessary to protect HNB and Howard Brand and is reasonably limited in scope.  By its performance under the Engagement

LA566938                                -11-

Letter, HNB should not be deemed a guarantor of Debtor's profitability, revenues or economic success, and should not be held vicariously liable for related damage claims. Moreover, this provision of the Engagement Letter is consistent with the practices of other investment bankers.

**IX.    HNB'S DISINTERESTEDNESS**

37.    To the best of Debtor's knowledge, and based on the Brand Declaration, HNB (a) is a "disinterested person" under § 101(14) of the Bankruptcy Code, as required by § 327(a) of the Bankruptcy Code; (b) neither holds nor represents any interest adverse to Debtor or its estate; and (c) has no material connection with Debtor, its creditors, any other party in interest, their respective attorneys, the United States Trustee, or any person employed in the office of the United States Trustee. In addition, based on the Brand Declaration, neither HNB nor any of its staff is or was, within two years before the date of the filing of the petition, a director, officer, or employee of Debtor.

38.    Prior to the Petition Date, Debtor paid approximately $105,000 in full payment of HNB's prepetition monthly fees and $0.00 for reimbursement of HNB's expenses. HNB has received no other compensation from Debtor pursuant to the Engagement Letter. As of the Petition Date, HNB did not hold a prepetition claim against Debtor for services rendered in connection with the engagement.

**X.    BASIS FOR RELIEF**

39.    Debtor seeks approval of the Engagement Letter and the Fee Structure contained therein pursuant to Bankruptcy Code sections 327 and 328(a). Section 328(a) provides, in relevant part, that Debtors, with the court's approval, may employ a professional person pursuant to § 327 on any reasonable terms and conditions of employment, including on a retainer, on an hourly basis, on a fixed or percentage fee basis, or on a contingent fee basis. Accordingly, § 328(a) permits the compensation of professionals, including investment bankers, on flexible terms that reflect the nature of their services and prevailing market conditions for those services.

40.    Under the circumstances, pursuant to the approval of the Engagement Letter under Bankruptcy Code § 328(a), HNB seeks entry of an order authorizing its payment without any

requirement for a fee application, consistent with the Fee Structure set forth in the Engagement Letter.

41. Debtor believes that the Fee Structure appropriately reflects the nature and scope of services to be provided by HNB in this complex chapter 11 case, HNB's substantial experience with respect to healthcare industry investment banking services, and the fee structures typically utilized by HNB and other investment banks of similar stature that do not bill their clients on an hourly basis. This Court has granted similar relief in other cases in the form of fixed and contingent fees for services provided by investment bankers. See, e.g., In re Phoenix MC, Inc., Case No. 09-18372 (Bankr. C.D. Cal. April 27, 2009); In re Z Gallerie, Case No. 09- 18400 (Bankr. C.D. Cal. April 10, 2009); Linquist & Craig Hotels and Resorts Inc., Case No. 04-12603 (Bankr. C.D. Cal. Oct. 19, 2004).

42. In light of the foregoing, and given the numerous issues that HNB may be required to address in the performance of its services hereunder, HNB's commitment to the variable level of time and effort necessary to address all such issues as they arise, and the market prices for HNB's services for engagements of this nature, Debtor believes that the terms and conditions of the Engagement Letter are fair, reasonable, and market-based consistent with the standards set forth in Bankruptcy Code § 328(a).

## XI.   REQUEST FOR EMERGENCY RELIEF

43. As mentioned above, Debtor acknowledges that it is requesting that the Court enter an order authorizing the Debtor to use property of the estate prior to the expiration of the twenty (20) day period mandated by Bankruptcy Rule 6003(a).

44. Bankruptcy Rule 6003 specifically provides that the court can disregard the twenty day period if "relief is necessary to avoid immediate and irreparable harm." Debtor submits that the relief requested in this Application is necessary to avoid immediate harm. As stated above, the Debtor believes that the best way to maximize its potential for a successful reorganization is the immediate interim approval of the DIP Loan, from which HNB is entitled to 50% of its Success Fee upon interim funding. In light of the fact that HNB's services are critical to the completion of the DIP Loan, it is imperative that Debtor be allowed to compensate HNB on the terms and conditions

set forth in the Engagement Letter (as modified between HNB and Debtor with respect to timing of payment of the two Success Fee installments).  Accordingly, the failure to approve Debtor's application to employ HNB on expedited basis would likely result in the Debtor's inability to ensure that the DIP Loan will obtain final approval and close, and that Debtor will receive all available funding under the DIP Loan.

**XII.    CONCLUSION**

WHEREFORE, Debtor respectfully requests that the Court grant the Application and grant such other and further relief as may be just and proper.

Dated:  Los Angeles, California
         September 14, 2009

Respectfully Submitted,

 /s/  Lisa Hill Fenning
Lisa Hill Fenning
Harry Garner
Arnold & Porter LLP
777 South Figueroa Street, 44th Floor
Los Angeles, California 90017
Telephone:  213.243.4000
Facsimile:   213.243.4199

*Proposed Counsel to the Debtor and Debtor-in-Possession*