# Exhibit A

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**LOS ANGELES DIVISION**

| | |
|---|---|
| In re<br><br>DOWNEY REGIONAL MEDICAL CENTER-HOSPITAL, INC., a California non-profit, public benefit corporation,<br><br>                    Debtor. | Case No.:<br><br>Chapter 11<br><br>**DECLARATION OF HOWARD BRAND IN SUPPORT OF EMERGENCY APPLICATION OF DEBTOR FOR ORDER AUTHORIZING EMPLOYMENT OF HNB CAPITAL LLC AS INVESTMENT BANKER EFFECTIVE AS OF THE PETITION DATE** |

I, Howard Brand, declare as follows:

1.  I am the principal and managing partner of HNB Capital LLC ("**HNB**"), whose business offices are located at 1732 Aviation Boulevard, Suite 223, Redondo Beach, California. The matters set forth herein are made of my own personal knowledge and, if called and sworn as a witness, I could and would testify competently testify to the matters set forth herein. Unless stated otherwise, all capitalized terms used herein have the same meaning as ascribed to them in the accompanying Application.

2.  This Declaration is made in support of the *Emergency Application for Order Authorizing Employment of HNB Capital LLC as Investment Banker Effective as of the Petition Date* (the "**Application**"), filed by Downey Regional Medical Center-Hospital, Inc., the debtor and debtor in possession the above-captioned case (the "**Debtor**" or "**Hospital**.").

3.  I hold a B.A. from UCLA and an M.B.A from the University of West Los Angeles. I have focused on corporate finance since 2000. Previously, I was employed by Kann Capital in Los Angeles where I focused on obtaining debt financing for small, troubled companies. In my work I have facilitated many financing deals for internet companies, computer equipment companies and packaging companies. I am not a licensed loan broker.

-15-

4.  HNB is a financial advisory and investment banking firm with expertise in, among other things, obtaining financing for hospitals and other healthcare businesses, hospital turnarounds, and restructuring, both out-of-court and in chapter 11 proceedings. Since 2004, HNB has focused almost exclusively on the field of healthcare finance. Since that time, HNB has been engaged as the financial consultant and helped to provide the debt capital for Olympia Medical Center in Los Angeles ("**Olympia**"). I also provided health care finance consulting services to Karykeion, Inc. d/b/a Huntington Park and Mission Community Hospital ("**Huntington Park**").

5.  Regarding Olympia, formerly known as Midway Hospital, I was engaged as the financial consultant for Olympia when it acquired Midway from Tenet Healthcare in 2004. At the time it was purchased, the hospital had a negative (loss) EBITDA of $8.0 million on an annualized basis. With the institution of financial planning, budgets, cost controls, new systems, employee motivation programs, and close personal supervision, Olympia today is generating over $5.0 million in positive EBITDA. In regards to Huntington Park, I was called in to determine the best course of action to solve the hospital's financial situation. I recommended that Huntington Park enter into Chapter 11 bankruptcy. I also helped them get legal counsel and develop a plan of financial management while in bankruptcy.

6.  HNB has also provided health care financing services to Sleepwell Laboratories LLC, a chain of medical sleep diagnostic centers.

7.  In July 2009, HNB undertook to assist the Hospital in its efforts to obtain post-petition financing. The Hospital signed a consulting agreement with HNB on July 7, 2009 (the "**Engagement Letter**"). Pursuant to the Engagement Letter, the specific services that HNB will provide include, but are not limited to, the following:

   a. Review of financial history
   b. Evaluation of potential financial structures
   c. Review Debtor business documents and operations
   d. Review of expected collection analysis and static pool analysis
   e. Review of financial projections and forecasts
   f. Search for potential lenders

        g.        Providing information to potential lenders

        h.        Discussions with potential lenders

        i.        Participation in evaluating potential lender proposals

        j.        Participation in chosen lender negotiations

8. The Hospital has agreed to pay HNB a monthly consulting fee of $35,000 at the beginning of each month. In addition, the Hospital and HNB further agreed that in the event that the Hospital was successful in obtaining post-petition financing as a result of my introductions and other efforts with healthcare finance companies with whom I had relationships, then HNB would be paid a "success fee" of 1.25% of the gross amount of the funds financed (the "**Success Fee**"). HNB has agreed that the Success Fee will be 50% payable upon funding of the initial advance under the DIP Loan, and 50% payable on the earlier of five business days after entry of the final order approving the DIP Loan or 30 days after entry of the interim order approving the DIP Loan, provided that a failure to obtain entry of the final DIP order by that date is not due to a default or breach of the DIP Loan agreements by HFG.

