LISA HILL FENNING (SBN 89238)
HARRY GARNER (SBN 254942)
ARNOLD & PORTER LLP
777 South Figueroa Street, 44th Floor
Los Angeles, California 90017
Telephone:     213.243.4000
Facsimile:     213.243.4199
Lisa.Fenning@aporter.com
Harry.Garner@aporter.com

*Proposed Counsel to the Debtor and Debtor-in-Possession*

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## LOS ANGELES DIVISION

| | |
|---|---|
| In re | Case No.: 09-bk-34714 |
| DOWNEY REGIONAL MEDICAL CENTER-HOSPITAL, INC., a California non-profit, public benefit corporation, | Chapter 11 |
| Debtor. | **EMERGENCY MOTION OF DEBTOR FOR ENTRY OF INTERIM AND FINAL DIP ORDERS (A) AUTHORIZING DEBTOR TO OBTAIN POSTPETITION FINANCING; (B) GRANTING SUPERPRIORITY EXPENSE CLAIMS AND SECURITY INTERESTS; AND (C) GRANTING OTHER RELIEF UNDER 11 U.S.C. §§ 105, 361, 362, 363 AND 364, F.R.B.P. 2002 AND 4001; AND LBRS 2002-1 AND 4001-2; MEMORANDUM IN SUPPORT THEREOF; EXHIBITS A AND B** |
| Tax I.D. 95-1903935 | |
| | HEARING |
| | Date:      September __, 2009 |
| | Time: |
| | Place:      Courtroom: 1475 |
| | United States Bankruptcy Court |
| | 255 E. Temple Street |
| | Los Angeles, CA 90012 |

# TABLE OF CONTENTS

Page

I.    JURISDICTION AND VENUE ................................................................1

II.    PROCEDURAL STATUS ....................................................................2

III.    BACKGROUND ................................................................................2

     A.    The Business of the Hospital ................................................2

     B.    The Causes of the Bankruptcy Filing.......................................3

     C.    The Tax-Exempt Bonds ........................................................5

     D.    Other Prepetition Secured Debt ............................................6

     E.    The DIP Loan and Summary of Terms Contained in the DIP Credit Agreement. ......................................................................7

IV.    RELIEF REQUESTED ......................................................................17

V.    BASIS FOR RELIEF ........................................................................17

     A.    Emergency Consideration of this Motion Is Appropriate .........17

     B.    Approving the DIP Credit Agreement Is Appropriate ..............18

     C.    Debtor Has Satisfied the Requirements Under Bankruptcy Code § 364(c) and Should Be Allowed to Borrow on a "Superpriority"and Senior Secured Basis ............................................................22

     D.    Debtor Has Satisfied the Requirements of Bankruptcy Code § 364(d) ...................23

     E.    The DIP Loan Is Supported by the Exercise of Sound Business Judgment and Good Faith ....................................................25

VI.    REQUEST FOR FINAL HEARING ....................................................27

VII.    WAIVER OF BANKRUPTCY RULE 6004(h) ......................................28

VIII.    CONCLUSION................................................................................29

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **TABLE OF AUTHORITIES**

**Page(s)**

**CASES**

*In re Adams Apple, Inc.,*
    829 F.2d 1484 (9th Cir. 1987)...................................................................... 28

*In re Ames Dep't Stores, Inc.,*
    115 B.R. 34 (Bankr. S.D.N.Y. 1990) ........................................................... 21, 27

*Bray v. Shenandoah Fed. Sav. & Loan Ass'n*
    *(In re Snowshoe Co., Inc.),* 789 F.2d 1085 (4th Cir. 1986)....................... 21

*In re FCX, Inc.,*
    54 B.R. 833 (Bankr. E.D.N.C. 1985) ........................................................... 29

*In re Keystone Camera Prods. Corp.,*
    126 B.R. 177 (Bankr. D.N.J. 1991)............................................................. 28

*In re Quigley Gen. Elec. Co. (hi re Elec. City, Inc.),*
    43 B.R. 336-38 (Bankr. W.D. Wash. 1984).............................................. 29

*In re Reading Tube Indus.,*
    72 B.R. 329 (Bankr. E.D. Pa. 1987)............................................................ 21

*Resolution Trust Co. v. Official Unsecured Creditors' Committee*
    *(In re Defender Drug Stores, Inc.),* 145 B.R. 312 (B.A.P. 9th Cir. 1992) ............................ 27

*Richmond Leasing v. Capital Bank, N.A.,*
    762 F.2d 1303 (5th Cir. 1985)...................................................................... 27

*In re Roblin Indus., Inc.,*
    52 B.R. 241 (Bankr. N.D.N.Y. 1985) .......................................................... 29

*In re Stacy Farms,*
    78 B.R. 494 (Bankr. S.D. Ohio 1987).......................................................... 21

*In re Stein & Day, Inc.,*
    87 B.R. 290-92 (Bankr. S.D.N.Y. 1988)..................................................... 28

*Unsecured Creditors' Comm. v. First Nat'l Bank and Trust Co.*
    *(In re Ellingsen MacLean Oil Co.),* 65 B.R. 358 (W.D. Mich. 1986) ................................... 28

*In re Vanguard Diversified, Inc.,*
    31 B.R. 364 (Bankr. E.D.N.Y. 1983)........................................................... 29

## STATUTES AND RULES

11 U.S.C. § 105 ........................................................................................... 1, 9, 30

11 U.S.C. § 361 ................................................................................. 1, 9, 19, 27, 30

11 U.S.C. § 362 ........................................................................................... 1, 9, 30

11 U.S.C. § 363 ........................................................................................... 1, 9, 30

11 U.S.C. § 364 ..................................................................... 1, 9, 19, 20, 27, 30

11 U.S.C. § 364(a) ............................................................................................. 20

11 U.S.C. § 364(c) ............................................................................................. 24

11 U.S.C. § 364(c)(1) ............................................................................. 24, 26, 27

11 U.S.C. § 364(c)(1)-(3) .................................................................................. 25

11 U.S.C. § 364(c)(3) ........................................................................................ 25

11 U.S.C. § 364(d) ................................................................................. 25, 26, 27

11 U.S.C. § 364(d)(1)(A) .................................................................................. 21

11 U.S.C. § 507 ........................................................................................... 1, 9, 30

11 U.S.C. § 1107(a) ............................................................................................. 2

11 U.S.C. § 1108 ..................................................................................... 2, 20, 28

28 U.S.C. § 157 .................................................................................................... 1

28 U.S.C. § 157(b)(2)(D) .................................................................................... 1

28 U.S.C. § 1334 .................................................................................................. 1

28 U.S.C. § 1408 .................................................................................................. 1

28 U.S.C. § 1409 .................................................................................................. 1

Fed. R. Bankr. P. 2002 .......................................................................... 1, 9, 19, 30

Fed. R. Bankr. P. 4001 .......................................................................... 1, 9, 19, 30

Fed. R. Bankr. P. 4001(c) ....................................................................... 8, 9, 20, 29

Fed. R. Bankr. P. 4001(c)(2) .............................................................................. 20

Fed. R. Bankr. P. 6004 ................................................................................ 1, 9, 30

Fed. R. Bankr. P. 9014 .................................................................................. 1, 9, 19, 30

LBR 2002-2 ................................................................................................. 1, 19, 30

LBR 2081-1(a)(9) .................................................................................................. 20

LBR 4001-2 ................................................................................................. 1, 9, 19, 30

LBR 9013 .................................................................................................... 1, 19, 30

1   **TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE, CREDITORS**

2   **HOLDING THE TWENTY LARGEST UNSECURED CLAIMS, ANY ALLEGED**

3   **SECURED CREDITORS, THE OFFICE OF THE UNITED STATES TRUSTEE, AND**

4   **OTHER PARTIES IN INTEREST:**

5        Downey Regional Medical Center-Hospital, Inc., the debtor and debtor-in-possession in the

6   above captioned case (the "**Debtor**"), hereby moves the Court for the entry of an interim order (the

7   "**Interim DIP Order**"), substantially in the form annexed hereto as <u>Exhibit B</u>, approving certain

8   postpetition financing, and following a final hearing (the "**Final Hearing**"), requests entry of a final

9   order granting the relief requested herein (the "**Final DIP Order**").

10       Debtor requests pursuant to Local Bankruptcy Rule ("**LBR**") 2081-1(a)(9) and LBR 9075-

11  1(a) that the Court schedule an interim hearing (the "**Interim Hearing**") on this Motion on less than

12  48 hours notice, upon timely notice to the Office of the United States Trustee ("**UST**"), creditors

13  holding the twenty largest unsecured claims, Debtor's alleged secured creditors, and other parties in

14  interest (collectively, the "**Interested Parties**").  A copy of this Motion was served, concurrent with

15  the filing hereof with the Court, on the Interested Parties by courier or overnight delivery.

