# Exhibit A

**[MCGUIREWOODS LLP DRAFT – 9/14/09
FOR DISCUSSION PURPOSES ONLY]**

### SECURED SUPER-PRIORITY DEBTOR IN POSSESSION
### LOAN AND SECURITY AGREEMENT

Dated as of September __, 2009

Among

DOWNEY REGIONAL MEDICAL CENTER-HOSPITAL, INC.
(d/b/a DOWNEY REGIONAL MEDICAL CENTER),
a non-profit public benefit corporation organized under the laws of the State of California and
a debtor and debtor in possession under Chapter 11 of the Bankruptcy Code

as the "Debtor"

THE LENDERS FROM TIME TO TIME PARTIES HERETO

and

HEALTHCARE FINANCE GROUP, INC.,
as Agent



\DRMC: DIP Loan and Security Agreement #9830081 (v.8).doc

# TABLE OF CONTENTS

**Page**

ARTICLE I.        DEFINITIONS............................................................ 1

Section 1.01        Definitions..................................................... 1

Section 1.02        Other Terms; Rules of Construction ................................. 19

ARTICLE II.        AMOUNTS AND TERMS  OF THE LOANS.......................... 19

Section 2.01        DIP Advances ..................................................... 19

Section 2.02        Interest and Fees ................................................. 21

Section 2.03        Computation of Interest; Payment of Fees......................... 23

Section 2.04        Procedures for Payment ................................... 23

Section 2.05        Indemnities................................................... 24

Section 2.06        Maximum Interest ................................... 26

Section 2.07        Use of Proceeds of DIP Loan............................... 26

ARTICLE III.        SECURITY ............................................. 26

Section 3.01        Grant of Security Interests ................................... 26

Section 3.02        Perfection of Security Interests............................ 26

Section 3.03        Covenants of the Debtor with Respect to Collateral.......................... 27

Section 3.04        Performance by Agent of the Debtor's Obligations .......................... 28

Section 3.05        Limitation on Agent's Duty in Respect of Collateral ...................... 28

ARTICLE IV.        PAYMENT MECHANICS............................................ 29

Section 4.01        Payment Mechanics ....................................... 29

Section 4.02        Misdirected Payments; EOB's................................ 29

Section 4.03        No Rights of Withdrawal ................................... 30

ARTICLE V.        COLLECTION AND DISTRIBUTION.......................................... 30

Section 5.01        Collections on the Receivables; Distributions ................................... 30

Section 5.02        Distribution of Funds to the Lenders ................................. 30

Section 5.03        Servicing Receivables................................... 31

Section 5.04        Distributions to the Debtor Generally............................... 32

ARTICLE VI.        CONDITIONS PRECEDENT ...................................... 32

Section 6.01        Conditions Precedent to the Initial Funding Date............................ 32

Section 6.02        Conditions Precedent to Incremental Facility Effective Date............ 33

**TABLE OF CONTENTS**
(continued)

**Page**

Section 6.03    Conditions Precedent to all Funding Dates ........................................ 33

ARTICLE VII.    REPRESENTATIONS AND WARRANTIES .............................................. 34

Section 7.01    Representations and Warranties ......................................................... 34

ARTICLE VIII.    AFFIRMATIVE COVENANTS ........................................................... 38

Section 8.01    Compliance with Laws, etc .............................................................. 38

Section 8.02    Offices, Records and Books of Account, Names .............................. 38

Section 8.03    Performance and Compliance with Contracts and Credit and
Collection Policy .............................................................................. 38

Section 8.04    Audits; Appraisals .......................................................................... 38

Section 8.05    Reporting Requirements .................................................................. 39

Section 8.06    Notice of Proceedings; Overpayments ............................................ 39

Section 8.07    Taxes .............................................................................................. 39

Section 8.08    Preservation of Existence ................................................................ 39

Section 8.09    DIP Documents ............................................................................... 40

Section 8.10    Implementation of Approved Patient Consent Forms ...................... 40

Section 8.11    Invoices .......................................................................................... 40

Section 8.12    Intentionally Omitted ...................................................................... 40

Section 8.13    Equipment ....................................................................................... 40

Section 8.14    Insurance ........................................................................................ 40

ARTICLE IX.    NEGATIVE COVENANTS ................................................................. 41

Section 9.01    Corporate Documentation ............................................................... 41

Section 9.02    Debt ................................................................................................ 41

Section 9.03    Bond Debt ....................................................................................... 41

Section 9.04    Liens, etc ........................................................................................ 41

Section 9.05    Capital Expenditures; Lease Obligations ........................................ 41

Section 9.06    Asset Sales; Sale/Leaseback Transaction; Etc ................................ 41

Section 9.07    Change In Business ......................................................................... 41

Section 9.08    Change in Credit and Collection Policy ........................................... 42

Section 9.09    Change in Payment Instructions ...................................................... 42

Section 9.10    Deviation from Terms of Receivable, etc ......................................... 42

\DRMC: DIP Loan and Security Agreement #9830081 (v.8).doc

**TABLE OF CONTENTS**
(continued)

**Page**

| | | |
|---|---|---|
| Section 9.11 | Mergers and Acquisitions; Dissolutions | 42 |
| Section 9.12 | No "Instruments" | 42 |
| Section 9.13 | Margin Loan Restrictions | 42 |
| Section 9.14 | Loans or Investments | 43 |
| Section 9.15 | Transactions with Affiliates | 43 |
| Section 9.16 | Distributions | 43 |
| Section 9.17 | Deviation from Approved Patient Consent Form | 43 |
| Section 9.18 | Subsidiaries | 43 |
| Section 9.19 | ERISA, Etc. | 43 |
| Section 9.20 | Chapter 11 Claims | 43 |
| Section 9.21 | The DIP Orders | 44 |
| ARTICLE X. | FINANCIAL COVENANTS | 44 |
| Section 10.01 | Cash Flow to Expenditures Tests | 44 |
| Section 10.02 | Minimum EBITDA | 44 |
| ARTICLE XI. | EVENTS OF DEFAULT | 44 |
| Section 11.01 | Events of Default | 44 |
| Section 11.02 | Events of Default; Remedies | 46 |
| Section 11.03 | Attorney-in-Fact | 47 |
| Section 11.04 | License | 48 |
| ARTICLE XII. | THE AGENT | 48 |
| Section 12.01 | Agency Provisions | 48 |
| ARTICLE XIII. | MISCELLANEOUS | 51 |
| Section 13.01 | Amendments, etc. | 51 |
| Section 13.02 | Notices, etc. | 52 |
| Section 13.03 | Assignments; Participations | 52 |
| Section 13.04 | Further Assurances; Financing Statements | 54 |
| Section 13.05 | Costs and Expenses; Collection Costs | 54 |
| Section 13.06 | Confidentiality | 55 |
| Section 13.07 | Term and Termination; Early Termination and Prepayment Fees | 55 |

-iii-

**TABLE OF CONTENTS**
(continued)

**Page**

Section 13.08    No Liability ........................................................................... 56

Section 13.09    Entire Agreement; Severability ............................................ 57

Section 13.10    GOVERNING LAW ............................................................... 57

Section 13.11    JURISDICTION AND VENUE ............................................ 57

Section 13.12    WAIVER OF JURY TRIAL; JUDICIAL REFERENCE ................. 58

Section 13.13    Execution in Counterparts .................................................... 60

Section 13.14    Intentionally Omitted ........................................................... 60

Section 13.15    Confidentiality and Notices ................................................. 60

Section 13.16    Accounting Information ........................................................ 60

Section 13.17    USA PATRIOT ACT .............................................................. 60

-iv-

EXHIBITS

| | |
|---|---|
| Exhibit A | Form of Interim Cash Collateral Order |
| Exhibit B | Form of Interim DIP Order |
| Exhibit C | Reporting Requirements |
| | |
| Exhibit I | Eligibility Criteria |
| Exhibit II | Form of Borrowing Base Report |
| Exhibit III | Receivable Information |
| Exhibit IV | Form of Notice to Obligors |
| Exhibit V | Transmission of Electronic Data Files |
| Exhibit VI | Form of Business Associate Agreement |
| Exhibit VII | Closing Document Checklist |
| Exhibit VIII | Form of Depositary Agreements |
| Exhibit IX | Form of Compliance Certificate |

SCHEDULES

| | |
|---|---|
| Schedule I | Addresses for Notices |
| Schedule II | Disclosures |
| Schedule III | Lockbox Information |
| Schedule IV | Net Value Factors |
| Schedule V | Credit and Collection Policy |

**SECURED SUPER-PRIORITY DEBTOR IN POSSESSION LOAN AND SECURITY AGREEMENT,** dated as of September __, 2009, among DOWNEY REGIONAL MEDICAL CENTER-HOSPITAL, INC. (d/b/a DOWNEY REGIONAL MEDICAL CENTER), a non-profit public benefit corporation organized under the laws of the State of California and a debtor and debtor in possession under Chapter 11 of the Bankruptcy Code (the "**Debtor**"), and HEALTHCARE FINANCE GROUP, INC., a Delaware corporation ("**HFG**"), in its capacity as a lender with a DIP Commitment (together with its successors and permitted assigns in such capacity, the "**Lenders**"), and as administrative agent and collateral agent (together with its successors and permitted assigns in such capacities, the "**Agent**") for the Lenders.

### W I T N E S S E T H:

WHEREAS, on September [**14**], 2009 (the "**Petition Date**"), the Debtor filed a voluntary petition for relief (the "**Case**") under Chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the Central District of California, Los Angeles Division (the "**Bankruptcy Court**"); and

WHEREAS, the Debtor is continuing to operate its businesses and manage its properties as debtor in possession under Sections 1107 and 1108 of the Bankruptcy Code; and

WHEREAS, the Debtor has requested that the Lenders provide a secured super-priority credit facility of up to $15,000,000 in order to fund the continued operation of the Debtor's business as debtor and debtor in possession under the Bankruptcy Code, up to $4,000,000 of which will be made available on an interim basis prior to the Incremental Facility Effective Date (as defined below); and

WHEREAS, the Lenders are willing to make available to the Debtor such post-petition loans upon the terms and subject to the conditions set forth herein; and

WHEREAS, the Debtor has agreed to secure its obligations to the Lenders hereunder with, *inter alia*, security interests in, and liens on, substantially all of its real and personal property and assets, all as more fully provided herein;

NOW, THEREFORE, in consideration of the premises and the covenants and agreements contained herein, the parties hereto hereby agree as follows:

### ARTICLE I.
### DEFINITIONS

Section 1.01    <u>Definitions</u>.  As used in this Agreement (including the Exhibits and Schedules attached hereto), the following terms shall have the following meanings:

"**Accrued Amounts**" means, as at any date, the aggregate amount of accrued or incurred but unpaid or unreimbursed (whether or not due and payable) (a) interest on the DIP Loan, (b) Non-Utilization Fee, (c) Minimum Usage Fees, (d) Collateral Tracking Fees, and (e) legal and due diligence costs and expenses.

"**Adjusted Borrowing Limit**" means the Borrowing Limit, *minus* (a) Accrued Amounts, *minus* (b) the Carve Out (to the extent required to be deducted by the Agent or the Required Lenders), *minus* (c) the Medicare/Medicare Reserve and any additional availability reserves as may be established and maintained from time to time by the Agent, including reserves for offsets or recoupment against Receivables.

"**Adjusted Expected Net Value**" means, with respect to any Eligible Receivable, the Expected Net Value, *minus* such adjustments and reserves as may be made or established and maintained from time to time by the Agent (including the Medicare/Medicaid Reserve, reserves for deferred revenue, unapplied cash and credit balances and other reserves).

"**Advance Rate Percentage**" means 75%.

"**Affiliate**" means, as to any Person, any other Person that, directly or indirectly, is in control of, is controlled by or is under common control with such Person or is a director or officer of such Person. For the purposes of this definition, "control", when used with respect to any specified Person, means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise.

"**Agent**" has the meaning set forth in the preamble hereto.

"**Agreement**" means this Secured Super-Priority Debtor In Possession Loan and Security Agreement, as amended, restated, modified, or supplemented from time to time in accordance with the terms hereof.

"**Approved Patient Consent Form**" means each type of patient consent form, in form and substance satisfactory to the Agent, to be signed by each patient for which a Receivable will be created on or after the Initial Funding Date, which authorizes certain demographic and medical information with respect to such patient to be disclosed by any Debtor to its lenders' agents and their servicing agents.

"**Asset Sale**" means any sale, lease, conveyance, transfer or other disposition of assets by the Debtor (including by way of merger or consolidation or sale-leaseback transaction, but not including sales of inventory in the ordinary course of business), whether in one transaction or a series or group of transactions.

"**Assignment and Assumption**" means an assignment and assumption agreement in a form reasonably satisfactory to the Agent.

"**Authorized Officer**" means an officer of the Debtor designated from time to time by the Debtor in a written notice to the Agent, which designation shall continue in force and effect until terminated in a written notice to the Agent from the Debtor.

"**Avoidance Action**" means claims and causes of action under Sections 502(d), 544, 545, 547, 548, 549, 550 and 553 of the Bankruptcy Code and any other avoidance actions under the Bankruptcy Code, and all monies and other property of any kind received therefrom.

"**Bankruptcy Code**" means Title 11, United States Code.

"**Bankruptcy Court**" is defined in the recitals to this Agreement or shall mean any other court having competent jurisdiction over the Case.

"**Bond Debt**" means, collectively, the Debt incurred by the Debtor pursuant to the Bond Debt Documents.

"**Bond Debt Documents**" means, collectively: (a) that certain Indenture dated as of August 1, 1993, as amended by the First Supplemental Indenture, dated as of February 26, 2004, entered into between the California Health Care Facilities Financing Authority and Norwest Bank Minnesota, National Association n/k/a Wells Fargo Bank, National Association, as Indenture Trustee; (b) the Loan Agreement, dated as of August 1, 1993, between the California Health Care Facilities Financing Authority and the Debtor, as amended by the First Amendment to Loan Agreement dated as of February 26, 2004; and (c) any documents related thereto; as each of them may be amended, restated, or otherwise modified from time to time.

"**Bond Funds**" means the "Bond Reserve Account" established under the Bond Debt Documents, and all other funds held by the Bond Trustee related to those certain $68,845,000 California Health Care Facilities Financing Authority Hospital Revenue Bonds (Downey Community Hospital), Series 1993 all as more fully set forth in the Interim Cash Collateral Order.  As of September 11, 2009, the balance of the Bond Funds was $6,785,359.53.

"**Bond Intercreditor Agreement**" means any intercreditor or similar agreement, if any, entered into from time to time by and between the Agent and the Bond Trustee or any holder of the Bond Debt (as amended, restated, or otherwise modified from time to time).

"**Bond Loan Agreement**" means that certain Loan Agreement dated as of August 1, 1993 between California Health Facilities Financing Authority and the Debtor, as amended by the First Amendment to Loan Agreement dated as of February 26, 2004.

"**Bond Trustee**" means Wells Fargo Bank, National Association, as trustee under the Bond Debt Documents, and its successors and assigns in such capacity.

"**Borrowing Base**" means, as of any time, an amount equal to the product of (a) the Adjusted Expected Net Value of Eligible Receivables of the Debtor at such time (as indicated on line VIII of the Borrowing Base Report as "Adjusted Expected Net Value"), and (b) the Advance Rate Percentage (as set forth on line IX of the Borrowing Base Report.

"**Borrowing Base Report**" means a certificate (which may be sent by Transmission), signed by an Authorized Officer of the Debtor, substantially in the form set forth in <u>Exhibit II</u> hereto, which shall provide the most recently available information with respect to the Eligible Receivables of the Debtor (segregated by the classes (if any) set forth on <u>Schedule IV</u> hereto) that is set forth in the aged accounts receivable trial balance and books and records of the Debtor, in form and substance satisfactory to the Agent.

-3-

"**Borrowing Base Deficiency**" means, as of any date, the positive difference, if any, between (a) the sum of the Outstanding Balance of the DIP Loan, minus (b) an amount equal to the Adjusted Borrowing Limit indicated on the most recent Borrowing Base Report or Monthly Report or as otherwise determined by the Agent.

"**Borrowing Limit**" means the lesser of (a) the Total DIP Commitment and (b) the Borrowing Base as of such time.

"**Business Day**" means any day on which banks are not authorized or required to close in New York City, New York or Los Angeles, California.

"**Capital Lease**" means, as applied to any Person, any lease of any Property (whether real, personal or mixed) by that Person as lessee, the obligations of which are required, in accordance with GAAP, to be capitalized on the balance sheet of that Person.

"**Carve Out**" means the "Carve Out" as defined in the Interim DIP Order or the Final DIP Order, as applicable.

"**Case**" has the meaning set forth in the preamble hereto, and included all successor or converted cases under the Bankruptcy Code in respect thereof.

"**Cash Collateral Orders**" means the Interim Cash Collateral Order or the Final Cash Collateral Order, as applicable.

"**Chattel Paper**" has the meaning given to such term in the UCC.

"**Claim**" has the meaning given to such term in Section 101(5) of the Bankruptcy Code.

"**CMS**" means the Centers for Medicare and Medicaid Services of the United States Department of Health and Human Services.

"**Code**" means the Internal Revenue Code of 1986, as amended, replaced or supplemented from time to time.

"**Collateral**" means all of the following property now owned or at any time hereafter acquired by the Debtor or in which the Debtor now has or at any time in the future may acquire any right, title or interests (or the power to transfer any such right, title or interests to a secured party):

        (a)      all Receivables;

        (b)      all Chattel Paper;

        (c)      to the maximum extent not prohibited by applicable law, the Debtor Lockbox Account;

-4-

(d)    all Deposit Accounts;

(e)    all Documents;

(f)    all Equipment;

(g)    all General Intangibles, including all Intellectual Property and all franchise rights and licenses, and federal, state and local tax refund claims of all kinds;

(h)    all Instruments;

(i)    all Inventory;

(j)    all Investment Property;

(k)    all Letter-of-Credit Rights;

(l)    all Real Property;

(m)    all vehicles covered by a certificate of title law of any state;

(n)    all Commercial Tort Claims, including those described on Schedule II;

(o)    all other goods and personal property of the Debtor, whether tangible or intangible, wherever located;

(p)    all property of the Debtor held by the Agent or any Lender, including all property of every description, in the possession or custody of or in transit to the Agent or such Lender for any purpose, including safekeeping, collection or pledge, for the account of the Debtor, or as to which the Debtor may have any right or power;

(q)    to the extent not otherwise included, all monies and other property of any kind that is, after the Petition Date, received by the Debtor in connection with refunds with respect to taxes, assessments and governmental charges imposed on the Debtor or any of its property or income;

(r)    to the extent not otherwise included, all causes of action (other than Avoidance Actions) and all monies and other property of any kind received therefrom, and all monies and other property of any kind recovered by the Debtor;

(s)    all insurance claims;

(t)    to the extent not otherwise included, all other property of any kind or character granted as collateral for the Lender Debt pursuant to the terms of the DIP Orders;

(u)    to the extent not otherwise included, all Proceeds of each of the foregoing and all accessions to, substitutions and replacements for, and rents, profits and

-5-

products of, each of the foregoing, any and all proceeds of insurance, indemnity, warranty or guaranty payable to the Debtor from time to time with respect to any of the foregoing; and

(v)        and all Records;

*provided*, *however*, that the Collateral shall not include (x) the Bond Funds, (y) any Real Property lease held by the Debtor; *provided*, *further* that (notwithstanding the foregoing) the Collateral shall in any event include all Proceeds, substitutions or replacements of any such Real Property lease (except in the case of a substitution or replacement thereof that is a Real Property lease); or (z) any Excluded Assets.

"**Collateral Tracking Fee**" has the meaning set forth in Section 2.02(d).

"**Collection Account**" means the Agent's account maintained at Bank of New York, ABA # 021000018, GLA 111565, For Further Credit to Account #205779, Ref:  HFG Healthco-4, LLC, Attn:  Shawn Campbell, or such other bank account designated by the Agent from time to time.

"**Collections**" means all cash collections, wire transfers, electronic funds transfers and other cash proceeds of Receivables deposited in or transferred to the Collection Account; *provided*, that except in the calculation of the Borrowing Base and the Non-Utilization Fee hereunder (which shall apply Collections as of the date of receipt in the Collection Account), Collections shall be applied hereunder only following a 3 Business Day clearance period applied thereto.

"**Commercial Tort Claim**" has the meaning given to such term in the UCC.

"**Committee**" means the official statutory committee of unsecured creditors, if any, approved in the Case pursuant to Section 1102 of the Bankruptcy Code.

"**Compliance Certificate**" means a certificate (which may be sent by Transmission), signed by an Authorized Officer of the Debtor, in the form set forth in Exhibit IX, duly completed.

"**Contracts**" means, collectively, all rights of the Debtor under all leases, contracts and agreements to which the Debtor is now or hereafter a party, including all rights of the Debtor to receive moneys due or to become due thereunder or pursuant thereto, but excluding rights under (but not excluding proceeds of) any lease, contract or agreement (including any license) that by the terms thereof, or under applicable law, cannot be assigned or a security interest granted therein in the manner contemplated by this Agreement unless consent from the relevant party or parties has been obtained and under the terms of which lease, contract or agreement any such assignment or grant of a security interest therein in the absence of such consent would, or could, result in the termination thereof, but only to the extent that (a) such rights are subject to such contractual or legal restriction and (b) such restriction is not, or could not be, rendered ineffective pursuant to the UCC of any relevant jurisdiction or any other applicable law (including the Bankruptcy Code) or principles of equity.

-6-

"**Contractual Obligation**" of any Person means any obligation, agreement, undertaking or similar provision of any security issued by such Person or of any agreement, undertaking, contract, lease, indenture, mortgage, deed of trust or other instrument (excluding a DIP Document) to which such Person is a party or by which it or any of its property is bound or to which any of its property is subject.

"**Control Agreement**" means each deposit account control agreement in favor of the Agent relating to a deposit account of the Debtor, in form and substance satisfactory to the Agent.

"**Credit and Collection Policy**" means those account receivable credit and collection policies and practices of the Debtor as in effect on the date of this Agreement and set forth in Schedule V hereto, as modified from time to time with the consent of the Agent.

"**Debt**" of any Person means (without duplication): (a) all obligations of such Person for borrowed money, (b) all obligations of such Person evidenced by bonds, notes, debentures, or other similar instruments or upon which interest payments are customarily made, (c) all obligations of such Person to pay the deferred purchase price of Property or services (other than trade payables or other accounts payable incurred in the ordinary course of such Person's business and not outstanding for more than 90 days after the date such payable was created), (d) all Debt of others directly or indirectly Guaranteed (which term shall not include endorsements in the ordinary course of business) by such Person, (e) all obligations created under Capital Leases of such Person, and (f) all obligations secured by a Lien on any Property owned by such Person, whether or not the obligations secured thereby have been assumed by such Person or are non-recourse to the credit of such Person (but only to the extent of the value of such Property).

"**Debtor**" has the meaning set forth in the preamble hereto.

"**Debtor Account**" means initially account #[_____] of the Debtor at [_____], ABA #[_____], or such other bank account designated by the Debtor by notice to the Agent from time to time.

"**Debtor Lockbox Account**" means the account set forth on Schedule III hereto in the name of the Debtor and controlled by the Debtor to deposit Collections received by wire transfer and automated clearinghouse payments directly from Governmental Entities, all as more fully set forth in the applicable Depositary Agreement.

"**Default**" means an event, act or condition that with the giving of notice or the lapse of time, or both, would constitute an Event of Default.

"**Denied Receivable**" means any Receivable to which any related representations or warranties (including the Eligibility Criteria) have been discovered at any time to have been breached.

"**Deposit Account**" has the meaning given to such term in the UCC.

-7-

"**Depositary Agreements**" means each of (i) the Three Party Lockbox Agreement Amendment to Cash Management Terms and Conditions, (ii) the Government Receivables Account Agreement (Standing Revocable Instructions), and (iii) the Deposit Account Control Agreement (Contingency), each dated the date hereof, among the Debtor, the Agent, and the Lockbox Bank, in substantially the forms attached hereto as Exhibit VIII.

"**DIP Advance**" has the meaning set forth in Section 2.01(a).

"**DIP Budget**" has the meaning set forth in the DIP Orders.

"**DIP Commitment**" means the commitment of each Lender to make DIP Advances up to the amount set forth below the signature of such Lender on the signature page of this Agreement or as set forth in the applicable Assignment and Assumption.

"**DIP Documents**" means this Agreement, the Depositary Agreements, the Lockbox Agreements, each Borrowing Base Report, each Monthly Report, each Control Agreement, the DIP Orders, the Bond Intercreditor Agreement (if any), and each other document or instrument now or hereafter executed and/or delivered to the Agent or any Lender pursuant to or in connection herewith or therewith (including each other agreement now existing or hereafter created providing collateral security for the payment or performance of any Lender Debt).

"**DIP Loan**" has the meaning set forth in Section 2.01(a).

"**DIP Orders**" means the Interim DIP Order or the Final DIP Order, as applicable.

"**Distribution**" means any dividend payment or other distribution of assets, properties, cash, rights, obligations or securities on account of any Equity Interests in the Debtor, any return of capital to the Debtor's equity holders as such, or any action to purchase, retire, defease, redeem or otherwise acquire for value or make any payment in respect of any Equity Interests in the Debtor or any warrants, rights or options to acquire any such interests, now or hereafter outstanding.

"**Document**" has the meaning given to such term in the UCC.

"**Eligible Assignee**" means any Lender, any Affiliate of any Lender, any other financial institution or fund that extends credit or buys loans as one of its businesses including insurance companies, mutual funds and lease financing companies, and any trust or special purpose funding vehicle; provided, that neither the Debtor nor any Affiliate of the Debtor shall be an Eligible Assignee.

"**Eligibility Criteria**" means the criteria and basis for determining whether a Receivable shall be deemed by the Agent to qualify as an Eligible Receivable, all as set forth in Exhibit I hereto, as such Eligibility Criteria may be modified from time to time as determined by the Agent in its credit judgment upon notice to the Debtor.

