LISA HILL FENNING (SBN 89238)
HARRY GARNER (SBN 254942)
ARNOLD & PORTER LLP
777 South Figueroa Street, 44th Floor
Los Angeles, California 90017
Telephone:    213.243.4000
Facsimile:    213.243.4199
Lisa.Fenning@aporter.com
Harry.Garner@aporter.com

*Proposed Counsel to Debtor and Debtor-in-Possession*

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

### LOS ANGELES DIVISION

| | |
|---|---|
| In re | Case No.:  09-bk-34714 |
| DOWNEY REGIONAL MEDICAL CENTER-HOSPITAL, INC., a California non-profit, public benefit corporation,<br><br>Debtor.<br><br>Tax I.D. 95-1903935 | Chapter 11<br><br>**EMERGENCY MOTION OF DEBTOR FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE USE OF CASH COLLATERAL, (II) GRANTING ADEQUATE PROTECTION WITH RESPECT THERETO, AND (III) SCHEDULING A FINAL HEARING; MEMORANDUM IN SUPPORT THEREOF**<br><br>HEARING<br>Date:      September __, 2009<br>Time:<br>Place:     Courtroom: 1475<br>United States Bankruptcy Court<br>255 E. Temple Street<br>Los Angeles, CA 90012 |

LA566950

# TABLE OF CONTENTS

Page

I.      JURISDICTION AND VENUE ........................................................................... 1

II.     PROCEDURAL STATUS ................................................................................. 1

III.    BACKGROUND ................................................................................................ 2

        A.      The Business of the Hospital .................................................................. 2

        B.      The Causes of the Bankruptcy Filing ..................................................... 2

        C.      The Tax-Exempt Bonds .......................................................................... 4

        D.      Other Prepetition Secured Debt .............................................................. 6

        E.      Debtor's Need to Use Cash Collateral .................................................... 7

        F.      Adequate Protection for the Use of Cash Collateral and Priming of the
                Bond Lien and Apollo Lien ..................................................................... 7

IV.     RELIEF REQUESTED ...................................................................................... 8

V.      BASIS FOR RELIEF ........................................................................................ 10

        A.      Debtor Should Be Authorized To Use The Cash Collateral ................... 10

        B.      Debtor's Proposed Adequate Protection Is Appropriate ......................... 10

        C.      Debtor's Inability To Use The Cash Collateral Within Fifteen (15)
                Days Of The Petition Date Will Cause Immediate And Irreparable
                Harm To Debtor And The Estate .............................................................. 12

        D.      Compliance With The Provisions Of Local Bankruptcy Rule 4001-2 ..... 12

        E.      Request For Final Hearing ....................................................................... 16

VI.     CONCLUSION .................................................................................................. 16

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*In re McCombs Properties VI, Ltd.*,
    88 B.R. 261 (Bankr. C.D. Cal. 1988)................................................................... 10

*In re Weinstein*,
    227 B.R. 284 (BAP 9th Cir. 1998)................................................................... 10

**STATUTES AND RULES**

11 U.S. C. § 105(a) ................................................................................................... 1

11 U.S.C. § 361 ............................................................................................... 1, 8, 9

11 U.S.C. § 362 ................................................................................................. 1, 8

11 U.S.C. § 363 .............................................................................................. 1, 8. 9

11 U.S.C. § 363(c)(1) .............................................................................................. 9

11 U.S.C. § 363(c)(2) ....................................................................................... 9, 10

11 U.S.C. § 363(e) .......................................................................................... 9, 10

11 U.S.C. § 364 ...................................................................................................... 8

11 U.S.C. § 506(c) ............................................................................................... 12

11 U.S.C. § 1107(a) ............................................................................................... 1

11 U.S.C. § 1108 ................................................................................................... 1

28 U.S.C. § 157 ..................................................................................................... 1

28 U.S.C. § 157(b) ................................................................................................ 1

28 U.S.C. § 1334 ................................................................................................... 1

28 U.S.C. § 1408 ................................................................................................... 1

28 U.S.C. § 1409 ................................................................................................... 1

LBR 4001-2 .......................................................................................................... 11

LBR 4001-2(b) ..................................................................................................... 11

LBR 4001-2(c) ..................................................................................................... 11

LBR 4001-2(e) ..................................................................................................... 11

LBR 4001-2(f) .............................................................................................................. 12

Fed. R. Bankr. P 4001(b)(2) ..................................................................................... 11, 12

**TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE, CREDITORS HOLDING THE TWENTY LARGEST UNSECURED CLAIMS, ANY ALLEGED SECURED CREDITORS, THE OFFICE OF THE UNITED STATES TRUSTEE, AND OTHER PARTIES IN INTEREST:**

Downey Regional Medical Center-Hospital, Inc., the debtor and debtor-in-possession in the above captioned case (the "**Debtor**"), hereby moves the Court for entry of an interim order, substantially in the form of the interim order attached hereto (the "**Interim Cash Collateral Order**"), and a final order, substantially in the form of the final order attached hereto (the "**Final Cash Collateral Order**," and, together with the Interim Cash Collateral Order, the "**Cash Collateral Orders**") (a) authorizing Debtor to use Cash Collateral (as defined in the Interim Cash Collateral Order) on an interim basis pending a final hearing on the Motion (the "**Final Hearing**"), (b) granting adequate protection with respect thereto, (c) scheduling the Final Hearing, and (d) granting related relief.