9. For the Hospital, I have generally provided financial structuring plans and suggestions. I reviewed and analyzed various company business operations, plans and documents in order to determine what was possible for achieving a workable capital structure. The Hospital and I determined that the best course of action would be to obtain accounts receivables financing after the Hospital entered into bankruptcy.

10. I have business relationships with over twenty-five healthcare finance companies. Within this universe of healthcare lenders there is an **even more limited** universe of healthcare lenders who will consider lending to a company of the Hospital's size, and almost none that will consider lending in the shadow of a potential or actual bankruptcy filing. As part of HNB's efforts to obtain senior secured DIP financing for the Hospital on the basis of its accounts receivable, I contacted the following lenders that, in my experience, are the only lenders that are in the market offering receivables financing to medium-sized hospitals like Debtor:

        A.  CapitalSource, Inc. ("**CapitalSource**");

        B.  Healthcare Finance Group ("**HFG**");

-17-

    C. Gemino Healthcare Financing;

    D. Sun Healthcare;

    E. GE Healthcare Finance; and

    F. Presidential Healthcare.

(collectively, the "**Lenders**").  Of those Lenders, the following had previously participated in or provided proposals for some of HNB's other healthcare financing consulting engagements: Capital Source, HFG, GE Healthcare Finance, Sun Healthcare and Presidential Healthcare.

   11. With respect to the Hospital, I provided each of the Lenders with business information that I had prepared and gathered from the Hospital, and then had multiple telephone conferences with them.  When HFG expressed a potential interest in financing Debtor, I conducted numerous follow-up conversations and personal meetings with HFG to explain the Hospital's situation and assist in both diligence efforts and negotiations between HFG and Debtor.  My intensive efforts over a two-month period have resulted in the HFG proposal for DIP financing that has become the basis of the DIP Loan.

   12. Except for HFG and CapitalSource, none of the Lenders was willing to make a proposal for the Hospital.  Before my retention, CapitalSource had expressed an interest and had entered into a January 2009 term sheet with the Hospital.  However, it had failed to commit to any financing, despite diligence efforts from January to July.  By the time I was retained, the Hospital had reached the conclusion that CapitalSource would never commit.  In addition, by July, the threat of the Alliance attachment meant that a bankruptcy filing was likely to be needed to protect the Hospital's working capital.  CapitalSource made it known that it was not interested in providing DIP financing.  Since the parties were working on a short time frame, HNB and the Hospital decided to work with the only interested lender who we believed would move expeditiously to complete the process and fund.  Therefore, HNB recommended HFG.

   13. HNB does not maintain contemporaneous time records or provide or conform to a schedule of hourly rates for its professionals.  HNB will maintain records in support of any actual, necessary costs and expenses incurred in connection with the rendering of its services in this case. Notwithstanding that HNB does not charge for its services on an hourly basis, HNB will

nonetheless maintain records (in summary format) of its post-petition services rendered for Debtor, including reasonably detailed descriptions of those services, the approximate time expended in providing those services on a daily basis, which will be made available to the U.S. Trustee and any committee appointed in the Chapter 11 Case. I expect to be providing all of those services personally.

14. HNB will not share or agree to share any compensation to be paid by Debtor in connection with services to be performed after the Petition Date with any other person

15. Neither HNB nor any of its staff hold or represent any interest adverse to Debtor or its estate.

16. HNB is not related or connected to and, to the best of my knowledge, no other member of HNB's staff is related or connected to, Debtor, its creditors, any other party in interest, their respective attorneys, or the United States Trustee for Region 16 or any employee in the offices thereof.

17. Neither HNB nor any of its staff is or was, within two years before the date of the filing of the petition, a director, officer, or employee of Debtor.

18. Prior to the Petition Date, Debtor paid approximately $105,000 in full payment of HNB's prepetition monthly fees and $0.00 for reimbursement of HNB's expenses. HNB has received no other compensation from Debtor pursuant to the Engagement Letter. As of the Petition Date, HNB did not hold a prepetition claim against Debtor for services rendered in connection with the engagement.

1 |     I declare under penalty of perjury that the foregoing is true and correct.

2 | Executed on this _13_ day of _September_ 2009.