16                          **SUMMARY OF RELIEF REQUESTED**

17       By this Motion, Debtor seeks interim and final approval of the $15 million postpetition

18  financing (the "**DIP Loan**") that it has negotiated with Healthcare Finance Group ("**HFG**" or "**DIP**

19  **Lender**"), substantially on the terms and conditions set forth in the form of Secured Super-Priority

20  Debtor In Possession Loan and Security Agreement (the "**DIP Credit Agreement**") between

21  Debtor and DIP Lender, a true and correct copy of which is attached as <u>Exhibit A</u>, and the proposed

22  Interim DIP Order, a true and correct copy of which is attached as hereto as <u>Exhibit B</u>.

23       Debtor does not have sufficient sources of working capital to carry on the operation of its

24  business during this case without the DIP Loan.  Uninterrupted operations are critical to a

25  successful reorganization, and the financing provided by the DIP Loan will ensure that Debtor's

26  vendors continue their business relationship with an operating company and allow the Debtor to

27  continue providing necessary services to patients.  Because a successful reorganization process will

28  require the Debtor to maintain its ongoing operations until the process has been completed, the

1   relief requested in the Motion is essential to preserving the Debtor's estate.  The terms and

2   conditions of the proposed DIP Loan are fair and reasonable under the circumstances.

3         This Motion is based on the attached Memorandum of Points and Authorities (the

4   "**Memorandum**"); the Declaration of Robert E. Fuller in Support of the Debtor's Chapter 11

5   Petition and First Day Motions (the "**Fuller Declaration**"), filed with the Court concurrently

6   herewith; and the arguments, evidence, and representations that may be presented at or prior to the

7   hearing on this Motion.

8         Pursuant to LBR 9075-1(a)(7), if you wish to oppose this Motion you may present a written

9   or oral response to the Motion at the time of the hearing on the Motion.

10        **WHEREFORE,** Debtor respectfully requests that the Court (ii) following the Interim

11  Hearing, enter the Interim DIP Order approving the DIP Loan with DIP Lender under sections 105,

12  361, 362, 363(c)(1)-(3), 364(d)(1), 364(e), and 507(b) of the Bankruptcy Code, Bankruptcy Rules

13  2002, 4001, 6004 and 9014, and LBR 4001-2, 2002-2 and 9013, on the terms set forth in the DIP

14  Credit Agreement; (ii) approve the form and scope of notice of the Final Hearing and schedule the

15  Final Hearing on the Motion; (iii) following the Final Hearing, enter the Final DIP Order; and (iv)

16  grant such other and further relief as may be just and proper.

17  Dated:  Los Angeles, California            Respectfully Submitted,
    September 14, 2009

18                                                /s/  Lisa Hill Fenning

19                                             Lisa Hill Fenning (SBN 89238)
                                               Harry Garner (SBN 254942)
20                                             Arnold & Porter LLP
                                               777 South Figueroa Street, 44th Floor
21                                             Los Angeles, California 90017
                                               Telephone:   213.243.4000
22                                             Facsimile:   213.243.4199

23
                                               *Proposed Counsel to the Debtor and Debtor-in-*
24                                             *Possession*

25

26

27

28

**MEMORANDUM OF POINTS AND AUTHORITIES**

Downey Regional Medical Center-Hospital, Inc., the debtor and debtor-in-possession in the above captioned case ("**Debtor**" or "**Hospital**"), hereby moves this Court (a) for the entry of an interim order, substantially in the form attached hereto as Exhibit B (the "**Interim DIP Order**") authorizing Debtor to enter into certain postpetition financing and scheduling a final hearing on the Motion (the "**Final Hearing**"), and (b) for entry of a final order (the "**Final DIP Order**") granting the relief requested herein (the "**Motion**"). Specifically, Debtor seeks interim and final approval of the $15 million postpetition financing (the "**DIP Loan**") that it has negotiated with Healthcare Finance Group ("**HFG**" or "**DIP Lender**"), substantially on the terms and conditions set forth in the form of Secured Super-Priority Debtor In Possession Loan and Security Agreement (the "**DIP Credit Agreement**") between Debtor and DIP Lender, a true and correct copy of which is attached hereto as Exhibit A, and authority to enter into the DIP Credit Agreement and such other documents, agreements and instruments reasonably necessary to document the DIP Loan, including without limitation deposit account control agreements, one or more lockbox agreements (the "**Lockbox Agreements**"), mortgages and certain other documents granting a lien upon, or control of the DIP Collateral (as defined below) (collectively, the "**Ancillary DIP Agreements**"). In support of the Motion, Debtor relies upon and incorporates by reference the Declaration of Robert E. Fuller in Support of the Debtor's Chapter 11 Petition and First Day Motions (the "**Fuller Declaration**"). In further support of the Motion, Debtor, by and through its undersigned counsel, respectfully states as follows:

I.    **JURISDICTION AND VENUE**

1.      This Court has jurisdiction to consider the Motion under 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. § 157(b)(2)(D). Venue of this case and the Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409. The statutory predicates for the relief requested herein are sections 105, 361, 362, 363, 364, and 507 of chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"), Rules 2002, 4001, 6004, 9013 and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rules 2002-2, 4001-2 , and 9013-1 of the Local Bankruptcy Rules ("**LBRs**").

## II.    **PROCEDURAL STATUS**

2.    On September 14, 2009 (the "**Petition Date**"), Debtor commenced a case (the "**Chapter 11 Case**") by filing a petition for relief under chapter 11 of the Bankruptcy Code.

3.    Debtor continues to operate its business and to manage its property as a debtor and debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in Debtor's Chapter 11 Case.

4.    No creditors' committee has been appointed in this Chapter 11 Case by the United States Trustee.

## III.    **BACKGROUND**

### A.    **The Business of the Hospital**

5.    The Hospital is a nonprofit general acute care and teaching hospital licensed for 199 beds located in Downey, California.  The Hospital currently operates 181 staffed inpatient beds, including an intensive care unit, a neo-natal intensive care unit for newborns with special health issues, a birth center, and definitive observation units, besides general medical-surgical beds.  It services approximately 14,000 inpatients per year in all services.  The Hospital's average length of stay is less than 4 days on a very acute population, making it one of the most efficient in the state.

6.    The Hospital offers a wide variety of clinical services and provides virtually all clinical services of a major tertiary university hospital except for organ transplants.  The Hospital has 11 operating rooms, and a very busy surgical practice.  It offers same day surgeries, and specializes in open heart surgery, general surgery, orthopedic surgery, and neurosurgery.  It operates on over 7,000 patients annually.  The Hospital also has numerous specialty outpatient services, seeing over 80,000 outpatients annually, including non-invasive cardiology, radiology, endoscopy, and physical therapy.

7.    The Hospital also has an emergency room of 22 beds.  The emergency room is not designated as a trauma unit, but it is equipped for and services trauma patients who are regularly brought to the Hospital in extremis or who come in via transportation other than ambulance.  The emergency room services over 50,000 patients annually.  Therefore, at about 2,500 patients per bed annually, it is one of the busiest in the area.  The emergency room is burdened because since 2001

1    there have been four major emergency rooms closed on the I-105 corridor, including Martin Luther

2    King Hospital, leaving only three remaining general emergency rooms in the area including the

3    Hospital.[1]

4    **B.** **The Causes of the Bankruptcy Filing**

5    8.    Although nominally profitable on an accrual basis, the Hospital has been forced to

6    commence the Chapter 11 Case as a result of a liquidity crisis. This crisis has two primary causes.

7    First, the Hospital has incurred substantial losses as a result of severe problems on the finance side

8    of its business (now largely corrected) due to defective charge capture practices and software billing

9    practices (the "**Charge Capture System Problems**") that resulted in the Hospital not collecting all

10   the revenues to which it would be entitled. Second, the Hospital was incurring significant losses

11   due to problems with respect to its "capitation" arrangements (the "**Capitation Program**") with

12   certain physician groups and health plans (the "**Capitation Program Problems**"). These losses

13   were so severe that the Hospital concluded it had to terminate the Capitation Program to staunch the

14   long-term hemorrhaging of cash, despite the short term cash flow interruption and claims that would

15   result (the "**Capitation Exit Consequences**"). The Hospital has taken steps to exit the Capitation

16   Program and adopt a fee-for-service model, but the exit costs are substantial. The combination of

17   the Charge Capture System and Capitation Program Problems has left the Hospital with no cash

18   reserves since March 2008.