"**Eligible Receivables**" means Receivables of the Debtor that satisfy the Eligibility Criteria, as determined by the Agent.

\DRMC: DIP Loan and Security Agreement #9830081 (v.8).doc

"**Employee Benefit Plan**" means any employee benefit plan within the meaning of Section 3(3) of ERISA maintained by the Debtor or any of its ERISA Affiliates, or with respect to which any of them have any liability.

"**Environmental Laws**" means any and all applicable federal, state and local laws, statutes, ordinances, rules, regulations, permits, licenses, approvals, interpretations and DIP Orders of courts or Governmental Entity, relating to the protection of human health from exposure to hazardous materials or the environment, including the Comprehensive Environmental Response, Compensation, and Liability Act (42 U.S.C. § 9601 et seq.), the Hazardous Material Transportation Act (49 U.S.C. § 331 et seq.), the Resource Conservation and Recovery Act (42 U.S.C. § 6901 et seq.), the Federal Water Pollution Control Act (33 U.S.C. § 1251 et seq.), the Clean Air Act (42 U.S.C. § 7401 et seq.), the Toxic Substances Control Act (15 U.S.C. § 2601 et seq.), the Safe Drinking Water Act (42 U.S.C. § 300, et seq.), the Environmental Protection Agency's regulations relating to underground storage tanks (40 C.F.R. Parts 280 and 281), and the Occupational Safety and Health Act (29 U.S.C. § 651 et seq.), and the rules and regulations thereunder, each as amended or supplemented from time to time. Environmental Laws include but are not limited to requirements pertaining to the manufacture, processing, distribution, use, treatment, storage, disposal, transportation, handling, reporting, licensing, permitting, investigation or remediation of hazardous materials.

"**EOB**" means the explanation of benefit or remittance advice from an Obligor that identifies the services rendered on account of the Receivable specified therein.

"**Equipment**" has the meaning given to such term in the UCC.

"**Equity Interest**" means any share, interest or other equivalent of capital stock of any Person, whether voting or non-voting and whether common or preferred (including any membership interest in a not-for-profit entity), all options, warrants and other rights to acquire, and all securities convertible into, any of the foregoing, all rights to receive interest, income, dividends, distributions, returns of capital and other amounts (whether in cash, securities, property, or a combination thereof), and including all rights to receive amounts due and to become due under or in respect of any investment agreement or upon the termination thereof, and all other rights, powers, privileges, interests, claims and other property in any manner arising out of or relating to any of the foregoing.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended, and the rules and regulations promulgated thereunder as from time to time in effect.

"**ERISA Affiliate**" means any trade or business (whether or not incorporated) that, together with the Debtor, is treated as a single employer under Section 414(b), (c), (m) or (o) of the Code or Section 4001 of ERISA.

"**Event of Default**" has the meaning set forth in <u>Section 11.01</u>.

"**Event of Loss**" means the occurrence of any event by which any item of Collateral of the Debtor is lost, stolen, destroyed, damaged beyond repair, rendered permanently unfit for use, or seized by a Governmental Entity for any period of time.

-9-

"**Exchange Act**" means The Securities Exchange Act of 1934, as amended, and as it may be further amended from time to time.

"**Excluded Assets**" means, collectively, (a)  any and all cash or other property received by the Debtor in the form of gifts, charitable donations, bequests or grants (including special purpose grants made by a Governmental Entity) that are by their terms, restricted in the manner in which they may be utilized by the Debtor to the extent, and only to the extent, that such restrictions would prohibit the granting of any such bequests or grants as collateral hereunder or prohibit the payment of any such bequests or grants to the Agent for application to the Lender Debt; and (b) all Avoidance Actions; *provided* that nothing herein shall affect the status of the Lender Debt as a "Superpriority Claim" as more particularly set forth in the DIP Orders.

"**Excluded Claims**" has the meaning set forth in Section 2.05(b).

"**Exit Fee**" has the meaning set forth in Section 2.02(g).

"**Expected Net Value**" means, with respect to any Eligible Receivable, the gross unpaid amount of such Receivable on the date of creation thereof, times the Net Value Factor.

"**Extraordinary Receipt**" means, the receipt by the Debtor of (a) cash receipts not in the ordinary course of business (including proceeds of insurance on Collateral or business interruption insurance (but excluding in any event Excluded Assets and any proceeds from workers' compensation or D&O insurance), pension plan reversions, foreign, United States, state or local tax refunds, judgments, proceeds of settlements or other consideration of any kind in connection with any cause of action, indemnity payments, and any purchase price adjustment received in connection with any purchase agreement); and (b) to the extent permitted to be included hereunder by the DIP Orders, proceeds of all Avoidance Actions.

"**Final Cash Collateral Order**" means that certain final order issued by the Bankruptcy Court authorizing the Debtor's use of certain cash collateral in which the Bond Trustee has an interest, and that is otherwise in form and substance satisfactory to the Agent and the Lenders in their sole discretion.

"**Final DIP Order**" means an order of the Bankruptcy Court pursuant to Section 364 of the Bankruptcy Code, approving permanent post-petition secured and super-priority indebtedness to be provided to the Debtor by the Agent and the Lenders pursuant to this Agreement, and as to which no stay has been entered and that has not been reversed, modified, vacated or overturned, and that is otherwise in form and substance satisfactory to the Agent and the Lenders in their sole discretion.

"**First Day DIP Orders**" means all DIP Orders entered by the Bankruptcy Court on the Petition Date or within five Business Days of the Petition Date or based on motions filed on or within five Business Days of the Petition Date.

"**Foreign Lender**" means any Lender that is organized under the laws of a jurisdiction other than the laws of the United States, or any state or district thereof.

-10-

"**Full Payment**" means, with respect to any Lender Debt, (a) the full and indefeasible cash payment thereof, including any interest, fees and other charges accruing during the Case and any other bankruptcy or other insolvency proceeding; (b) if such Lender Debt is inchoate or contingent in nature, cash collateralization thereof (or delivery of a standby letter of credit acceptable to the Agent in its sole discretion), in an amount reasonably satisfactory to the Agent; and (c) a release of any Indemnified Claims of the Debtor against each Indemnified Party arising on or before the payment date. No Lender Debt shall be deemed to have been paid in full until all DIP Commitments and all other obligations of the Agent and the Lenders hereunder have expired or been expressly terminated in writing.

"**Funding Date**" means any Business Day on which a DIP Advance is made at the request of the Debtor in accordance with provisions of this Agreement.

"**GAAP**" means generally accepted accounting principles in the United States of America.

"**General Intangible**" has the meaning given to such term in the UCC.

"**Governmental Entity**" means the United States of America, any state thereof, any political subdivision of a state thereof and any agency or instrumentality of the United States of America or any state or political subdivision thereof and any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government. Payments from Governmental Entities shall be deemed to include payments governed under the Social Security Act (42 U.S.C. §§ 1395 *et seq.*), including payments under Medicare, Medicaid and TRICARE/CHAMPUS, and payments administered or regulated by CMS.

"**Guaranty**" by any Person means any obligation, contingent or otherwise, of such Person directly or indirectly guaranteeing any Debt or other obligation of any other Person and, without limiting the generality of the foregoing, any obligation, direct or indirect, contingent or otherwise, of such Person (a) to purchase or pay (or advance or supply funds for the purchase or payment of) such Debt or other obligation (whether arising by virtue of partnership arrangements, by agreement to keep-well, to purchase assets, goods, securities or services, or to take-or-pay), or (b) entered into for the purpose of assuring in any other manner the obligee of such Debt or other obligation of the payment thereof or to protect the obligee of such Debt or other obligation of the payment thereof or to protect the obligee against loss in respect thereof (in whole or in part), *provided* that the term Guaranty shall not include endorsements for collection or deposit in the ordinary course of business. The term "Guaranty" used as a verb has a corresponding meaning.

"**HFG**" has the meaning set forth in the preamble hereto.

"**Incremental Facility Effective Date**" means the date on which each of the conditions precedent set forth in Section 6.02 have been satisfied.

"**Indemnified Claims**" has the meaning set forth in Section 2.05(b).

"**Indemnified Party**" has the meaning set forth in Section 2.05(b).

-11-

"**Interim Cash Collateral Order**" means that certain interim order issued by the Bankruptcy Court substantially the form of Exhibit A and otherwise in form and substance satisfactory to the Agent in its sole discretion.

"**Interim DIP Order**" means that certain order issued by the Bankruptcy Court in substantially the form of Exhibit B and otherwise in form and substance satisfactory to the Agent in its sole discretion.

"**Initial Funding Date**" means the date of funding of the initial DIP Advance(s).

"**Initial Term**" has the meaning set forth in Section 13.07(a).

"**Instrument**" has the meaning given to such term in the UCC, other than instruments that constitute, or are a part of a group of writings that constitute, Chattel Paper.

"**Insolvency**" means, with respect to any Person, such Person shall generally not pay its debts as such debts become due, or shall admit in writing its inability to pay its debts generally, or shall make a general assignment for the benefit of creditors; or any proceeding shall be instituted by or against such Person seeking to adjudicate it a bankrupt or insolvent, or seeking liquidation, winding up, reorganization, arrangement, adjustment, protection, relief, or composition of it or its debts under any law relating to bankruptcy, insolvency or reorganization or relief of debtors, or seeking the entry of an order for relief or the appointment of a receiver, trustee, custodian or other similar official for it or for any substantial part of its Property and, in the case of any such proceeding instituted against it (but not instituted by it), either such proceeding shall remain undismissed or unstayed for a period of 60 days, or any of the actions sought in such proceeding (including the entry of an order for relief, or the appointment of a receiver, trustee, custodian or other similar official for it or for any substantial part of its Property) shall occur; or such Person shall take any action to authorize any of the actions set forth above.

"**Insurer**" means any Person (other than a Governmental Entity) that in the ordinary course of its business or activities agrees to pay for healthcare goods and services received by individuals, including commercial insurance companies, nonprofit insurance companies (such as the Blue Cross, Blue Shield entities), employers or unions that self insure for employee or member health insurance, prepaid health care organizations, preferred provider organizations, health maintenance organizations, commercial hospitals, physicians groups or any other similar Person. "Insurer" includes insurance companies issuing health, personal injury, workers' compensation or other types of insurance but does not include any individual guarantor.

"**Intellectual Property**" means, collectively, all rights, priorities and privileges relating to intellectual property, whether arising under United States, multinational or foreign laws or otherwise, including copyrights, copyright licenses, patents, patent licenses, trademarks, trademark licenses and trade secrets, and all rights to sue at law or in equity for any infringement or other impairment thereof, including the right to receive all proceeds and damages therefrom.

"**Interest Period**" means each one month period (or shorter period ending on the Maturity Date); *provided, that* the initial Interest Period shall commence on the Initial Funding

-12-

Date and shall end on the last calendar day of the month in which the Initial Funding Date occurred.

"**Inventory**" has the meaning given to such term in the UCC.

"**Investment Property**" has the meaning given to such term in the UCC.

"**IRC**" means the Internal Revenue Code of 1986, as amended (or any successor statute thereto) and the regulations thereunder.

"**Issuance**" means the issuance by the Debtor of Debt (other than the DIP Loan and Permitted Debt), or the issuance by the Debtor of any Equity Interest.

"**Land**" means all of those plots, pieces or parcels of land now owned, leased or hereafter acquired or leased or purported to be owned, leased or hereafter acquired or leased by the Debtor.

"**Last Service Date**" means, with respect to any Eligible Receivable, the date set forth on the related invoice or statement as the most recent date on which services, goods or merchandise were provided by the Debtor to the related patient or customer.

"**Lenders**" has the meaning set forth in the preamble hereto.

"**Lender Debt**" means and includes any and all amounts due, whether now existing or hereafter arising, under this Agreement or any other DIP Document in respect of the DIP Loan, including any and all principal, interest, penalties, fees, charges, premiums, indemnities and costs owed or owing to the Agent or any Lender by the Debtor (including but not limited to the Facility Fee and the Exit Fee), in each instance, whether absolute or contingent, direct or indirect, secured or unsecured, due or not due, primary or secondary, joint or several, arising by operation of law or otherwise, and all interest and other charges thereon, including post-petition interest.

"**Lender Group**" means (a) the Agent and each Lender, and (b) each of their respective agents and delegates identified from time to time to effectuate this Agreement.

"**Lender Lockbox**" means the lockbox located at the address set forth on Schedule III to receive checks and EOB's with respect to Receivables payable by Insurers and other non-Governmental Entities.

"**Lender Lockbox Account**" means the account(s) at the Lockbox Bank as set forth on Schedule III as associated with the Lender Lockbox and established by the Debtor to deposit Collections, including Collections received in the Lender Lockbox and Collections received by wire transfer directly from Insurers and all other Non-Governmental Entities, all as more fully set forth in the Depositary Agreement.

"**Letter-of-Credit Right**" has the meaning given to such term in the UCC.

-13-

"**LIBOR**" for any Interest Period, means the rate *per annum* established by the Agent two Business Days prior to the first day of such Interest Period based on an annualized 90-day interest rate (calculated on the basis of actual days elapsed over a 360-day year) equal to the offered rate that appears on page 3750 of the Dow Jones Market for U.S. dollar deposits on the date of determination; *provided*, *however*, that for purposes of this Agreement, in no event shall "LIBOR" be less than 2.75% at any time.

"**Lien**" means any lien, charge, deed of trust, mortgage, security interest, tax lien, pledge, hypothecation, assignment, preference, priority, other charge or encumbrance, or any other type of preferential arrangement of any kind or nature whatsoever by or with any Person (including any conditional sale or title retention agreement), whether arising by contract, operation of law, or otherwise.

"**Lockbox**" means the Lender Lockbox.

"**Lockbox Account**" means either the Debtor's Lockbox Account or the Lender Lockbox Account, as the context requires.

"**Lockbox Bank**" means the applicable bank set forth on Schedule III hereto.

"**Material Adverse Effect**" means (a) a material adverse effect on the business, Properties, assets, liabilities, operations, prospects or condition (financial or other) of the Debtor, (b) the material impairment of the ability of the Debtor to perform its obligations under this Agreement or any of the other DIP Documents, (c) the material impairment of the validity or enforceability of, or the rights, remedies or benefits available to the Agent or the Lenders under, this Agreement or any other DIP Document, or (d) the material impairment of the validity, perfection or priority of any Lien granted in favor of the Agent pursuant to this Agreement or any other DIP Document.

"**Maturity Date**" means the earliest of (a) the Termination Date, (b) the occurrence of an Event of Default described in paragraph (i) or (n) of Section 11.01 and (c) the declaration by the Agent or Required Lenders of the Maturity Date in accordance with Section 11.02(a).

"**Maximum Permissible Rate**" has the meaning set forth in Section 2.06.

"**Medicaid**" means the medical assistance program established by Title XIX of the Social Security Act (42 U.S.C. Secs. 1396 *et seq.*) and any statutes succeeding thereto.

"**Medicare**" means the health insurance program for the aged and disabled established by Title XVIII of the Social Security Act (42 U.S.C. Secs. 1395 *et seq.*) and any statutes succeeding thereto.

"**Medicare/Medicaid Reserve**" means, as of any date of determination, an amount, determined by the Agent in its sole discretion, equal to the sum of (a) the amount of retroactive settlements estimated to be due and owing to Governmental Entities and (b) without

-14-

duplication, 100% of those amounts for which payment plans have been established with the appropriate Governmental Entity.

"**Minimum Balance Requirement**" means (a) at all times prior to the Incremental Facility Effective Date, $4,000,000, and (b) at all times from and after the Incremental Facility Effective Date, $5,000,000.

"**Minimum Usage Fee**" has the meaning set forth in Section 2.03(g).

"**Misdirected Payment**" means any form of payment in respect of a Receivable made by an Obligor in a manner other than as provided in the Notice sent to such Obligor.

"**Monthly Report**" means a report (which may be sent by Transmission), signed by the Debtor, containing the following information as of month-end: (a) the information contained on Exhibit II; (b) confirmation that the electronic download of transaction files to the Agent is complete; and (c) confirmation that the electronic download of the monthly aged trial balance to the Agent is complete.

"**Multiemployer Plan**" means a multiemployer plan as defined in Section 4001(a)(3) of ERISA to which any Debtor or any ERISA Affiliate has any obligation or liability, contingent or otherwise.

"**Net Proceeds**" means with respect to any Asset Sale, Issuance or Extraordinary Receipt by the Debtor, the aggregate amount of cash proceeds (after a reasonable estimate of taxes payable in connection therewith and payment of associated fees and expenses (including reasonable fees and expenses of counsel, accountants, appraisers, brokers, investment bankers and, with respect to any Issuance, any reasonable underwriter's discount and, with respect to Asset Sales, repayment of any Debt secured specifically by and with a first priority (as set forth in the DIP Orders) lien on the asset, the sale or disposition of which gave rise to such Asset Sale) received or receivable by such Person, and cash proceeds paid from time to time to such Person with respect to any promissory note or other instrument or security delivered in connection therewith.

"**Net Value Factor**" means, initially, the percentages set forth on Schedule IV attached hereto, as such percentages may be adjusted, upwards or downwards, in the sole discretion of the Agent, based on actual collection experience.

"**Non-Utilization Fee**" has the meaning set forth in Section 2.02(c).

"**Notice**" means a notice letter on any Debtor's corporate letterhead to an Obligor in substantially the form attached hereto as Exhibit IV.

"**Obligor**" means an Insurer, Governmental Entity or other Person, as applicable, who is responsible for the payment of all or any portion of a Receivable.

"**Other Taxes**" has the meaning set forth in Section 2.04(b).

-15-

"**Outstanding Balance**" means as of any date of determination, the aggregate outstanding principal balance of the DIP Loan, plus the amount of interest, fees, reimbursable expenses and other amounts payable to the Agent and the Lenders by the Debtor that are at such date due and payable and that remain unpaid beyond the due date therefor.

"**PBGC**" means the Pension Benefit Guaranty Corporation.

"**Permitted Debt**" means Debt outstanding on the Petition Date, the Lender Debt, and any post-petition Debt approved by the Agent and the Required Lenders as part of the DIP Budget.

"**Permitted Liens**" means any of the following:

(a)     Liens securing the Lender Debt;

(b)     Liens in existence on the Petition Date, but not the extension of coverage thereof to any other property or assets;

(c)     junior Liens in favor of the Bond Trustee;

(d)     junior Liens on accounts in favor of Apollo Health Care, subject, however, to all defenses and objections to any such Liens or Claims secured thereby;

(e)     valid and perfected pre-petition Liens on leased or purchase money financed Equipment of the Debtor;

(f)     Liens for taxes, assessments or other governmental charges or statutory obligations that (i) are not delinquent or remain payable without any penalty or that are being contested in good faith by appropriate proceedings and for which adequate reserves have been established in accordance with GAAP and (ii) the Debtor has the financial ability to pay, with all penalties and interest, without resulting in a Material Adverse Effect;

(g)     with respect to any real property occupied by any Debtor, all easements, rights of way, licenses and similar encumbrances on title that do not (i) secure obligations for the payment of money or (ii) materially impair the value of such property or the use of such Property for its intended purposes; and

(h)     to the extent constituting "Liens", Liens consisting of restrictions on gifts, charitable donations, bequests or grants (including special purpose grants made by a Governmental Entity) to the extent that such restrictions were implemented in the ordinary course.

"**Person**" means an individual, partnership, corporation (including a business trust), limited liability company, joint stock company, trust, unincorporated association, joint venture or other entity, or a Governmental Entity.

-16-

"**Petition Date**" has the meaning set forth in the preamble hereto.

"**Plan**" means any employee pension benefit plan (other than a Multiemployer Plan) subject to the provisions of Title IV of ERISA, Section 412 of the IRC or Section 302 of ERISA, and in respect of which any Debtor or any ERISA Affiliate is (or, if such plan were terminated, would under Section 4069 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA.

"**Pro Rata Share**" means, with respect to a Lender, a fraction (expressed as a percentage), the numerator of which is the amount of such Lender's DIP Commitment and the denominator of which is the Total DIP Commitment, or if no DIP Commitments are in effect, a fraction (expressed as a percentage), the numerator of which is the amount of Lender Debt owed to such Lender and the denominator of which is the aggregate amount of the Lender Debt owed to the Lenders.

"**Property**" means property of all kinds, movable, immovable, corporeal, incorporeal, real, personal or mixed, tangible or intangible (including all rights relating thereto), whether owned or acquired on or after the date of this Agreement.

"**Real Property**" of any Person means the Land of such Person, together with the right, title and interest of such Person, if any, in and to the streets, the Land lying in the bed of any streets, roads or avenues, opened or proposed, in front of, the air space and development rights pertaining to the Land and the right to use such air space and development rights, all rights of way, privileges, liberties, tenements, hereditaments and appurtenances belonging or in any way appertaining thereto, all fixtures, all easements now or hereafter benefiting the Land and all royalties and rights appertaining to the use and enjoyment of the Land, including all alley, vault, drainage, mineral, water, oil and gas rights, together with all of the buildings and other improvements now or hereafter erected on the Land, and any fixtures appurtenant thereto.

"**Receivable Information**" means the information listed on <u>Exhibit III</u> hereto (together with any other information relating to the Receivables provided by the Debtor to the Agent from time to time) as such Exhibit may be modified by the Agent in consultation with the Debtor from time to time.

"**Receivables**" means all accounts, instruments, general intangibles and health-care-insurance receivables, all other obligations for the payment of money and goodwill, whether now existing or hereafter arising, including all payments based on a cost report settlement or expected settlement, and all proceeds of any of the foregoing, in each case, including rights of payment arising out of the rendition of medical, surgical, diagnostic or other professional medical services or the sale of medical products by the Debtor in the ordinary course of its business, including all third-party reimbursable portions or third-party directly payable portions of health-care–insurance receivables or general intangibles owing by an Obligor, including all rights to reimbursement under any agreements with and payments from Obligors, patients or other Persons, together with all books, records and other property evidencing or related to the foregoing, and all proceeds of any of the foregoing; *provided*, that "Receivables" shall not include any Excluded Assets.

-17-

"**Records**" means all of the Debtor's present and future books and records of account of every kind or nature, service and management agreements, invoices, ledger cards, statements, correspondence, memoranda, credit files, data processing records and other data relating to the Receivables and the other Collateral or any account debtor or Obligor, together with all computer software, and the tapes, disks, diskettes and other data and software storage media and devices, file cabinets or containers in or on which the foregoing are stored (including any rights of the Debtor with respect to the foregoing maintained with or by any other Person) and other property at any time used or useful in connection with, evidencing, embodying, referring to, or relating to, any of the foregoing.

"**Related Person**" means any incorporator, equityholder (or immediate family member of an equityholder), Affiliate (other than the Agent), agent, attorney, officer, director, member, manager, employee or partner of any Lender or its members or its equityholders.

"**Required Lenders**" means, at any time, Lenders holding DIP Commitments representing at least 66⅔% of the Total DIP Commitment or, if the DIP Commitments shall have been terminated, holding at least 66⅔% of the outstanding DIP Loan.

"**Securities Entitlement**" has the meaning given to such term in the UCC.

"**Subsidiary**" means any corporation or entity of which at least a majority of the outstanding shares of stock or other ownership interests having by the terms thereof ordinary voting power to elect a majority of the board of directors (or Persons performing similar functions) of such corporation or entity (irrespective of whether or not at the time, in the case of a corporation, stock of any other class or classes of such corporation shall have or might have voting power by reason of the happening of any contingency) is at the time directly or indirectly owned or controlled by the Debtor.

"**Taxes**" has the meaning set forth in Section 2.04(a).

"**Term**" has the meaning set forth in Section 13.07.

"**Termination Date**" the earliest of (a) thirty (30) days from the date of the entry of the Interim DIP Order if a Final DIP Order has not been issued, or such later date to which the Agent and the Required Lenders may consent in writing, (b) provided that a Final DIP Order is entered, one (1) year from and after the date of the entry of the Interim DIP Order, (c) the date (if any) specified as the Termination Date in any notice of an Event of Default delivered by the Agent to the Debtor, the United States Trustee in the Case, and the Committee, which shall be deemed given immediately upon docketing in the Court's ECF system, or (d) the effective date of a plan of reorganization in the Case.

"**Total DIP Commitment**" means (a) prior to the Incremental Facility Effective Date, $4,000,000; and (b) from and after the Incremental Facility Effective Date, $15,000,000.

"**Transmission**" means, upon establishment of a computer interface between the Debtor and the Agent or an FTP site, in each case in accordance with the specifications

established by the Agent, the transmission of Receivable Information through such computer interface or FTP site or e-mail communication to the Agent in a manner satisfactory to the Agent.

"**TRICARE/CHAMPUS**" means the Civilian Health and Medical Program of the Uniformed Service, a program of medical benefits covering former and active members of the uniformed services and certain of their dependents, financed and administered by the United States Departments of Defense, Health and Human Services and Transportation and established pursuant to 10 USC §§ 1071-1106, and all regulations promulgated thereunder including (a) all federal statutes (whether set forth in 10 USC §§ 1071-1106 or elsewhere) affecting TRICARE/CHAMPUS; and (b) all rules, regulations (including 32 CFR 199), manuals, DIP Orders and administrative, reimbursement and other guidelines of all Governmental Entities (including the Department of Health and Human Services, the Department of Defense, the Department of Transportation, the Assistant Secretary of Defense (Health Affairs), and the Office of TRICARE/CHAMPUS, or any Person or entity succeeding to the functions of any of the foregoing) promulgated pursuant to or in connection with any of the foregoing (whether or not having the force of law) in each case as may be amended, supplemented or otherwise modified from time to time.

"**UCC**" means the Uniform Commercial Code as in effect from time to time in effect in the specified or applicable jurisdiction.

"**Variances**" has the meaning set forth in the DIP Orders.