Debtor requests pursuant to Local Bankruptcy Rule ("**LBR**") 2081-1(a)(9) and LBR 9075-1(a) that the Court schedule a hearing on this Motion on less than 48 hours notice, upon timely notice to the Office of the United States Trustee ("**UST**"), creditors holding the twenty largest unsecured claims, Debtor's alleged secured creditors, and other parties in interest (collectively, the "**Interested Parties**"). A copy of this Motion was served, concurrent with the filing hereof with the Court, on the Interested Parties by courier or overnight delivery.

## SUMMARY OF RELIEF REQUESTED[1]

By this Motion, Debtor seeks authority to use certain cash collateral with the consent of Wells Fargo, National Association, as indenture trustee (the "**Indenture Trustee**") with respect to the secured tax-exempt bonds at issue, on the terms and conditions set forth in the Cash Collateral Orders. The Indenture Trustee has consented to Debtor's use of such in the ordinary course of business, and Debtor and the Indenture Trustee have agreed that the proposed adequate protection

---

[1] Capitalized terms used but not defined in this Motion shall have the meaning given to them in the accompanying Memorandum.

provisions set forth in the Cash Collateral Orders are necessary and appropriate (i) to shield the Indenture Trustee from diminution in the value of the Indenture Trustee's interest in the cash collateral Debtor proposes to use and (ii) to compensate and protect the Indenture Trustee from the additional risks inherent in the subordination of its security interest in favor of the priming lien for the Interim and Final DIP Financing that Debtor intends to grant, and to which the Indenture Trustee does not object, subject to the proposed adequate protection set forth in the Cash Collateral Orders.

The Motion also seeks to use cash collateral subject to the lien of Apollo Health Street, LLC ("**Apollo**"). Debtor has had some discussions with Apollo, has offered replacement and supplemental liens as adequate protection, and hopes to reach agreement before the hearing. If no agreement is reached, Debtor will seek a determination that the proposed additional liens constitute adequate protection.

If Debtor is not authorized to utilize the cash collateral at the very outset of its chapter 11 case, it will be unable to operate the hospital. Debtor will be unable to pay its vendors, who likely will cease to provide goods and services to Debtor, or to meet payroll obligations owed to its more than 1,200 employees. Ultimately, Debtor will be unable to serve its many patients, putting their welfare and safety in jeopardy. Such an outcome would cause immediate and irreparable harm to Debtor's estate. Accordingly, the relief requested herein should be granted and the Cash Collateral Orders should be approved.

This Motion is based on the Memorandum of Points and Authorities below (the "**Memorandum**"); the Declaration of Robert E. Fuller in Support of Debtor's Chapter 11 Petition and First Day Motions (the "**Fuller Declaration**"), filed with the Court concurrently herewith; and the arguments, evidence, and representations that may be presented at or prior to the hearing on this Motion.

Pursuant to LBR 9075-1(a)(7), if you wish to oppose this Motion you may present a written or oral response to the Motion at the time of the hearing on the Motion.

1      **WHEREFORE** Debtor respectfully requests that the Court enter interim and final orders (i)

2 authorizing the use of cash collateral, (ii) granting adequate protection to prepetition lenders, (iii)

3 scheduling a final hearing, and (iv) granting such other and further relief as may be just and proper.

4

5 Dated:  Los Angeles, California                  Respectfully Submitted,
           September 14, 2009

6                                     /s/  Lisa Hill Fenning

7                                Lisa Hill Fenning (SBN 89238)
                               Harry Garner (SBN 254942)

8                                Arnold & Porter LLP
                               777 South Figueroa Street, 44th Floor

9                                Los Angeles, California 90017

10                                Telephone:  213.243.4000
                               Facsimile:   213.243.4199

11

12                                *Proposed Counsel to Debtor and Debtor-in-Possession*

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## MEMORANDUM OF POINTS AND AUTHORITIES

Downey Regional Medical Center-Hospital, Inc., the debtor and debtor-in-possession in the above captioned case (the "**Debtor**" or "**Hospital**"), hereby moves this Court for entry of an interim order, substantially in the form of the interim order attached hereto (the "**Interim Cash Collateral Order**"), and a final order, substantially in the form of the interim order attached hereto (the "**Final Cash Collateral Order**," and, together with the Interim Cash Collateral Order, the "**Cash Collateral Orders**") (a) authorizing Debtor to use Cash Collateral (as defined in the Interim Cash Collateral Order) on an interim basis pending a final hearing on the Motion (the "**Final Hearing**"), (b) granting adequate protection with respect thereto, (c) scheduling the Final Hearing, and (d) granting related relief. In support of the Motion, Debtor relies upon and incorporates by reference the Declaration of Robert E. Fuller in Support of Debtor's Chapter 11 Petition and First Day Motions (the "**Fuller Declaration**"), filed with the Court concurrently herewith. In further support of the Motion, Debtor, by and through its undersigned counsel, respectfully states as follows:

## I.     JURISDICTION AND VENUE

1.     This Court has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. § 157(b). Venue of these cases and this Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409. The statutory predicates for the relief requested herein are sections 105(a), 361, 362, and 363 of title 11 of the United States Code (the "Bankruptcy Code").