3

4 |                                          /s/ _____

5 |                                       HOWARD BRAND
                                      Managing Partner, HNB Capital LLC

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LA: 568607v1

# Exhibit B

**HNB Capital LLC**
*1732 Aviation Blvd. #223
Redondo Beach, CA 90278
FAX 310-379-0940
TEL 310-379-4605
Email hnb@gte.net*

## CONSULTING AGREEMENT

This Consulting Agreement ("Agreement") is made and entered into as of the 7th day of July 2009, by and between Downey Regional Medical Center (the "Company"), and HNB Capital LLC and/or Howard Brand ("Consultant"). In consideration of the terms, conditions and covenants contained herein, the parties hereto agree as follows:

1. **Consulting.** Consultant agrees to provide consultation and advisory services relating to corporate management, financing and discussions with the Company's lenders as may be reasonably requested from time to time with respect to the Company's business ("Services"). As part of this engagement Consultant shall review and analyze Company's business documents and operations. Company agrees that any projections, forecasts, exit plans, static pool analysis, expected collection analysis, audit reviews or IT systems analysis shall be solely developed by the Company. The Services to be performed pursuant to this Agreement may be rendered at or from any locations, including without limitation Manhattan Beach, California or Los Angeles, California, selected by Consultant in the exercise of his sole discretion. Company agrees to engage Consultant as its primary advisor for financing as described in paragraph 3 during the term of this engagement.

2. **Cash Compensation.** Company understands that Consultant's normal hourly rate is $350 an hour. Company agrees to pay Consultant a monthly non refundable cash retainer of $35,000 which shall equate to approximately 100 hours a month. If the number of hours spent by the Consultant exceeds 100 hours a month, then the parties shall negotiate in good faith for additional compensation. The first payment of this cash compensation shall be payable upon the signing of this Agreement and then payable at the beginning of every month thereafter until terminated by the Company or the completion of the Financing.

3. **Bonus Compensation.** In addition to the services Consultant is to render under this Agreement, Company shall pay to Consultant a bonus equal to one and quarter percent (1.25%) of the total amount of debt, mezzanine or equity financing ("Financing") Company obtains from or through any lender/investor identified by Consultant or to whom Company is introduced by Consultant, including, but not limited to, Healthcare Finance Group. Consultant may from time to time provide Company with a list of the lenders/investors Consultant has identified or introduced to Company. For purposes of this Agreement, the total amount of Financing shall include (i) the maximum principal amount of the Financing for which Company is approved without deduction for any kind or form of fees or costs which the lender or any other third party may charge or which Company may be obligated to pay in connection with the Financing; (ii) the total amount of Financing for which Company

HNB Downey Consulting Agreement v3 clean        Page 1 of 4

is approved irrespective of whether the Financing is funded in a lump sum, in draws, in stages or in any other increments; and (iii) the total amount of Financing for which Company is approved within two years of the date on which Company is first introduced to the lender by Consultant or within a one-year period prior to the termination date of this Agreement, whichever is later. Consultant's total bonus fee shall be earned and shall be due when the Company receives Financing. Company hereby authorizes Consultant to submit a copy of this Agreement to each lender/investor who approves Financing and each such lender is hereby authorized to deem this an irrevocable instruction to pay Consultant the fee herein provided. Company agrees to execute such further documents as Consultant may request or as the lender/investor may require in order to facilitate the payment of Consultant's fee. The Company shall be responsible for the payment of any and all lender/investor costs and appraisal costs necessary in completing the Financing.

4. **Independent Contractor Status**. It is understood that Consultant will be performing services under this Agreement as an independent contractor, and not as an employee. Consultant (a) shall not receive any fringe benefits pursuant to this Agreement, and (b) shall personally be responsible for the payment of all federal, state and local taxes incurred as a result of any fees or other payments received under this Agreement.

5. **Confidentiality**. Consultant agrees that all documents and information received from the Company will be held in strictest confidence and will only be divulged to parties directly involved in this Agreement. During the course of this engagement and transaction the Company will been introduced to certain information, techniques and parties that are business trade secrets of and are proprietary to Consultant. The Company and their respective affiliates agree to keep confidential all such information, forms, correspondence, writings and sources concerning Consultant and its business. The advice (written or oral) rendered by Consultant pursuant to this agreement is intended solely for the benefit and use of Company in considering the matters to which this agreement relates. The Company further agrees that neither such advice nor Consultant's retention may be disclosed publicly or made available to third parties without the prior written consent of Consultant. Furthermore, Company agrees for a period of three years from the signing of this Agreement that Company and its affiliates or associates shall not contact nor conduct business with any financial institution, investor, or placement agent introduced by Consultant to the Company without first obtaining written consent from Consultant and reaching an agreement for just compensation.