19   9.    In essence, due to software and process failings, the Hospital's financial, billing and

20   collections systems had failed to capture charges which led to incomplete bills for a significant

21   portion of its services for nearly a decade, causing unrecoverable losses. A cost-accounting

22   problem caused the misallocation of costs to the capitation contracts, resulting in the Hospital's

23   books showing a profit in capitation where none really existed. These problems have been

24   investigated, diagnosed, and continue to be remedied under the direction of a new chief executive

25   officer, Kenneth Strople, who took the reins in 2007, Robert Fuller, the chief operating officer, and

26   consultant Richard Yardley, the acting chief financial officer. Given sufficient time to operate

27
28   ------

[1] There is also a Kaiser Permanente Facility in the area, and although its emergency room is technically open to everyone, paramedic operators tend to take only Kaiser patients to this facility.

1  under a regime in which charges are properly captured, bills are complete when invoiced, and

2  financial reports provide reliable real-time information, the Hospital should be able to repay its

3  debts in full.

4        10.    However, demands by certain creditors for immediate payment – and for payment of

5  more than the Hospital believes it owes in some cases – prevented an orderly restructuring outside

6  of bankruptcy and forced this filing.  Much of the pressure has come from the physician groups who

7  have asserted claims in excess of $9 million against the Hospital related to the termination of the

8  capitation contracts.

9        11.    The exit from the Capitation Program created three distinct cash drains: (1) the tail of

10  claims for services provided 'out-of-network' by other hospitals and health care providers, (2) the

11  claims by the physician groups participating in the Capitation Program for risk-sharing profit splits,

12  much of which is disputed by the Hospital (the "**Risk Share Claims**"), and (3) the transitional loss

13  of cash occasioned by the change in business model out of capitation (where under the Hospital was

14  paid up front, before services were rendered) to fee-for service (where under the Hospital is paid in

15  arrears, typically up to 150 days following the rendering of services), some of which was eased by

16  the $8.8 million in advances by the insurers who participated in the program.  However, the

17  Hospital does not have the financial capacity to bridge the costs of exiting capitation within the time

18  frame being demanded by impacted parties.  In short, this reorganization filing has resulted from

19  demands made by parties who greatly benefitted from the Capitation Program while it was

20  operational (the physicians), but who are now not patient enough to allow the Hospital to implement

21  its new business model and return to financial stability before demanding payment.

22        12.    The immediate problem that forced the Hospital to file this Case arose from an

23  arbitration brought by one of the physician groups and the potential for the other two groups to

24  follow suit.  The physician groups are expected to assert claims for over $9 million.

25        13.    Alliance Physicians Medical Group ("**Alliance**"), one of the physician groups,

26  recently filed an arbitration in an attempt to collect their alleged 'risk share' profits from 2006 to

27  2008.  In its arbitration, Alliance claimed it was owed up to $4.7 million or more.  It sought to

28  attach the Hospital's bank accounts in the fall of 2008.  The arbitrator's award is imminent, and the

1   Hospital believes that Alliance will seek immediate enforcement by attaching the Hospital's bank

2   accounts.

3          14.     The threat of attachments relating to the estimated $9 million of Risk Share Claims

4   has scared off prospective lenders who would not want the loan proceeds intended for critically

5   needed working capital to be diverted to paying historical disputed debts.  Such a diversion of funds

6   would shut down the Hospital.  The automatic bankruptcy stay will protect the Hospital from the

7   catastrophic interruption of its operations that would result from such an attachment.

8          **C.     The Tax-Exempt Bonds**

9          15.     The Hospital's principal secured debt consists of certain tax-exempt bonds were

10  authorized and issued in the original aggregate principal amount of $68,485,000 by the California

11  Health Facilities Financing Authority (the "**Authority**"), to fund certain capital projects of the

12  Hospital (the "**Bonds**"), pursuant to an Indenture dated as of August 1, 1993 (the "**Original**

13  **Indenture**") as amended by, among other things, the First Supplemental Indenture, dated as of

14  February 26, 2004, 1998 (the "**Supplemental Indenture**," together with the Original Indenture, the

15  "**Indenture**"), entered into between the Authority and Norwest Bank Minnesota, National

16  Association n/k/a Wells Fargo Bank, National Association, as Indenture Trustee (the "**Indenture**

17  **Trustee**").

18         16.     Simultaneous with the issuance of the Bonds, the Authority loaned proceeds of the

19  Bond issuance to the Hospital pursuant to a Loan Agreement, dated as of August 1, 1993, between

20  the Authority and the Hospital (the "**Original Loan Agreement**").  The Loan Agreement was

21  amended by the First Amendment to Loan Agreement dated as of February 26, 2004 (the "**First**

22  **Amendment**," together with the Original Loan Agreement, the "**Loan Agreement**"  The Indenture

23  and the Loan Agreement with all other documents related thereto are hereinafter referred to as the

24  "**Bond Documents**").  As security for the payment of all amounts due under the Loan Agreement,

25  the Hospital granted to the Authority, inter alia, (i) a first priority security interest (the "**Bond**

26  **Lien**") on Gross Operating Revenues ("**Gross Receipts**"), consisting of all of its accounts

27  receivables, revenues, income and receipts, and rights to receive the same, as set forth more

28

LA566949                                    -5-

1    particularly in the Bond Documents (collectively, the Gross Receipts together with the Bond Funds,

2    the "**Prepetition Bond Collateral**").

3         17.    Pursuant to the Bond Documents, the Authority's rights under the Loan Agreement,

4    including all of the security interests and rights and remedies granted by Debtor to the Authority in

5    the Pre-Petition Bond Collateral, were assigned to the Indenture Trustee, subject to the retention of

6    certain rights by the Authority.  The Indenture Trustee has the sole right to exercise the rights and

7    benefits granted to the Authority under the Bond Documents.

8         18.    As of Petition Date, Debtor was indebted under the Bond Documents in the principal

9    amount of approximately $26 million (including principal and interest), with interest continuing to

10    accrue at a per diem of about $3,900 (the "**Bond Claim**").  It is Debtor's understanding that the

11    Indenture Trustee has also incurred attorneys' fees and expenses that, according to the Bond

12    Documents, would also be includable in the Bond Claim (the "**Prepetition Expense Claim**").

13         19.    A portion of the initial proceeds of the Bonds was used to create a Bond Reserve

14    Account, and certain other accounts and funds are held by the Indenture Trustee under the terms of

15    the Bond Documents (collectively, the "**Bond Funds**").  As of Petition Date, the balance held in the

16    Bond Funds was approximately $6.8 million.  These funds also constitute security for the Bond

17    Claim.

18         20.    As of Petition Date, Debtor has net accounts receivable of approximately $43 million

19    that constitute Prepetition Bond Collateral.  This amount is within the typical range for the past four

20    months, as new receivables are generated and old receivables are collected.

21        **D.**    **Other Prepetition Secured Debt**

22         21.    To Debtor's knowledge, other than some equipment lease UCC filings and certain

23    statutory tax liens, as of Petition Date, the Hospital's only other secured creditor is Apollo Health

24    Street, Inc. ("**Apollo**"), one of the Hospital's former billing and collections servicers.  In March

25    2009, the Hospital entered into a settlement agreement that provided for termination of the parties'

26    contract and payment by the Hospital of about $2.3 million to resolve disputes about amounts due to

27    Apollo (the "**Apollo Settlement**").  Approximately $1.2 million remains outstanding.  The Apollo

28    Settlement also granted Apollo a security interest in the Hospital's accounts receivable (the "**Apollo**

1    **Lien**").  It is Debtor's understanding that the Indenture Trustee and DIP Lender contend the Apollo

2    Lien is junior to the Bond Lien and may be invalid, because, <u>inter alia</u>, the Hospital did not obtain

3    the consent of the Indenture Trustee before granting the Apollo Lien.

4          22.    The Hospital also maintained a secured line of credit with Bank of the West, having

5    a prepetition balance of about $7.1 million.  Bank of the West also guaranteed two equipment leases

6    in the total amount of $2 million, and provided a letter of credit for $100,000.  These obligations

7    totaling about $9.2 million were secured by a lien on the leased equipment and on certain

8    investment securities in brokerage accounts having an estimated market value of more than $10

9    million (the "**BOTW Liens**").  However, prior to the Petition Date, the Hospital liquidated the

10   investment collateral securing the BOTW Liens, repaid the credit line obligations owing to Bank of

11   the West, and has obtained a release of the BOTW Liens with respect to the investment collateral.

12   The equipment liens remain in place.

13          **E.    The DIP Loan and Summary of Terms Contained in the DIP Credit Agreement.**

14          23.    Due to the Capitation Exit Consequences, Debtor needs $15 million in debtor in

15   possession financing to be able to pay its immediate expenses during this Chapter 11 Case.  As of

16   Petition Date, Debtor has about $340,000 in cash on hand, about $43 million in accounts receivable,

17   and no other liquid assets.  Debtor's monthly cash expenses average $12.5 million, including about

18   $5.92 million for payroll and about $1.8 million for other employee-related obligations.  Monthly

19   net cash collections have been averaging about $12 million over the past four months, although

20   improvement is expected within a few months, due to the correction of the Charge Capture System

21   Problems and improved cash flow from fee-for-service patients.  Without using the cash it collects,

22   Debtor has no other source of income from which to pay its bills.  Use of the Indenture Trustee's

23   collateral – Debtor's Gross  Receipts – is thus critical for the ongoing business of Debtor.