Section 1.02   Other Terms; Rules of Construction.   All accounting terms not specifically defined herein shall be construed in accordance with GAAP.   Defined terms and calculations in connection with the covenants and other provisions of this Agreement, including Article X, shall be based upon and utilize GAAP applied in a manner consistent with that used in preparing the financial statements referred to in Section 8.05.   All terms used in Article 9 of the UCC in the State of New York, and not specifically defined herein, are used herein as defined in such Article 9.   Any of the terms defined herein may, unless the context otherwise requires, be used in the singular or the plural, depending on the reference.   Unless the context otherwise provides to the contrary, the term "month" means a calendar month.   The terms "herein," "hereof," "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular section, paragraph or subdivision.   Any pronoun used shall be deemed to cover all genders.   In the computation of periods of time from a specified date to a later specified date, "from" means "from and including,", "through" means "through and including," and "to" and "until" each mean "to but excluding,".   The terms "including" and "include" shall mean "including, without limitation," and, for purposes of each DIP Document, the parties agree that the rule of *ejusdem generis* shall not be applicable to limit any provision.   Section titles appear as a matter of convenience only and shall not affect the interpretation of any DIP Document.   All references to (a) laws or statutes include all related rules, regulations, interpretations, amendments and successor provisions; (b) any document, instrument or agreement include any amendments, waivers and other modifications, extensions or renewals (to the extent permitted by the DIP Documents); (c) any Section or Article mean, unless the context otherwise requires, a Section or Article of this Agreement; (d) any Exhibits mean, unless the context otherwise requires, Exhibits attached hereto, and any Schedules mean, unless the context otherwise

-19-

\DRMC: DIP Loan and Security Agreement #9830081 (v.8).doc

requires, the Schedules attached hereto, all of which are hereby incorporated by reference; and (e) unless otherwise specified, discretion of the Agent or any Lender mean the sole and absolute discretion of such Person.   The Debtor shall have the burden of establishing any alleged negligence, misconduct or lack of good faith by the Agent or any Lender under any DIP Documents.   No provision of any DIP Documents shall be construed against any party by reason of such party having, or being deemed to have, drafted the provision.   Whenever the phrase "to the best of the Debtor's knowledge" or words of similar import are used in any DIP Documents, it means actual knowledge of an officer, or knowledge that an officer would have obtained if he or she had engaged in good faith and diligent performance of his or her duties, including reasonably specific inquiries of employees or agents and a good faith attempt to ascertain the matter to which such phrase relates.   Any Event of Default shall be deemed to be continuing unless and until waived in writing by the Agent and the Required Lenders.

## ARTICLE II.
## AMOUNTS AND TERMS
## OF THE LOANS

Section 2.01    <u>DIP Advances</u>.

(a)    The Lender(s) agree to lend to the Debtor from time to time during the Term, subject to and upon the terms and conditions herein set forth, on any Funding Date, such amounts as in accordance with the terms hereof may be requested by the Debtor from time to time (each such borrowing, a "**DIP Advance**" and the aggregate outstanding principal balance of all DIP Advances from time to time, the "**DIP Loan**").

(b)    The aggregate outstanding principal amount of DIP Advances made by any Lender shall not at any time exceed the amount of such Lender's DIP Commitment. The sum of the principal amount of the DIP Loan outstanding at any time shall not exceed an amount equal to the Adjusted Borrowing Limit.

(c)    Subject to the limitations herein (including the conditions to funding DIP Advances set forth in <u>Article VI</u> hereof), the Debtor may borrow, repay (without premium or penalty, except as expressly set forth in this Agreement) and reborrow DIP Advances under each Lender's DIP Commitment.   The DIP Loan shall not exceed, and the Lenders shall not have any obligation to make any DIP Advance that would result in the DIP Loan being in excess of, the Adjusted Borrowing Limit at any time.   If at any time the DIP Loan exceeds the Adjusted Borrowing Limit at such time, the Debtor shall promptly (and in any event within one Business Day) eliminate such excess by repaying the DIP Loan in an amount equal to such excess.   The Lenders may, but shall not be obligated to, make any or all adequate protection payments required to be made to the Bond Trustee upon the Debtor's failure to timely do so or if they otherwise elect to do so; provided that the Agent shall have notified the Debtor of the Lender's election and making of such payment(s).   All such adequate protection payments will be charged to the Debtor as a DIP Advance.

(d)    Each Lender, at its option, may make any DIP Advance by causing any domestic or foreign branch or Affiliate of such Lender to make such DIP Advance; *provided*

-20-

that any exercise of such option shall not affect the obligation of the Debtor to repay such DIP Advance in accordance with the terms of this Agreement.

(e)    Whenever the Debtor desires a DIP Advance be made, the Debtor shall, not later than 2:00 p.m. (New York City time) one Business Day prior to the proposed Funding Date of the DIP Advance, provide the Agent with a Borrowing Base Report, which shall constitute notice (which notice, in each case, shall be irrevocable) of the desire to make a borrowing of a DIP Advance.   Each such Borrowing Base Report shall be signed by an Authorized Officer of the Debtor, shall specify the date on which the Debtor desires to make a borrowing of a DIP Advance (which in each instance shall be a Business Day) and shall specify the requested amount of the proposed DIP Advance (which shall not be less than $100,000). Promptly following receipt of such Borrowing Base Report, the Agent shall advise each Lender of the details thereof and of the amount of such Lender's Pro Rata Share of the requested DIP Advance.   In the event that one or more payments in respect of any Lender Debt shall become due and payable, the Debtor shall be deemed to have made an irrevocable request for DIP Advances in an aggregate amount equal to such payments, and the proceeds of such DIP Advances shall be applied by the Agent directly to make such payments; *provided*, *however*, that if any conditions contained herein to the funding of the aggregate amount of such DIP Advances shall not have been satisfied, such DIP Advances shall be made only to the extent that the Required Lenders have consented thereto.

(f)    Each Lender shall make each DIP Advance to be made by it hereunder on the proposed Funding Date thereof by wire transfer of immediately available funds by 12:00 noon, (New York City time) to the account of the Agent most recently designated by it for such purpose by notice to the Lenders.   The Agent will make such DIP Advances available to the Debtor by promptly transferring the amount so received, in like funds, to the Debtor Account. The DIP Advances made by the Lenders on any Funding Date shall be made by the Lenders ratably in accordance with their respective DIP Commitments.   The failure of any Lender to make any DIP Advance or portion thereof required to be made by it shall not relieve any other Lender of its obligations hereunder; *provided* that the DIP Commitments of the Lenders are several and no Lender shall be responsible for any other Lender's failure to make DIP Advances as required.

(g)    On the Maturity Date, each Lender's DIP Commitment shall terminate automatically.  Upon such termination, the DIP Loan (together with all other Lender Debt) shall become, without further action by any Person, immediately due and payable together with all accrued interest thereon plus any fees, premiums, charges or costs provided for hereunder with respect thereto, and the Exit Fee.

(h)    The Debtor may (in addition to any reduction by application of the Collections in accordance with Section 5.02) on any Business Day voluntarily prepay the outstanding principal amount of the DIP Loan in whole or in part; *provided*, *however*, that the Debtor shall provide the Agent with at least one week's prior written notice to the extent such prepayment is in an amount equal to or greater than $3,000,000.

-21-

(i)    The Debtor shall prepay the outstanding principal amount of the DIP Loan in an amount equal to all Net Proceeds received by it from time to time (such prepayment to be effectuated by deposit, within one Business Day of receipt thereof, of all Net Proceeds into the Lender Lockbox or Lender Lockbox Account for application to the Lender Debt); *provided, however*, that no mandatory prepayment will be required in connection with the Debtor's receipt of Net Proceeds of an Asset Sale of any Real Property, or any Issuance secured by any Real Property, in either case at fair market value (it being understood and agreed that a regularly conducted and non-collusive sale pursuant to Section 363 of the Bankruptcy Code after notice and a hearing shall be deemed to establish fair market value) so long as no Event of Default has occurred and is continuing at or prior to the closing of such sale or Issuance, *provided, further*, that if an Event of Default has occurred and is continuing, the Required Lenders may, in their sole and absolute discretion, require application of the Net Proceeds of any such sale or Issuance to be applied as a mandatory prepayment of the Lender Debt.  The DIP Commitments shall be permanently reduced on a dollar-for-dollar basis by the aggregate amount of all mandatory prepayments made or required to have been made pursuant to this clause (i) during the Term, except to the extent that any such mandatory prepayment made hereunder is made with the proceeds of casualty insurance and the Collateral lost or damaged is replaced or repaired within 30 days of such prepayment.    Together with each mandatory prepayment hereunder, the Debtor shall pay the Exit Fee in accordance with Section 2.02(g).

Section 2.02    Interest and Fees.

(a)    Interest on the DIP Loan.  The Debtor shall pay to the Agent, for the account of the Lenders:  (i) interest on the average daily Outstanding Balance of the DIP Loan during the prior month on the first Business Day of each month, and (ii) all accrued and unpaid interest on the Outstanding Balance of the DIP Loan on the Maturity Date (whether by acceleration or otherwise), in each case, at an interest rate *per annum* equal to LIBOR *plus* 6.25%.

(b)    Default Interest.  At all times following the occurrence of any Default or Event of Default, without notice to the Debtor interest on the DIP Loan shall accrue, at the Agent's discretion, at a rate *per annum* equal to 4.00% in excess of the rate then otherwise applicable.  Interest accrued pursuant to this paragraph (b) shall be payable on the earlier of (i) the next date for payment of interest pursuant to paragraph (a) above, and (ii) the date on which Agent shall make demand therefor.

(c)    Non-Utilization Fee.  The Debtor shall pay to the Agent, for the ratable account of the Lenders, in arrears, on the first Business Day of each month and the Maturity Date, a fee (the "**Non-Utilization Fee**") equal to 0.50% *per annum* on the average amount, calculated on a daily basis, by which the Total DIP Commitments exceeded the greater of (i) the aggregate amount of DIP Advances that were outstanding during the prior month, or (ii) the average Minimum Balance Requirement during the prior month.

(d)    Collateral Tracking Fee.  The Debtor shall pay to the Agent, for its own account, an account receivable tracking fee (the "**Collateral Tracking Fee**"), due in arrears on the first Business Day of each month and on the Maturity Date, in an amount equal to the

-22-

product of:  (i) the average Outstanding Balance of the DIP Loan for the prior month (or portion thereof), calculated as the arithmetic average of all daily balances; multiplied by (ii) a fraction, expressed as a decimal, the numerator of which is equal to the actual number of days in the prior month (or portion thereof) and the denominator of which is 30; multiplied by (iii) 0.50%.

        (e)    Facility Fee.  The Debtor shall pay to the Agent, for the account of the Lenders a facility fee (the "**Facility Fee**") of $380,000 with respect to the DIP Loan.  The Facility Fee shall be fully earned upon the entry of the Interim DIP Order and shall be payable in immediately available funds in two equal installments of $190,000 each, due (i) on the date of the entry of the Initial DIP Order and (ii) the earlier of five (5) Business Days after entry of the Final DIP Order or 30 days after entry of the Interim DIP Order; *provided* that the failure to obtain entry of the Final DIP Order within such 30 days is not due to a default or breach of the DIP Documents by the Agent or Lenders.

        (f)    Minimum Usage Fee.  If at any time and from time to time, the outstanding principal amount of the DIP Loan is below the Minimum Balance Requirement, the Debtor shall pay to the Agent, for the account of each Lender, in arrears on the first Business Day of each month and on the Maturity Date or on such other date on which the Lenders' obligation to make DIP Advances shall terminate, a fee (the "**Minimum Usage Fee**") equal to the rate of interest calculated and payable pursuant to Section 2.03(a) and, if otherwise applicable, Section 2.02(b), multiplied by the positive difference between the Minimum Balance Requirement and the aggregate amount of the average daily outstanding DIP Advances during the prior month (or portion thereof).

        (g)    Exit Fee.  Together with each permanent repayment of the DIP Loan (whether pursuant to the mandatory prepayment provisions of this Agreement or otherwise) or the reduction or termination of any of the DIP Commitments, the Debtor shall pay to the Agent, for the account of each Lender, an exit fee (the "**Exit Fee**"), equal to 2.0% of the amount so permanently prepaid or reduced or terminated, as applicable; *provided* that in the event that the Agent, in its sole and absolute discretion, provides the Debtor with post-reorganization senior financing, the aggregate amount of the Exit Fee actually paid to the Agent hereunder will be credited against the facility fee related to such chapter 11 plan exit financing facility.

        (h)    Wire Transfer Fees.  The Debtor agrees to pay to the Agent, in consideration of electronic funds transfer transactions initiated by the Agent or the Lenders at the request of the Debtor, a wire transfer fee in the amount of $40.00 for each such transaction. The Debtor irrevocably authorizes the Agent to charge any and all such fees to the DIP Loan.

    Section 2.03    Computation of Interest; Payment of Fees.

        (a)    Interest on the DIP Loans and fees and other amounts calculated on the basis of a rate *per annum* shall be computed on the basis of actual days elapsed over a 360-day year.

        (b)    Whenever any payment to be made hereunder or under any other DIP Document shall be stated to be due and payable on a day that is not a Business Day, such

-23-

payment shall be made on the next succeeding Business Day and such extension of time shall in such case be included in computing interest on such payment.

(c)    All fees owed by the Debtor under this Agreement are, and shall be deemed hereunder for all purposes to be, fully earned and non-refundable on the due date thereof.

Section 2.04    Procedures for Payment.

(a)    Each payment hereunder and under the other DIP Documents shall be made not later than 2:00 p.m. (New York City time) on the day when due in lawful money of the United States of America without counterclaim, defense, offset, claim or recoupment of any kind and free and clear of, and without deduction for, any present or future withholding or other taxes, duties, levies, imposts, deductions, charges or other liabilities of any nature imposed on such payments or prepayments by or on behalf of any Governmental Entity, except for taxes upon or determined by reference to a Lender's net income imposed by the jurisdiction in which such Lender is organized or has its principal or registered lending office (all such nonexcluded taxes, levies, imposts, deductions, charges, withholdings and liabilities hereinafter referred to as "**Taxes**").  If any such Taxes are so levied or imposed on any payment to any Lender, the Debtor will make additional payments in such amounts as may be necessary so that the net amount received by such Lender, after withholding or deduction for or on account of all Taxes, including deductions applicable to additional sums payable under this Section 2.04, will be equal to the amount provided for herein or in the other DIP Documents.  Whenever any Taxes are payable by the Debtor with respect to any payments hereunder, the Debtor shall furnish promptly to the Agent information, including certified copies of official receipts (to the extent that the relevant governmental authority delivers such receipts), evidencing payment of any such Taxes so withheld or deducted.  If the Debtor fails to pay any such Taxes when due to the appropriate taxing authority or fails to remit to the Agent the required information evidencing payment of any such Taxes so withheld or deducted, the Debtor shall indemnify the Agent and each Lender for any incremental Taxes, interest or penalties that may become payable by the Agent or such Lender as a result of any such failure.

(b)    Notwithstanding anything to the contrary contained in this Agreement, the Debtor shall pay any present or future stamp or documentary taxes, any intangibles tax or any other sales, excise or property taxes, charges or similar levies now or hereafter assessed that arise from and are attributable to any payment made hereunder or from the execution, delivery or performance of, or otherwise with respect to, this Agreement or any other DIP Documents and any and all recording fees relating to any DIP Documents securing any Lender Debt ("**Other Taxes**").

(c)    The Debtor shall indemnify the Agent and each Lender for the full amount of any and all Taxes and Other Taxes (including any Taxes and Other Taxes imposed by any jurisdiction on amounts payable under this Section 2.04) paid or payable by the Agent or such Lender (whether or not such Taxes or Other Taxes were correctly or legally asserted) and any liability (including penalties, interest and expenses) arising therefrom or with respect thereto.

-24-

Indemnification payments due to the Agent or any Lender under this Section 2.04 shall be made within 10 days from the date the Agent or such Lender makes written demand therefor.

(d)     Without prejudice to the survival of any other agreement of the Debtor hereunder, the agreements and obligations of the Debtor contained in this Section 2.04 shall survive the Full Payment of all Lender Debt.

(e)     Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the indebtedness of the Debtor to such Lender resulting from each DIP Advance owing to such Lender from time to time, including the amounts of principal and interest payable and paid to such Lender from time to time hereunder.

(f)     The register maintained by the Agent with respect to the DIP Loans, shall include accounts for each Lender, in which accounts (taken together) shall be recorded (i) the rate and amount of each DIP Advance made hereunder, (ii) the amount of each DIP Lender's DIP Commitment and the terms of each Assignment and Acceptance delivered to and accepted by it, (iii) the amount of any principal or interest due and payable or to become due and payable from the Debtor to each Lender hereunder, and (iv) the amount of any sum received by the Agent from the Debtor hereunder and each Lender's share thereof.  The parties hereto acknowledge and agree that the entries made by the Agent as provided in this Section 2.04(f) shall be conclusive and binding for all purposes, absent manifest error.

(g)     Any Foreign Lender that is entitled to an exemption from or reduction of withholding tax under the law of the jurisdiction in which the Debtor is resident for tax purposes, or any treaty to which such jurisdiction is a party, with respect to payments under any DIP Document shall deliver to the Agent and the Debtor, at the time or times prescribed by applicable law or reasonably requested by the Agent or the Debtor, such properly completed and executed documentation prescribed by applicable law as will permit such payments to be made without withholding or at a reduced rate of withholding.  In addition, any Foreign Lender, if requested by the Agent, shall deliver such other documentation prescribed by applicable law or reasonably requested by the Agent as will enable the Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements.  Without limiting the generality of the foregoing, a Foreign Lender shall deliver to the Agent and to the Debtor (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender hereunder (and from time to time thereafter upon the request of the Agent or the Debtor, but only if such Foreign Lender is legally entitled to do so), (a) duly completed copies of IRS Form W-8BEN claiming eligibility for benefits of an income tax treaty to which the United States is a party; (b) duly completed copies of IRS Form W-8ECI; (c) in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under section 881(c) of the Code, (i) a certificate to the effect that such Foreign Lender is not (A) a "bank" within the meaning of section 881(c)(3)(A) of the Code, (B) a "10 percent shareholder" of the Debtor within the meaning of section 881(c)(3)(B) of the Code, or (C) a "controlled foreign corporation" described in section 881(c)(3)(C) of the Code, and (ii) duly completed copies of IRS Form W-8BEN; or (d) any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in United States federal withholding tax, duly completed

\DRMC: DIP Loan and Security Agreement #9830081 (v.8).doc

together with such supplementary documentation as may be prescribed by applicable law to permit the Debtor to determine the withholding or deduction required to be made.

Section 2.05    Indemnities.

(a)    The Debtor hereby agrees to indemnify the Agent and each Lender on demand against any loss or expense that the Agent or such Lender or a branch or an Affiliate of such Person may sustain or incur as a consequence of:  (i) any default in payment or prepayment of the principal amount of the DIP Loan or any portion thereof or interest accrued thereon, as and when due and payable (at the due date thereof, by irrevocable notice of payment or prepayment, or otherwise); (ii) the effect of the occurrence of any Default or Event of Default upon the DIP Loan or any portion thereof; (iii) the payment or prepayment of the principal amount of the DIP Loan or any portion thereof on any day other than the last day of an Interest Period; or (iv) the failure by the Debtor to accept any DIP Advance or any portion thereof after the Debtor has requested such borrowing; in each case including any loss or expense sustained or incurred in liquidating or employing deposits from third parties acquired to effect or maintain the DIP Loan or any portion thereof.  The Agent or Lender, as applicable, shall provide to the Debtor a statement, supported when applicable by documentary evidence, explaining the amount of any such loss or expense it incurs, which statement shall be conclusive and binding for all purposes, absent manifest error.

(b)    The Debtor hereby agrees to indemnify and hold harmless the Agent, the Lenders, and each of their respective Affiliates, directors, officers, agents, representatives, counsel and employees and each other Person, if any, controlling them or any of their respective Affiliates within the meaning of either Section 15 of the Securities Act of 1933, as amended, or Section 20(a) of the Exchange Act (each, an "**Indemnified Party**"), from and against any and all losses, claims, damages, costs and expenses (including reasonable counsel fees and disbursements) and liabilities that may be incurred by or asserted against such Indemnified Party with respect to or arising out of the DIP Commitments hereunder, the DIP Loan contemplated hereby, the DIP Documents, the Collateral (including the use thereof by any of such Persons or any other Person, the exercise by any Indemnified Party of rights and remedies or any power of attorney with respect thereto, and any action or inaction of any Indemnified Party under and in accordance with any DIP Documents), the use of proceeds of any financial accommodations provided hereunder, any investigation, litigation or other proceeding (pending or threatened) relating thereto, or the role of any such Person or Persons in connection with the foregoing whether or not they or any other Indemnified Party is named as a party to any legal action or proceeding ("**Indemnified Claims**").   The Debtor will not, however, be responsible to any Indemnified Party hereunder for any Indemnified Claims to the extent that a court having jurisdiction shall have determined by a final nonappealable judgment that any such Indemnified Claim shall have arisen out of or resulted solely from actions taken or omitted to be taken by such Indemnified Party by reason of its willful misconduct or gross negligence ("**Excluded Claims**").  Further, should any employee of an Indemnified Party, in connection with such employee's employment by such Indemnified Party, be involved in any legal action or proceeding in connection with the transactions contemplated hereby (other than relating to an Excluded Claim), the Debtor hereby agrees to pay to such Indemnified Party such reasonable *per diem* compensation as such Indemnified Party shall request for each employee for each day or

-26-

portion thereof that such employee is involved in preparation and testimony pertaining to any such legal action or proceeding.  Each Indemnified Party shall give the Debtor prompt notice of any Indemnified Claim with respect to which such Indemnified Party is seeking indemnification hereunder, setting forth a description of those elements of the Indemnified Claim of which such Indemnified Party has knowledge.  The Indemnified Party shall be permitted hereunder to select counsel to defend such Indemnified Claim at the expense of the Debtor.  The Indemnified Parties and the Debtor and their respective counsel shall cooperate with each other in all reasonable respects in any investigation, trial and defense of any such Indemnified Claim and any appeal arising therefrom.

Section 2.06   Maximum Interest.  No provision of this Agreement shall require the payment to any Lender or permit the collection by any Lender of interest in excess of the maximum rate of interest from time to time permitted (after taking into account all consideration that constitutes interest) by laws applicable to the Lender Debt and binding on such Lender (such maximum rate being such Lender's "**Maximum Permissible Rate**").  If the amount of interest (computed without giving effect to this Section 2.06) payable to any Lender in respect of any interest computation period would exceed the amount of interest computed in respect of such period at such Lender's Maximum Permissible Rate, the amount of interest payable to such Lender in respect of such period shall be computed at such Lender's Maximum Permissible Rate and any excess shall be applied to reduce any Lender Debt (other than interest) then owing to such Lender in such order as it shall determine.

Section 2.07   Use of Proceeds of DIP Loan.  The Debtor shall use the proceeds of each DIP Advance solely in accordance with the DIP Budget, subject to the permitted Variances:  (a) to fund post-petition operating expenses of the Debtor incurred in the ordinary course of business, (b) to pay adequate protection payments to the Bond Trustee to the extent required by the Cash Collateral Orders, (c) to pay certain other costs and expenses of administration of the Case to be specified in writing to the Agent, and (d) for working capital and other general corporate purposes of the Debtor not in contravention of any requirement of law or the DIP Documents.  The Debtor shall use the entire amount of the proceeds of each DIP Advance in accordance with this Section 2.07; *provided*, *however*, that nothing herein shall in any way prejudice or prevent the Agent or the Lenders from objecting, for any reason, to any requests, motions or applications made in the Bankruptcy Court, including any applications for interim or final allowances of compensation for services rendered or reimbursement of expenses incurred under Sections 105(a), 330 or 331 of the Bankruptcy Code, by any party in interest, and *provided*, *further*, that the Debtor shall not use the proceeds from any Advance for any purpose that is prohibited under the Bankruptcy Code.

## ARTICLE III.
## SECURITY

Section 3.01   Grant of Security Interests.  To induce the Lenders to make the DIP Loans, the Debtor hereby grants to the Agent, for itself and for the benefit of the Lender Group, as security for the full and prompt payment when due (whether at stated maturity, by acceleration or otherwise) of all Lender Debt (including all indemnification and reimbursement obligations to

-27-

the Lender Group hereunder), a continuing first priority Lien and security interest (subject only to the Carve Out) in and to, and a right of set-off against, all Collateral.

Section 3.02    Perfection of Security Interests.

(a)    The Debtor shall, at its expense, perform any and all steps that may be reasonably requested by the Agent at any time to perfect, maintain, protect, and enforce the Agent's Lien in the Collateral, including (i) executing and filing financing or continuation statements, and amendments thereof, in form and substance satisfactory to the Agent, (ii) maintaining complete and accurate books and records, and (iii) taking such other steps as are deemed necessary or desirable to maintain the Agent's Lien in the Collateral.

(b)    The Debtor hereby authorizes the Agent to execute and file financing statements or continuation statements, and amendments thereto, on the Debtor's behalf covering the Collateral. The Administrative Agent may file one or more financing statements disclosing the Agent's Lien under this Agreement without the signature of the Debtor appearing thereon. The Debtor shall pay the costs of, or incidental to, any recording or filing of any financing statements concerning the Collateral. The Debtor agrees that a carbon, photographic, photostatic, or other reproduction of this Agreement or of a financing statement is sufficient as a financing statement.

(c)    Notwithstanding subsections (a) and (b) of this Section 3.02, or any failure on the part of the Debtor or the Agent to take any of the actions set forth in such subsections, the Liens and security interests granted herein shall be deemed valid, enforceable and perfected by entry of the Interim DIP Order and the Final DIP Order, as applicable. No financing statement, notice of lien, mortgage, deed of trust or similar instrument in any jurisdiction or filing office need be filed or any other action taken in order to validate and perfect the Liens and security interests granted by or pursuant to this Agreement, the Interim DIP Order or the Final DIP Order.

Section 3.03    Covenants of the Debtor with Respect to Collateral. The Debtor hereby covenants and agrees with the Agent that from and after the date of this Agreement and until the Full Payment of all Lender Debt:

(a)    Maintenance of Records. The Debtor will keep and maintain, at its own cost and expense, satisfactory and complete records of the Collateral, in all material respects, including a record of all payments received and all credits granted with respect to the Collateral and all other dealings concerning the Collateral. For the Agent's further security, the Debtor agrees that the Agent shall have a property interest in all of the Debtor's books and records pertaining to the Collateral and, upon the occurrence and during the continuation of an Event of Default, the Debtor shall deliver and turn over any such books and records to the Agent or to its representatives at any time on demand of the Agent.