## II.     PROCEDURAL STATUS

2.     On September 14, 2009 (the "**Petition Date**"), Debtor commenced a case by filing a petition for relief under chapter 11 of the Bankruptcy Code (the "**Chapter 11 Case**").

3.     Debtor continues to operate its business and to manage its property as a debtor and debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in Debtor's Chapter 11 Case.

4.     No creditors' committee has been appointed in this Chapter 11 Case by the United States Trustee.

## III.    BACKGROUND

### A.    The Business of the Hospital

5.    The Hospital is a nonprofit general acute care and teaching hospital licensed for 199 beds located in Downey, California.  The Hospital currently operates 181 staffed inpatient beds, including an intensive care unit, a neo-natal intensive care unit for newborns with special health issues, a birth center, and definitive observation units, besides general medical-surgical beds.  It services approximately 14,000 inpatients per year in all services.  The Hospital's average length of stay is less than 4 days on a very acute population, making it one of the most efficient in the state.

6.    The Hospital offers a wide variety of clinical services and provides virtually all clinical services of a major tertiary university hospital except for organ transplants.  The Hospital has 11 operating rooms, and a very busy surgical practice.  It offers same day surgeries, and specializes in open heart surgery, general surgery, orthopedic surgery, and neurosurgery.  It operates on over 7,000 patients annually.  The Hospital also has numerous specialty outpatient services, seeing over 80,000 outpatients annually, including non-invasive cardiology, radiology, endoscopy, and physical therapy.

7.    The Hospital also has an emergency room of 22 beds.  The emergency room is not designated as a trauma unit, but it is equipped for and services trauma patients who are regularly brought to the Hospital in extremis or who come in via transportation other than ambulance.  The emergency room services over 50,000 patients annually.  Therefore, at about 2,500 patients per bed annually, it is one of the busiest in the area.  The emergency room is burdened because since 2001 there have been four major emergency rooms closed on the I-105 corridor, including Martin Luther King Hospital, leaving only three remaining general emergency rooms in the area including the Hospital.

### B.    The Causes of the Bankruptcy Filing

8.    Although nominally profitable on an accrual basis, the Hospital has been forced to commence the Chapter 11 Case as a result of a liquidity crisis.  This crisis has two primary causes.  First, the Hospital has incurred substantial losses as a result of severe problems on the finance side of its business (now largely corrected) due to defective charge capture practices and software billing

practices (the "**Charge Capture System Problems**") that resulted in the Hospital not collecting all the revenues to which it would be entitled. Second, the Hospital was incurring significant losses due to problems with respect to its "capitation" arrangements (the "**Capitation Program**") with certain physician groups and health plans (the "**Capitation Program Problems**"). These losses were so severe that the Hospital concluded it had to terminate the Capitation Program to staunch the long-term hemorrhaging of cash, despite the short term cash flow interruption and claims that would result. The Hospital has taken steps to exit the Capitation Program and adopt a fee-for-service model, but the exit costs are substantial. The combination of the Charge Capture System and Capitation Program Problems has left the Hospital with no cash reserves since March 2008.

9. In essence, due to software and process failings, the Hospital's financial, billing and collections systems had failed to capture charges which led to incomplete bills for a significant portion of its services for nearly a decade, causing unrecoverable losses. A cost-accounting problem caused the misallocation of costs to the capitation contracts, resulting in the Hospital's books showing a profit in capitation where none really existed. These problems have been investigated, diagnosed, and continue to be remedied under the direction of a new chief executive officer, Kenneth Strople, who took the reins in 2007, Robert Fuller, the chief operating officer, and consultant Richard Yardley, the acting chief financial officer. Given sufficient time to operate under a regime in which charges are properly captured, bills are complete when invoiced, and financial reports provide reliable real-time information, the Hospital should be able to repay its debts in full.

10. However, demands by certain creditors for immediate payment–and for payment of more than the Hospital believes it owes in some cases–prevented an orderly restructuring outside of bankruptcy and forced this filing. Much of the pressure has come from the physician groups who have asserted claims in excess of $9 million against the Hospital related to the termination of the capitation contracts.