6. **Limitation of Liability and Indemnification.** The Company agrees that in no event shall Consultant be liable to the Company, whether in contract or in tort or under any other legal theory for lost profits or revenues, loss of use, or similar economic loss, or for any indirect, special, incidental, consequential or similar damages, arising out of or in connection with Consultant's performance or non-performance of this Agreement. Company shall indemnify, defend and hold Consultant and its affiliates, and their respective directors, officers, agents, employees and each of their respective successors and assigns harmless from and against any and all liabilities, claims, suits, actions, demands, losses, damages, costs, expenses and attorneys' fees incurred by Consultant as a result of the above or as a result of Company's (or any of its affiliates, directors, officers, employees or agents) actions, inactions, statements, or

omissions to state made to Consultant under this Agreement. This document does not guarantee loan approval. Consultant is working on a "best efforts" basis.

7. <u>Obligations of Company</u>. The Company shall provide Consultant with all required information and documentation (all such information and documentation so furnished being the "Information") in a timely fashion. Company represents and warrants that all Information previously or hereafter furnished by it or on its behalf to Consultant shall be complete, accurate and not misleading. Company agrees to promptly notify Consultant of any material change in the Company's business, condition (financial or other), assets, prospects or liabilities, whether or not such change is adverse. It is understood and agreed that Consultant assumes no responsibility for such information or the accuracy, completeness or fairness of the information memorandum prepared and distributed on behalf of the Company. The Company shall make available all appropriate personnel upon reasonable notice as may be needed for the purpose of conference calls, site inspections, meetings, and other due diligence information gathering as deemed necessary by Consultant.

8. <u>Expense Reimbursement.</u> The Company agrees to pay for all major out-of-pocket expenses of Consultant during the course of this engagement. These expenses will be billed as incurred and are immediately due and payable upon receipt. Prior to Consultant incurring any expense over $450.00 per item, a written approval and acknowledgement from the Company will be required.

9. <u>Term of Engagement</u>. If the Company accepts this Agreement, it shall become effective as of the date signed by you, on behalf of the Company, and shall terminate on the earlier of (i) November 7, 2009, or (ii) the occurrence of one or more of the following: (a) Non-payment of any of the fees or expense reimbursements mentioned herein; (b) conclusion of a transaction between the Company and an investor and/or lender that accomplishes the purpose and goals of the engagement; (c) a determination by Consultant that the financing request is no longer feasible due to materially adverse changes in the Company, its circumstances or capital market conditions; or (d) either party from the other has received a written 30-day notice of engagement termination. Requirements of confidentiality, non-circumvention, indemnification and compensation due to Consultant shall survive termination of this Agreement.

10. <u>Right to Advertise</u>. Consultant, at its own expense, shall have the right to advertise its consulting and involvement with the Company.

11. <u>Governing Law and Venue</u>. This Agreement shall be governed by, construed and prosecuted in accordance with the laws of the State of California and the County of Los Angeles, notwithstanding any choice of law principles or rules of such State or any other State to the contrary.

12. <u>Counterpart</u>. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but both of which together shall constitute one and the same instrument.

13. <u>Entire Agreement</u>. This Agreement contains the entire agreement between the parties with respect to the engagement of Consultant by the Company and supersedes all prior and contemporaneous agreements, representations and understandings (either oral or written) of the parties. No modification, amendment, supplement or waiver of any of the provisions of this Agreement shall be effective unless in writing specifically referring hereto and executed by both parties.

14. <u>Severability</u>. To the extent that the terms set forth in this Agreement or any word, phrase, clause or sentence is found to be illegal or unenforceable for any reason, the balance of this Agreement shall not be affected thereby, such balance being construed as severable and independent, and the remaining portion of this Agreement shall remain in full force and effect as if this Agreement had been executed with the invalid provision eliminated.

15. <u>Dispute Resolution.</u>  Any controversy or claim arising out of or relating to this Agreement, or performance or interpretation of it, may at the discretion of Consultant be submitted to final binding arbitration before a judge selected from the Directory of Independent Retired Superior Court Judges Available for Alternative Dispute Resolution (the "Gold Card"), and judgment upon the award rendered by the arbitrator may be entered in any court having jurisdiction thereof. Such arbitration shall take place as soon as practicable following the occurrence of any dispute. All costs of such arbitration shall be borne by the losing party.

16. <u>Attorneys' Fees</u>. The prevailing party in any litigation shall have its attorney fees and costs reimbursed by the losing party.

IN WITNESS WHEREOF, the undersigned have duly executed this Agreement as of the date first set forth above.

| | |
|---|---|
| **THE COMPANY:**<br>**Downey Regional Medical Center** | **Consultant:**<br>**HNB Capital LLC** |
| By: _____<br>Kenneth Strople<br>President and Chief Executive Officer | By: _____<br>Howard Brand<br>Managing Partner |