24          24.    However, because the Hospital has still been experiencing negative cash flow –

25   which is projected to turn positive due to the improvements of the Charge Capture System and other

26   steps implemented by new management – use of the Indenture Trustee's Gross Receipts collateral is

27   not enough to fund operations.  The Hospital also requires DIP financing.  Without financing, the

28   Hospital would have to close its doors.

25.    The DIP Lien (as defined below) would prime the Bond Lien in the Prepetition

Collateral.  Persuaded by the urgent need for additional liquidity, the Indenture Trustee has not

objected to being subordinated to the new money.  In consideration of the material increase in the

Indenture Trustee's  risk profile, Debtor has agreed to provide, and the Indenture Trustee has agreed

to accept, adequate protection as set forth more fully in a proposed stipulated cash collateral order

including the following:  (a) continued payment of the regularly scheduled payments provided for

under the Bond Documents; (b) a replacement lien on Gross Receipts; (c) in addition to the lien on

Gross Receipts, a lien in substantially all of Debtor's assets, junior only to existing prepetition

encumbrances (if any) and the senior lien to be grant to DIP Lender to secure the DIP Loan; and (d)

guarantees of Debtor's parent DRMCI and affiliate Properties, with the Properties' guarantee to be

secured by a lien on the medical office building it owns, subject to existing encumbrances (the

"**MOB Lien**"), to be released upon confirmation if the plan of reorganization provides for a

Working Capital credit line (as defined in the Bond Documents) of $5 million or less.

26.    Debtor has discussed with Apollo the need to use its cash collateral and to prime the

Apollo Lien by granting the super-priority DIP Lien.  Debtor has offered additional collateral and

other adequate protection in consideration of such use and priming, and hopes to reach agreement

with Apollo no later than the hearing on the Final DIP Order.

27.    DIP Lender has offered to provide a DIP Loan in the amount of up to $15 million, on

a revolving basis, secured by a priming lien in substantially all of Debtor's assets except for leased

and purchase money financed equipment.  The DIP Loan is essentially structured as an accounts

receivable financing in which advances are based upon a formula for eligible accounts, but under all

the circumstances, DIP Lender insists upon security in addition to the Hospital's receivables.   The

terms of the DIP Loan are set forth in the form of DIP Credit Agreement attached as Exhibit A to

this Motion.  The Hospital is working with DIP Lender to complete due diligence and

documentation of the DIP Loan, which must be finalized before DIP Lender will make any

advances.

28.    The DIP Loan is the result of arm's length negotiations between Debtor and DIP

Lender.  The commitment of DIP Lender to extend the DIP Loan is set forth in (and subject to the

terms and conditions of) the DIP Credit Agreement and the Interim DIP Order.  A summary of key provisions is set forth in the Concise Statement[2] below, together with citations to specific sections or paragraphs to the DIP Credit Agreement and the Interim DIP Order, as required by Bankruptcy Rule 4001-2(c).[3]

| PROVISION | CONTENT | LOCATION |
| --- | --- | --- |
| Borrower | Debtor as debtor in possession. | DIP Credit Agreement at 1; Interim DIP Order at 1. |
| Lender | HFG as agent for lender group | DIP Credit Agreement at 1; Interim DIP Order at 1. |
| Total Commitment and Borrowing Limits | **Interim DIP Advance:** $4,000,000.<br><br>**Final DIP Facility:** Up to a maximum of $15,000,000 with $5,000,000 minimum usage. | DIP Credit Agreement at 1; Interim DIP Order at 2. |
| Borrowing Conditions | **Interim DIP Advance:**<br><br>1.    Entry of the Interim DIP Order in form acceptable to DIP Lender.<br><br>2.    Control agreements with designated lockboxes and lockbox accounts established in favor of DIP Lender for all collection accounts.<br><br>3.    Approval of the credit committee of DIP Lender or its assigns.<br><br>4.    Completion of due diligence.<br><br>5.    Agreement to allow Cymetrix to act as DIP | DIP Credit Agreement §§ 6.01-6.03 ; Interim DIP Order §§ 18, 19. |

[2] The following summary is qualified in all respects by the actual terms and conditions of the DIP Credit Agreement and the Interim DIP Order.  In the event of a conflict between the summary set forth herein, the DIP Documents and the Interim DIP Order, the Interim DIP Order shall control.

[3] Local Bankruptcy Rule 4001-2(d) also requires that Debtor either file form F4001-2 with the Motion or file a statement consistent with that form.  Debtor submits that the concise statement now required by Bankruptcy Rule 4001(c) is consistent with form F4001-2.

| PROVISION | CONTENT | LOCATION |
|-----------|---------|----------|
| | Lender's hot back up servicer.<br><br>6.    Fully functional interface with DIP Lender's A/R systems.<br><br>7.    Opinion letters by Debtor's counsel as requested by DIP Lender.<br><br>**Final DIP Facility:**<br>1.    No Event of Default under Interim DIP Order.<br><br>2.    Entry of the Final DIP Order.<br><br>3.    Delivery to DIP Lender of any additional requested documents, information and materials. | |
| Uses of Funds | 1.    Hospital operations per lender approved budget  (the "**DIP Budget**").<br><br>2.    Payment of the $380,000 Facility Fee.<br><br>3.    Payment of Placement Fee of 1.25% of Final DIP Facility to HNB Capital, Debtor's investment banker.<br><br>4.    Payment of the Carve Out for court costs and professional fees (including committee professionals).<br><br>5.    Payment of adequate protection payments to Indenture Trustee on the Bond Claim.<br><br>6.    Other Permissible Uses listed in the DIP Financing Orders or as agreed by DIP Lender and Debtor, with Indenture Trustee's consent.. | DIP Credit Agreement § 2.07; Interim DIP Order § 4(b). |
| Interest | **Non-Default Interest Rate:** 3-month LIBOR + 6.25% (with LIBOR minimum of 2.75%), calculated daily, payable monthly.<br><br>**Default Interest Rate:** 3-month LIBOR + 10.25%. | DIP Credit Agreement § 2.02; Interim DIP Order § 15. |
| Maturity | Earlier of one year from entry of Interim DIP Order or plan confirmation, provided the Final | DIP Credit Agreement at 14, § 11.02; Interim DIP |

| PROVISION | CONTENT | LOCATION |
|---|---|---|
|  | DIP Order has been entered. | Order § 8. |
| Mandatory Prepayments | 1.    Upon receipt of proceeds from Extraordinary Receipts (excluding gifts, charitable contributions, bequests and grants).<br><br>2.    Upon sale of collateral (other than in the ordinary course).<br><br>3.    Upon sale of Debtor's real property (if DIP Loan is in default). | DIP Credit Agreement § 2.01(i); Interim DIP Order § 7. |
| Events of Default | Standard provisions found in post-petition financing agreements, including, but not limited to:<br><br>1.    Dismissal, conversion, or appointment of a trustee or examiner with enlarged powers.<br><br>2.    Entry of order for relief from stay permitting foreclosure on assets exceeding $50,000 in the aggregate.<br><br>3.    Entry of an order reversing, amending, supplementing, staying the Interim DIP Order or the Final DIP Order.<br><br>4.    Postpetition liens or security interests in excess of $50,000, absent DIP Lender consent.<br><br>5.    Any judgment against Debtor in excess of $50,000 as to any post-petition date obligation not covered by insurance and the enforcement of the judgment has not been stayed.<br><br>6.    Any filing by Debtor challenging the DIP Loan or DIP Lien.<br><br>7.    Confirmation of a plan that fails to provide for payment in full the DIP Loan.<br><br>8.    Dismissal of the Case without providing for payment of the DIP Loan.<br><br>9.    Any filing by Debtor that could reasonably be expected to result in a material impairment of | DIP Credit Agreement § 11.01; Interim DIP Order § 25. |