(b)    Indemnification With Respect to Collateral. In any suit, proceeding or action brought by the Agent relating to any Receivable, Chattel Paper, Contractual Obligations, General Intangible, Investment Property, Instrument, Intellectual Property or other

-28-

Collateral for any sum owing thereunder or to enforce any provision of any Receivable, Chattel Paper, Contractual Obligations, General Intangible, Investment Property, Instrument, Intellectual Property or other Collateral, the Debtor will save, indemnify and keep the Lender Group harmless from and against all expense, loss or damage suffered by the Lender Group by reason of any defense, setoff, counterclaim, recoupment or reduction of liability whatsoever of the obligor thereunder, arising out of a breach by the Debtor of any obligation thereunder or arising out of any other agreement, indebtedness or liability at any time owing to, or in favor of, such obligor or its successors from the Debtor, and all such obligations of the Debtor shall be and remain enforceable against and only against the Debtor and shall not be enforceable against the Agent or any Lender.

(c)    <u>Limitation on Liens on Collateral</u>.  The Debtor will not create, permit or suffer to exist, and will defend the Collateral against and take such other action as is necessary to remove, any Lien on the Collateral except Liens expressly permitted under this Agreement and will defend the right, title and interest of the Agent in and to all of the Debtor's rights under the Chattel Paper, Leases, Real Estate, Contracts, DIP Documents, General Intangibles, Instruments, Investment Property and to the Intellectual Property, Equipment and Inventory and in and to the proceeds thereof against the claims and demands of all Persons whomsoever other than claims or demands arising out of Liens permitted hereunder.

(d)    <u>Commercial Tort Claims</u>.  The only Commercial Tort Claims of the Debtor existing on the date hereof (regardless of whether the amount, defendant or other material facts can be determined) are those listed on <u>Schedule II</u>.  The Debtor agrees that, if it shall acquire any interest in any Commercial Tort Claim (whether from another Person or because such Commercial Tort Claim shall have come into existence), (i) the Debtor shall, promptly following such acquisition, deliver to the Agent, in each case in form and substance reasonably satisfactory to the Agent, a notice of the existence and nature of such Commercial Tort Claim and deliver a supplement to <u>Schedule II</u> containing a specific description of such Commercial Tort Claim, (ii) the provision of <u>Section 3.01</u> shall apply to such Commercial Tort Claim and (iii) the Debtor shall execute and deliver to the Agent, in each case in form and substance reasonably satisfactory to the Agent, any certificate, agreement and other document, and take all other action, deemed by the Agent to be reasonably necessary or appropriate for the Agent to obtain a first-priority, perfected security interest in all such Commercial Tort Claims.  Any supplement to <u>Schedule II</u> delivered pursuant to this <u>Section 3.04(e)</u> shall, after the receipt thereof by the Agent, become part of <u>Schedule II</u> for all purposes hereunder other than in respect of representations and warranties made prior to the date of such receipt.

Section 3.04    <u>Performance by Agent of the Debtor's Obligations</u>.  If the Debtor fails to perform or comply with any of its agreements contained in this Agreement and the Agent, as provided for by the terms of this Agreement, shall itself perform or comply, or otherwise cause performance or compliance, with such agreement, the expenses of the Agent incurred in connection with such performance or compliance, together with interest thereon at the rate then in effect hereunder, shall be payable by the Debtor to the Agent on demand and shall constitute Lender Debt secured by the Collateral.  Performance of the Debtor's obligations as permitted under this <u>Section 3.05</u> shall in no way constitute a violation of the automatic stay provided by Section 362 of the Bankruptcy Code and the Debtor hereby waives applicability thereof.

-29-

Moreover, the Agent shall in no way be responsible for the payment of any costs incurred in connection with preserving or disposing of Collateral pursuant to Section 506(c) of the Bankruptcy Code and the Collateral may not be charged for the incurrence of any such cost.

Section 3.05    Limitation on Agent's Duty in Respect of Collateral.  Neither the Agent nor any Lender shall have any duty as to any Collateral in its possession or control or in the possession or control of any agent or nominee of it or any income thereon or as to the preservation of rights against prior parties or any other rights pertaining thereto, except that the Agent shall, with respect to the Collateral in its possession or under its control, deal with such Collateral in the same manner as the Agent deals with similar property for its own account.

### ARTICLE IV.
### PAYMENT MECHANICS

Section 4.01    Payment Mechanics.

(a)    On or prior to the Initial Funding Date, the Debtor, the Agent, and the Lockbox Bank shall have entered into the Depositary Agreements and shall have caused the Lockbox Banks to establish the Lockbox and the Lockbox Accounts.

(b)    The Debtor shall prepare, execute and deliver to (or, in the case of Notice to an Insurer, provide to the Agent for delivery to) each Obligor (or, in the case of a Governmental Entity, its fiscal intermediary) who is proposed to be a payor of Receivables, with copies to the Agent, on or prior to the Initial Funding Date, a Notice, which Notice shall state that all present and future Receivables owing to the Debtor are subject to the Lien of the Agent and that:  (i) in the case of any Notice to an Insurer, all checks and EOB's from such Insurer on account of Receivables shall be sent to the Lender Lockbox and all wire transfers from such Insurer on account of Receivables shall be wired directly into the Lender Lockbox Account; and (ii) in the case of any Notice to a Governmental Entity, all payments from such Governmental Entity on account of Receivables shall be sent by wire transfer or automated clearinghouse to the Debtor Lockbox Account.  All EOB's from any Governmental Entity shall be sent electronically to the Debtor and the Agent shall be provided access thereto (which access may be by means  of inclusion of such electronic EOB's in the Transmissions).

(c)    The Debtor covenants and agrees that, on and after the Initial Funding Date, all invoices (and, if provided by the Debtor, return envelopes) to be sent to Obligors shall set forth: (i) in the case of Insurers, only the address of a designated Lender Lockbox as a return address for payment of Receivables by check and delivery of EOB's, and only a Lender Lockbox Account with respect to wire transfers for payment of Receivables; and (ii) in the case of Governmental Entities, only the Debtor Lockbox Account with respect to wire transfers and automated clearinghouse payments for payment of Receivables.  The Debtor hereby further covenants and agrees to instruct and notify each of the members of its accounting and collections staff to provide identical information in communications with Obligors with respect to payment of Receivables, wire transfers and EOB's.

-30-

(d)    The Debtor shall maintain its Debtor Lockbox Account solely and exclusively for the receipt of payments on account of Receivables from Governmental Entities. The Debtor shall take all actions necessary to ensure that no payments from any Person other than a Governmental Entity shall be deposited in the Debtor Lockbox Account. The Debtor shall deposit, within one Business Day of receipt thereof, all checks from any Governmental Entity on account of Receivables delivered to the Debtor and all Net Proceeds into the Lender Lockbox Account for application to the Lender Debt.

Section 4.02    Misdirected Payments; EOB's.

(a)    In the event that the Debtor receives an EOB or a Misdirected Payment in the form of a check, the Debtor shall immediately send such EOB or check to the appropriate Lender Lockbox or deposit the same into the Debtor Lockbox Account, as the case may be. In the event that the Debtor receives a Misdirected Payment in the form of cash or wire transfer, the Debtor shall immediately wire transfer the amount of such Misdirected Payment directly into the appropriate Lender Lockbox Account. All Misdirected Payments shall be sent promptly upon receipt thereof, and in no event later than the close of business on the first Business Day after receipt thereof.

(b)    The Debtor shall take such actions as are reasonably necessary or as are reasonably requested by the Agent to ensure that future payments from any Obligor of a Misdirected Payment shall be made in accordance with any Notice previously delivered to such Obligor or, in the case of any Person that is an Insurer and has not previously been sent a Notice, to a designated Lender Lockbox, in the case of checks and EOBs, or a designated Lender Lockbox Account, in the case of wire transfers, including (i) delivering to such Obligor a new Notice in form and substance satisfactory to the Agent, and (ii) contacting such Obligor by telephone to (x) convey new directions for payment, or (y) confirm the instructions previously set forth in any Notice to such Obligor. If the Debtor does not promptly (and in any event, within one Business Day from the Agent's request) take such actions or such similar actions as the Agent may request, then the Agent, its assigns or designees, or any member of the Lender Group, may, to the maximum extent permitted by law, execute and deliver such Notices, contact such Obligors to convey such instructions or directions, or take such similar actions as the Agent, its assigns or designees or any member of the Lender Group may, in its discretion, deem appropriate.

Section 4.03    No Rights of Withdrawal. The Debtor shall not have any rights of direction or withdrawal with respect to amounts held in the Lender Lockbox Accounts.

## ARTICLE V.
## COLLECTION AND DISTRIBUTION

Section 5.01    Collections on the Receivables; Distributions. The Agent, for the account of the Lenders, shall be entitled: (a) to receive and hold as Collateral all Receivables, deposits and all Collections on Receivables in accordance with the terms of the Depositary Agreements; and (b) to have and exercise any and all rights, to the extent permitted by, and in a manner consistent with, all applicable laws and regulations, to collect, record, track and, during

-31-

the continuance of an Event of Default, take all actions to obtain Collections with respect to all Receivables. The Debtor hereby consents to the distribution by the Agent of all Collections and proceeds of Collateral in accordance with this Article V and hereby authorizes and directs the Agent to distribute all Collections and proceeds of Collateral in accordance with this Article V.

Section 5.02   Distribution of Funds to the Lenders.  On each Business Day (*provided*, with respect to distributions made prior to the Maturity Date and so long as no Event of Default exists, that the Debtor shall have successfully sent by Transmission to the Agent all Receivable Information required with respect to the Receivables), the Agent shall distribute any and all cash Collections in the Collection Account (*provided*, with respect to distributions made prior to the Maturity Date and so long as no Event of Default exists, that such Collections were deposited in the Collection Account prior to 12:00 p.m. (New York City time) on the immediately preceding Business Day), and all other proceeds or other amounts with respect to the Collateral, as follows:

**FIRST,** to the Agent, an amount in cash equal to expenses incurred with respect to the administration, service and maintenance of the Agent's Lien on the Collateral and all fees and collection costs that are due and payable, if any, as set forth in Sections 2.05 and 13.05, until such amounts have been paid in full;

**SECOND,** to the Agent, for the account of the Lenders, an amount in cash equal to fees, interest and expenses that are due and payable to the Lenders as of such Business Day and have not otherwise been paid in full by the Debtor, if any, until such amounts have been paid in full;

**THIRD,** to the Agent, for the account of the Lenders, an amount in cash equal to: (a) in the case of distributions made prior to the Maturity Date and so long as no Event of Default exists, the Borrowing Base Deficiency, if any, until such amount is paid in full, and then the reduction of the principal amount of the DIP Loan, if any, until such amount has been paid in full; and (b) with respect to distributions made on or after the Maturity Date or while an Event of Default exists, the principal amount of the DIP Loan, until such amount has been paid in full;

**FOURTH,** to the Agent, for the account of the Agent and/or any applicable Lenders, an amount in cash equal to the aggregate amount of any other Lender Debt due and payable on such Business Day, if any, until such amount has been paid in full; and

**FIFTH,** to the Debtor, all remaining amounts of Collections, as requested.

Section 5.03   Servicing Receivables.  Subject to the review and authority of the Agent, the Debtor shall administer and service the Receivables (i) in compliance at all times with all legal requirements and the terms and conditions of this Agreement, (ii) in accordance with industry standards for servicing receivables of the type included in the Collateral to the extent that such standards do not conflict with the terms and conditions of this Agreement, (iii) in a manner consistent in all respects with the Credit and Collection Policy, and (iv) until such time as a successor servicer shall be designated and shall accept appointment pursuant to this Section. The Debtor shall establish and maintain electronic data processing services for monitoring,

administering and collecting the Receivables in accordance with the foregoing standards and shall, within three Business Days of the deposit of any checks, other forms of cash deposits, EOB's or other written matter into a Lockbox, post such information to its electronic data processing services.

(a)    The Debtor shall not change in any material respect its existing policies and procedures with respect to the administration and servicing of accounts receivable (including the amount and timing of write-offs) without the prior written consent of the Agent.

(b)    If the Debtor determines that a payment with respect to a Receivable has been received directly by a patient or any other Person, the Debtor shall promptly advise the Agent, and demand that such patient or other Person remit and return such funds.  If such funds are not promptly received by the Debtor, the Debtor shall take all reasonable steps to obtain such funds.

(c)    Upon the occurrence and during the continuance of an Event of Default: (i) the Agent may terminate the Debtor's performance of servicing responsibilities with respect to the Receivables and appoint another Person to succeed the Debtor in the performance of such servicing responsibilities (which replacement may be effectuated through the outplacement to a third-party collection firm obligated to use commercially reasonable efforts to maximize collections in accordance with the provisions of Article 9 of the UCC), in which event the Debtor shall immediately transfer to any successor servicer designated by the Agent all records, computer access and other information as shall be necessary or desirable, in the judgment of any such successor servicer, to perform such responsibilities; and (ii) at the Required Lenders' request, all enforcement and collection proceedings with respect to the Receivables shall, unless prohibited by applicable law, be instituted and prosecuted in the name of the Agent.  The Debtor shall otherwise cooperate fully with such successor servicer.

(d)    The members of the Lender Group and the Debtor shall comply with the requirements of the Business Associate Addendum set forth in Exhibit VI.

Section 5.04    Distributions to the Debtor Generally.  All remaining amounts of Collections pursuant to Section 5.02, as requested by the Debtor, shall be deposited in the Debtor Account.

## ARTICLE VI.
## CONDITIONS PRECEDENT

Section 6.01    Conditions Precedent to the Initial Funding Date.  The making of the initial DIP Advance on the Initial Funding Date is subject to the conditions precedent that the Agent shall have received on or before the Initial Funding Date the following (or evidence of the following), each document (unless otherwise indicated) dated such date and executed by each Person party thereto, in form and substance satisfactory to the Agent:

(a)    The Bankruptcy Court shall have entered the Interim DIP Order, certified by the Clerk of the Bankruptcy Court as having been duly entered, and the Interim DIP

-33-

Order shall be in full force and effect and shall not have been vacated, reversed, modified, amended or stayed without the prior written consent of the Agent.

(b)    All motions and other documents filed in connection with this Agreement, the other DIP Documents and the credit facility evidenced hereby and thereby and all First Day DIP Orders shall be in form and substance satisfactory to the Agent in its sole discretion.

(c)    The Debtor shall have paid (or shall pay from the initial DIP Advances) the initial installment of the Facility Fee for application pursuant to Section 2.02(f) and all other closing costs and expenses, including attorneys' fees.

(d)    The Agent shall have received executed originals of this Agreement and the other DIP Documents, originals or copies (as specified by the Agent) of all of the other documents and opinions listed on the Closing Document Checklist attached hereto as Exhibit VII, and such other certificates, documents, agreements and information as the Agent may reasonably request.

(e)    The Debtor will be in compliance in all material respects with all applicable laws and regulations, and shall have obtained all licenses, consents and approvals necessary to operate its business and shall have obtained all material and appropriate approvals pertaining to all applicable governmental, ERISA, retiree health benefits, workers' compensation and other requirements, regulations and laws including Environmental Laws.

(f)    Control Agreements, if required in Agent's sole discretion, shall be executed in favor of the Agent over all of the Debtor's Deposit Accounts, and procedures to sweep proceeds therein to the Lockboxes and the Lockbox Accounts.

(g)    The Lockboxes and Lockbox Accounts shall have been established and be subject to the Depositary Agreements.

(h)    Satisfactory business due diligence review by the Agent of the Debtor and the DIP Budget, cash flow projections and operating plan and other relevant information.

(i)    Satisfactory legal due diligence review, including but not limited to the Debtor's disclosure to the Agent of the extent and amount of rights of setoff or recoupment arising from the Debtor's capitation or risk-sharing contracts or agreements by claimants which are account debtors of the Debtor.

(j)    Appointment of Cymetrix to act as Agent's hot back up servicer on terms and conditions acceptable to the Agent.

Section 6.02    Conditions Precedent to Incremental Facility Effective Date.  The increase in the DIP Commitments contemplated to occur on the Incremental Facility Effective Date shall be subject to the conditions precedent that on or before October __, 2009 **[30 days after closing]**:

-34-

(a)     No Default or Event of Default shall have occurred and be continuing.

(b)     The Bankruptcy Court shall have entered the Final DIP Order, certified by the Clerk of the Bankruptcy Court as having been duly entered, and the Final DIP Order shall be in full force and effect and shall not have been vacated, reversed, modified, amended or stayed without the prior written consent of the Agent and the Required Lenders.

(c)     The Agent shall have received a leasehold deed of trust of the Debtor in favor of Agent on the Debtor's interest in the lease from the City of Downey to the Debtor, and the consent of the City of Downey thereto, each in forms acceptable to the Agent in its sole and absolute discretion.

(d)     The Agent shall have received an intercreditor agreement between the Agent, the Indenture Trustee and such other parties as the DIP Lender deems necessary in its sole discretion, satisfactory to the agent and the Required Lenders in their sole and absolute discretion.

(e)     The Agent shall have received an assignment and agreement in favor of Agent, effective upon a Termination Date, from Siemens or the Debtor's alternative information technology services provider (who shall be satisfactory to the Agent), in form satisfactory to the Agent and the Required Lenders in their sole and absolute discretion.

(f)     The Bankruptcy Court shall have approved the appointment of an outside financial advisor to the Debtor which is acceptable to the Agent and the Required Lenders, with a scope of service acceptable to the Agent and the Required Lenders.

(g)     The Debtor shall have delivered a "drive-by" appraisal of the Debtor's Land in form acceptable to the Agent and the Required Lenders in their sole and absolute discretion.

(h)     The Agent shall have received such additional documents, information and materials as the Agent or any Lender, may reasonably request.

Section 6.03   Conditions Precedent to all Funding Dates.  Each DIP Advance on a Funding Date (including the initial DIP Advance) shall be subject to the conditions precedent that (a) at least one Business Day prior to such Funding Date, the Debtor shall have delivered to the Agent a Borrowing Base Report and such other information as may be requested by the Agent, in form and substance satisfactory to the Agent, and (b) on such Funding Date that the following statements shall be true and correct (and acceptance of the proceeds of such DIP Advance shall be deemed a representation and warranty by the Debtor that such statements are then true and correct):

(i)     the representations and warranties contained in Article VII hereof and Exhibit I hereto are true and correct on and as of the date of such DIP Advance as though made on and as of such date (except any representation or warranty

-35-

that expressly indicates that it is being made as of a specific date, in which case such representation or warranty shall be true and correct as of such specified date); and

(ii)     no event has occurred and is continuing, or would result from such DIP Advance or any actions connected therewith, that constitutes a Default or an Event of Default.

## ARTICLE VII.
## REPRESENTATIONS AND WARRANTIES

Section 7.01   <u>Representations and Warranties</u>.  The Debtor hereby makes, and shall be deemed to have made, on the Initial Funding Date, on each subsequent Funding Date, and upon delivery of each Borrowing Base Report, the following representations and warranties to the Agent and each Lender:

(a)     The Debtor is duly formed and organized, validly existing and in good standing under the laws of the State of California.  The Debtor is duly qualified to do business, and is in good standing, in every jurisdiction where the nature of its business requires it to be so qualified, except where the failure to be so qualified would not have a Material Adverse Effect.

(b)     Upon entry of the applicable DIP Orders, the execution, delivery and performance by the Debtor of the DIP Documents to which it is a party and any other documents to be delivered by it thereunder, (i) are within its corporate powers, (ii) have been duly authorized by all necessary corporate action (iii) do not contravene (1) its organizational documents, (2) any law, rule or regulation applicable to it (including laws, rules and regulations relating to section 501(c)(3) of the Code, usury, truth in lending, fair credit billing, fair credit reporting, equal credit opportunity, fair debt collection practices, licensing and privacy), (3) except as set forth on <u>Schedule II</u>, any contractual restriction binding on or affecting it or its Property, or (4) any order, writ, judgment, award, injunction or decree binding on or affecting it or its Property, (iv) do not result in or require the creation of any Lien upon or with respect to any of its Properties, other than the security interests created by this Agreement and the other DIP Documents, and (v) do not and will not result in any default, noncompliance, suspension, revocation, impairment, forfeiture or non-renewal of any permit, license, authorization or approval applicable to its operations or any of its Properties.  Except as expressly disclosed to the Agent in writing prior to the date hereof, the Debtor is not in violation of any material term of any material agreement or instrument binding on or otherwise affecting it or any of its Properties other than defaults arising solely from the filing of the Case.

(c)     No investment banking, brokerage, finders' or similar fees are payable to any Person (other than the payment of the Placement Fee (as defined in the DIP Orders) and fees to the Agent under the DIP Documents and other than) in connection with the execution, delivery and performance of this Agreement, the other DIP Documents or the transactions contemplated hereby or thereby.

-36-

(d)    Subject to the entry of the DIP Orders, this Agreement is, and the other DIP Documents will be, when delivered hereunder, the legal, valid and binding obligation of the Debtor, enforceable against the Debtor in accordance with its terms.

(e)    The Debtor has all power and authority, and has all permits, licenses, accreditations, certifications, authorizations, approvals, consents and agreements of all Obligors, Governmental Entities, accreditation agencies and other Persons (including, (i) accreditation by the appropriate Governmental Entities and industry accreditation agencies, (ii) accreditation and certifications as a provider of healthcare services eligible to receive payment and compensation and to participate under Medicare, Medicaid, TRICARE/CHAMPUS, Blue Cross/Blue Shield and other equivalent programs and (iii) valid provider identification numbers and licenses to generate the Receivables) necessary or required for it (A) to own the assets (including Receivables) that it now owns, (B) to carry on its business as now conducted, (C) to execute, deliver and perform the DIP Documents to which it is a party, and (D) if applicable, to receive payments from the Obligors in the manner contemplated in this Agreement and the other DIP Documents.

(f)    Except as disclosed on <u>Schedule II</u> hereto, the Debtor has not been notified by any Governmental Entity, accreditation agency or any other Person, during the immediately preceding 24 month period, that such Person has rescinded or not renewed, or is reasonably likely to rescind or not renew, any permit, license, accreditation, certification, authorization, approval, consent or agreement granted to it or to which it is a party and no other condition exists or event has occurred that, in itself or with the giving of notice or lapse of time or both, would result in the suspension, revocation, impairment, forfeiture or non renewal of any permit, license, authorization, approval, entitlement or accreditation, and to the best of the Debtor's knowledge, there is no claim that any thereof is not in full force and effect.

(g)    <u>Schedule II</u> sets forth the full and complete corporate structure of the Debtor and its Affiliates as of the Initial Funding Date, including the sole member of the Debtor.  Except as set forth on <u>Schedule II</u>, there are no outstanding Debt securities of the Debtor.  The Debtor has no Subsidiaries.

(h)    The Agent has received complete copies of the Bond Debt Documents (including all exhibits, schedules and disclosure letters referred to therein or delivered pursuant thereto, if any) and all amendments thereto, waivers relating thereto and other side letters or agreements affecting the terms thereof.  Except as set forth in the Cash Collateral Orders, none of such documents and agreements has been amended or supplemented, nor have any of the provisions thereof been waived, except pursuant to a written agreement or instrument which has heretofore been delivered to the Agent.

(i)    <u>Schedule II</u> contains a correct and complete list (indicating the location of such real property by street address and state) of all real property owned or leased by the Debtor.

(j)    As of the Initial Funding Date, all conditions precedent set forth in <u>Article VI</u> have been fulfilled or waived in writing by the Agent, and as of each Funding Date, all

-37-

conditions precedent set forth in <u>Section 6.02(c)</u> shall have been fulfilled or waived in writing by the Agent.

(k)    The audited financial statements of the Debtor for the fiscal year 2007, the draft financial statements of the Debtor for the fiscal year 2008, and each of the interim financial statements for the fiscal year 2009 (through June 30, 2009), together with all subsequent financial statements of the Debtor furnished to the Agent, fairly present the financial condition of the Debtor as of the dates referred to therein and the results of the operations of the Debtor for the periods ended on such dates, all in accordance with GAAP (except, where applicable, for the absence of normal and otherwise immaterial year-end audit adjustments and the absence of footnotes).  Since the Petition Date, other than the filing of the Case, there has been no change that has had or resulted in, or is reasonably likely to have or result in, a Material Adverse Effect.  All information provided in the application for the financing effectuated by this Agreement, and each other document, report and Transmission provided by or on behalf of the Debtor to the Lender Group is or shall be true and accurate in all material respects as of its date and as of the date so furnished; *provided that*, with respect to projected financial information, the Debtor represents only that such information was prepared in good faith based upon assumptions believed to be reasonable at the time.  The Debtor has disclosed to the Agent all agreements, instruments and corporate or other restrictions to which it is subject, and all other matters known to it, that, individually or in the aggregate, could reasonably be expected to have or result in a Material Adverse Effect and, as of the Initial Funding Date, there exists no contingent liability or other fact or circumstance that could reasonably be expected to have or result in a Material Adverse Effect that has not been set forth on <u>Schedule II</u> hereto.

(l)    Except as disclosed on <u>Schedule II</u> hereto, other than the Case, there is no pending or, to its knowledge, threatened action or proceeding or investigation, injunction, writ or order affecting the Debtor before or by any court, Governmental Entity or arbitrator that could reasonably be expected to have or result in a Material Adverse Effect or that purports to affect the legality, validity or enforceability of this Agreement or any other DIP Document.

(m)    The Debtor is the legal and beneficial owner of the Collateral and upon the execution of the DIP Documents, the entry of the Interim DIP Order, and the filing of the UCC financing statements with respect thereto (i) the Agent will hold a valid, perfected and continuing Lien in the Collateral (with the priorities set forth in the DIP Orders) as security for the Lender Debt, free and clear of any Lien (including any Lien in favor of the Internal Revenue Service, any Employee Benefit Plan, any Multiemployer Plan or the PBGC) other than Permitted Liens.  No effective financing statement or other instrument similar in effect covering the Receivables is on file in any recording office other than those evidencing Permitted Liens, and no competing notice or notice inconsistent with the transactions contemplated in this Agreement has been sent to any Obligor.