11. The exit from the Capitation Program created three distinct cash drains: (1) the tail of claims for services provided 'out-of-network' by other hospitals and health care providers, (2) the claims by the physician groups participating in the Capitation Program for risk-sharing profit splits,

much of which is disputed by the Hospital (the "**Risk Share Claims**"), and (3) the transitional loss of cash occasioned by the change in business model out of capitation (where under the Hospital was paid up front, before services were rendered) to fee-for service (where under the Hospital is paid in arrears, typically up to 150 days following the rendering of services), some of which was eased by the $8.8 million in advances by the insurers who participated in the program. However, the Hospital does not have the financial capacity to bridge the costs of exiting capitation within the time frame being demanded by impacted parties. In short, this reorganization filing has resulted from demands made by parties who greatly benefitted from the Capitation Program while it was operational (the physicians), but who are now not patient enough to allow the Hospital to implement its new business model and return to financial stability before demanding payment.

12.     The immediate problem that forced the Hospital to file this Case arose from an arbitration brought by one of the physician groups and the potential for the other two groups to follow suit. The physician groups are expected to assert claims for over $9 million.

13.     Alliance Physicians Medical Group ("**Alliance**"), one of the physician groups, recently filed an arbitration in an attempt to collect their alleged 'risk share' profits from 2006 to 2008. In its arbitration, Alliance claimed it was owed up to $4.7 million or more. It sought to attach the Hospital's bank accounts in the fall of 2008. The arbitrator's award is imminent, and the Hospital believes that Alliance will seek immediate enforcement by attaching the Hospital's bank accounts.

14.     The threat of attachments relating to the estimated $9 million of Risk Share Claims has scared off prospective lenders who would not want the loan proceeds intended for critically needed working capital to be diverted to paying historical disputed debts. Such a diversion of funds would shut down the Hospital. The automatic bankruptcy stay will protect the Hospital from the catastrophic interruption of its operations that would result from such an attachment.

C.     **The Tax-Exempt Bonds**

15.     The Hospital's principal secured debt consists of certain tax-exempt bonds were authorized and issued in the original aggregate principal amount of $68,485,000 by the California Health Care Facilities Financing Authority (the "**Authority**"), to fund certain capital projects of the

Hospital (the "**Bonds**"), pursuant to an Indenture dated as of August 1, 1993 (the "**Original Indenture**") as amended by, among other things, the First Supplemental Indenture, dated as of February 26, 2004, 1998 (the "**Supplemental Indenture**," together with the Original Indenture, the "**Indenture**"), entered into between the Authority and Norwest Bank Minnesota, National Association n/k/a Wells Fargo Bank, National Association, as Indenture Trustee (the "**Indenture Trustee**").

16.    Simultaneous with the issuance of the Bonds, the Authority loaned proceeds of the Bond issuance to the Hospital pursuant to a Loan Agreement, dated as of August 1, 1993, between the Authority and the Hospital (the "**Original Loan Agreement**").  The Loan Agreement was amended by the First Amendment to Loan Agreement dated as of February 26, 2004 (the "**First Amendment**," together with the Original Loan Agreement, the "**Loan Agreement**"  The Indenture and the Loan Agreement with all other documents related thereto are hereinafter referred to as the "**Bond Documents**").  As security for the payment of all amounts due under the Loan Agreement, the Hospital granted to the Authority, inter alia, (i) a first priority security interest (the "**Bond Lien**") on Gross Operating Revenues ("**Gross Receipts**"), consisting of all of its accounts receivables, revenues, income and receipts, and rights to receive the same, as set forth more particularly in the Bond Documents (collectively, the Gross Receipts together with the Bond Funds, the "**Prepetition Bond Collateral**").

17.    Pursuant to the Bond Documents, the Authority's rights under the Loan Agreement, including all of the security interests and rights and remedies granted by Debtor to the Authority in the Pre-Petition Bond Collateral, were assigned to the Indenture Trustee, subject to the retention of certain rights by the Authority.  The Indenture Trustee has the sole right to exercise the rights and benefits granted to the Authority under the Bond Documents.

18.    As of Petition Date, Debtor was indebted under the Bond Documents in the principal amount of approximately $26 million (including principal and interest), with interest continuing to accrue at a per diem of about $3,900 (the "**Bond Claim**").  It is Debtor's understanding that the Indenture Trustee has also incurred attorneys' fees and expenses that, according to the Bond Documents, would also be includable in the Bond Claim (the "**Prepetition Expense Claim**").

19.     A portion of the initial proceeds of the Bonds was used to create a Bond Reserve Account, and certain other accounts and funds are held by the Indenture Trustee under the terms of the Bond Documents (collectively, the "**Bond Funds**").  As of Petition Date, the balance held in the Bond Funds was approximately $6.8 million.  These funds also constitute security for the Bond Claim.

20.     As of Petition Date, Debtor has net accounts receivable of approximately $43 million that constitute Prepetition Bond Collateral.  This amount is within the typical range for the past four months, as new receivables are generated and old receivables are collected.