| PROVISION | CONTENT | LOCATION |
|---|---|---|
| | the rights or interests of DIP Lender; | |
| | 10.  Any court determination with respect to a motion, pleading or proceeding brought by another party that results in a material impairment of the DIP Lender's rights, claims or liens. | |
| | 11.  Creation of any other superpriority administrative expense claim or lien (other than the Carve Out). | |
| | 12.  Failure to obtain a Final DIP Order within 30 days of entry of the Interim DIP Order. | |
| | 13.  Interim DIP Advance exceeding at any time 75% of Eligible Accounts Receivable. | |
| | 14.  Any default under the DIP Loan Agreement. | |
| | 15.  Any failure by Debtor to meet the DIP Budget or the 13 week rolling forecasts, as modified by permitted variances. | |
| | 16.  Failure of Debtor to provide timely reports. | |
| Liens/Collateral | Valid and perfected first priority priming liens on and security interests in substantially all of the tangible and intangible assets of Debtor and real estate owned by Debtor, except Bond Funds, gifts, charitable contributions, bequests and grants (the "**DIP Collateral**"). | DIP Credit Agreement § 3.01; Interim DIP Order § 20. |
| Fees | **Placement Fee**: Fee payable to HNB Capital, LLC of 1.25 % of the committed amount of the DIP Loan.<br><br>**Facility Fee**: $380,000.<br><br>The Placement Fee and Facility Fee shall be 50% payable upon such funding of the Initial DIP Advance or incurrence of the Non-Utilization Fee and 50% payable on the earlier of five (5) business days after entry of the Final DIP Order or 30 days after entry of the Interim DIP Order. | DIP Credit Agreement § 2.02; Interim DIP Order § 15. |

| PROVISION | CONTENT | LOCATION |
|---|---|---|
| | **Collateral Tracking Fee**: 0.50% per annum, calculated daily, payable monthly on the average outstanding balance.<br><br>**Non-Utilization Fee**: 0.50% per annum, calculated daily, payable monthly on the difference between $4,000,000 (prior to entry of the Final DIP Order) or $15,000,000 (after entry of the Final DIP Order) and the average outstanding balance.<br><br>**Exit Fee**: 2.0% upon permanent repayment of the DIP Loan, provided that the Exit Fee will be credited against the facility fee related to a chapter 11 plan exit financing facility if DIP Lender chooses to provide exit financing.<br><br>**Minimum Usage Fee**:  A fee, calculated daily, payable monthly, equal to interest that would have accrued but for the actual amount of the outstanding Interim DIP Advances being less than $4,000,000 at any time, and $5,000,000 under the Final DIP Facility.<br><br>**Wire Transfer Fees**:  $40 per wire transfer.<br><br>**Expenses**: $70,000 paid prepetition for legal and other expenses. | |
| Grant of priority claim or lien pursuant to §§364(c) and (d) | **Super-priority administrative expense claim pursuant to § 364(c)(1)**:  Subject to the Carve Out; includes super-priority claims with respect to avoidance action claims and recoveries and otherwise unencumbered assets.<br><br>**First-priority lien on substantially all of the property of the estate**:  _Excludes_, inter alia, (i) leased or purchase money-financed equipment subject to valid and perfected pre-petition security interests, (ii) proceeds of avoiding power actions; (iii) the Bond Funds; and (iv) restricted gifts, bequests and grants.<br><br>**Junior lien on estate assets (mostly equipment) that are subject to valid existing encumbrances**. | DIP Credit Agreement §§ 3.01, 9.20; Interim DIP Order §§ 20, 21. |

| PROVISION | CONTENT | LOCATION |
|---|---|---|
| | **Adequate protection/junior lien to Indenture Trustee and Apollo:** (i) on same collateral that is subject to DIP Lien and subject to the same exclusions; (ii) adequate protection liens to be granted pursuant to cash collateral orders entered concurrently with Interim DIP Loan Order (iii) Apollo's junior lien to remain subject to all defenses and objections. | |
| Reporting Requirements | 1.    Weekly rolling 13 week forecasts by line item of net cash flow (including cash receipts and cash disbursements), expenditures (accounts payable) and Borrowing Base.<br><br>2.    Weekly reports of actual net cash flow (including cash receipts and cash disbursements) and expenditures (accounts payable).<br><br>3.    An updated weekly Borrowing Base.<br><br>4.    Daily cash balance reports.<br><br>5.    Weekly variance reports explaining any variance in the actual cash flows and borrowing base report from the Budget and the most recent thirteen week forecast. | DIP Credit Agreement § 8.05, Exhibit B; Interim DIP Order § 11. |
| Lockboxes | 1.    Lockboxes and lockbox accounts over which DIP Lender will have control for non-governmental payments;<br><br>2.    Lockboxes over which Debtor will have control with respect to all remittances from governmental payors, (the "**Governmental Remittance Lockbox**"), subject to Debtor's agreement to allow the funds in such lockbox to be swept to lockboxes controlled by DIP Lender. | DIP Credit Agreement § 4.01; Interim DIP Order § 6. |
| Carve-Out | 1.    The Carve-Out will be $500,000 on a rolling basis and will include:<br><br>a)    all court and U.S. Trustee fees under 28 U.S.C. §1930(a);<br><br>b)    fees and expenses up to $15,000 for the benefit of a potential chapter 7 trustee; and | DIP Credit Agreement at 4; Interim DIP Order § 22. |

| PROVISION | CONTENT | LOCATION |
|---|---|---|
| | c)   allowed professional fees and expenses for both Debtor and Committee professionals.<br><br>2.   For the purpose of clarity, the Carve-Out shall not be reduced by (i) amounts paid to Professional Persons or on account of Court and UST Fees prior to the delivery by DIP Lender of a notice of an Event of Default or (ii) retainers held by Professional Persons. | |
| Adequate protection or priority for a prepetition claim | No prepetition claim. | N/A. |
| Determination of the validity, enforceability, priority, or amount of a prepetition claim or lien | No prepetition claims or liens. | N/A |
| Waiver or modification of Bankruptcy Code provisions or applicable rules relating to the automatic stay | <u>Without stay or further court order:</u>  Upon giving notice of default and termination by DIP Lender, (i) DIP Lender shall have the right to cease any further DIP Advances, and (ii) the unpaid balance of the Interim DIP Obligations (and any unpaid and accrued interest) shall automatically be accelerated and become immediately due and payable.<br><br><u>On 3 business days' notice, unless the Court orders otherwise,</u> DIP Lender will have relief from the automatic stay for all purposes and Debtor shall have no further right to use of cash collateral *unless* Debtor, the Indenture Trustee, or the Committee contest whether an Event of Default has occurred by filing a motion within that 3 business day period.  Subject to the Court's convenience, the hearing shall be within 5 business days after filing of the motion.  Failure to seek a prompt hearing will cause the stay to be deemed terminated without further order.<br><br><u>No relief under §105:</u>  Debtor and the | DIP Credit Agreement § 11.02; Interim DIP Order § 26. |

| PROVISION | CONTENT | LOCATION |
|---|---|---|
| | Committee shall not have the right to seek relief, including, without limitation, under §105 that would impair or restrict the rights and remedies of the DIP Lender. | |
| Waiver or modification of right to file a plan, seek extension of exclusivity period, request use of cash collateral, or request authority to obtain credit | The DIP Loan terminates upon plan confirmation.<br><br>No other use of cash collateral or loans are permitted.. | DIP Credit Agreement § 11.02; Interim DIP Order § 25. |
| Establishment of deadlines regarding filing a plan, etc. | Event of Default if Debtor has not filed a plan (and disclosure statement) in the Case at least ninety days before the Maturity Date, which plan does not provide for the payment in full of the DIP Loan on its effective date. | Interim DIP Order § 25. |
| Waiver or modification of the applicability of nonbankruptcy law relating to the perfection, etc. | DIP Lender is permitted but not required to perfect under applicable nonbankruptcy law. Enforcement of remedies remains subject to applicable nonbankruptcy law. | DIP Credit Agreement § 3.02; Interim DIP Order § 24. |
| Release, etc., regarding any estate claims or causes of action | No.  No prepetition lending relationship or potential claims. | N/A |
| Indemnification | Yes.  Full indemnification of DIP Lender for losses, claims or damages arising from DIP Loan, including payment of (i) DIP Lender's attorneys' fees and costs, and (ii) any taxes paid by DIP Lender as a result of Debtor's failure to pay required taxes. | DIP Credit Agreement § 2.05; Interim DIP Order § 16. |
| Release or waiver of surcharge claim under § 506(c) | Surcharge is prohibited, except for Carve Out.<br><br>For avoidance of doubt, budgeted administrative expenses and other amounts may be paid in the ordinary course, unless a notice | DIP Credit Agreement § 3.04; Interim DIP Order § 23 |

| PROVISION | CONTENT | LOCATION |
|-----------|---------|----------|
| | of default has been issued by DIP Lender.. | |
| Granting of liens on avoidance actions | No. | |

## IV.    RELIEF REQUESTED

29.     By this Motion, Debtor requests that the Court (i) following the Interim Hearing, enter the Interim DIP Order approving the DIP Loan with DIP Lender §§ 105, 361, 362, 363(c)(1)-(3), 364(c) and (d), 364(e), and 507(b), Bankruptcy Rules 2002, 4001, 6004, 9013 and 9014, and LBRs 2002-2, 4001-2, and 9013-1, on the terms set forth in the DIP Credit Agreement; (ii) approve the form and scope of notice of the Final Hearing and schedule the Final Hearing on the Motion; (iii) following the Final Hearing, enter the Final DIP Order; and (iv) grant such other and further relief as may be just and proper.