(n)    The Debtor's exact name, principal place of business and chief executive office and the office where its keeps its records concerning the Receivables and other Collateral are located at the addresses referred to on <u>Schedule I</u> hereto and, as of the Initial Funding Date, except as disclosed on <u>Schedule II</u> hereto, there have been no other such locations

-38-

for the four immediately prior months. Except as disclosed on <u>Schedule II</u> hereto, the Debtor has not changed its principal place of business or chief executive office in the last five years.  Except as disclosed on <u>Schedule II</u> hereto, the Debtor has not used and does not now use any fictitious or trade name during the five years immediately prior to the date of this Agreement and as of the Initial Funding Date, it has not changed its name in the last 24 months.

(o)     All required Notices have been prepared and delivered to the Agent for mailing to the Obligors, and all invoices issued on or after September __, 2009, bear only the appropriate remittance instructions for payment direction to the Lockboxes or the Lockbox Accounts, as the case may be.

(p)     The Debtor has filed on a timely basis all tax returns (federal, state and local) required to be filed and has paid, or made adequate provision for payment of, all taxes, assessments and other governmental charges due from it.   No tax Lien has been filed and is now effective against it or any of the Debtor's Properties except any Lien in respect of taxes and other charges not yet due or contested in good faith by appropriate proceedings and for which appropriate reserves in accordance with GAAP have been established.  To the Debtor's best knowledge, and except as disclosed on <u>Schedule II</u> hereto, there is no pending investigation by any taxing authority nor any pending but unassessed tax liability relating to the Debtor.

(q)     The Debtor maintains only one Debtor Lockbox Account, as more particularly described on <u>Schedule III</u> hereto, for Receivables the Obligors with respect to which are Governmental Entities; the Lender Lockbox is the only post office box and the Lender Lockbox Account is the only lockbox account maintained for Receivables, the Obligors with respect to which are not Governmental Entities; and no direction is in effect directing Obligors to remit payments on Receivables other than to the applicable Lockbox, and Lockbox Accounts, each as described on <u>Schedule III</u>.

(r)     The Debtor has no Plans or Multiemployer Plans, or, except as set forth on <u>Schedule II</u>, any material consulting agreements, executive employment agreements, executive compensation plans, deferred compensation agreements, employee stock purchase, stock option or severance plans.

(s)     Only Approved Patient Consent Forms for which favorable opinions of counsel have been received and in compliance with all applicable laws, rules and regulations are being obtained from each patient and customer receiving services or products.

(t)     <u>Schedule II</u> accurately and completely sets forth, as of the date hereof, all asserted actions, suits, proceedings, and disputes, and all potential set-offs, deductions, defenses or counterclaims in excess of $10,000 individually that have been or that reasonably could be expected to be asserted by an Obligor with respect to any of the Receivables, and includes therewith the maximum amount of such potential set-off, deduction, defense or counterclaim.  Without limiting the generality of the foregoing, <u>Schedule II</u> also sets forth the amount of all amounts payable as of the date hereof by the Debtor to each of the following (including each of their respective Affiliates):     Cymetrix Corporation, Siemens,

**-39-**

PacificCare/United HealthCare, Healthnet, and any other commercial insurance provider who is also an Obligor on Receivables.

(u)    The information prepared or furnished by or on behalf of the Debtor in connection with this Agreement or the consummation of the transactions contemplated hereunder taken as a whole, does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements contained therein or herein not misleading. All facts known to the Debtor material to an understanding of the financial condition, business, properties or prospects of the Debtor have been disclosed to the Agent.

## ARTICLE VIII.
## AFFIRMATIVE COVENANTS

Until the Full Payment of all Lender Debt, the Debtor agrees to perform all covenants in this Article VIII.

Section 8.01    Compliance with Laws, etc.    The Debtor shall comply in all material respects with all applicable laws (including Environmental Laws), rules, regulations and DIP Orders.  The Debtor shall obtain, maintain and preserve, and take all necessary action to timely renew, all material permits, licenses, authorizations, approvals, entitlements and accreditations necessary or useful in the proper conduct of its business.

Section 8.02    Offices, Records and Books of Account, Names.    The Debtor shall keep its principal place of business and chief executive office and the offices where it keeps its records concerning the Collateral at its address set forth on Schedule I or, upon 30 days' prior notice to the Agent, at any other locations in jurisdictions where all actions reasonably requested by the Agent or otherwise necessary to protect, maintain and perfect the Agent's Lien on the Collateral have been taken and completed.  The Debtor shall maintain proper books and accounts in which full, true and correct entries in conformity with GAAP are made of all dealings and transactions in relation to its business and activities and shall not make any notation on its books and records, including any computer files, that is inconsistent with the assignment of the Collateral to the Agent as collateral security.   The Debtor shall maintain and implement administrative and operating procedures (including an ability to recreate records evidencing Receivables and related contracts and pertinent documentation with respect to all other Collateral in the event of the destruction of the originals thereof), and keep and maintain all documents, books, records and other information reasonably necessary or advisable for collecting all Receivables (including records adequate to permit the daily identification of each Receivable and all Collections of and adjustments to each existing Receivable) and for providing the Receivable Information.  The Debtor shall keep its exact legal name as set forth on Schedule I hereto and will not change its name without providing 30 days' prior written notice to the Agent and taking and completing all actions reasonably requested by the Agent or otherwise necessary to protect, maintain and perfect the Agent's Lien on the Collateral.

Section 8.03    Performance and Compliance with Contracts and Credit and Collection Policy.    The Debtor shall, at its expense, timely and fully perform and comply with all material provisions, covenants and other promises required to be observed by it under all

-40-

contracts related to the Receivables and other Collateral. The Debtor shall timely and fully comply in all material respects with the Credit and Collection Policy in regard to the Collateral, including each Receivable and the related contract, and it shall maintain, at its expense, in full operation each of the bank accounts and lockboxes required to be maintained under this Agreement. The Debtor shall do nothing, nor suffer or permit any other Person, to impede or interfere with the collection by the Agent, or any other Person designated by the Agent or on its behalf, of the Collateral, including the Receivables.

Section 8.04    Audits; Appraisals. The Debtor shall, at any time and from time to time during regular business hours as requested by the Agent, permit the Agent (who may be accompanied by any members of the Lender Group) or its representatives, upon reasonable notice or during the continuance of any Event of Default without notice, and subject to compliance with applicable law in the case of review of patient/customer information, (i) on a confidential basis, to examine and make copies of and abstracts from all books, records and documents (including computer tapes and disks) in the Debtor's or any of its Affiliates' possession or under its or their control relating to the Collateral including the related contracts, and (ii) to visit the Debtor's or any of its Affiliates' offices and properties for the purpose of examining and auditing such materials described in clause (i) above, and (iii) to discuss accounting, financial and general business matters and matters relating to the Collateral or the Debtor's performance under the DIP Documents or under the contracts relating to the Collateral with any of the Debtor's or any of its Affiliates' officers or employees having knowledge of such matters.

Section 8.05    Reporting Requirements.    The Debtor shall comply with all Reporting Requirements (as defined in the DIP Orders) and, without limiting the Reporting Requirements, shall provide to the Agent (in multiple copies, if requested by the Agent) the reports, financial statements and other items set forth on Exhibit C at the times specified therein.

Section 8.06    Notice of Proceedings; Overpayments. The Debtor shall promptly notify the Agent (and modify the next Borrowing Base Report to be delivered hereunder to reflect same) in the event of any action, suit, proceeding, dispute, set-off, deduction, defense or counterclaim that is asserted by an Obligor with respect to any of the Receivables. The Debtor shall make all payments to the Obligors necessary to prevent the Obligors from offsetting any earlier overpayment by the Obligors against any amounts the Obligors owe on any Receivables.

Section 8.07    Taxes. The Debtor shall, and shall cause each of its Subsidiaries to, (i) file when due all federal, national and state income and other tax returns and other reports that it is required to file; and (ii) pay, or provide for the payment, when due, of all taxes (including sales taxes), fees, assessments and other governmental charges against it or upon its Property, income or franchises, including taxes relating to the transactions contemplated under this Agreement, make all required withholding and other tax deposits, and establish adequate reserves for the payment of all such items, and provide to the Agent, upon request, satisfactory evidence of its timely compliance with the foregoing; *provided, however*, so long as the Debtor have notified the Agent in writing, the Debtor or any of its Subsidiaries need not pay any such amount (x) that it is contesting in good faith by appropriate proceedings diligently pursued, (y) with respect to which it has established proper reserves as provided in GAAP, and (z) for

-41-

which no Lien (other than a Permitted Lien) results from such non-payment. Except pursuant to any tax sharing agreement disclosed in Schedule II hereto, the Debtor shall not have any obligation under any tax sharing agreement.

Section 8.08    Preservation of Existence. The Debtor shall preserve and maintain its existence, rights, franchises and privileges in the jurisdiction of its organization, and qualify and remain qualified in good standing as a foreign corporation in each jurisdiction where the failure to maintain such qualification would have or result in a Material Adverse Effect.

Section 8.09    DIP Documents. The Debtor shall, at its sole expense, timely and fully perform and comply with all provisions, covenants and other promises required to be observed by it under the DIP Documents, maintain the DIP Documents in full force and effect, enforce each DIP Document in accordance with its terms, take all such action to such end as may be from time to time reasonably requested by the Agent, and make upon any party to the DIP Documents such demands and requests for information and reports or for action as the Debtor is entitled to make thereunder and as may be from time to time reasonably requested by the Agent. The Debtor shall not permit any waiver, modification or amendment of any DIP Document, except as may be requested (or consented to in their sole discretion) by the Agent or Lenders.

Section 8.10    Implementation of Approved Patient Consent Forms. As soon as possible after the Initial Funding Date and in any event no later than **[September __, 2009]**, the Debtor shall deliver to the Agent a certificate of an Authorized Officer stating that the Approved Patient Consent Forms are the only forms being used by the Debtor.

Section 8.11    Invoices. The Debtor shall take all reasonable steps to ensure that all invoices rendered or dispatched on or after the Initial Funding Date contain only the remittance instructions required under Article IV of this Agreement.

Section 8.12    Intentionally Omitted.

Section 8.13    Equipment. The Debtor shall, in accordance with sound business practices, maintain all equipment and other Properties used by it in its business (other than obsolete or worn-out equipment) in good repair, working order and condition (normal wear and tear excepted) and make all necessary repairs, renewals, replacements and improvements thereof so that the value and operating efficiency thereof shall at all times be maintained and preserved.

Section 8.14    Insurance. The Debtor shall keep insured by financially sound and reputable insurers all Property of a character usually insured by corporations engaged in the same or similar business similarly situated, including, all Collateral, against loss or damage of the kinds and in the amounts customarily insured against by such corporations and carry such other insurance as is usually carried by such corporations conducting a similar business in similar locales. Each policy referred to in this Section 8.14 shall provide that it will not be canceled, amended, or reduced except after not less than 30 days' prior notice to the Agent and shall also provide that the Agent (and/or its designees and assigns) shall be named as loss (or co-loss) payee and additional insured, as applicable and as its interests may appear, and such interests shall not be invalidated by any act or negligence of the Debtor or any of its Affiliates.

**-42-**

The Debtor shall advise the Agent promptly of any policy cancellation, reduction, or amendment. Each insurance policy for property, casualty, liability and business interruption coverage for the Debtor shall name the Agent as lender loss payee (as its interests may appear) or an additional insured, as appropriate.

## ARTICLE IX.
## NEGATIVE COVENANTS

Until the Full Payment of all Lender Debt, the Debtor agrees to perform all covenants in this Article IX.

Section 9.01    Corporate Documentation.  The Debtor shall not modify, amend or alter its organizational documents in any manner that is adverse to the interests of the Agent or any Lender or in any other material manner.

Section 9.02    Debt.  The Debtor shall not incur or assume any Debt following the Initial Funding Date other than Permitted Debt.

Section 9.03    Bond Debt.  Except as set forth in the Cash Collateral Orders, the Debtor shall not enter into any material amendment, waiver or modification of the Bond Debt Documents (or any of them) or any related agreements unless (a) such amendment, waiver or modification is not prohibited by the Bond Intercreditor Agreement (if any), and (b) a copy of all documents executed or delivered in connection with such amendment, waiver or modification has been provided to the Agent.  The Debtor shall not, directly or indirectly at any time pay, prepay, defease, purchase or redeem any of the Bond Debt except as may be expressly provided for in the DIP Budget and the Cash Collateral Orders.

Section 9.04    Liens, etc.  The Debtor shall not create or suffer to exist any Liens upon or with respect to any of its Properties (including any Collateral) or assign any right to receive income in respect thereof, except Permitted Liens.

Section 9.05    Capital Expenditures; Lease Obligations.  The Debtor shall not make or become committed to make any capital expenditures, or enter into, or suffer to exist, any lease of real or personal Property as lessee or sublessee (other than a those leases in existence on the Petition Date), unless such capital expenditures or leases and all payments due in respect thereof are properly reflected in the DIP Budget.

Section 9.06    Asset Sales; Sale/Leaseback Transaction; Etc.  The Debtor shall not (except with the Agent's prior written consent, to be given or withheld in its sole discretion or at the direction of the Required Lenders in their sole discretion) sell, assign (by operation of law or otherwise), transfer, lease, sublease, liquidate or otherwise dispose of (including pursuant to any sale/leaseback transaction) any of its Properties (including any Collateral), or assign any right to receive income in respect thereof, other than:

(a)    sales of inventory in the ordinary course of its business; and

**-43-**

(b)        replacement and disposition of worn out and obsolete equipment in the ordinary course of business;

*provided*, that the foregoing limitations are not intended to prevent the Debtor from rejecting unexpired leases or executory contracts pursuant to Section 365 of the Bankruptcy Code in connection with the Case.

Section 9.07    Change In Business.  The Debtor shall not engage in any business other than the business engaged in by it on the Initial Funding Date.

Section 9.08    Change in Credit and Collection Policy.  The Debtor shall not make any material change in the Credit and Collection Policy without the prior written consent of the Agent.

Section 9.09    Change in Payment Instructions.  The Debtor shall not terminate, or suffer or permit the termination of, any of the Lockboxes or the Lockbox Accounts, or make any change or replacement (i) in the instructions contained in any Notice or otherwise, (ii) regarding payments with respect to Receivables to be made to the Lockboxes or the Lockbox Accounts, (iii) in the Standing Revocable Instruction referred to in the Depositary Agreements or otherwise, or (iv) regarding payments to be made to the Agent, except upon the prior and express written direction of the Agent.

Section 9.10    Deviation from Terms of Receivable, etc.  Except in accordance with the Credit and Collection Policy, the Debtor shall not, without the prior written consent of the Agent:

(a)        compromise, adjust, extend, satisfy, subordinate, rescind, set off, waive, amend, or otherwise modify, or permit or agree to any deviation from, the terms and conditions of any Receivable or materially or adversely modify or waive any term or condition of any contract related thereto;

(b)        (x) amend, modify, supplement or delete in any way or to any extent any provision for uncollectible accounts and free care applicable to any Receivable or (y) amend, modify or supplement in any way or to any extent any financial category or change in any way or to any extent the manner in which any financial category is treated or reflected in its records;

(c)        alter or modify (x) its claims processing system, or (y) its third party billing system, as applicable (except for technical changes of an immaterial nature); or

(d)        change, modify or rescind any direction contained in any invoice or previously delivered Notice.

Section 9.11    Mergers and Acquisitions; Dissolutions.  Neither the Debtor nor any of its Subsidiaries shall consummate or enter into any transaction or agreement that shall result or be intended to result in a merger, acquisition, dissolution or wind-up, unless such

**-44-**

transaction provides by its express terms for the Full Payment of all Lender Debt on the effective date of such transaction.

Section 9.12    No "Instruments". The Debtor shall not take any action that would allow, result in or cause any Eligible Receivable to be evidenced by an "instrument" within the meaning of the UCC of the applicable jurisdiction.

Section 9.13    Margin Loan Restrictions.    No portion of the proceeds of any borrowing hereunder shall be used in any manner that might cause the borrowing or the application of such proceeds to violate Regulation U, T, or X of the Board of Governors of the Federal Reserve System or any other regulation of such .

Section 9.14    Loans or Investments.    Except with respect to loans and investments set forth on Schedule II, the Debtor shall not enter into an agreement to make any loans to or investments in any Person, other than loans and advances to physicians for reasonable travel, relocation and business expenses in the ordinary course of business, *provided*, that (i) such loans and advances comply with all applicable laws and regulations (including the Sarbanes Oxley Act of 2002 and any successor laws or regulations, as amended from time to time) and (ii) the aggregate outstanding amount of all such loans and advances shall not exceed $[_____] at any time outstanding during the term of this Agreement.

Section 9.15    Transactions with Affiliates.    The Debtor shall not sell, transfer, distribute, or pay any money or property, including any fees or expenses of any nature (including any fees or expenses for management services), to any Affiliate, or lend or advance money or property to any Affiliate, or invest in (by capital contribution or otherwise) or purchase or repurchase any equity interest or indebtedness, or any Property, of any Affiliate, or become liable under any Guaranty for the obligations of any Affiliate except as set forth on Schedule II. Notwithstanding the foregoing, the Debtor may engage in transactions with Affiliates in the ordinary course of business, in amounts and upon terms fully disclosed to the Agent, and no less favorable to the Debtor than would be obtained in a comparable arm's-length transaction with a third party who is not an Affiliate.

Section 9.16    Distributions.    The Debtor shall not make, or enter into any agreement to make, or enter into any transaction or agreement that shall result or be intended to result in, any dividends or other Distributions being paid to any Person.

Section 9.17    Deviation from Approved Patient Consent Form.    The Debtor shall not, without the prior written consent of the Agent, substitute, alter, modify or change in any way the Approved Patient Consent Form.

Section 9.18    Subsidiaries.    The Debtor shall not maintain, suffer to exist, create or acquire any Subsidiaries.

Section 9.19    ERISA, Etc..    Neither the Debtor nor any of its ERISA Affiliates shall become a party to, or otherwise be obligated on, any Plan or Multiemployer Plan.  The Debtor shall not become a party to or otherwise become obligated on any material:  consulting agreement, executive employment agreement, executive compensation plan, deferred

-45-

compensation agreement, or any employee stock purchase, stock option or severance plan except those set forth on Schedule II.

Section 9.20    Chapter 11 Claims.    Except as set forth in the Cash Collateral Orders, the Debtor shall not agree to, incur, create, assume, suffer to exist or permit (a) except to the extent set forth in the DIP Budget, any administrative expense, unsecured claim, or other super-priority claim or lien that is *pari passu* with or senior to the claims of the Agent and the Lenders against the Debtor hereunder (other than to incur Indebtedness that will cause the Full Payment of all Lender Debt; *provided*, that the incurrence of such Indebtedness shall be conditioned by the Bankruptcy Court upon the Full Payment of the Lender Debt), or apply to the Bankruptcy Court for authority to do so, except for the Carve Out or (b) the extension of any existing adequate protection or the grant of further adequate protection or apply to the Bankruptcy Court for authority to do so, in each case pursuant to this clause (b) without the consent of the Agent in its sole discretion.

Section 9.21    The DIP Orders.    The Debtor shall not make or seek any change, amendment or modification, or any application or motion for any change, amendment or modification, to the Interim or Final DIP Order without the prior written consent of the Agent.

## ARTICLE X.
## FINANCIAL COVENANTS

Until the Full Payment of all Lender Debt, the Debtor agrees to perform all covenants in this Article X.

Section 10.01    Cash Flow to Expenditures Tests.    The Debtor shall comply with the Cash Flow to Expenditures Tests as set forth in the DIP Orders and shall not permit or suffer to exist any Variances in excess of the maximum amounts permitted thereunder.

Section 10.02    Minimum EBITDA.    EBITDA of the Debtor and its Subsidiaries on a consolidated basis and calculated on a monthly basis shall not be less than $1,200,000.    As used herein, "**EBITDA**" of any Person for any period means, the sum of (a) net income (or net loss) of such Person (calculated before extraordinary items, it being understood and agreed that bankruptcy expenses shall not be deemed extraordinary items) during such period *plus* (b) the sum of the following, in each case (unless otherwise indicated) to the extent included in determining such net income (or net loss):    (i) interest expense (including that portion attributable to Capital Leases in accordance with GAAP and capitalized interest) during such period; *plus* (ii) income taxes accruing, paid or payable during such period; *plus* (iii) depreciation and amortization expense; *minus* (vi) gains from asset dispositions outside of the normal course of business *minus* (vii) pension liability adjustment to the extent excluded in determining such net income (or net loss), determined in each case in accordance with GAAP.    For the purposes of determining EBITDA of any Person for any period, "net income (or net loss)" means and refers to the amount set forth on the applicable financial statements of such Person for such period as "Net Increase/Decrease in Unrestricted Assets".

**-46-**

## ARTICLE XI.
## EVENTS OF DEFAULT

Section 11.01 <u>Events of Default</u>.  Each of the following shall be an "**Event of Default**":

(a)    The Debtor shall default in the due and punctual payment of any payment, fee or expense owing to the Agent or any Lender pursuant to any of the DIP Documents, when and as the same shall become due and payable, except that the Debtor shall have up to one day to cure such a default on the DIP Loan with respect to a Borrowing Base Deficiency, whether pursuant to <u>Article II</u> of this Agreement, at maturity, by acceleration or otherwise.

(b)    Any material provision of this Agreement or any other DIP Document shall at any time fail for any reason to be in full force and effect, or this Agreement or any other DIP Document shall terminate, be terminated or become void or unenforceable by the Agent or any Lender party thereto for any reason whatsoever without the prior written consent of the Agent.

(c)    This Agreement and the other DIP Documents and the DIP Orders shall, for any reason, cease to create a valid Lien on any of the Collateral purported to be covered thereby or such Lien shall cease to be a perfected Lien having the priority provided herein pursuant to Section 364 of the Bankruptcy Code against the Debtor, or the Debtor shall so allege in any pleading filed in any court.

(d)    The Debtor shall default in the performance or observance of any covenant, agreement or provision contained in:  (i) the DIP Order, Article IV, Article V, Sections 8.03, 8.05, 8.06, 8.07, 8.08, 8.09, 8.10, 8.11, 8.14, Article IX or Article X; or (ii) any other Section or Article of this Agreement or any other DIP Document or in any other instrument or document evidencing or creating any obligation, guaranty or Lien in favor of the Agent in connection with or pursuant to this Agreement or any Lender Debt, and, in the case of any default referred to in this clause (ii), such default continues for a period of 3 Business Days.

(e)    A "Revocation Order" (as defined in the Depositary Agreement) shall have been sent or any change or replacement shall have been made in the standing revocable instructions (as described in each of the Depositary Agreement(s)) or any bank (including the Lockbox Bank) at which any deposit account, blocked account, or lockbox account (including the Lockbox Accounts) is maintained shall fail to comply with any of the terms of any deposit account, blocked account, lockbox account or similar agreement (including any Depositary Agreement) to which such bank is a party.

(f)    Any representation or warranty made or deemed made by the Debtor under or in connection with this Agreement or any other DIP Document or any information or report delivered by the Debtor pursuant to this Agreement or any other DIP Document shall prove to have been incorrect or untrue in any material respect when made or deemed made or delivered.

-47-

(g)        As of any date of determination, any Debtor is found to have been overpaid by Governmental Entities during any period covered by an audit conducted by CMS or any State entity and such overpayment is not repaid within three days of its due date or reserved for in a manner reasonably acceptable to the Agent.

(h)        There shall have occurred any event, or any condition shall exist, other than the filing of the Case, that has had or resulted in, or could reasonably be expected to have or result in, a Material Adverse Effect since the Petition Date.

(i)        The Debtor or any of its Subsidiaries is enjoined, restrained or in any way prevented by the order of any court or any Governmental Entity from conducting all or any material part of its business for more than 5 days.

(j)        The Case is (or the Bankruptcy Court shall make a ruling requiring that the Case be) dismissed, suspended or converted to a case under Chapter 7 of the Bankruptcy Code, or the Debtor shall file any pleading requesting any such relief; or an application shall be filed by the Debtor for the approval of, or there shall arise, (i) any other Claim having priority senior to or *pari passu* with the claims of the Agent and the Lenders under the DIP Documents or any other claim having priority over any or all administrative expenses of the kind specified in Sections 503(b) or 507(b) of the Bankruptcy Code (other than the Carve Out) or (ii) any Lien on the Collateral having a priority senior to or *pari passu* with the Liens and security interests granted herein, except as may otherwise be expressly provided herein.

(k)        The Debtor shall file a motion seeking, or the Bankruptcy Court shall enter, an order (i) approving payment of any prepetition Claim, (ii) granting relief from the automatic stay applicable under Section 362 of the Bankruptcy Code to any holder of any Lien to permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any assets having a book value in excess of $50,000 in the aggregate, (iii) approving any other settlement or other stipulation with any creditor of the Debtor, other than the Agent and the Lenders, or otherwise providing for payments as adequate protection or otherwise to such creditor; or (iv) approving payment of or granting any adequate protection with respect to pre-petition Debt. Notwithstanding the foregoing, the Debtor's motion for the entry of, and the Bankruptcy Court's entry of, the Cash Collateral Orders shall not constitute an "Event of Default" under this subparagraph (k).

(l)        An order is entered reversing, amending, supplementing, staying the DIP Orders.

(m)        Any judgment in excess of $50,000 as to any post-petition date obligation not covered by insurance is rendered against the Debtor and the enforcement of the judgment has not been stayed.

(n)        The Debtor (or any of its successors or assigns) files a motion or application or adversary proceeding challenging the validity, enforceability, perfection or priority of any claim or Lien securing or pertaining to this Agreement, the other DIP Documents and the credit facility evidenced hereby and thereby or the Lender Debt.