**D.     Other Prepetition Secured Debt**

21.     To Debtor's knowledge, other than some equipment lease UCC filings, as of Petition Date, the Hospital's only other secured creditor is Apollo Health Street, Inc. ("**Apollo**"), one of the Hospital's former billing and collections servicers.  In March 2009, the Hospital entered into a settlement agreement that provided for termination of the parties' contract and payment by the Hospital of about $2.3 million to resolve disputes about amounts due to Apollo (the "**Apollo Settlement**").  Approximately $1.2 million remains outstanding.  The Apollo Settlement also granted Apollo a security interest in the Hospital's accounts receivable (the "**Apollo Lien**").  It is Debtor's understanding that the Indenture Trustee and HFG contend the Apollo Lien is junior to the Bond Lien and may be invalid, because, inter alia, the Hospital did not obtain the consent of the Indenture Trustee before granting the Apollo Lien.

22.     The Hospital also maintained a secured line of credit with Bank of the West, having a prepetition balance of about $7.1 million.  Bank of the West also guaranteed two equipment leases in the total amount of $2 million, and provided a letter of credit for $100,000.  These obligations totaling about $9.2 million were secured by a lien on the leased equipment and on certain investment securities in brokerage accounts having an estimated market value of more than $10 million (the "**BOTW Liens**").  However, prior to the Petition Date, the Hospital liquidated the investment collateral securing the BOTW Liens, repaid the credit line obligations owing to Bank of the West, and has obtained a release of the BOTW Liens with respect to the investment collateral.  The equipment liens remain in place.

**E. Debtor's Need to Use Cash Collateral**

23. As of Petition Date, the Hospital has about $340,000 in cash on hand, about $43 million in accounts receivable, and no other liquid assets. Debtor's monthly cash expenses average $12.5 million, including about $5.92 million for payroll and about $1.8 million for other employee-related obligations. Monthly net cash collections have been averaging about $12 million over the past four months, although improvement is expected within a few months, due to the correction of the Charge Capture System Problems and improved cash flow from fee-for-service patients. Without using the cash it collects, Debtor has no other source of income from which to pay its bills. Use of the Indenture Trustee's collateral – Debtor's Gross Receipts – is thus critical for the ongoing business of Debtor.

24. However, because the Hospital has still been experiencing negative cash flow – which is projected to turn positive due to the improvements of the Charge Capture System and other steps implemented by new management – use of the Indenture Trustee's Gross Receipts collateral is not enough to fund operations. The Hospital also requires DIP financing. Without financing, the Hospital would have to close its doors.

**F. Adequate Protection for the Use of Cash Collateral and Priming of the Bond Lien and Apollo Lien**

25. As set forth in detail in the Emergency Motion of Debtor for Entry of Interim and Final DIP Orders (A) Authorizing Debtor to Obtain Postpetition Financing; (B) Granting Superpriority Expense Claims and Security Interests; and (C) Granting Other Relief, Healthcare Finance Group LLC ("**HFG**") has offered to provide a DIP Loan in the amount of up to $15 million, on a revolving basis, secured by a lien in substantially all of Debtor's assets. The DIP Loan is essentially structured as an accounts receivable financing in which advances are based upon a formula for eligible accounts, but under all the circumstances, HFG insists upon security in addition to the Hospital's receivables.

26. Adequate protection for a debtor's use of cash proceeds from collection of receivables usually takes the form of replacement liens. Here, however, the Hospital not only needs to use the Indenture Trustee's Gross Receipts collateral but also to prime these liens by incurring

$15 million in senior debt secured by essentially all of Debtor's assets. Persuaded by the urgent need for additional liquidity, the Indenture Trustee has not objected to being subordinated to the new money.

27. HFG has insisted upon a first priority lien on all of Debtor's assets as a condition for the DIP Loan. Therefore, Debtor cannot provide the Indenture Trustee with a first priority lien in any substitute collateral. Although Debtor's receivables are believed to be approximately $43 million, and Debtor believes that it has made substantial progress to remedy its prior collection issues, hospital receivables are subject to many contingencies that affect ultimate collections. Therefore, additional collateral beyond replacement collateral is reasonable and necessary.

28. In addition to its Gross Receipts, Debtor owns certain hospital facilities and equipment, as well as two parcels of unencumbered real property, one of which is used as a parking lot, the other of which is intended for eventual use for a community clinic or similar facilities. Assuming that the DIP Loan is approved, these assets will all be subject to HFG's first priority lien. Pledging these assets as additional security provides additional, but not adequate protection both because of HFG's senior lien and because of their uncertain value in today's marketplace. Therefore, the Indenture Trustee has also requested the further protection of guarantees of Debtor's parent and certain of its affiliates, backed by a junior security interest in real property owned by an affiliate.

## IV. RELIEF REQUESTED

29. By this Motion, Debtor seeks entry of the Interim Cash Collateral Order and a Final Cash Collateral Order (a) authorizing Debtor to use Cash Collateral pursuant to sections 361 and 363 of the Bankruptcy Code; (b) approving the form of adequate protection provided to the Indenture Trustee and Apollo pursuant to sections 361, 362, 363, and 364 of the Bankruptcy Code; (c) scheduling a Final Hearing on the Motion to consider entry of the Final Cash Collateral Order; and (d) granting related relief.