## V.    BASIS FOR RELIEF

### A.    Emergency Consideration of this Motion Is Appropriate

30.     Bankruptcy Rule 4001(c) governs the procedure for consideration of motions to obtain post-petition financing.  Subsection (c)(2) provides for an expedited consideration of the Motion:

> If the motion so requests, the court may conduct a hearing before such 15 day period expires, but the court may authorize the obtaining of credit only to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing.

See Fed. R. Bankr. P. 4001(c)(2).  LBR 2081-1(a)(9) also provides for an expedited consideration of the Motion.

31.     The DIP Loan is needed to pay Debtor's essential operating expenses.  If Debtor is not authorized to obtain financing under the DIP Loan and the AncillaryDIP Agreements in the amount of not more than $4 million at the outset of this Chapter 11 Case, it will be unable to operate the hospital.  Debtor also will be unable to pay its vendors, who likely will cease to provide goods

and services to Debtor.  Ultimately, Debtor will be unable to serve its many patients, putting their

welfare and safety in jeopardy.  Such an outcome would cause immediate and irreparable harm to

Debtor's estate.  The interim relief requested by Debtor is precisely what is contemplated by

Bankruptcy Rule 4001(c)(2) and should be granted.

**B.**    **Approving the DIP Credit Agreement and Ancillary DIP Agreements Is Appropriate**

32.    As a debtor in possession, Debtor is authorized to operate its business under § 1108.

As part of that operation, Debtor may incur unsecured debt in the ordinary course of business.  See

11 U.S.C. § 364(a).  The Bankruptcy Code offers a debtor in possession additional flexibility to the

extent it needs additional credit, but cannot attract such credit on unsecured terms.  Section 364

provides a progression of various protections to induce a post-petition lender to extend credit to a

debtor in possession.

33.    To justify a post-petition credit on "superpriority" basis or by granting a priming

lien, Debtor must show that it is unable to obtain the necessary credit otherwise and the lienholder

to be primed (to the extent that such priming is not consensual) is adequately protected.  Section

364, however, does not impose upon a debtor in possession the onerous duty to seek credit from

every possible lender before concluding that such credit is available.  See Bray v. Shenandoah Fed.

Say. & Loan Ass'n (In re Snowshoe Co., Inc.), 789 F.2d 1085, 1088 (4th Cir. 1986); In re Ames

Dep't Stores, Inc., 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) (holding that contacting four financial

institutions regarding a loan satisfied the requirements of § 364(d)(1)(A)).  Instead, a good faith

effort to obtain less burdensome credit from other sources is all that is required of a debtor,

especially when time is of the essence.  See, e.g., In re Reading Tube Indus., 72 B.R. 329, 333

(Bankr. E.D. Pa. 1987); In re Stacy Farms, 78 B.R. 494, 498 (Bankr. S.D. Ohio 1987).

34.    DIP Lender is the only lender ready and willing to make a working capital loan to

Debtor–and certainly the only one able to do so in time to fund Debtor's payroll on September 22,

2009.  Due to the specialized nature of Medicare, Medi-Cal, and third party payor systems and their

control over the revenues and cash flow available for hospitals, only a relative handful of lenders

are willing to provide medical accounts receivables financing in the $15 million range under the

1   best of circumstances.  And these were not the best of circumstances.  The global economic crisis

2   that struck in the fall of 2008 and its continuing impact on the availability of financing have stymied

3   all efforts by the Hospital to raise the necessary funds for the past 15 months.  With the credit

4   markets still in turmoil, its financial statements under review due to the Charge Capture System

5   Problems, and Alliance and other parties pressing significant Exit Claims, the Hospital has been

6   unable to obtain other viable offers of financing.

7        35.     Indeed, the Hospital has been seeking financing since May 2008, when it retained

8   London & Pacific Capital Advisers LLC ("**L&P**") as its exclusive investment banker to explore

9   refinancing alternatives.  That search became extremely urgent in August 2008, following its

10  decision to exit the Capitation Program and recognized that the short-term financial impact of the

11  Capitation Exit Consequences could be as much as $30 million.  Given its lack of any cash reserves,

12  the Hospital began a multi-front process of trying to obtain the financing needed to sustain itself

13  during the transition.

14       36.     First, the Hospital tried to obtain bank loans.  At the time, the Hospital had a secured

15  bank line of credit with Bank of the West, with a balance of about $6.7 million.  That line was

16  collateralized by investment securities, which of course lost considerable face value in the collapse

17  of the stock markets.  The Hospital sought to increase that line, but lacked additional liquid

18  collateral.  Bank of the West refused to increase the line or provide any other form of financing.

19  Despite talks with numerous banks, no one was interested in extending the credit line following the

20  collapse of the credit markets in October 2008.

21       37.     Second, the Hospital tried to obtain mezzanine financing from hedge funds or other

22  non-bank lenders.  L&P initially proposed a two level re-capitalization of the Hospital's financing;

23  an intermediate term mezzanine level of $15 million above the bank credit line and a long term $25

24  million top level.  L&P informed the Hospital that, although initial talks were held with a variety of

25  lenders, mostly hedge funds, that the October market collapse had caused market paralysis for such

26  loans.

27       38.     Third, the Hospital approached its participating health plans for financial help.  The

28  Hospital was successful in obtaining approximately $8.8 million in temporary bridge loans and

LA566949                              -19-

other assistance, including offers for the following: $365,000 short term advance from Blue Shield, $1.3 million advance from SCAN, $5 million intermediate term loan from United/Pacificare, and a total of $3.3 million in loans and advances from Health Net. The Hospital received the Blue Shield advance in September 2008, and subsequently repaid it. The SCAN offer expired before the Hospital was able to meet one or two of its conditions, but it was replaced with a separate cash flow facility that assisted in speeding up cash flow from them. No repayment was required as it was a one-time resetting of the payment flows that in essence permanently advanced the Hospital 45 days of payments from SCAN, which was worth about $600,000. The Hospital has borrowed and still owes about $4.5 million on the United/Pacificare loan. The Hospital received and subsequently repaid an $800,000 advance from Health Net, and has borrowed about another $1.5 million on longer terms that it still owes.

39.    The health plan loans and advances enabled the Hospital to keep its doors open. However, they were all very short-term: some have already had to be repaid; others are due to be repaid starting in January 2010. In January 2009, once the extent of the assistance from the health plans became fully known, the Hospital and L&P intensified their efforts to identify a trade accounts lender who would provide a three-year, $15 million line, to assist in meeting the Hospital's liquidity needs. Six term sheet offers were received in January; five developed by L&P and one by the Hospital. The Hospital initially worked with two of the lenders, but after a couple of weeks exclusivity was demanded and the Hospital began working with CapitalSource, a Maryland-based trade accounts lender.

40.    The Hospital and CapitalSource worked from January through June in an effort to agree upon terms of a potential line of credit. When no agreement was forthcoming, the Hospital finally discontinued its efforts with CapitalSource in July, and notified L&P of the termination of its relationship as well.

41.    Thereafter, the Hospital reconnected with two of the lenders previously showing interest, and one additional new lender, HFG. One of the prior lenders was willing only to entertain a $5 million line. Negotiations did not progress beyond the expression of interest phase. The Hospital terminated L&P's contract due to the lack of progress toward closure.

42.      In early July 2009, in order to meet the diligence and other requirements to complete a financing with HFG, the Hospital had no choice but to seek the assistance of another investment banker to help address its critical funding needs.  It retained Howard Brand of HNB Capital, L.L.C. ("**HNB Capital**"), an independent investment banker specializing in healthcare financing.  A separate application to retain HNB Capital is being filed concurrently.

43.      HNB Capital analyzed Debtor's situation, the history of its contacts with potential lenders, the urgent nature of its cash needs, and investigated the overall financial situation.  HNB Capital advised senior management that L&P had contacted the appropriate potential lenders, but that most of them do not provide DIP financing.  It quickly became apparent that HFG was one of very few, if not the only lender willing to fund a loan that could satisfy the Hospital's needs.  The Hospital decided to proceed with HFG on the exclusive basis that HFG required.

44.      The DIP Loan was originally intended to be a regular, nonbankruptcy loan.  By the middle of August, the Hospital indicated that due to the pressing of contingencies beyond its control, it would need funding in September.  However, primarily because of the threatened attachment of the Debtor's bank accounts by Alliance and potentially other physician groups, HFG decided that it was only willing to make the financing available in the form of a DIP Loan in a chapter 11 case, and then only on the basis of a priming lien.