**-48-**

(o)     A plan of reorganization is confirmed in the Case that does not provide for Full Payment of all Lender Debt (on the effective date of such plan of reorganization or liquidation), or any order is entered that dismisses the Case and which order does not provide for Full Payment of all Lender Debt, or the Debtor seeks support or fails to contest the filing or confirmation of a plan or the entry of an order that does not provide for Full Payment of all Lender Debt.

(p)     The filing of a motion, pleading, or proceeding by the Debtor, or any of its Affiliates, that could reasonably be expected to result in a material impairment of the rights or interests of the Agent or any Lender; or a determination by the Bankruptcy Court or any other Governmental Entity with respect to a motion, pleading or proceeding brought by another party that results in a material impairment of the rights, claims and liens relating to this Agreement, the other DIP Documents and the credit facility evidenced hereby and thereby or the Lender Debt.

(q)     As a result of an act or omission of the Debtor, the Debtor is unable to maintain the Transmission interface described in Exhibit V to the commercially reasonable satisfaction of the Agent, or the electronic information servicing capabilities of the Debtor are not functioning, in either case, for a period of more than three consecutive Business Days.

(r)     The Debtor has sent multiple Transmissions to the Agent in a manner that is not in compliance with the specifications set forth in Exhibit V.

(s)     Any "Termination Event" as defined in the Interim Cash Collateral Order (or any similar event under the Final Cash Collateral Order) shall have occurred or the Debtor's authorization to use cash collateral of the Bond Trustee is otherwise terminated or stayed for any reason.

(t)     If the Debtor fails, within 15 days after entry of the Interim DIP Order, to file an application to retain an outside financial advisor to the Debtor who is acceptable to DIP Lender, with a scope of service acceptable to the DIP Lender, each in its sole and absolute discretion, and authorizing the financial advisor to make (i) periodic reports on the Debtor's finances and operations in form and frequency reasonably acceptable to the Agent and the Required Lenders, and (ii) its data, analysis and personnel available to the Agent or its professionals on reasonable notice and at reasonable times, to answer the Agent's and its professionals' questions with respect to the matters within such financial advisers scope of service.

Section 11.02  Events of Default; Remedies.

(a)     Subject to the provisions set forth in the DIP Orders, if any Event of Default shall occur and be continuing, the Agent may, and at the request of the Required Lenders with respect to the DIP Loan, shall, without further order of, application to, or action by, the Bankruptcy Court (except as expressly required by the Interim DIP Order), by notice to the Debtor, take any of the following actions:  (x) declare the Maturity Date to have occurred and all

-49-

Lender Debt, shall become immediately due and payable in full; (y) terminate all commitments and obligations of the Lenders hereunder, and (z) without limiting any rights hereunder and subject to applicable law, replace the Debtor in its performance of any or all of its Receivables servicing responsibilities; *provided*, that with respect to the Event of Default in paragraphs (i) or (n) of Section 11.01, the Maturity Date shall be deemed to have occurred automatically and without notice and all Lender Debt shall automatically become immediately due and payable and all commitments and obligations of the Lenders shall be terminated without any notice or demand of any kind.  Upon any such declaration or designation, the Agent and the Lenders shall have, in addition to the rights and remedies that it may have under this Agreement, all other rights and remedies provided in the Interim DIP Order, after default under the UCC and under other applicable law, which rights and remedies shall be cumulative.  In addition to the remedies set forth above, subject solely to any requirement of the giving of notice by the terms of the Interim DIP Order, the Agent may exercise any remedies provided for by this Agreement and the other DIP Documents in accordance with the terms hereof and thereof or any other remedies provided by applicable law.  Each Lender agrees that it will not have any right individually to enforce or seek to enforce this Agreement or any other DIP Document or to realize upon any Collateral for the Lender Debt, it being understood and agreed that such rights and remedies may be exercised only by the Agent in its discretion granted hereunder or at the direction of the applicable Lenders as set forth hereunder.

(b)    The Debtor hereby irrevocably authorizes and instructs the Agent and each Lender to set-off the full amount of any Lender Debt that has become due and payable against (i) any Collections, (ii) any other proceeds of Collateral, or (iii) the principal amount of any DIP Advance requested on or after the date that any such any Lender Debt became due and payable.  No further notification, act or consent of any nature whatsoever is required prior to the exercise by the Agent or any Lender of such right of set off; *provided, however*, the Agent shall notify the Debtor: (1) that a set off pursuant to this Section 11.02(b) occurred, (2) the amount of such set off, and (3) a description of the Lender Debt that was due and payable.

Section 11.03  Attorney-in-Fact.  The Debtor hereby irrevocably designates and appoints the Agent and each Lender and each other Person in the Lender Group, to the extent permitted by applicable law and regulation, as such Debtor's attorney-in-fact, which irrevocable power of attorney is coupled with an interest, with authority (and to the extent not prohibited under applicable law and regulations) to (i) endorse or sign such Debtor's name to remittances, invoices, assignments, checks (other than, absent a court order, payments from Governmental Entities), drafts or other instruments or documents in respect of the Receivables, (ii) notify Insurers to make payments on the Receivables directly to the Agent, and (iii) bring suit in such Debtor's name and settle or compromise such Receivables as the Agent or Required Lenders may, in their discretion, deem appropriate.  The Lender Group agrees that it will forbear from exercising the power of attorney or any rights granted pursuant to this Section 11.03, except upon the occurrence and during the continuation of an Event of Default.  The Debtor hereby ratifies, to the extent permitted by law, all that said attorneys shall lawfully do or cause to be done by virtue hereof.  Exercise of the powers granted hereunder is not a violation of the automatic stay provided by Section 362 of the Bankruptcy Code and the Debtor waives applicability thereof.  The power of attorney granted pursuant to this Section 11.03 is a power coupled with an interest and shall be irrevocable until Full Payment of the Lender Debt.

-50-

Section 11.04  <u>License</u>.  The Agent is hereby granted an irrevocable, non-exclusive license or other right to use, license or sub-license (without payment of royalty or other compensation to any Person) any or all General Intangibles and other Intellectual Property of the Debtor, computer hardware and software, customer lists, and other Property, in collecting, or otherwise exercising any rights or remedies with respect to, any Collateral.  The Debtor's rights and interests under any General Intangibles or other Intellectual Property shall inure to the Agent's benefit.

**ARTICLE XII.**
**THE AGENT**

Section 12.01  <u>Agency Provisions</u>.

(a)  Each of the Lenders hereby irrevocably appoints HFG as its administrative and collateral agent and authorizes the Agent to take such actions on behalf of such Lender and to exercise such powers as are delegated to the Agent by the terms hereof and the other DIP Documents, together with such actions and powers as are reasonably incidental thereto.

(b)  Each Lender authorizes and directs the Agent to enter into this Agreement and the other DIP Documents, for the benefit and obligation of the Agent and the Lenders.  Each Lender agrees that any action taken by the Agent in accordance with the terms of this Agreement or the other DIP Documents, and the exercise by the Agent of its powers set forth herein or therein, together with such other powers that are reasonably incidental thereto, shall be binding upon all of the Lenders.  Each Lender agrees that any action taken by the Required Lenders (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in <u>Section 13.01</u>), in accordance with the terms of this Agreement or the other DIP Documents, and the exercise by the Required Lenders (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in <u>Section 13.01</u>) of their respective powers set forth herein or therein, together with such other powers that are reasonably incidental thereto, shall be binding upon all of the Lenders.

(c)  Each Person serving as an agent hereunder and/or under the other DIP Documents shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not an agent and each such Person and its respective Affiliates may accept deposits from, lend money to and generally engage in any kind of business with the Debtor or any Affiliate thereof as if it were not an agent hereunder or under the other DIP Documents.

(d)  The Agent shall not have any duties or obligations except those expressly set forth herein or in the other DIP Documents.  Without limiting the generality of the foregoing, (a) the Agent shall not be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing, (b) the Agent shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or thereby that the Agent is required to exercise pursuant to written instructions by the Required Lenders (or such other number or percentage of the

-51-

Lenders as shall be necessary under the circumstances as provided in <u>Section 13.01</u>), and (c) except as expressly set forth herein, the Agent shall not have any duty to disclose, and shall not be liable for any failure to disclose, any information relating to the Debtor that is communicated to or obtained by any of them serving as an agent or any of their respective Affiliates in any capacity. The Agent shall not be liable for any action taken or not taken by it (a) with respect to the DIP Loan, with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in <u>Section 13.01</u>), or (b) in the absence of its own gross negligence or willful misconduct. The Agent shall not be deemed to have knowledge of any Default unless and until notice thereof is given to the Agent by any Debtor or a Lender, and the Agent shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement, (ii) the contents of any certificate, report or other document delivered hereunder or in connection herewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement or any other agreement, instrument or document, or (v) the satisfaction of any condition set forth in Article VI or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Agent.

(e)     The Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing believed by it to be genuine and to have been signed or sent by the proper Person. The Agent also may rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall not incur any liability for relying thereon. The Agent may consult with legal counsel (who may be counsel for the Debtor), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

(f)     The Agent may perform any and all of its duties and exercise its rights and powers by or through any one or more sub-agents appointed by the Agent. The Agent and any such sub agent may perform any and all its duties and exercise its rights and powers through its respective Related Parties. The exculpatory provisions of the preceding paragraphs shall apply to any such sub agent and to the Related Parties of the Agent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as the Agent.

(g)     With respect to the release of Collateral, the Lenders hereby irrevocably authorize the Agent to release any Lien granted to or held by it upon any Property covered by this Agreement or the other DIP Documents (i) upon Full Payment of all Lender Debt; or (ii) constituting Property being sold or disposed of in compliance with the provisions of the DIP Documents (and the Agent may rely in good faith conclusively on any certificate stating that the Property is being sold or disposed of in compliance with the provisions of the DIP Documents, without further inquiry); *provided, however*, that (x) the Agent shall not be required to execute any release on terms that, in the Agent's opinion, would expose the Agent to liability or create any obligation or entail any consequence other than the release of such Liens without

-52-

recourse or warranty, and (y) such release shall not in any manner discharge, affect or impair any Liens upon all interests retained, all of which shall continue to constitute part of the Property covered by the DIP Documents.

(h)    With respect to perfecting security interests in Collateral that, in accordance with Article 9 of the UCC or any comparable provision of any Lien perfection statute in any applicable jurisdiction, can be perfected only by possession, each Lender hereby appoints each other Lender and the Agent as its agent for the purpose of perfecting such interest. Should any Lender obtain possession of any such Collateral, such Lender shall notify the Agent, and, promptly upon the Agent's request, shall deliver such Collateral to the Agent or in accordance with the Agent's instructions.

(i)    Intentionally Omitted.

(j)    Subject to the appointment and acceptance of a successor agent as provided in this paragraph, the Agent may resign at any time by notifying the Lenders and the Debtor; *provided, that* unless such resignation is accepted by the Lenders, such resignation shall not become effective until the appointment of a successor Agent pursuant to the terms of this Section 12.02(j). Upon any such notice of resignation, the Required Lenders shall have the right to appoint a successor for the Agent. If no successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days after the Agent gives notice of its resignation, then the Agent may, on behalf of the Lenders, appoint a successor Agent. Upon the acceptance of its appointment as the Agent hereunder by a successor, such successor shall succeed to and become vested with all the rights, powers, privileges and duties of the retiring Agent, and the retiring Agent shall be discharged from its duties and obligations hereunder. The fees payable by the Debtor to a successor Agent shall be the same as those payable to its predecessor unless otherwise agreed in writing among the Debtor and such successor. After any Agent's resignation hereunder, the provisions of this Article and Sections 2.05 and 13.05 shall continue in effect for the benefit of such retiring Agent, its sub agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while it was acting as the Agent.

(k)    Each Lender acknowledges that it has, independently and without reliance upon the Agent or any Related Party thereof or any other Lender, and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement. Each Lender also acknowledges that it will, independently and without reliance upon the Agent, or any Related Party thereof or any other Lender, and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any related agreement or any document furnished hereunder or thereunder.

(l)    Each of the Lenders irrevocably authorizes the Agent, at its option and in its discretion, to enter into the Bond Intercreditor Agreement (if any) and to take such actions as required or permitted thereunder from time to time. Each Lender hereby agrees to be bound by the terms of the Bond Intercreditor Agreement (if any) and acknowledges that the

-53-

Bond Trustee and the holders represented by the Bond Trustee in connection with the Bond Debt Documents are third party beneficiaries of this <u>Section 12.01(l)</u>.

## ARTICLE XIII.
## MISCELLANEOUS

Section 13.01  <u>Amendments, etc.</u>

(a)    (1)  No amendment or waiver of any provision of this Agreement or consent to any departure therefrom by a party hereto shall be effective unless in a writing signed by the Agent, the Required Lenders, and the Debtor, and then such amendment, waiver or consent shall be effective only in the specific instance and for the specific purpose for which given; *provided* that no such amendment shall (i) increase the DIP Commitment of any Lender without the written consent of such Lender, (ii) reduce the principal amount of the DIP Loan or reduce the rate of interest thereon, or reduce any fees payable hereunder, without the written consent of each Lender directly affected thereby, (iii) postpone the Maturity Date of the DIP Loan without the written consent of each Lender directly affected thereby, (iv) increase any percentage contained in the definition of Borrowing Base without the written consent of each Lender, (v) release all or a material portion of the Collateral without the consent of the Agent, (vi) release any Guaranty (other than in accordance with its terms) of the DIP Loan without the written consent of each Lender directly affected thereby, or (vii) change any of the provisions of this Section or the definition of "Required Lenders" or any other provisions hereof specifying the number or percentage of Lenders required to waive, amend or modify any rights hereunder or make any determination or grant any consent hereunder, without the written consent of each Lender affected thereby; and (2) no such agreement shall amend, modify or otherwise affect the rights or duties of the Agent hereunder without the prior written consent of the Agent.

(b)    No failure on the part of the Agent or any Lender or the Debtor to exercise, and no delay in exercising, any right hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any right hereunder preclude any other or further exercise thereof or the exercise of any other right.

Section 13.02  <u>Notices, etc.</u>  All notices and other communications hereunder shall, unless otherwise stated herein, be in writing (which may include email, facsimile and telephone calls followed promptly by hard copy or facsimile communication) and shall be delivered to each applicable party, at the address set forth under its name on <u>Schedule I</u> hereto (or, in the case of a Lender, as set forth in the Assignment and Assumption pursuant to which it became a party hereto) or at such other address as shall be designated by such party in a notice to the other parties hereto; *provided* that any notice by Agent to the Debtor of any Event of Default may also be deemed given (and received) immediately upon docketing in the Court's ECF system.  All notices by the Debtor to the Agent shall be delivered by an Authorized Officer. Notices and communications by email and facsimile shall be effective when sent (and shall be immediately followed by hard copy sent by regular mail), and notices and communications sent by other means shall be effective when received.  Without in any way limiting the Debtor's obligation to confirm in writing any telephonic notice of a borrowing, the Agent may act without

-54-

liability upon the basis of telephonic notice believed by the Agent in good faith to be from an Authorized Officer of the Debtor prior to receipt of written confirmation.

Section 13.03 <u>Assignments; Participations</u>.

(a) (1) This Agreement shall inure to the benefit of and be binding upon the parties hereto and their respective successors and permitted assigns; *provided*, that the Debtor may not assign any of its rights or obligations hereunder or any interest herein without the prior written consent of the Agent and Lenders.

(b) Subject to the conditions set forth in paragraph (c) of this Section, each Lender may assign to one or more assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its commitments and the advances or loans at the time owing to it) with the prior written consent (such consent not to be unreasonably withheld) of the Agent, *provided* that no consent of the Agent shall be required for an assignment to an assignee that is a Lender immediately prior to giving effect to such assignment or to any Affiliate or branch of any Lender, or to any trust or special purpose funding vehicle, whether or not the Agent maintains any interest in such trust or special purpose funding vehicle. The Agent shall notify the Debtor of any such assignment; *provided, however*, that failure to so notify the Debtor shall not affect the validity of such assignment. In the event that, as a result of one or more assignments pursuant to this paragraph (b), there shall be more than one Lender hereunder, then the commitment of each Lender to make DIP Loans hereunder shall be several and not joint.

(c) Assignments shall be subject to the following additional conditions:

(i) the assignee shall be an Eligible Assignee with the financial ability to perform as a Lender under this Agreement and the other DIP Documents;

(ii) with respect to assignments of the DIP Commitments, except in the case of an assignment to a Lender or an Affiliate of a Lender or an assignment of the entire amount of the assigning Lender's DIP Commitment or DIP Advances, the amount of the DIP Commitment or DIP Advances of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Agent) shall not be less than $1,000,000 unless the Agent otherwise consents; and

(iii) the parties to each assignment shall execute and deliver to the Agent an Assignment and Assumption, together with a processing and recordation fee of $3,500; *provided* that such fee shall not apply to an assignment to another Lender or an Affiliate of the assigning Lender.

(d) Subject to acceptance by the Agent, as the case may be, pursuant to paragraph (e) of this Section with respect to assignments of the DIP Loan, from and after the effective date specified in each Assignment and Assumption the assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and shall be bound by the terms of

-55-

each of the other DIP Documents, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement and the other DIP Documents (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Sections 2.05 and 13.05).    Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this Section 13.03 shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with paragraph (f) of this Section.

(e)    Upon its receipt of a duly completed Assignment and Assumption executed by an assigning Lender and an assignee and the processing and recordation fee referred to in paragraph (c)(iii), if applicable, and any written consent to such assignment required by paragraph (b) of this Section, the Agent shall accept such Assignment and Assumption.

(f)    Any Lender may, without the consent of the Debtor, any other Lender or the Agent, sell participations to one or more banks or other entities (a "**Participant**") in all or a portion of such Lender's rights and obligations under this Agreement (including, if applicable, all or a portion of its commitments and the loans and advances owing to it); *provided* that (A) such Lender's obligations under this Agreement shall remain unchanged, (B) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (C) the Debtor, the other Lenders and the Agent shall continue to deal solely and directly with such Lender in connection with all of such Lender's rights and obligations under this Agreement.  Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; *provided* that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver described in the first proviso to Section 13.01(a) that affects such Participant.  The Debtor agrees, to the fullest extent permitted under applicable law, that each Participant shall be entitled to the benefits of Section 2.05 to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to paragraph (c) of this Section.  A Participant shall not be entitled to receive any greater payment under Section 2.05 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Debtor's prior written consent.

(g)    Any Lender may at any time pledge or assign a security interest in all or any portion of its rights (and subject to the consent of the Agent, the Collateral) under this Agreement to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank, and this Section shall not apply to any such pledge or assignment of a security interest; *provided* that no such pledge or assignment of a security interest shall release a Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

Section 13.04  Further Assurances; Financing Statements.  The Debtor shall, and shall cause its Subsidiaries to, at the Debtor's expense, promptly execute and deliver all further

-56-

instruments and documents, and take all further action that the Agent or any Lender may request, from time to time, as may be necessary or proper in the reasonable opinion of the Agent or such Lender to carry out more effectively the provisions and purposes of this Agreement and the other DIP Documents, in order to perfect, protect or more fully evidence the assignment as security of the Receivables and the other Collateral, or to enable the Agent and Lenders to exercise or enforce their respective rights hereunder and under the other DIP Documents.  Without limiting the generality of the foregoing, the Debtor shall, upon the request of the Agent, execute and file such UCC financing or continuation statements, or amendments thereto or assignments thereof, and such other documents or notices, as may be, in the reasonable opinion of the Agent, necessary or appropriate.  The Debtor hereby authorizes the Agent to file one or more financing or continuation statements and amendments thereto and assignments thereof, relative to all or any of the Collateral now existing or hereafter arising without the Debtor's signature where permitted by law.  If the Debtor fails to perform any of its agreements or obligations under this Agreement, the Agent may (but shall not be required to) itself perform, or cause performance of, such agreement or obligation, and the expenses of the Agent incurred in connection therewith shall be payable by the Debtor.

Section 13.05  Costs and Expenses; Collection Costs.  The Debtor agrees to pay on demand (i) all reasonable non-legal costs and expenses of the Agent and each Lender in connection with the preparation, execution, delivery and administration of this Agreement and the DIP Documents; (ii) the reasonable fees and expenses of counsel for each member of the Lender Group in connection with this Agreement and the transactions contemplated hereby; (iii) all reasonable costs and out-of-pocket expenses, if any (including reasonable counsel fees and expenses), of the Agent and Lenders in connection with any waiver, modification, supplement or amendment hereto, or any action to collect, enforce, protect, maintain, preserve or foreclose its interests with respect to any DIP Document or Collateral and (iv) any and all wire fees initiated by Agent or any Lender to or for the benefit of the Debtor.  The Debtor further agrees to pay on the Initial Funding Date and thereafter on demand (1) all reasonable costs and expenses incurred by the Agent or any Lender in connection with periodic audits of the Collateral (including the Receivables), books and records, accounting, financial and general business matters of the Debtor, (2) all reasonable costs and expenses incurred by the Agent to accommodate any significant coding or data system changes made by the Debtor that would affect the transmission or interpretation of data received through the interface, (3) all reasonable costs and expenses incurred by the Agent resulting from a lack of either cooperation or responsiveness of the Debtor to agreed-upon protocol and schedules; *provided*, that the Debtor has been informed of the alleged lack of cooperation or responsiveness and has been provided the opportunity to correct such problems, and (4) all successor and substitute servicing costs.  Without limiting the generality of the foregoing, the expenses, costs, charges and fees referred to in this Section may include the following: recording costs, appraisal costs, paralegal fees, costs and expenses; accountants' fees, costs and expenses; court costs and expenses; photocopying and duplicating expenses; court reporter fees, costs and expenses; long distance telephone charges; air express charges; telegram charges; telecopier charges; secretarial overtime charges; and expenses for travel, lodging and food.

Section 13.06  Confidentiality.  Each of the parties hereto hereby acknowledges that this Agreement and the other DIP Documents (including any information relating to the

-57-

Debtor or any member of the Lender Group) contain confidential and proprietary information. Unless otherwise required by applicable law, each of the parties hereto hereby agrees to maintain the confidentiality of this Agreement (and all drafts, memos and other documents delivered in connection herewith including any information relating to the Debtor or any member of the Lender Group delivered hereunder) in communications with third parties and otherwise and to take all reasonable actions to prevent the unauthorized use or disclosure of and to protect the confidentiality of such confidential information; *provided*, that such confidential information may be included in ay filing made with the Court and may otherwise be disclosed (in accordance with applicable laws) on a confidential need-to-know basis to (i) the Debtor's legal counsel, accountants and investors, (ii) each member of the Lender Group, investors in and creditors of any Lender, or the Agent, appropriate rating agencies with respect to such Persons, and each of their respective legal counsel and auditors, (iii) to the Bond Trustee and its counsel, (iv) any Person, if such information otherwise becomes available to such Person or publicly available through no fault of any party governed by this <u>Section 13.06</u>, (v) any Governmental Entity requesting such information, and (vi) any other Person with the written consent of each affected party, which consent shall not be unreasonably withheld.  Each member of the Lender Group hereby agrees to, and shall take reasonable steps to cause each other member of the Lender Group to, comply with all applicable laws (including the provisions set forth in the Business Associate Addendum set forth in <u>Exhibit VI</u>) regarding confidential patient information, if any, it receives in connection with the transactions described in this Agreement.  The Debtor hereby authorizes the Agent and each Lender, at Agent's and such Lender's own expense, to make announcements of the financial arrangement entered into among the Debtor and the Agent and Lenders, including announcements which are commonly known as tombstones, in such publications and to such selected parties as the Agent and Lenders shall deem appropriate.  The Debtor hereby grants the Agent the right to place one or more advertisements in newspapers and journals, on its website and in its other materials (all, at its own expense) that recites the transaction hereunder, the amount of such transaction and utilizes the corporate logo of the Debtor.

Section 13.07  <u>Term and Termination; Early Termination and Prepayment Fees</u>.

(a)  This Agreement shall have a term commencing on the Initial Funding Date and expiring on the Termination Date (the "**Term**").

(b)  The obligations of the Lenders under this Agreement shall continue in full force and effect from the Initial Funding Date until the Maturity Date.

(c)  Upon each permanent payment applied to the DIP Loan, and the termination of the DIP Commitments (including by reason of an Event of Default), the Debtor shall pay to the Agent for the account of the Lenders the applicable Exit Fee.

(d)  The termination of this Agreement shall not affect any rights of the Agent or any Lender or any obligations of the Debtor arising on or prior to the effective date of such termination, and the Debtor's duties and obligations hereunder shall continue to be fully operative until Full Payment of all Lender Debt (including all Lender Debt incurred on or prior to such termination).

-58-

(e)　　The Liens and rights granted to the Agent hereunder for the benefit of the Lenders shall continue in full force and effect, notwithstanding the termination of this Agreement, until the Full Payment of all Lender Debt.  Upon Full Payment of all Lender Debt, the Agent shall, at the Debtor's sole cost and expense, execute and deliver such documents as the Debtor shall reasonably request to evidence such termination.

(f)　　All indemnities of the Debtor contained herein shall survive termination hereof and Full Payment of all Lender Debt unless otherwise provided.  In furtherance and not in limitation of the foregoing, if after receipt of any payment of all or any part of the Lender Debt, the Agent or any Lender is for any reason compelled to surrender such payment to any Person or entity because such payment is determined to be void or voidable as a preference, an impermissible setoff, a diversion of trust funds or for any other reason, this Agreement shall continue in full force (except that the DIP Commitment shall have been terminated), and the Debtor shall be liable to, and shall indemnify and hold the Agent and each Lender harmless for the amount of such payment surrendered until the applicable Lenders and the Agent shall have been finally and irrevocably paid in full in cash.  The provisions of the foregoing sentence shall be and remain effective notwithstanding any contrary action that may have been taken by the Agent or any Lender in reliance upon such payment, and any such contrary action so taken shall be without prejudice to the Agent's and Lenders' rights under this Agreement and shall be deemed to have been conditioned upon such payment having become final and irrevocable.