30. In consideration of the material increase in the Indenture Trustee's risk profile due to the subordination of its lien with respect to the DIP Loan first priority lien, the parties have agreed to the following adequate protection:

a. Adequate protection payments in the amount of the regularly scheduled payments required by the Bond Documents, including any fees and expenses to which the Indenture Trustee would be entitled under the Bond Documents;

b. A replacement lien junior to HFG in new receivables that will secure both the pre- and post-petition Bond Claims;

c. A lien junior to HFG in substantially all of Debtor's assets that will secure both the pre- and post-petition Bond Claims; and

d. Guarantees of Debtor's parent and certain of its affiliates, secured by a junior lien on certain real property owned by an affiliate that will secure both the pre- and post-petition Bond Claims

31. Debtor has discussed with Apollo the need to use its cash collateral and to prime the Apollo Lien by granting the super-priority lien to HFG as DIP lender. Debtor has offered the following additional collateral in consideration of such use and priming, and hopes to reach agreement before the hearing:

a. A junior replacement lien in new receivables that will secure both the pre- and post-petition Apollo Settlement claims; and

b. A junior supplemental lien in substantially all of Debtor's assets that will secure both the pre- and post-petition Apollo Settlement claims.

32. These adequate protection liens to be granted to Apollo would be subject to (i) prior valid and perfected liens existing as of the Petition Date; (ii) the liens, if any, granted to HFG as the DIP lender; and (iii) the adequate protection liens granted to the Indenture Trustee, provided, however, that Apollo would have the right to contest the relative prepetition priority of the Apollo Lien versus the Bond Lien.[1] Even if Apollo's consent cannot be obtained, Debtor contends that adequate protection of the Apollo Lien is established by the proposed additional liens and collateral.

---

[1] Because the UCC financing statement with respect to the Apollo Lien was filed after that of the Indenture Trustee, the Apollo Lien is presumptively junior to the Bond Lien, even though the Apollo Settlement stated that Apollo was being granted a first priority lien in Accounts. The grant of the replacement and supplemental liens in favor of Apollo are subject to the reservation of rights by HFG and the Indenture Trustee to contest the Apollo Lien in its entirety, and by Debtor to contest its priority, as set forth in the Cash Collateral Orders.

1    33.    Debtor believes that the proposed adequate protection is reasonable and appropriate

2    under all of the circumstances, and requests approval of the proposed order attached hereto.

3    **V.    BASIS FOR RELIEF**

4        **A.    Debtor Should Be Authorized To Use The Cash Collateral**

5        34.    Debtor's use of property of the estate is governed by § 363 of the Bankruptcy Code,

6    which provides, inter alia, that a debtor may use property of the estate in the ordinary course of

7    business without notice or a hearing.  11 U.S.C. § 363(c)(1).  The use of cash collateral, however, is

8    subject to § 363(c)(2), which permits a debtor to use cash collateral pursuant to subsection (c)(1)

9    only if

10            (A) each entity that has an interest in such cash collateral consents; or

11            (B) the court, after notice and a hearing, authorizes such use . . . in
12            accordance with the provisions of this section.

13        35.    As discussed above, the Indenture Trustee does not object to Debtor's use of Cash

14    Collateral in the ordinary course of business pursuant to the terms set forth in the Cash Collateral

15    Orders.  With respect to Apollo, if its consent is not forthcoming, Debtor contends that the adequate

16    protection being offer is reasonable and appropriate under all of the circumstances.  Accordingly,

17    Debtor has satisfied the requirements of Bankruptcy Code § 363(c)(2).

18        **B.    Debtor's Proposed Adequate Protection Is Appropriate**

19        36.    In addition to the provisions of Bankruptcy Code § 363(c)(2), a debtor's use of cash

20    collateral is subject to § 363(e), which requires that the debtor provide adequate protection to the

21    secured creditor's interest in the cash collateral sought to be used by the debtor.  Although the

22    Bankruptcy Code does not provide a precise definition of "adequate protection," § 361 sets forth

23    three non-exclusive means of providing adequate protection:

24            a.    making periodic cash payments to the secured creditor;

25            b.    providing the secured creditor with additional or replacement liens on the
26                debtor's property; or

27            c.    granting other relief that provides the secured creditor with the indubitable
28                equivalent of the creditor's interest in the cash collateral.

1    37.    Courts are supposed to use a flexible approach in making the determination of what

2    constitutes adequate protection.  See In re McCombs Properties VI, Ltd., 88 B.R. 261, 267 (Bankr.

3    C.D. Cal. 1988).  The object of the inquiry is to determine whether the adequate protection

4    proposed by a debtor sufficiently shields the debtor's secured creditors from diminution in the value

5    of the creditors' collateral during the process of reorganization.  See In re Weinstein, 227 B.R. 284,

6    296 (BAP 9th Cir. 1998).