45.      While not advantageous in many respects, the terms of the DIP Loan are the best terms that the Hospital could negotiate with HFG, and HFG is the only lender willing to provide this financing.  Although CapitalSource's proposed January 2009 term sheet had lower interest rates and fees than the DIP Loan, that lender was never willing to commit to make a loan on the terms it had proposed.  In the meantime, the Hospital's cash position has become even more strained.  That DIP Lender would insist upon higher rates and fees, and more stringent conditions is, unfortunately, not a surprise, given that the Hospital has no other viable offers left on the table.

46.      Debtor does not have sufficient sources of working capital to carry on the operation of its business during this case without the DIP Loan.  Uninterrupted operations are critical to a successful reorganization, and the financing provided by the DIP Loan will ensure that Debtor's vendors continue their business relationship with an operating company and allow the Debtor to

continue providing necessary services to patients.  Because a successful reorganization process will require the Debtor to maintain its ongoing operations until the process has been completed, the relief requested in the Motion is essential to preserving the Debtor's estate.  The terms and conditions of the proposed DIP Loan, as set forth in further detail herein and as supplemented by the Ancillary DIP Agreements, are fair and reasonable under the circumstances.

**C.**    **Debtor Has Satisfied the Requirements Under Bankruptcy Code § 364(c) and Should Be Allowed to Borrow on a "Superpriority"and Senior Secured Basis**

47.    The DIP Credit Agreement provides DIP Lender with the following protections:

a.    A super-priority administrative expense claim pursuant to §364(c)(1), subject to the Carve Out, with priority over any and all administrative expenses, and payable from all assets of the estate, including proceeds of avoidance actions, whether or not such proceeds or property is recovered from a judgment, settlement or otherwise, in the event that the Interim DIP Obligations are not indefeasibly paid in cash in full.

b.    A valid and perfected first-priority lien on property of the estate (other than (i) leased or purchase money-financed equipment of Debtor subject to valid and perfected pre-petition security interests and (ii) proceeds of avoidance actions) pursuant to §364(d), which lien shall include a first-priority lien on Accounts existing pre-petition and created post-petition, all inventory, general intangibles related to the accounts and inventory, all commercial tort claims and all deposit accounts; and

c.    A valid and perfected junior lien on the following property of the estate pursuant to § 364(c)(3) that is subject to valid existing encumbrances, including leased or purchase money-financed equipment of Debtor subject to valid and perfected pre-petition security interests.

Other than the requirement of "notice and a hearing," the only statutory prerequisite for obtaining secured credit on a "superpriority" basis under 364(c)(1)-(3) is that "the [debtor in possession] is unable to obtain unsecured credit allowable under § 503(b)(1) of this title as an administrative expense."  This threshold test is satisfied here.

LA566949

48.     As set forth in above and in the Fuller Declaration, despite its efforts, Debtor, as of the Petition Date, was unable to obtain unsecured credit sufficient to finance its operations. Moreover, Debtor simply cannot obtain alternative financing of the magnitude proposed under the DIP Credit Agreement on an unsecured basis, even if the resulting claim were to be allowed as an administrative claim, because Debtor is likely to be unable to pay any such administrative claim without the consent of Indenture Trustee, which has a lien on Debtor's Accounts.  Debtor has evaluated alternative post-petition financing concepts, none of which contemplate a financing on anything other than a fully secured basis.  And even DIP Lender has agreed to provide funding to Debtor only if it is given the added protection and benefits provided by the DIP Credit Agreement. Consequently, Debtor should be permitted to borrow under the DIP Credit Agreement on a "superpriority," senior secured, and junior secured basis under § 364(c)(1)-(3), as such borrowing is the only source of funds available to Debtor at this time.

**D.     Debtor Has Satisfied the Requirements of Bankruptcy Code § 364(d)**

49.     Under the DIP Credit Agreement, DIP Lender is requiring that the funds advanced under the DIP Loan be secured by a lien that has priority over the Bond Lien and all other liens except liens on equipment to secure purchase money or financing leases which were valid and perfected on the Petition Date, but consents to a junior lien on all property of the estate to be granted in favor of the Indenture Trustee pursuant to the Cash Collateral Orders, and a junior lien in favor of Apollo subject, however, to all defenses and objections to the Apollo Lien.

50.     The only statutory prerequisites for obtaining credit on a priming lien basis under §364(d) are that "the [debtor in possession] is unable to obtain such credit otherwise" and that, absent the consent of the secured creditor sought to be primed, "there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted."  Each of these tests is satisfied in this case.

51.     As set forth above, Debtor simply cannot obtain alternative financing of the magnitude proposed under the DIP Loan on an unsecured basis.  Debtor is unable to obtain unencumbered access to its receivables because of the Bond Lien, and Debtor otherwise does not have unencumbered sources of cash to fund its operations.  Due to the uncertainty created by the

LA566949                                      -23-

1   current economic crisis, even DIP Lender has refused to extend credit post-petition without the

2   "superpriority" and the "priming" protections afforded by §§ 364(c)(1) and (d), and Debtor has been

3   unable to obtain financing on any other feasible and more favorable terms.  DIP Lender has

4   specifically required that the DIP Lien "prime" the Bond Lien and the Apollo Lien with respect to

5   substantially all the assets of the estate, except as set forth in the DIP Credit Agreement.

6         52.    As set forth in the proposed Cash Collateral Orders, in exchange for replacement

7   liens, Indenture Trustee has agreed to subordinate its prepetition lien to the competing liens arising

8   in connection with the DIP Loan.  However, Indenture Trustee has conditioned its consent to be

9   primed upon the provision of such protections as described in the Cash Collateral Orders, including

10   that, without limitation, Debtor has agreed to provide Indenture Trustee with replacement liens to

11   adequately protect it from any diminution in value of its security interests, and Debtor's parent and

12   certain of its affiliates have agreed to provide certain secured guarantees.  Indenture Trustee is also

13   protected by the advance of funds under the DIP Loan because the value created by maintaining

14   Debtor as a going concern benefits all creditor constituencies.

15         53.    Debtor has asked Apollo to consent as well, and discussions are ongoing.  Even if

16   Apollo's consent cannot be obtained, Debtor contends that adequate protection of the Apollo Lien is

17   established by the proposed grant of a replacement junior lien in Accounts estimated at $43 million,

18   plus a supplemental junior lien in substantially all of Debtor's assets, including plant, furniture,

19   fixtures, and equipment with a book value of at least $50 million, inventory of at least $16.2

20   million, the Land worth an estimated $6.2 million, and such other assets as are subject to pledge.[4]

21         54.    Debtor submits that the entirety of the protection being offered to the Indenture

22   Trustee and Apollo is adequate for the purposes of § 361.  The financing provided under the DIP

23

24

25        [4]  Because the UCC financing statement with respect to the Apollo Lien was filed after that of
26   the Indenture Trustee, the Apollo Lien is presumptively junior to the Bond Lien, even though the
Apollo Settlement stated that Apollo was being granted a first priority lien in Accounts.  The grant
27   of the replacement and supplemental liens in favor of Apollo are subject to the reservation of rights
by DIP Lender and the Indenture Trustee to contest the Apollo Lien in its entirety, and by Debtor to
28   contest its priority, as set forth in the orders governing use of cash collateral to be entered
concurrently with the DIP Orders.

Loan will enable the Debtor to continue its operations and preserve its ability to reorganize, which is ultimately for the benefit of the estate and creditors.

### E.    The DIP Loan Is Supported by the Exercise of Sound Business Judgment and Good Faith

55.    The fact that Debtor has satisfied the requirements of § 364, of course, does not end the inquiry, as these sections are permissive, not mandatory.  See 11 U.S.C. § 364(c)(1) and (d) ("after notice and a hearing", the court "may authorize the obtaining of credit or the incurring of debt") (emphasis added).  Generally, however, courts give broad deference to business decisions of a debtor in possession.  See Resolution Trust Co. v. Official Unsecured Creditors' Committee (In re Defender Drug Stores, Inc.), 145 B.R. 312, 317 (B.A.P. 9th Cir. 1992) Richmond Leasing v. Capital Bank, N.A., 762 F.2d 1303, 1311 (5th Cir. 1985).  Moreover, a bankruptcy court generally will respect a debtor in possession's business judgment regarding the need for and the proposed use of funds.  As the court noted in In re Ames Dep't Stores, Inc.,

> A court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party in interest.

In re Ames Dep't Stores, Inc., 115 B.R. at 40.

56.    The power of the debtor in possession to incur secured debt follows necessarily from the general power of the debtor in possession to operate its business in the exercise of its business judgment pursuant to § 1108.  Without the ability to incur secured debt, the debtor in possession would be placed at a significant competitive disadvantage and its efforts to reorganize could be seriously impaired.