Section 13.08　No Liability.  Neither this Agreement nor any document executed in connection herewith shall constitute an assumption by the Agent or any Lender of any obligation to any Obligor or any patient or customer of the Debtor.  Notwithstanding any other provision herein, no recourse under any obligation, covenant, agreement or instrument of the Agent or any Lender contained herein or with respect hereto shall be had against any Related Person whether arising by breach of contract, or otherwise at law or in equity (including any claim in tort), whether express or implied, it being understood that the agreements and other obligations of the Agent and each Lender herein and with respect hereto are solely its corporate obligations; *provided, however*, nothing herein shall operate as a release of any liability that may arise as a result of such Related Person's gross negligence or willful misconduct.

Section 13.09　Entire Agreement; Severability.　This Agreement, including all exhibits and schedules hereto and the other DIP Documents, embody the entire agreement and understanding of the parties concerning the subject matter contained herein.  This Agreement supersedes any and all prior agreements and understandings between the parties, whether written or oral.  If any provision of this Agreement shall be declared invalid or unenforceable, the parties hereto agree that the remaining provisions of this Agreement shall continue in full force and effect.

Section 13.10　GOVERNING LAW.　THIS AGREEMENT, AND ALL MATTERS ARISING OUT OF OR RELATED TO THIS AGREEMENT, SHALL, IN ACCORDANCE WITH SECTION 5-1401 OF THE GENERAL OBLIGATIONS LAW OF THE STATE OF NEW YORK,  BE GOVERNED BY THE LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO ANY CONFLICTS OF LAWS PRINCIPLES THEREOF THAT

WOULD CALL FOR THE APPLICATION OF THE LAWS OF ANY OTHER JURISDICTION, EXCEPT TO THE EXTENT THAT THE VALIDITY OR PERFECTION OF THE SECURITY INTERESTS GRANTED HEREUNDER, OR REMEDIES RELATED THERETO, IN RESPECT OF ANY PARTICULAR COLLATERAL ARE GOVERNED BY THE LAWS OF A JURISDICTION OTHER THAN THE STATE OF NEW YORK.

Section 13.11 <u>JURISDICTION AND VENUE</u>.  ANY JUDICIAL PROCEEDING BROUGHT BY OR AGAINST THE DEBTOR WITH RESPECT TO ANY OF THE LENDER DEBT, THIS AGREEMENT, THE OTHER DOCUMENTS OR ANY RELATED AGREEMENT MAY BE BROUGHT IN THE BANKRUPTCY COURT OR IN ANY COURT OF COMPETENT JURISDICTION IN THE CITY OF NEW YORK, BOROUGH OF MANHATTAN, STATE OF NEW YORK, UNITED STATES OF AMERICA, AND, BY EXECUTION AND DELIVERY OF THIS AGREEMENT, THE DEBTOR ACCEPTS FOR ITSELF AND IN CONNECTION WITH ITS PROPERTIES, GENERALLY AND UNCONDITIONALLY, THE NON-EXCLUSIVE JURISDICTION OF THE AFORESAID COURTS, AND IRREVOCABLY AGREES TO BE BOUND BY ANY JUDGMENT RENDERED THEREBY IN CONNECTION WITH THIS AGREEMENT.  THE DEBTOR WAIVES ANY OBJECTION TO JURISDICTION AND VENUE OF ANY ACTION INSTITUTED HEREUNDER AND SHALL NOT ASSERT ANY DEFENSE BASED ON LACK OF JURISDICTION OR VENUE OR BASED UPON *FORUM NON CONVENIENS*. THE DEBTOR WAIVES THE RIGHT TO REMOVE ANY JUDICIAL PROCEEDING BROUGHT AGAINST THE DEBTOR IN ANY STATE COURT TO ANY FEDERAL COURT.  ANY JUDICIAL PROCEEDING BY THE DEBTOR AGAINST THE AGENT OR ANY LENDER INVOLVING, DIRECTLY OR INDIRECTLY, ANY MATTER OR CLAIM IN ANY WAY ARISING OUT OF, RELATED TO OR CONNECTED WITH THIS AGREEMENT, ANY DIP DOCUMENTS, OR ANY RELATED AGREEMENT, SHALL BE BROUGHT ONLY IN THE BANKRUPTCY COURT OR IN A FEDERAL OR STATE COURT LOCATED IN THE CITY OF NEW YORK, BOROUGH OF MANHATTAN, STATE OF NEW YORK, UNITED STATES OF AMERICA.  IN ANY SUCH LITIGATION, EACH OF THE PARTIES HERETO WAIVES PERSONAL SERVICE OF ANY SUMMONS, COMPLAINT OR OTHER PROCESS AND AGREES THAT SERVICE THEREOF MAY BE MADE BY CERTIFIED OR REGISTERED MAIL DIRECTED TO THE PARTIES HERETO AT THEIR ADDRESSES SET FORTH ON <u>SCHEDULE I</u>.

Section 13.12 <u>WAIVER OF JURY TRIAL; JUDICIAL REFERENCE</u>.  TO THE EXTENT NOT PROHIBITED BY APPLICABLE LAW, EACH OF THE PARTIES HERETO HEREBY WAIVES ALL RIGHTS TO A TRIAL BY JURY IN THE EVENT OF ANY LITIGATION (A) ARISING UNDER THIS AGREEMENT, THE OTHER DIP DOCUMENTS, OR ANY OTHER INSTRUMENT, DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH, OR (B) IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO OR THERETO OR ANY OF THEM WITH RESPECT TO THIS AGREEMENT, THE OTHER DIP DOCUMENTS OR ANY OTHER INSTRUMENT, DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH, OR THE TRANSACTIONS RELATED HERETO OR THERETO, IN EACH CASE, WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT OR TORT OR

\DRMC: DIP Loan and Security Agreement #9830081 (v.8).doc

OTHERWISE AND EACH PARTY HEREBY CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY, AND THAT ANY PARTY TO THIS AGREEMENT OR SUCH OTHER LOAN DOCUMENT MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENTS OF THE PARTIES HERETO TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY. SOLELY IN THE EVENT THAT NOTWITHSTANDING THE PARTIES' ELECTION OF NEW YORK LAW, CALIFONRIA LAW IS APPLIED, THE WAIVER OF JURY TRIAL SET FORTH IN THIS SECTION 13.12 IS NOT ENFORCEABLE, AND EACH PARTY TO SUCH ACTION DOES NOT SUBSEQUENTLY WAIVE IN AN EFFECTIVE MANNER UNDER APPLICABLE LAW ITS RIGHT TO A TRIAL BY JURY, THE PARTIES HERETO HEREBY AGREE TO CAUSE VENUE OF SUCH ACTION TO BE TRANSFERRED TO A COURT OF COMPETENT JURISDICTION LOCATED IN LOS ANGELES, CALIFORNIA AND ELECT THEREAFTER TO PROCEED AS FOLLOWS:

(a)    WITH THE EXCEPTION OF THE ITEMS SPECIFIED IN CLAUSE (b) BELOW, ANY CONTROVERSY, DISPUTE OR CLAIM (EACH, A "**CONTROVERSY**") BETWEEN THE PARTIES ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER DIP DOCUMENT WILL BE RESOLVED BY A REFERENCE PROCEEDING IN ACCORDANCE WITH THE PROVISIONS OF SECTIONS 638, *ET SEQ.* OF THE CALIFORNIA CODE OF CIVIL PROCEDURE ("**CCP**"), OR THEIR SUCCESSOR SECTIONS, WHICH SHALL CONSTITUTE THE EXCLUSIVE REMEDY FOR THE RESOLUTION OF ANY CONTROVERSY, INCLUDING WHETHER THE CONTROVERSY IS SUBJECT TO THE REFERENCE PROCEEDING.  EXCEPT AS OTHERWISE PROVIDED ABOVE, VENUE FOR THE REFERENCE PROCEEDING WILL BE IN ANY COURT IN WHICH VENUE IS APPROPRIATE UNDER APPLICABLE LAW (THE "**COURT**").

(b)    THE MATTERS THAT SHALL NOT BE SUBJECT TO A REFERENCE ARE THE FOLLOWING:  (i) NON-JUDICIAL FORECLOSURE OF ANY SECURITY INTERESTS IN PERSONAL PROPERTY; (ii) EXERCISE OF SELF HELP REMEDIES (INCLUDING SET-OFF); (iii) APPOINTMENT OF A RECEIVER; AND (iv) TEMPORARY, PROVISIONAL OR ANCILLARY REMEDIES (INCLUDING WRITS OF ATTACHMENT, WRITS OF POSSESSION, TEMPORARY RESTRAINING DIP ORDERS OR PRELIMINARY INJUNCTIONS).  THIS AGREEMENT DOES NOT LIMIT THE RIGHT OF ANY PARTY TO EXERCISE OR OPPOSE ANY OF THE RIGHTS AND REMEDIES DESCRIBED IN CLAUSES (i) AND (ii) OR TO SEEK OR OPPOSE FROM A COURT OF COMPETENT JURISDICTION ANY OF THE ITEMS DESCRIBED IN CLAUSES (iii) AND (iv).  THE EXERCISE OF, OR OPPOSITION TO, ANY OF THOSE ITEMS DOES NOT WAIVE THE RIGHT OF ANY PARTY TO A REFERENCE PURSUANT TO THIS AGREEMENT.

(c)    THE REFEREE SHALL BE A RETIRED JUDGE OR JUSTICE SELECTED BY MUTUAL WRITTEN AGREEMENT OF THE PARTIES.  IF THE PARTIES DO NOT AGREE WITHIN TEN (10) DAYS OF A WRITTEN REQUEST TO DO SO BY ANY PARTY, THEN, UPON REQUEST OF ANY PARTY, THE REFEREE SHALL BE

SELECTED BY THE PRESIDING JUDGE OF THE COURT (OR HIS OR HER REPRESENTATIVE).  A REQUEST FOR APPOINTMENT OF A REFEREE MAY BE HEARD ON AN *EX PARTE* OR EXPEDITED BASIS, AND THE PARTIES AGREE THAT IRREPARABLE HARM WOULD RESULT IF *EX PARTE* RELIEF IS NOT GRANTED.

(d)    EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, THE REFEREE SHALL DETERMINE THE MANNER IN WHICH THE REFERENCE PROCEEDING IS CONDUCTED INCLUDING THE TIME AND PLACE OF HEARINGS, THE ORDER OF PRESENTATION OF EVIDENCE, AND ALL OTHER QUESTIONS THAT ARISE WITH RESPECT TO THE COURSE OF THE REFERENCE PROCEEDING.  ALL PROCEEDINGS AND HEARINGS CONDUCTED BEFORE THE REFEREE, EXCEPT FOR TRIAL, SHALL BE CONDUCTED WITHOUT A COURT REPORTER, EXCEPT THAT WHEN ANY PARTY SO REQUESTS, A COURT REPORTER WILL BE USED AT ANY HEARING CONDUCTED BEFORE THE REFEREE, AND THE REFEREE WILL BE PROVIDED A COURTESY COPY OF THE TRANSCRIPT.  THE PARTY MAKING SUCH A REQUEST SHALL HAVE THE OBLIGATION TO ARRANGE FOR AND PAY THE COURT REPORTER.  SUBJECT TO THE REFEREE'S POWER TO AWARD COSTS TO THE PREVAILING PARTY, THE DEBTOR SHALL BEAR THE COST OF THE REFEREE AND THE COURT REPORTER AT TRIAL.

(e)    THE REFEREE SHALL BE REQUIRED TO DETERMINE ALL ISSUES IN ACCORDANCE WITH EXISTING APPLICABLE CASE LAW AND STATUTORY LAW.  THE RULES OF EVIDENCE APPLICABLE TO PROCEEDINGS AT LAW IN THE COURT WILL BE APPLICABLE TO THE REFERENCE PROCEEDING. THE REFEREE SHALL BE EMPOWERED TO ENTER EQUITABLE AS WELL AS LEGAL RELIEF, ENTER EQUITABLE DIP ORDERS THAT WILL BE BINDING ON THE PARTIES AND RULE ON ANY MOTION THAT WOULD BE AUTHORIZED IN A COURT PROCEEDING.  THE REFEREE SHALL ISSUE A DECISION AT THE CLOSE OF THE REFERENCE PROCEEDING WHICH DISPOSES OF ALL CLAIMS OF THE PARTIES THAT ARE THE SUBJECT OF THE REFERENCE.  PURSUANT TO CCP SECTION 644, SUCH DECISION SHALL BE ENTERED BY THE COURT AS A JUDGMENT OR AN ORDER IN THE SAME MANNER AS IF THE ACTION HAD BEEN TRIED BY THE COURT AND ANY SUCH DECISION WILL BE FINAL, BINDING AND CONCLUSIVE. THE PARTIES RESERVE THE RIGHT TO APPEAL FROM THE FINAL JUDGMENT OR ORDER OR FROM ANY APPEALABLE DECISION OR ORDER ENTERED BY THE REFEREE.   THE PARTIES RESERVE THE RIGHT TO FINDINGS OF FACT, CONCLUSIONS OF LAWS, A WRITTEN STATEMENT OF DECISION, AND THE RIGHT TO MOVE FOR A NEW TRIAL OR A DIFFERENT JUDGMENT, WHICH NEW TRIAL, IF GRANTED, IS ALSO TO BE A REFERENCE PROCEEDING UNDER THIS PROVISION.

(f)    The foregoing reference to the CCP shall apply notwithstanding the provisions of <u>Section 13.10</u>; *provided*, that the inclusion of the reference provisions in this <u>Section 13.12</u> shall not otherwise affect or limit in any way the parties' choice of New York law.

-62-

Section 13.13  <u>Execution in Counterparts</u>.  This Agreement may be executed in counterparts, each of which when so executed shall be deemed to be an original and all of which when taken together shall constitute one and the same agreement.

Section 13.14  <u>Intentionally Omitted</u>.

Section 13.15  <u>Intentionally Omitted</u>.

Section 13.16  <u>Accounting Information</u>.  The Debtor hereby authorizes the Agents and the Lenders to discuss the financial condition of the Debtor with its independent public accountants and agrees that such discussion or communication shall be without liability to such Person or the independent public accountants.

Section 13.17  <u>USA PATRIOT ACT</u>.  The Debtor acknowledges and consents that, in accordance with the reporting requirements of the USA PATRIOT Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "**Act**"), the Lenders may require, obtain, verify and record information that identifies the Debtor, which information includes the name and addresses of the Debtor and its principals, as well as any other information that will allow the Agent and the Lenders to identify the Debtor and its principals in accordance with, and otherwise comply with the requirements of, the Act.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

**-63-**

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first above written.

**DOWNEY REGIONAL MEDICAL CENTER-HOSPITAL, INC.** (d/b/a DOWNEY REGIONAL MEDICAL CENTER), a non-profit public benefit corporation organized under the laws of the State of California and a debtor and debtor in possession under Chapter 11 of the Bankruptcy Code

By: _____
     Name:
     Title:

**HEALTHCARE FINANCE GROUP, INC.,**
as Lender and Agent

By: _____
     Name:
     Title:

DIP Commitment:

Prior to the Incremental Facility Effective Date: $4,000,000

Following the Incremental Facility Effective Date: $15,000,000

EXHIBIT A

FORM OF INTERIM CASH COLLATERAL ORDER


[ATTACHED]

\DRMC: DIP Loan and Security Agreement #9830081 (v.8).doc

EXHIBIT B

FORM OF INTERIM DIP ORDER


[ATTACHED]

\DRMC: DIP Loan and Security Agreement #9830081 (v.8).doc

EXHIBIT C

REPORTING REQUIREMENTS

| | |
|---|---|
| On the first Business Day following the Debtor's request for the initial DIP Advance: | (a)  A Borrowing Base Report calculating the Borrowing Base as of the close of business as of the day of the request for the Interim DIP Advance. |
| On each Funding Date, and more frequently if requested by the Agent: | (b)  The Debtor's good faith estimates of amounts of Receivables that are subject to offset by any Governmental Entity. |
| Daily, on each Business Day, beginning on the Business Day following the entry of the Interim DIP Order: | (c)  A report, as of the close of the immediately preceding Business Day, stating the Debtor's actual cash balances, in form and in detail reasonably satisfactory to the Agent and the Required Lenders. |
| Weekly, on each Tuesday, beginning with Tuesday of the **[first]** week following entry of the Interim DIP Order: | (d)  A Variance Report, in a form reasonably satisfactory to the Agent and the Required Lenders, together with a certification from an Authorized Officer certifying that the report fairly presents the results of operations of the Debtor for such period. |
| Weekly, on each Wednesday, beginning with Wednesday of the first week following entry of the Interim DIP Order: | (e)  Irrespective of whether Debtor has requested a DIP Advance, a Borrowing Base Report calculating the Borrowing Base as of the close of business of Tuesday of the previous week, together with supporting information in form and substance acceptable to the Agent and the Required Lenders.

(f)  A "Thirteen Week Forecast" (as defined in the DIP Orders), which Thirteen Week Forecast shall be subject to the consent of the Agent and the Required Lenders in their sole and absolute discretion.

(g)  An "Actual Cash Flows Report" (as defined in the DIP Orders) for the week ending on the preceding Wednesday (together with comparative figures set forth in each of the Actual Cash Flows Reports previously delivered to the Agent), together with a certification from an Authorized Officer certifying that the report fairly presents the financial condition and results of operations of the Debtor for such period.

(h)  Patient census, and changes in the patient volume and patient mix since the prior report, at the Debtor's hospital facility.

(i)  Any other matters material to the Debtor's continuing operation |

C-1

| | |
|---|---|
| | of its business. |
| Monthly, on or prior to the 10th day of each month: | (j)  A copy of the Monthly Report, together with a revised Borrowing Base Report based on reconciliations and adjustments reflected in such Monthly Report, certified by the chief financial officer of the Debtor. |
| Monthly, as soon as available and in any event no later than 30 days after the end of each month that is not the last month of a fiscal quarter and 45 days after the end of each month that is the last month of a fiscal quarter of the Debtor: | (k)  Combined and combining balance sheets, income statements and statements of changes in cash flow of the Debtor as of the end of such month or quarter. <br><br>(l)   A Compliance Certificate. <br><br>(m)Statistical report, including census, statistics and such other information as may be requested by the Agent. <br><br>(n)  If adjusted from the prior month's value, internally prepared cost report settlement estimates with respect to Governmental Entities. |
| Annually, as soon as available and in any event within 90 days after the end of each fiscal year of the Debtor: | (o)  A copy of the audited individual and combined and combining financial statements (together with explanatory notes thereon) and the auditor's unqualified report letter for such year for the Debtor, containing financial statements for such year audited by independent certified public accountants of recognized standing acceptable to the Agent and a copy of any management letter or written report submitted to the Debtor by independent certified public accountants with respect to the business, condition (financial or otherwise), operations, prospects, or Properties of the Debtor; <br><br>(p)  A Compliance Certificate; <br><br>(q)  A report satisfactory in form to the Agent, listing all material insurance coverage maintained as of the date of such report by the Debtor and all material insurance planned to be maintained by the Debtor in the subsequent fiscal year. |
| As and when reported to the United States Trustee: | (r)  All interim reports and operating statements. |
| As and when reported to the Bond Trustee: | (s)  All reports given or required to be given under any cash collateral order or adequate protection stipulation between the Debtor and the Bond Trustee. |
| Promptly (and in no event later than one Business Day following the Debtor obtaining | (t)  Any breach by the Debtor of any covenants or representations and warranties hereunder or under any other DIP Document, |

\DRMC: DIP Loan and Security Agreement #9830081 (v.8).doc

| actual knowledge thereof), notice in reasonable detail of: | including upon discovery of a breach of the Eligibility Criteria. |
|---|---|
| | (u) The occurrence of any Default or any Event of Default, such notice to be accompanied by a statement of the Authorized Officer of the Debtor setting forth details of such Default or Event of Default, and the action that the Debtor has taken and/or proposes to take with respect thereto. |
| | (v) Any Lien asserted or claim made against a Receivable or any Lien asserted or claim made against any other Collateral other than a Permitted Lien. |
| | (w) The occurrence of any other event that could reasonably be expected to adversely affect the value of any equipment, inventory, real property or other assets of the Debtor, the other Collateral or the interest of the Agent therein. |
| | (x) Any notice of any investigations or audits (including cost reports or similar audits regarding the valuation of receivables payments) of the Debtor being conducted by any federal, state or county Governmental Entity or its agents or designees, and the results thereof. |
| | (y) Any matter that could reasonably be expected to have or result in a Material Adverse Effect. |
| As soon as available: | (z) Copies of each financial statement, report, notice or proxy statement sent by the Debtor to its stockholders generally. |
| | (aa) Copies of each press release or other statement made available by the Debtor to the public concerning developments in the business of the Debtor. |
| | (bb) Copies of any statement or report furnished by the Debtor to any other party pursuant to the terms of any indenture, loan, or credit or similar agreement and not otherwise required to be furnished to the Agent or any Lender pursuant to this Agreement. |
| Upon request by Agent | (cc) Such other information respecting the Receivables, the equipment, inventory, real property or other assets of the Debtor, the other Collateral or the condition or operations, financial or otherwise, of the Debtor as the Agent or any of the Lenders may from time to time reasonably request. |

\DRMC: DIP Loan and Security Agreement #9830081 (v.8).doc

EXHIBIT I

ELIGIBILITY CRITERIA

The following shall constitute the eligibility criteria for acceptance of Receivables for financing and inclusion in the Borrowing Base under the Agreement (the "**Eligibility Criteria**"):

(a)    The information provided by the Debtor with respect to each such Receivable is complete and correct and all documents, attestations and agreements relating thereto that have been delivered to the Agent are true and correct.

(b)    All information set forth in the bill and supporting claim documents with respect to such Receivable is true, complete and correct; if additional information is requested by the Obligor, the Debtor has provided, or will promptly provide, the same, and if any error has been made with respect to such information, the Debtor will promptly correct the same and, if necessary, rebill such Receivable.

(c)    The Debtor has billed the applicable Obligor and has delivered to such Obligor all requested supporting claim documents with respect to such Receivable and no amounts with respect to such Receivable have been paid as of the date and time of the inclusion of such Receivable in the Borrowing Base.  The Debtor has, or has the right to use, valid identification numbers and licenses to generate valid Receivables.

(d)    The Debtor's Medicare and Medicaid cost reports with respect to such Receivable for all cost reporting periods ending on or before the date of the last audited cost report have been examined and audited by (i), as to Medicaid, the applicable state agency or other CMS designated agent or agents of such state agency, charged with such responsibility or (ii), as to Medicare, the Medicare intermediary or other CMS designated agents charged with such responsibility; and there is no basis for any Governmental Entity to assert an offset with respect to such Receivable against the Debtor.

(e)    Each such Receivable (i) is payable in an amount not less than its Expected Net Value, by the Obligor or Obligors identified by the applicable Debtor in its records as being obligated to do so, (ii) is based on an actual and bona fide rendition of services or sale of goods to the patient by the Debtor in the ordinary course of business, (iii) is denominated and payable only in U.S. dollars in the United States, (iv) is an account or general intangible within the meaning of the UCC of the state in which the Debtor is incorporated, and is not evidenced by any instrument or chattel paper, (v) shall be subject to a patient consent form approved by the Agent and executed by the applicable patient, (vi) is net of any contractual allowances, deductible limitations, commissions, fees, or other discounts and (vii) does not cover any treatment for alcohol, drug or substance abuse, workers' compensation claims or personal injury claims.  There are no payors other than the Obligor or Obligors identified in the Debtor's records as the payors primarily liable on such Receivable.

(f)    Each such Receivable (i) is not the subject of any action, suit, proceeding or dispute (pending or threatened), setoff, counterclaim, defense, abatement, suspension,

\DRMC: DIP Loan and Security Agreement #9830081 (v.8).doc

deferment, deductible, reduction or termination by the Obligor thereof (except for statutory rights of Governmental Entities that are not pending or threatened), and (ii) is not past, or within 60 days of, the statutory limit for collection applicable to the Obligor thereof or is not aged more than 150 days from its Last Service Date.

(g)    Each such Receivable is not due from any Governmental Entity based on any cost report settlement or expected settlement.

(h)    The Debtor has no Guaranty of, letter of credit providing credit support for, or collateral security for, such Receivable, other than any such guaranty, letter of credit or collateral security as has been assigned to the Agent, and any such guaranty, letter of credit or collateral security is not subject to any Lien in favor of any other Person.

(i)    The goods and services constituting the basis for such Receivable were medically necessary for the customer or patient, and the customer or patient has received such goods and services.

(j)    The fees charged for the goods and services constituting the basis for such Receivable are consistent with the usual, customary and reasonable fees charged by other similar medical providers for the same or similar goods in the Debtor's community and in the community in which the patient resides.

(k)    The Obligor with respect to each such Receivable (i) is not currently the subject of any bankruptcy, insolvency or receivership proceeding, nor is it unable to make payments on its obligations when due, (ii) is located in the United States of America, (iii) is not a subsidiary, parent or other Person that is an Affiliate of the Debtor, (iv) is not the Obligor of any Receivable that was a Defaulted Receivable (as defined below) in the past 12 months, and (v) is an Insurer with a credit quality acceptable to the Agent or a Governmental Entity.  For purposes hereof, "**Defaulted Receivable**" means a Receivable (i) as to which the Obligor thereof or any other Person obligated thereon instituted or suffered any Insolvency, or (ii) that has not been paid in full on or following the 180th day following the Last Service Date with respect thereto or otherwise, consistent with the Credit and Collection Policy, would have been written off the Debtor's books as uncollectible.

(l)    The financing of such Receivables hereunder is made in good faith and without actual intent to hinder, delay or defraud present or future creditors of the Debtor.

(m)    Any insurance policy, contract or other instrument obligating an Obligor to make payment with respect to such Receivable (i) does not contain any provision prohibiting the grant of a Lien in such payment obligation from the patient to the Debtor, or from the Debtor to the Agent, (ii) has been duly authorized and, together with such Receivable, constitutes the legal, valid and binding obligation of the Obligor in accordance with its terms, (iii) together with such Receivable, does not contravene in any material respect any requirement of law applicable thereto, and (iv) was in full force and effect and applicable to the customer or patient at the time the goods or services constituting the basis for such Receivable were sold or performed.