7    38.    The adequate protection proposed by Debtor, which has been accepted by the

8    Indenture Trustee as adequate, is set forth in detail in the Cash Collateral Orders.  In general, Debtor

9    proposes to provide the following forms of adequate protection:

10       a.    With respect to the Indenture Trustee, (i) payment of all regularly scheduled,

11       non-default amounts due to be paid by Debtor under the Bond Documents; (ii) replacement

12       and additional subordinate liens on certain assets of Debtor; and (iii) guarantees of Debtor's

13       parent and certain affiliates, secured by certain assets of the affiliates; and

14       b.    With respect to Apollo, replacement and additional subordinate liens on

15       certain assets of Debtor.

16    39.    Debtor believes that revenues from its operations will be sufficient to make the

17    periodic payments to the Indenture Trustee as provided by the adequate protection provisions of the

18    Cash Collateral Orders.

19    40.    Debtor submits, and the Indenture Trustee agrees, that the proposed adequate

20    protection provisions set forth in the Cash Collateral Orders are necessary and appropriate to shield

21    the Indenture Trustee from diminution in the value of the Indenture Trustee's interest in the cash

22    collateral Debtor proposes to use.  Similarly, the adequate protection to be provided to Apollo

23    (assuming it does not consent) is sufficient in light of the disputed nature of its lien and the

24    substantial value of the assets being pledged as additional collateral.  Accordingly, the proposed

25    adequate protection is fair, reasonable, and sufficient to satisfy the requirements of §§ 363(c)(2) and

26    (e).

27

28

**C.**     **Debtor's Inability To Use The Cash Collateral Within Fifteen (15) Days Of The Petition Date Will Cause Immediate And Irreparable Harm To Debtor And The Estate**

41.     The Court may grant the relief requested in the Motion within fifteen (15) days of the service of the Motion only to the extent that the relief requested therein is "necessary to avoid immediate and irreparable harm to the estate pending a final hearing." Bankruptcy Rule 4001(b)(2); Local Bankruptcy Rule 4001-2(e).

42.     If Debtor is not authorized to utilize the Cash Collateral at the very outset of its Chapter 11 Case, it will be unable to operate the hospital. Debtor will be unable to pay its vendors, who likely will cease to provide goods and services to Debtor, or to meet payroll obligations owed to its more than 1,200 employees. Ultimately, Debtor will be unable to serve its many patients, putting their welfare and safety in jeopardy. Such an outcome would cause immediate and irreparable harm to Debtor's estate.

43.     Accordingly, Debtor seeks immediate authority to use the Cash Collateral as set forth in the Interim Cash Collateral Order pending the Final Hearing pursuant to Bankruptcy Rule 4001(b)(2).

**D.**     **Compliance With The Provisions Of Local Bankruptcy Rule 4001-2**

44.     Local Bankruptcy Rule 4001-2(c) requires a debtor to summarize the essential terms of the debtor's proposed use of cash collateral. While Debtor discussed certain components of the Cash Collateral Orders above, Debtor hereby incorporates by reference the Cash Collateral Orders, which set forth in detail the proposed terms of Debtor's use of the Cash Collateral. A summary of key provisions is also set forth in the Concise Statement[2] below, together with citations to specific sections of the Interim Cash Collateral Order, as required by Bankruptcy Rule 4001-2(c).

45.     In addition, Local Bankruptcy Rule 4001-2(b) requires a debtor to identify whether a proposed cash collateral stipulation contains certain provisions. As evidenced by the Interim Cash

_____
    [2] The following summary is qualified in all respects by the actual terms and conditions of the Interim Cash Collateral Order. In the event of a conflict between the summary set forth herein and the Interim Cash Collateral Order, the Interim Cash Collateral Order shall control.

Collateral Order, Debtor seeks the Court's approval of the following provisions on an interim basis, and will also seek their approval on a final basis in the Final Cash Collateral Order: [3]

| PROVISION | CONTENT | LOCATION IN ORDER |
|---|---|---|
| Cross-collateralization clauses | With respect to the Indenture Trustee, junior replacement liens and supplemental liens in all pre- and postpetition assets and guarantees by Debtor's parent and certain affiliates, secured by assets of one of the affiliates.<br><br>With respect to Apollo, junior replacement and supplemental liens in all pre- and postpetition assets. | Interim Cash Collateral Order §§ 8-10; 13 |
| Provisions or findings of fact that bind the estate or all parties in interest with respect to the validity, perfection or amount of the secured party's lien or debt | As to Debtor: Entry of Interim Cash Collateral Order constitutes conclusive and binding determination of amount of the Bond Claim, and validity and priority of the Indenture Trustee's security interest in the Prepetition Bond Collateral.<br><br>As to Committee and others: The Interim Cash Collateral Order is without prejudice to the rights of any Committee to challenge the validity, amount, perfection, priority, extent or enforceability of the Bond Claim, the Indenture Trustee's pre-petition security interests, or the Apollo Lien; the rights of Apollo to challenge the priority of the Indenture Trustee's prepetition security interests in Apollo's prepetition collateral; the rights of the Indenture Trustee to challenge all aspects of the Apollo Settlement and Lien; and Debtor's rights to challenge the priority of the Apollo Lien. | Interim Cash Collateral Order §§ 14, 24. |

---

[3] Local Bankruptcy Rule 4001-2(d) also requires that Debtor either file form F4001-2 with the Motion or file a statement consistent with that form. Debtor submits that the concise statement now required by Bankruptcy Rule 4001(c) is consistent with form F4001-2.