57.    In the present case, Debtor's decision to enter into the DIP Loan represents an exercise of sound business judgment in the continued operation of Debtor's business and preservation of going concern value and the possibility of reorganization.  Moreover, the terms of the proposed transaction are fair, reasonable, and adequate given the circumstances of the Debtor.  Like most business decisions, Debtor's decision to enter into the DIP Loan will both confer a number of benefits on Debtor and impose several tradeoffs.  The DIP Loan should provide the

1    Debtor with sufficient capital to operate its business in the ordinary course, pending the formulation

2    and confirmation of a plan of reorganization.  DIP Lender also agreed to fund certain carve-outs for

3    payment of statutory fees, professional fees, and other necessary expenses.  Further, the terms of the

4    DIP Loan have been negotiated in good faith and at arms' length by and between the parties, with

5    all parties represented by counsel.  Any credit extended under the DIP Loan should be held to

6    qualify as having been extended in good faith by DIP Lender as that term is used in § 364(e).

7         58.    The concessions that Debtor has made in exchange for the DIP Loan are

8    commonplace in complex financing arrangements and are amply justified here in light of the

9    benefits conferred upon Debtor under the DIP Loan and the absence of any other available

10   financing.  In fact, bankruptcy courts routinely recognize that concessions by debtors similar (or

11   even greater) to those made here are often included in both debtor-in-possession financing and cash

12   collateral arrangements.  See e.g.,In re Adams Apple, Inc., 829 F.2d 1484, 1488 (9th Cir. 1987)

13   ("[S]ection 364 was designed to provide a debtor a means to obtain credit after filing bankruptcy.

14   As such, cross collateralization clauses appear to be covered by section 364."); In re Keystone

15   Camera Prods. Corp., 126 B.R. 177, 182-83 (Bankr. D.N.J. 1991); In re Stein & Day, Inc., 87 B.R.

16   290-92 (Bankr. S.D.N.Y. 1988) (providing for payment of pre-petition debt); Unsecured Creditors'

17   Comm. v. First Nat'l Bank and Trust Co. (In re Ellingsen MacLean Oil Co.), 65 B.R. 358 (W.D.

18   Mich. 1986), affil, 834 F.2d 599 (6th Cir. 1987), cert. denied, 488 U.S. 817 (1988) (validation of

19   liens, repayment of debt, cross collateralization); In re FCX, Inc., 54 B.R. 833, 840-41 (Bankr.

20   E.D.N.C. 1985) (cross collateralization); In re Quigley Gen. Elec. Co. (hi re Elec. City, Inc.), 43

21   B.R. 336-38 (Bankr. W.D. Wash. 1984) (stipulation provided for post-petition lien and conceded

22   validity of lien).

23        59.    Such concessions are especially justified in cases where the failure to approve the

24   requested financing threatens to doom any prospects the debtor has for a successful restructuring.

25   See, e.g., In re Roblin Indus., Inc., 52 B.R. 241, 245 (Bankr. N.D.N.Y. 1985) (approving cross

26   collateralization; "if in fact [the lenders] are undersecured [and] absent financing the debtor would

27   in all likelihood shut down, [then] liquidation would follow, and unsecured creditors would receive

28   no distribution from the debtor's estate"); In re Vanguard Diversified, Inc., 31 B.R. 364 (Bankr.

E.D.N.Y. 1983) (approving cross collateralization and the granting of a super-administrative priority claim in favor of a pre-petition lender where, among other things, failure to provide such financing would result in the failure of the chapter 11 case and the value of the encumbered assets at liquidation were less than the lenders' claims).

60.     The proposed Interim DIP Order provides that the automatic stay provisions of Bankruptcy Code § 362 are vacated and modified to the extent necessary to permit the DIP Lender to exercise certain rights and remedies as provided for in the DIP Credit Agreement without further order of or application to the Court.  However, except with respect to certain rights available on the Termination Date (as defined in the DIP Credit Agreement), under the terms of the proposed Interim DIP Order, the DIP Lender must provide Debtor, the United States Trustee, the Indenture Trustee, Apollo, and counsel for the Committee with three business days' written notice prior to exercising any such rights or remedies under the DIP Credit Agreement or upon a shorter period of time after notice and a hearing.  Moreover, Debtor and any other parties in interest may seek within the three business day notice period an expedited hearing before this Court to be conducted within five days business days thereafter (subject to the convenience of the Court's calendar) solely for the purpose of considering whether, in fact, an Event of Default (as defined in the DIP Credit Agreement) has occurred.  Stay modification provisions of this sort are ordinary and usual features of DIP financing facilities and, in Debtor's business judgment, are reasonable under the present circumstances.

61.     In sum, the substantial benefits the Debtor will derive from the proposed financing amply justify the Debtor's decision to enter into the DIP Loan, a decision that the Court should approve as being in the best interests of the Debtor and the estate.

## VI.     REQUEST FOR FINAL HEARING

62.     Pursuant to Bankruptcy Rule 4001(c), Debtor respectfully requests that the Court schedule a Final Hearing for no later than twenty (20) days from the date that the Court enters the Interim DIP Order.  Debtor's request for interim approval of the DIP Loan is intended to provide an amount of cash sufficient to permit the Debtor to continue to operate during the near term and maintain the confidence of vendors and employees.  Accordingly, in order to maintain their

1    operations and the confidence of their vendors and employees, the Debtors will need prompt final

2    approval of the DIP Loan.

3         63.      The Debtors request that they be permitted to serve notice of the Motion, the Interim

4    DIP Order and the Final Hearing by telecopy, overnight delivery service, hand delivery or U.S. mail

5    to (a) the United States Trustee; (b) counsel for the Indenture Trustee, (c) the Twenty Largest

6    Unsecured Creditors as set forth in the list filed by Debtor pursuant to Bankruptcy Rule 1007(d), (d)

7    all parties in interest on whom service is required by Debtor's order limiting notice entered in this

8    Case and their counsel, (e) Apollo, and all other known holders of liens on Debtor's assets, (f)

9    counsel to the Committee, if any has been appointed, (g) the California Department of Public Health

10    Licensing and Certification Program, (h) the United States Department of Health and Human

11    Services' Centers for Medicare and Medicaid Services, (i) the California Department of Justice,

12    Attorney General's Office, (j) the California Health Facilities Financing Authority, (k) the other

13    parties on whom the Court directed service on the record of the Interim Hearing, and (l) if

14    practicable, on the applicable state and local taxing agencies.  Debtor requests that the Court

15    determine such notice to be good and sufficient notice of the Final Hearing under Bankruptcy Rule

16    4001.  Debtor also requests that such notice of approval of the Interim DIP Order shall state that any

17    party in interest objecting to the DIP Loan or the terms of the Final Order shall file written

18    objections with the Court no later than ten calendar days prior to the Final Hearing.

19    **VII.    WAIVER OF BANKRUPTCY RULE 6004(H)**

20         64.      Debtor further seeks a waiver of any stay of the effectiveness of the Interim DIP

21    Order.  Pursuant to Bankruptcy Rule 6004(h), "[a]n order authorizing the use, sale, or lease of

22    property other than cash collateral is stayed until the expiration of 10 days after entry of the order,

23    unless the court orders otherwise."  As set forth above, authorizing the DIP Loan on an interim basis

24    is necessary because Debtor does not have enough working capital to carry on the operation of its

25    business, and the interim financing will preserve Debtor's operations in the very near term.

26    Accordingly, Debtor submits that ample cause exists to justify a waiver of the ten (10) day stay

27    imposed by Bankruptcy Rule 6004(h), to the extent it applies.

28

1

## VIII.   <u>CONCLUSION</u>

2       WHEREFORE, Debtor respectfully requests that the Court (i) following the Interim

3   Hearing, enter the Interim DIP Order approving the DIP Loan with DIP Lender under Bankruptcy

4   Code §§ 105, 361, 362, 363, 364(c) - (d), and 364(e), Bankruptcy Rules 2002, 4001, 9013 and 9014,

5   and LBRs 2002-2, 4001-2, and 9013-1, on the terms set forth in the DIP Credit Agreement; (ii)

6   approve the form and scope of notice of the Final Hearing and schedule the Final Hearing on the

7   Motion; (iii) following the Final Hearing, enter the Final DIP Order; and (iv) grant such other and

8   further relief as may be just and proper.

9

10   Dated:  Los Angeles, California           Respectfully Submitted,
     September 14, 2009

11                                              /s/  Lisa Hill Fenning
                                               Lisa Hill Fenning (SBN 89238)
12                                             Harry Garner (SBN 254942)
                                               Arnold & Porter LLP
13                                             777 South Figueroa Street, 44th Floor
                                               Los Angeles, California 90017
14                                             Telephone:   213.243.4000
                                               Facsimile:   213.243.4199
15

16                                             *Proposed Counsel to the Debtor and Debtor-in-*
                                               *Possession*
17

18

19

20

21

22

23

24

25

26

27

28

LA566949                                    -29-