I-2

(n)     The insurance policy, contract or other instrument obligating a Governmental Entity to make payment with respect to such Receivable (i) has been duly authorized and, together with the applicable Receivable, constitutes the legal, valid and binding obligation of the Governmental Entity in accordance with its terms, (ii) together with the applicable Receivable, does not contravene in any material respect any requirement of law applicable thereto, and (iii) was in full force and effect and applicable to the customer or patient at the time the goods or services constituting the basis for such Receivable were sold or performed.

(o)     No consents by any third party to the grant of a security interest in such Receivable are required other than consents previously obtained in writing by the Debtor, a copy of each such consent having been provided to the Agent.

(p)     The inclusion of such Receivable in the Borrowing Base would not increase the total aggregate gross value of all Receivables in the Borrowing Base for any Obligor (or group of Obligors) listed below, as a percentage of the total aggregate gross value of Receivables of all Obligors in the Borrowing Base, above the corresponding percentages listed below:

| Obligor | Maximum Eligibility |
| --- | --- |
| Medicare | 75% |
| Medicaid | 75% |
| Blue Cross/Blue Shield | 40% |
| All Commercial Insurance Obligors, HMOs and PPOs | 40% |
| any single AAA rated (non-governmental) Obligor | 10% |
| any single AA rated (non-governmental) Obligor | 6% |
| any single A rated (non-governmental) Obligor | 4% |
| any single BBB rated (non-governmental) Obligor | 3% |
| any single unrated (non-governmental) Obligor | 2% |

(q)     Unless specifically verified by the Debtor and accepted by the Agent, no single Eligible Receivable is in an amount in excess of **[$50,000]**.

(r)     If the percentage of Eligible Receivables aged over **[90/120]** days at any point in time is greater than [___] % of the total Eligible Receivables, the dollar amount of Eligible Receivables over the aforementioned percentage will not be considered Eligible Receivables.

(s)     No Lien that is still in effect on the applicable Funding Date has been made with respect to or granted in any such Receivable except for the Lien in favor of the Agent and other Permitted Liens.

I-3

(t)      **[Each such Receivable, regardless of whether otherwise eligible, is not due from an Obligor if [\_\_]% or more of the total amount of Receivables due from such Obligor are not Eligible Receivables.]**

\DRMC: DIP Loan and Security Agreement #9830081 (v.8).doc

EXHIBIT II

FORM OF BORROWING BASE REPORT

HEALTHCARE FINANCE GROUP, INC.

Report Submission Date:_____
As of Date:_____

| | | |
|---|---|---|
| I | Gross Receivables Balance as of: _____ | |
| | | |
| II | Deductions to Gross Receivables: | |
| | Ineligible Receivables | |
| | Cross-Aged | |
| | Other Ineligibles | |
| | Total Ineligible A/R | |
| | | |
| III | Gross Eligible Receivables as of: _____ | |
| | | |
| IV | Net Value Factor | % |
| | | |
| V | Expected Net Value | |
| | | |
| VI | Additions to Expected Net Value | |
| | Expected Net Value of New Receivables | |
| | Adjustments | |
| | | |
| VII | Deductions to Expected Net Value | |
| | Collections | |
| | Aged Claims | |
| | Deferred Revenue | |
| | Unapplied Cash | |
| | Credit Balances | |
| | Medicare/Medicaid Reserve | |
| | Horizon Reserve | |
| | Other Adjustments/Reserves | |
| | | |
| VIII | Adjusted Expected Net Value | |
| | | |
| IX | Advance Rate | % |
| | | |
| X | Borrowing Base | |

**II-1**

\DRMC: DIP Loan and Security Agreement #9830081 (v.8).doc

| XI | Revolving Commitment | |
| XII | Borrowing Limit (Lesser of Revolving Commitment and Borrowing Base) | |
| XIII | Less: Accrued Amounts | |
| XIV | Less: Minimum Liquidity Block (Reserve) | |
| XV | Adjusted Borrowing Limit | |
| XVI | Outstanding Revolving Loan Balance Prior Report | |
| XVII | Less: Collections | |
| XVIII | Total Interest, Fees, Charges & Expenses | |
| XIX | Revolving Advance Request This Report | |
| XX | Revolving Loan Balance This Report | |
| XXI | Net Availability | |

The undersigned desires to make a borrowing of a DIP Advance on _____, 200_ in the amount of $_____.

The undersigned represents and warrants that the foregoing information is true, complete and correct and that the collateral reflected herein complies with and conforms to the Eligibility Criteria set forth in Exhibit I to the Secured Super-Priority Debtor In Possession Loan and Security Agreement between the undersigned and HEALTHCARE FINANCE GROUP INC., a Delaware corporation ("**HFG**") and any supplements and amendments, if any, thereto (the "**Agreement**"; capitalized terms used herein and not otherwise defined shall have the meanings assigned thereto in the Agreement). The undersigned promises to pay to HFG the new loan balances reflected above, plus interest, as set forth in the Agreement.

The undersigned represents and warrants that (1) as of the date hereof, (x) the Debtor is in compliance with each of the terms, covenants, and conditions set forth in the Agreement and that no Default or Event of Default exists or is continuing under the Agreement, and (y) if this Borrowing Base is being delivered in connection with a request for a DIP Advance, the representations, warranties and covenants contained in Articles VII, VIII, IX and X

\DRMC: DIP Loan and Security Agreement #9830081 (v.8).doc

of the Loan Agreement are and will be true, correct, and in compliance both before and after giving effect to the DIP Advance requested herein and to the application of the proceeds thereof, as though made on and as of such date (it being understood and agreed that any representation or warranty that by its terms is made on a specified date shall be required to be true and correct only as of such specified date), (2) within 90 days preceding and through the date hereof, the Debtor has not received any notice from any state or federal regulatory or law enforcement agency citing specific deficiencies that (x) pose immediate jeopardy to the health or safety of the patients in any of the Debtor's facilities; or (y) would otherwise threaten the Debtor's continued participation in the Medicare, Medicaid, Medical and/or any other applicable government program, (3) within 90 days preceding and through the date hereof, the Debtor is not subject to any investigatory visits by and has not received any correspondence from any state or federal agency alleging possible improper billing or claims activity, and (4) the aggregate amount of cost report settlement liability owing to Medicare/Medicaid is $_____.

As of the date hereof, the Debtor has not diverted or permitted to be diverted any such payments on Receivables from the Lockbox Accounts or issued any Revocation Order as defined in the Depositary Agreements).

**DOWNEY REGIONAL MEDICAL CENTER-HOSPITAL, INC.**
(d/b/a DOWNEY REGIONAL MEDICAL CENTER),
a non-profit public benefit corporation organized under
the laws of the State of California and a debtor and debtor in possession
under Chapter 11 of the Bankruptcy Code, as Debtor and as
servicer of Primary Servicing Responsibilities


By:    _____
       Name:
       Title:

Date:    _____

**II-3**

EXHIBIT III

RECEIVABLE INFORMATION

Subject to compliance with and the limitations of applicable law in effect from time to time, including patient confidentiality restrictions that may limit or otherwise proscribe the providing of requested medical information, the following information shall, as appropriate, be provided by the Debtor to the Agent with respect to the Receivables, together with such other information and in such form as may reasonably be requested from time to time by the Agent (the "**Receivable Information**"):

customer/patient information;

insured party and other policy-related information;

services and products classification information (i.e., D.R.G. and other like information established by the Debtor from time to time to classify services rendered by the Debtor or goods sold at or by the Debtor's institutions);

Obligor required information (*i.e.*, information provided in the ordinary course of business to any specified Obligor or any other information required to be provided to an Obligor pursuant to any agreement, contract or other arrangement with such Obligor); and

billing information (*i.e.*, all information provided by the Debtor on invoices to Obligors and any other information required to be provided pursuant to the Credit and Collection Policy and, to the extent the Transmission will not be via computer interface, including a copy of the admitting face sheet, CMS Form and a detailed copy of the bill).

**III-1**

EXHIBIT IV

FORM OF NOTICE TO OBLIGORS

[Letterhead of the Debtor]

[Date]

[Name and Address
of Obligor]

Re:    Change of Account and Address for Provider [#_____]

To Whom it May Concern:

Please be advised that we are granting in favor of HEALTHCARE FINANCE GROUP INC. a security interest in all of our existing and future receivables payable by you to us.  Accordingly, you are hereby directed to make:

**Section 2.**    All wire transfers directly to the following account:

_____

_____

_____

Account #
ABA #
Confirm Phone Number:
Attention:

**Section 3.**    All Explanation of Benefits, remittance advices and other forms of payment, including checks, to the following address:

_____

_____

Reference: HEALTHCARE FINANCE GROUP INC.

The foregoing directions shall apply to all existing receivables payable to us and (until further notice) to all receivables arising in the future and may not be revoked except by a writing executed by the Agent.

Please acknowledge your receipt of this notice by signing the enclosed copy of this letter and returning it in the enclosed envelope.

**IV-1**

\DRMC: DIP Loan and Security Agreement #9830081 (v.8).doc

Thank you for your cooperation in this matter.

**DOWNEY REGIONAL MEDICAL CENTER-
HOSPITAL, INC.** (d/b/a DOWNEY REGIONAL
MEDICAL CENTER)


By:_____

    [Authorized Officer]


Agreed to and Acknowledged:
[Name of Obligor]

By:_____

    Title:


**IV-2**

EXHIBIT V

TRANSMISSION OF ELECTRONIC DATA FILES

1.    The Agent will convey appropriate data requirements and guidelines to the Debtor in order for the Debtor to provide the necessary data files from its accounts receivable system(s).  The Agent will require data files of a format reasonably acceptable to the lender that contains the Debtor's accounts receivable information and summary reports.  This will include, but not be limited to, detailed charges, payments, adjustments, write offs, aging summary information, insurance master detail and control totals.  The above mentioned data files will be provided to the Agent via secure electronic transfer through the Agent's secure FTP site.  These files will be provided on an on-going basis according to an established schedule.

2.    The Debtor shall give the Agent at least ten Business Days' notice of any coding changes or electronic data processing system modifications made by the Debtor that could affect the Agent's processing or interpretation of the data received.

3.    The Agent shall have no responsibility to return to the Debtor any information that the Debtor provides via e-mails or through the secure FTP site.

4.    The Debtor will prepare detailed accounts receivable data files of all transaction types for all of its sites that are included in the program.  The weekly or monthly cutoff, as applicable, will occur at a predetermined time in each such period, and such cutoff date for all of the sites must occur at exactly the same time.  The cutoff date that will be selected will be at the end of business for a specific day of the week or month, as applicable, or in other words, at the end of the Debtor's transaction posting process for that day.  The Debtor will temporarily maintain a copy of the accounts data files in the event that the data is degraded or corrupted during transmission, and needs to be re-transmitted.

The Agent will be responsible for the management of the hardware, communications and software used in the program.

5.    The Agent's data analyst will receive the receivables data files, and confirm that the files have been passed without degradation or corruption of data by balancing the detailed items to the control totals that accompany the files.  Any problems in this process will be reported to the Debtor so that the receivables data file can be re-transmitted, if necessary.

6.    Once the receipt of the receivables data files has been confirmed, the Agent will perform certain tests and edits to determine which receivables meet the Eligibility Criteria.  Compliance with concentration limits will be verified by the Agent.

7.    The Debtor will create the necessary data files for each of the eligible sites.  The data files will contain all detail transactions posted to the accounts receivable system for the specified period (and will indicate the site and the number of items and total dollars on each transaction report for control purposes).  The data files will contain balances that

V-1

reflect the transactions posted on the Debtor's systems through the end of business of the specified period.

The Debtor will transmit the data files to the Agent according to the established schedule. The Debtor should, again, maintain the backup of each of these data files in the event that a re-transmission is necessary.

8.    The Agent's data analyst will confirm that the data files have been received, and will communicate any problems to the Debtor in order to initiate a re-transmission.  The Agent will then post the transaction files and consequently update the affected balances. Upon completion of the posting process, the Agent will generate summary reports of the posting process that the Agent will use to complete various funding activities.  The Agent summary reports will reference the Debtor's transaction codes and activity to codes that are common to the funding program.

9.    The Agent will then compare the updated accounts balances on the Agent's system to the corresponding account balances reflected on the applicable receivable data file.  The Agent expects that the balances for the funded receivables will be congruent, and any discrepancies will be immediately examined and resolved through the cooperative effort of the Agent and the Debtor.  The Agent will produce discrepancy reports (*e.g.*, "Roll-Forward" or "Out of Balance" reports) and the Debtor shall respond promptly to such reports.

10.    Once the reconciliation process has been completed and any discrepancies between the Agent's and the Debtor's receivable data files resolved through the discrepancy report process described in paragraph 9 above, the Agent will then process the receivables file and advise the Lenders that they may make additional DIP Loans with respect to any new receivable that has satisfied the Eligibility Criteria.  The Agent will then proceed through exactly the same process described in paragraph 6 above.

11.    The Agent will use commercially reasonable efforts to comply with, and to cause the members of the Lender Group to comply with, all laws and regulations applicable to its duties hereunder, including patient confidentiality laws and regulations, including as set forth under the Health Insurance Portability and Accountability Act of 1996.

**V-2**

EXHIBIT VI

BUSINESS ASSOCIATE ADDENDUM
PROTECTED HEALTH INFORMATION

1.        Definitions.  As used in this Agreement, the following capitalized terms shall have the following meanings.  Capitalized terms contained herein and not otherwise defined herein shall have the meanings given to such terms under the Privacy Standards (as defined below).

"**Business Associate**" means each member of the Lender Group that, on behalf of the Covered Entity, performs or assists in the performance of a function or activity involving the Use or Disclosure of Protected Health Information.

"**Covered Entity**" means the Debtor.

"**Designated Record Set**" means a group of records maintained by or for the Covered Entity that is:

a.        The medical records and billing records about Individuals maintained by or for the Covered Entity; or

b.        Used, in whole or in part, by or for the Covered Entity to make decisions about Individuals.

For purposes of this definition, the term "Record" means any item, collection, or grouping of information that includes Protected Health Information and is maintained, collected, used, or disseminated by or for the Covered Entity.

"**Disclose**", "**Disclosed**", or "**Disclosure**" means the release, transfer, provision of, access to, or divulging in any other manner of information outside the entity holding the information.

"**Electronic Media**" shall have the same meaning as the term "electronic media" in 45 CFR § 160.103.

"**Electronic Protected Health Information**" shall have the same meaning as the term "electronic protected health care information" in 45 CFR § 160.103, limited to the information that the Business Associate creates, receives, maintains, or transmits from or on behalf of the Covered Entity.

"**HIPAA**" means the Health Insurance Portability and Accountability Act of 1996, Pub. L. No. 104-191 (the "Act"), the privacy standards adopted by the U.S. Department of Health and Human Services ("HHS") as they may be amended from time to time, 45 C.F.R. parts 160 and 164, subparts A and E (the "Privacy Rule"), the security standards adopted by HHS as they may be amended from time to time, 45 C.F.R., parts 160, 162 and 164, subparts C (the "Security Rule"), and the Privacy provisions (Subtitle D) of the Health Information Technology

**VI-1**

\DRMC: DIP Loan and Security Agreement #9830081 (v.8).doc

for Economic Clinical Health Act, Division A, Title XIII of Pub. L. 111-5, and its implementing regulations (the "HITECH Act").

"**Individual**" shall have the same meaning as the term "individual" in 45 CFR § 160.103 and shall include a person who qualifies as a personal representative in accordance with 45 CFR § 164.502(g).

"**Individually Identifiable Health Information**" is information, including demographic information collected from an Individual, that:

      a.     Is created or received by the Covered Entity or Business Associate; and

      b.     Relates to the past, present, or future physical or mental health or condition of an Individual, the provision of health care to an Individual, or the past, present, or future payment for the provision of health care to an Individual; and,

      i.     That identifies the Individual; or,

      ii.     With respect to which there is a reasonable basis to believe the information can be used to identify the Individual.

"**Privacy Standards**" means the Standards for Privacy of Individually Identifiable Health Information contained in 45 CFR Parts 160 and 164.

"**Protected Health Information**" or "**PHI**" means any Individually Identifiable Health Information that is transmitted or maintained in any form or medium pursuant to the Service Agreement, including, but not limited to, by Electronic Media, but excluding any Individually Identifiable Health Information excluded from the definition of Protected Health Information under the Privacy Standards.

"**Required by Law**" shall have the same meaning as the term "required by law" in 45 CFR § 164.103.

"**Security Standards**" shall mean the Security Standards at 45 CFR Parts 160 and 164.

"**Use**" or "**Used**" means, with respect to Individually Identifiable Health Information, the sharing, employment, application, utilization, examination, or analysis of such information within an entity that maintains such information.

2.    <u>Use and Disclosure of Protected Health Information</u>. The Business Associate agrees that it and its employees, officers, and directors (collectively, its "Employees") will not Use or Disclose the Protected Health Information provided to it by the Covered Entity under this Agreement except as permitted or required by this Agreement or as otherwise Required by Law, and will ensure that each of its agents, including subcontractors (collectively, its "Agents"), to whom it provides Protected Health Information received from, or created or received by the Business Associate on behalf of, the Covered Entity agrees in writing to the same restrictions and

VI-2

conditions that apply to the Business Associate throughout this Exhibit VI with respect to such information. Further, the Business Associate may:

      a.    Use the Protected Health Information received by the Business Associate in its capacity as the Business Associate if necessary for the proper management and administration of the Business Associate or to carry out its legal responsibilities; or,

      b.    Disclose the Protected Health Information received by the Business Associate in its capacity as the Business Associate if necessary for the proper management and administration of the Business Associate or to carry out its legal responsibilities, if:

          i.    the Disclosure is Required by Law; or,

          ii.    the Business Associate obtains reasonable assurances from the person to whom the Protected Health Information is Disclosed that it will be held confidentially and Used or further Disclosed only as Required by Law or for the purpose for which it was Disclosed to the person, and the person agrees in writing to notify the Business Associate of any instances of which it is aware in which the confidentiality of the Protected Health Information has been breached; or,

      c.    De-identify Protected Health Information and may aggregate, manipulate, use, disclose, sell, publish and distribute such de-identified health information and data provided that such de-identification is in accordance with HIPAA.

3.    <u>Business Associate Records</u>.  The Business Associate agrees that it will implement a suitable record keeping system that enables the Business Associate to trace all Disclosures of Protected Health Information as would be required by the Covered Entity to respond to a request by an Individual for an accounting of Disclosures of Protected Health Information under the Privacy Standards in accordance with 45 CFR § 164.528.

4.    <u>Appropriate Safeguards for Privacy of Information</u>.  The Business Associate agrees that it will use appropriate safeguards to prevent Use or Disclosure of Protected Health Information other than as are permitted by this Agreement and this Exhibit VI. Without limiting the generality of the foregoing sentence, the Business Associate will:

      a.    Implement administrative, physical, and technical safeguards that reasonably and appropriately protect the confidentiality, integrity, and availability of Electronic Protected Health Information as required by the Security Standards;

      b.    Ensure that any Agents to whom the Business Associate provides Electronic Protected Health Information agree to implement reasonable and appropriate safeguards to protect Electronic Protected Health Information; and

      c.    Report to the Covered Entity any security incident (as defined by the Security Standards) of which the Business Associate becomes aware.

VI-3

5.      Reporting Inappropriate Use or Disclosure of Information.  The Business Associate shall notify the Covered Entity of any Use or Disclosure prohibited hereunder of Protected Health Information of which the Business Associate becomes aware.  Business Associate agrees to report to Covered Entity the aggregate number of unsuccessful, unauthorized attempts to access, use, disclose, modify or destroy electronic versions of any of Covered Entity's PHI or interfere with systems operations in an Information System containing Covered Entity's PHI, of which Covered Entity becomes aware, provided that: (a) such reports will be provided only as frequently as the parties mutually agree, but no more than once per month; and, (b) if the definition of "Security Incident" is amended under the Security Rule to remove the requirement for reporting "unsuccessful" attempts to use, disclose, modify or destroy electronic PHI, this Section 5 shall no longer apply as of the effective date of such information.

6.      Access to Information.  To the extent the Business Associate possesses or maintains Protected Health Information in a Designated Record Set, the Business Associate shall, within a reasonable time period following the request of the Covered Entity, provide the Covered Entity with access to Protected Health Information about an Individual contained in a Designated Record Set in order for the Covered Entity to meet the requirements under 45 CFR § 164.524.

7.      Amendment of Protected Health Information.  To the extent the Business Associate possesses or maintains Protected Health Information in a Designated Record Set, the Business Associate agrees that it will, within a reasonable time period of such a request by the Covered Entity, make available Protected Health Information for amendment and incorporate any amendments to Protected Health Information in a Designated Record Set that the Covered Entity directs or agrees to under 45 CFR § 164.526.

8.      Accounting of Disclosures.  The Business Associate agrees to provide to the Covered Entity, within a reasonable time period after being notified, information collected in accordance with Section 3 of this Exhibit VI in order to permit the Covered Entity to respond to a request by an Individual for an accounting of Disclosures of Protected Health Information in accordance with 45 CFR § 164.528.

9.      Information to be Available to the Secretary.  The Business Associate agrees that it will make its internal practices, books, and records relating to the Use and Disclosure of Protected Health Information received from, or created or received by the Business Associate on behalf of, the Covered Entity available to the Secretary of the Department of Health and Human Services for purposes of determining the Covered Entity's compliance with the Privacy Standards.

10.     Obligations of Covered Entity.  Covered Entity shall notify Business of any restriction on the use or disclosure of PHI to which Covered Entity has agreed in accordance with the relevant provisions of HIPAA, to the extent that such restriction may affect Business Associate's use or disclosure of PHI.  Covered Entity agrees (i) to use appropriate safeguards to maintain and ensure the confidentiality, privacy and security of PHI transmitted to Business Associate pursuant to this Exhibit VI, in accordance with the standards and requirements of HIPAA and the Privacy Rule and, as applicable, the Security Rule, until such PHI is received by Business Associate; (ii) to inform Business Associate of any consent or authorization, including any changes in or withdrawal of any such consent or authorization, provided to the Covered Entity by

VI-4

an individual pursuant to 45 C.F.R. § 164.506 or § 164.508; and (iii) that Business Associate may make any use or disclosure of Covered Entity's PHI permitted under 45 C.F.R. § 164.512.

11.    <u>Term and Termination</u>.

      a.    <u>Term</u>.  This Exhibit VI shall be effective as of the effective date first set forth above in this Agreement.

      b.    <u>Termination for Cause</u>.  Upon reasonable determination by the Covered Entity of a material breach by the Business Associate hereunder, the Covered Entity shall provide an opportunity for the Business Associate to cure the breach or end the violation. If the Business Associate does not cure the breach or end the violation within a reasonable time period after notice of the exact nature of the breach and the proposed cure, the Covered Entity shall, if feasible, terminate: (a) this Exhibit VI; and (b) all of the provisions of the DIP Documents that involve the Use or Disclosure of Protected Health Information; provided, however, that such termination shall be deemed to be infeasible unless and until this Agreement is likewise terminated in accordance with its terms or the Business Associate otherwise agrees in writing to such termination. If neither termination nor cure is feasible in accordance with this paragraph, the Covered Entity shall report the violation to the Secretary of the Department of Health and Human Services and shall provide the Business Associate with a copy of such report.

      c.    <u>Effect of Termination</u>.

      (i)    Except as set forth in clause 3.b. below, upon termination of this Exhibit VI, for any reason, the Business Associate shall return or destroy all Protected Health Information received from the Covered Entity, or created or received by the Business Associate on behalf of the Covered Entity. This provision shall apply to Protected Health Information that is in the possession of Agents of the Business Associate. The Business Associate shall retain no copies of the Protected Health Information.

      (ii)    In the event that the Business Associate determines that returning or destroying the Protected Health Information is infeasible, the Business Associate shall provide to the Covered Entity notification of the conditions that make return or destruction infeasible. Upon such determination by the Business Associate that return or destruction of Protected Health Information is infeasible, the Business Associate shall extend the protections of this Exhibit VI to such Protected Health Information and limit further Uses and Disclosures of such Protected Health Information to those purposes that make the return or destruction infeasible, for so long as the Business Associate maintains such Protected Health Information.

12.    <u>Regulatory References</u>.  A reference in this Exhibit VI to a section in HIPAA means the section as in effect or as amended.

VI-5

13.    <u>Subpoenas</u>.  Each party will provide written notice to the other party of any subpoena or other legal process seeking PHI received from or created on behalf of Covered Entity.  Such written notice shall be provided within 48 hours of receipt of a subpoena or other legal process.

**VI-6**

EXHIBIT VII

CLOSING DOCUMENT CHECKLIST

[See Attached]

**VII-1**

EXHIBIT VIII

FORM OF DEPOSITARY AGREEMENTS

[See Attached]

\DRMC: DIP Loan and Security Agreement #9830081 (v.8).doc

SCHEDULE I

ADDRESSES FOR NOTICE

If to the Agent or Lender :    Healthcare Finance Group Inc.
199 Water Street, 20th Floor
New York, New York  10038
Attention:  Chief Credit Officer
Tel:  (212) 785-9212
Fax:  (212) 785 8501

With a copy (which shall not constitute notice) to:

McGuireWoods LLP
1800 Century Park East, 8th Floor
Los Angeles, California 90067
Attention:  Gary D. Samson, Esq.
Tel:  (310) 315-8200
Fax:  (310) 315-8210

If to the Debtor:    [_____
_____
_____
Attention: _____
Tel: _____
Fax: _____]

**Sch. I-1**

SCHEDULE II

<u>DISCLOSURES</u>

**Sch. II-1**

SCHEDULE III

<u>LOCKBOX INFORMATION</u>

\DRMC: DIP Loan and Security Agreement #9830081 (v.8).doc

SCHEDULE IV

NET VALUE FACTORS

To be determined by the Agent during due diligence review

SCHEDULE V

CREDIT AND COLLECTION POLICY

**Sch. V-1**