-13-

| | | |
|---|---|---|
| Provisions or findings of fact that bind the estate or all parties in interest with respect to the relative priorities of the secured party's lien and liens held by persons who are not party to the stipulation, or which create a lien senior or equal to any existing lien | <u>As to the Indenture Trustee:</u> Bond Lien determined to be subject only to (i) prior valid and perfected liens existing as of the Petition Date and (ii) the liens, if any, granted to HFG as DIP lender pursuant to the Interim DIP Financing Order.<br><br><u>As to Apollo:</u> Apollo Lien determined to be subject only to (i) prior valid and perfected liens existing as of the Petition Date (including the Bond Lien, subject to Apollo's rights to challenge its priority); (ii) the liens, if any, granted to HFG as DIP lender pursuant to the Interim DIP Financing Order | Interim Cash Collateral Order §§ 9-10, 12-13 |
| Waivers of 11 U.S.C. § 506(c), unless the waiver is effective only during the period in which the debtor is authorized to use cash collateral or borrow funds | <u>As to the Indenture Trustee:</u> Surcharge is waived. | Interim Cash Collateral Order § 14 |
| Releases of liability for the creditor's alleged prepetition torts or breaches of contract | <u>As to the Indenture Trustee:</u> Full releases of the Indenture Trustee and all holders of the Bonds (subject to the rights of the Committee to challenge within 60 days). | Interim Cash Collateral Order § 18 |
| Waivers of avoidance actions arising under the Bankruptcy Code | <u>As to the Indenture Trustee:</u> Full waiver of avoidance actions.. | Interim Cash Collateral Order § 18 |

| Waiver of automatic stay | Upon a termination event, the automatic stay shall be lifted with respect to the Indenture Trustee and Apollo's pre- and post-petition collateral, *provided, however*, that the Indenture Trustee and Apollo shall not take any action to collect, seize, realize upon, or foreclose upon such collateral that is also collateral for the DIP Loan until the payment in full of the DIP Loan, *provided, further*, that the Indenture Trustee may collect, seize, realize upon or foreclose upon its affiliate liens or its supplemental liens but solely on such assets that are subject to such liens and not also part of the Indenture Trustee's replacement lien and prepetition collateral if Debtor has not timely made all adequate protection payments to the Indenture Trustee, *provided, further*, that upon payment in full of the DIP Loan, the automatic stay shall be lifted without further order of the Court, unless a party or entity, including Debtor, obtains an order re-imposing the automatic stay. | Interim Cash Collateral Order § 17. |
| Waivers of procedural requirements, including those for foreclosure mandated under applicable non-bankruptcy law, and for perfection of replacement liens | As to both: Full waiver of perfection requirements; enforcement remains subject to applicable nonbankruptcy law.. | Interim Cash Collateral Order § 13 |

46.     The provisions identified in the foregoing summary are important components of the Cash Collateral Orders.  Although atypical, their approval on an interim basis is necessary and appropriate because the Bond and Apollo Liens will both be primed immediately upon entry of the Interim DIP Financing Order, with blanket security interests being granted to the DIP Lender in all of Debtor's assets.  In consideration of this subordination, the Cash Collateral Orders should be approved.  Further, the Indenture Trustee has represented to Debtor that it is not willing to consent to Debtor's use of Cash Collateral absent the Court's approval of these provisions.

1    **E.**    **Request For Final Hearing**

2         47.    Pursuant to Bankruptcy Rule 4001(b)(2) and Local Bankruptcy Rule 4001-2(f),

3    Debtor requests that the Court set a date for the Final Hearing and fix the time and date prior to the

4    Final Hearing for parties to file objections to the Motion.

5    **VI.**    **CONCLUSION**

6         WHEREFORE, Debtor respectfully requests that the Court enter the Interim Cash Collateral

7    Order and grant such other and further relief as may be just and proper.

8

9    Dated:   Los Angeles, California                    Respectfully Submitted,
              September 14, 2009

10                                                        /s/  Lisa Hill Fenning

11                                                       Lisa Hill Fenning (SBN 89238)
                                                         Harry Garner (SBN 254942)

12                                                       Arnold & Porter LLP
                                                         777 South Figueroa Street, 44th Floor

13                                                       Los Angeles, California 90017
                                                         Telephone:   213.243.4000

14                                                       Facsimile:    213.243.4199

15                                                       *Proposed Counsel to Debtor and Debtor-in-*

16                                                       *Possession*

17

18

19

20

21

22

23

24

25

26

27

28