LISA HILL FENNING (SBN 89238)
HARRY GARNER (SBN 254942)
ARNOLD & PORTER LLP
777 South Figueroa Street, 44th Floor
Los Angeles, California 90017
Telephone:    213.243.4000
Facsimile:     213.243.4199
Lisa.Fenning@aporter.com
Harry.Garner@aporter.com

*Proposed Counsel to the Debtor and Debtor-in-Possession*

# UNITED STATES BANKRUPTCY COURT

# CENTRAL DISTRICT OF CALIFORNIA

# LOS ANGELES DIVISION

| | |
|---|---|
| In re | Case No.: 2:09-bk-34714 |
| DOWNEY REGIONAL MEDICAL CENTER-HOSPITAL, INC., a California non-profit, public benefit corporation, | Chapter 11 |
| Debtor. | MOTION OF DEBTOR FOR ORDER AUTHORIZING DEBTOR TO ASSUME LEASE AGREEMENT WITH THE CITY OF DOWNEY; MEMORANDUM IN SUPPORT THEREOF |
| Tax I.D. 95-1903935 | HEARING<br>Date:         September __, 2009<br>Time:<br>Place:        Courtroom: 1475<br>                  United States Bankruptcy Court<br>                  255 E. Temple Street<br>                  Los Angeles, CA 90012 |

**TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE, CREDITORS HOLDING THE TWENTY LARGEST UNSECURED CLAIMS, ANY ALLEGED SECURED CREDITORS, THE OFFICE OF THE UNITED STATES TRUSTEE, AND OTHER PARTIES IN INTEREST:**

Downey Regional Medical Center-Hospital, Inc., the debtor and debtor-in-possession in the above captioned case (the "**Debtor**" or "**Hospital**"), hereby moves this Court for entry of an order, pursuant to § 365(a) of title 11 of the United States Code (the "**Bankruptcy Code**"), authorizing Debtor to assume its unexpired lease with the City of Downey (the "**Assumption Motion**").

## **SUMMARY OF RELIEF REQUESTED**[1]

By this Assumption Motion, Debtor seeks authority to assume its unexpired lease with the City of Downey (the "**City**"), dated February 8, 1983, pursuant to which the City leased to Debtor the parcel underlying Debtor's hospital and certain other property (the "**Leased Property**") for a term of fifty-five (55) years, renewable at Debtor's option for an additional forty-four (44) years (the "**Lease**"). Currently, the rent payable pursuant to the Lease is one dollar ($1.00) per year (the "**Base Rent**") plus a sum of money sufficient to reimburse the City each year for all payments required to be made by the City on account of all taxes and assessments in connection with the Leased Property. The Base Rent was prepaid, on the initial term and for the forty-four year option, and Debtor is current under all obligations under the Lease. Further, the Mayor of the City of Downey is supportive of the assumption of the Lease by Debtor.

Debtor wishes to assume the Lease at this time to emphasize its strong relationship with and commitment to the City of Downey and the community it serves. The Lease is essential to the continued operations and successful reorganization of Debtor and is not burdensome: The Base Rent is prepaid, and the ongoing tax and other financial obligations under the Lease are minimal. Accordingly, the relief requested herein should be granted and Debtor should be authorized to assume the Lease.

---

[1] Capitalized terms used but not defined in this Assumption Motion shall have the meaning given to them in the accompanying Memorandum.

LA567490    -2-

This Assumption Motion is based on the Memorandum of Points and Authorities below (the "**Memorandum**"); the Declaration of Robert E. Fuller in Support of Debtor's Chapter 11 Petition and First Day Motions (the "**Fuller Declaration**"), filed with the Court concurrently herewith; and the arguments, evidence, and representations that may be presented at or prior to the hearing on this Assumption Motion.

Pursuant to Local Bankruptcy Rule ("**LBR**") 9013-1(f), any party that wishes to oppose or otherwise respond to this Assumption Motion must file with the Court and serve upon the appropriate parties a written response at least fourteen (14) days before the hearing on this Assumption Motion.

**WHEREFORE**, Debtor respectfully requests that the Court enter an order (i) authorizing Debtor to assume its unexpired Lease with the City of Downey and (ii) granting such other and further relief as may be just and proper.

Dated: Los Angeles, California
September 14, 2009

Respectfully Submitted,

/s/ Lisa Hill Fenning
Lisa Hill Fenning (SBN 89238)
Harry Garner (SBN 254942)
Arnold & Porter LLP
777 South Figueroa Street, 44th Floor
Los Angeles, California 90017
Telephone: 213.243.4000
Facsimile: 213.243.4199

*Proposed Counsel to the Debtor and Debtor-in-Possession*

**MEMORANDUM OF POINTS AND AUTHORITIES**

Downey Regional Medical Center-Hospital, Inc., the debtor and debtor-in-possession in the above captioned case (the "**Debtor**" or "**Hospital**"), hereby moves this Court for entry of an order, pursuant to § 365(a) of title 11 of the United States Code (the "**Bankruptcy Code**"), authorizing Debtor to assume its unexpired lease with the City of Downey. In support of the Assumption Motion, Debtor relies upon and incorporates by reference the Declaration of Robert E. Fuller in Support of the Debtor's Chapter 11 Petition and First Day Motions (the "**Fuller Declaration**"), filed with the Court concurrently herewith. In further support of the Assumption Motion, Debtor, by and through its undersigned counsel, respectfully states as follows:

**I.    JURISDICTION AND VENUE**

1.    This Court has jurisdiction to consider this Assumption Motion under 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. § 157(b). Venue of these cases and this Assumption Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409. The statutory predicate for the relief requested herein is § 365(a) of the Bankruptcy Code.

**II.   PROCEDURAL STATUS**

2.    On September 14, 2009 (the "**Petition Date**"), Debtor commenced a case (the "**Chapter 11 Case**") by filing a petition for relief under chapter 11 of the Bankruptcy Code.

3.    Debtor continues to operate its business and to manage its property as a debtor and debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in Debtor's Chapter 11 Case.

4.    No creditors' committee has been appointed in this Chapter 11 Case by the United States Trustee.

**III.  BACKGROUND**

**A.    The Business of the Hospital**

5.    The Hospital is a nonprofit general acute care and teaching hospital licensed for 199 beds located in Downey, California. The Hospital currently operates 181 staffed inpatient beds, including an intensive care unit, a neo-natal intensive care unit for newborns with special health issues, a birth center, and definitive observation units, besides general medical-surgical beds. It

services approximately 14,000 inpatients per year in all services. The Hospital's average length of stay is less than 4 days on a very acute population, making it one of the most efficient in the state.

6. The Hospital offers a wide variety of clinical services and provides virtually all clinical services of a major tertiary university hospital except for organ transplants. The Hospital has 11 operating rooms, and a very busy surgical practice. It offers same day surgeries, and specializes in open heart surgery, general surgery, orthopedic surgery, and neurosurgery. It operates on over 7,000 patients annually. The Hospital also has numerous specialty outpatient services, seeing over 80,000 outpatients annually, including non-invasive cardiology, radiology, endoscopy, and physical therapy.

7. The Hospital also has an emergency room of 22 beds. The emergency room is not designated as a trauma unit, but it is equipped for and services trauma patients who are regularly brought to the Hospital in extremis or who come in via transportation other than ambulance. The emergency room services over 50,000 patients annually. Therefore, at about 2,500 patients per bed annually, it is one of the busiest in the area. The emergency room is burdened because since 2001 there have been four major emergency rooms closed on the I-105 corridor, including Martin Luther King Hospital, leaving only three remaining general emergency rooms in the area including the Hospital.[2]

### B. The Causes of the Bankruptcy Filing

8. Although nominally profitable on an accrual basis, the Hospital has been forced to commence the Chapter 11 Case as a result of a liquidity crisis. This crisis has two primary causes. First, the Hospital has incurred substantial losses as a result of severe problems on the finance side of its business (now largely corrected) due to defective charge capture practices and software billing practices (the "**Charge Capture System Problems**") that resulted in the Hospital not collecting all the revenues to which it would be entitled. Second, the Hospital was incurring significant losses due problems with respect to its "capitation" arrangements (the "**Capitation Program**") with certain physician groups and health plans (the "**Capitation Program Problems**"). These losses

---

[2] There is also a Kaiser Permanente Facility in the area, and although its emergency room is technically open to everyone, paramedic operators tend to take only Kaiser patients to this facility.

were so severe that the Hospital concluded it had to terminate the Capitation Program to staunch the long-term hemorrhaging of cash, despite the short term cash flow interruption and claims that would result. The Hospital has taken steps to exit the Capitation Program and adopt a fee-for-service model, but the exit costs are substantial. The combination of the Charge Capture System and Capitation Program Problems has left the Hospital with no cash reserves since March 2008.

9. In essence, due to software and process failings, the Hospital's financial, billing and collections systems had failed to capture charges which led to incomplete bills for a significant portion of its services for nearly a decade, causing unrecoverable losses. A cost-accounting problem caused the misallocation of costs to the capitation contracts, resulting in the Hospital's books showing a profit in capitation where none really existed. These problems have been investigated, diagnosed, and continue to be remedied under the direction of a new chief executive officer, Kenneth Strople, who took the reins in 2007, Robert Fuller, the chief operating officer, and consultant Richard Yardley, the acting chief financial officer. Given sufficient time to operate under a regime in which charges are properly captured, bills are complete when invoiced, and financial reports provide reliable real-time information, the Hospital should be able to repay its debts in full.

10. However, demands by certain creditors for immediate payment–and for payment of more than the Hospital believes it owes in some cases–prevented an orderly restructuring outside of bankruptcy and forced this filing. Much of the pressure has come from the physician groups who have asserted claims in excess of $9 million against the Hospital related to the termination of the capitation contracts.

11. The exit from the Capitation Program created three distinct cash drains: (1) the tail of claims for services provided 'out-of-network' by other hospitals and health care providers, (2) the claims by the physician groups participating in the Capitation Program for risk-sharing profit splits, much of which is disputed by the Hospital (the "**Risk Share Claims**"), and (3) the transitional loss of cash occasioned by the change in business model out of capitation (where under the Hospital was paid up front, before services were rendered) to fee-for service (where under the Hospital is paid in arrears, typically up to 150 days following the rendering of services), some of which was eased by

1     the $8.8 million in advances by the insurers who participated in the program. However, the

2     Hospital does not have the financial capacity to bridge the costs of exiting capitation within the time

3     frame being demanded by impacted parties. In short, this reorganization filing has resulted from

4     demands made by parties who greatly benefitted from the Capitation Program while it was

5     operational (the physicians), but who are now not patient enough to allow the Hospital to implement

6     its new business model and return to financial stability before demanding payment.

7           12.     The immediate problem that forced the Hospital to file this Case arose from an

8     arbitration brought by one of the physician groups and the potential for the other two groups to

9     follow suit. The physician groups are expected to assert claims for over $9 million.

10         13.     Alliance Physicians Medical Group ("**Alliance**"), one of the physician groups,

11     recently filed an arbitration in an attempt to collect their alleged 'risk share' profits from 2006 to

12     2008. In its arbitration, Alliance claimed it was owed up to $4.7 million or more. It sought to

13     attach the Hospital's bank accounts in the fall of 2008. The arbitrator's award is imminent, and the

14     Hospital believes that Alliance will seek immediate enforcement by attaching the Hospital's bank

15     accounts.

16         14.     The threat of attachments relating to the estimated $9 million of Risk Share Claims

17     has scared off prospective lenders who would not want the loan proceeds intended for critically

18     needed working capital to be diverted to paying historical disputed debts. Such a diversion of funds

19     would shut down the Hospital. The automatic bankruptcy stay will protect the Hospital from the

20     catastrophic interruption of its operations that would result from such an attachment.

21        **C.**       **Debtor's Lease with the City of Downey**

22         15.     In 1968, the City of Downey (the "**City**") and Downey Community Hospital

23     Foundation (Debtor's former name) entered into a lease agreement whereby the City agreed to lease

24     to Debtor certain real property and provide Debtor with guarantees to support bond funding for

25     construction of a hospital. After construction of the new hospital, disagreements arose between the

26     City and Debtor during the early 1980s that were settled through the execution of a new lease dated

27     February 8, 1983 (the "**Lease**"), for the 11500 Brookshire Avenue parcel upon which Debtor had

28     constructed the new hospital and other facilities (the "**Leased Property**"). Under this new lease, all

1  facilities constructed since 1968 (which includes all existing buildings and equipment) belong to Debtor with the City retaining a reversionary interest at the conclusion of the Lease term. A copy of the Lease is attached hereto as Exhibit A.

16. The Lease provides that the Leased Property will be used by Debtor for the operation of a hospital for the primary benefit of the residents of the City of Downey. The term of the Lease is fifty-five (55) years, with an option granted to Debtor to renew the Lease for an additional forty-four (44) year term, for a total of ninety-nine (99) years.

17. The rent payable pursuant to the Lease was initially pegged to the amount of rent required to be paid by the City to a third party pursuant to a leaseback agreement. Upon the termination of the leaseback agreement, Debtor became obligated to pay to the City rent in the amount of one dollar ($1.00) per year (the "**Base Rent**"), plus a sum of money sufficient to reimburse the City each year for all payments required to be made by the City on account of all taxes and assessments in connection with the Leased Property. The Base Rent was prepaid on the initial term and for the forty-four year option. Debtor is current on all obligations under the Lease.

18. The Hospital seeks to assume the Lease at this time to emphasize its strong relationship with and commitment to the City of Downey and the community it serves. The Lease is essential to the continued operations of the Hospital. It imposes no material financial obligations upon the Hospital.

19. Pursuant to Section 14(A) of the Lease, the Hospital may not encumber the hospital premises without the consent of the City Council of the City of Downey, which consent shall not be unreasonably withheld. Debtor has requested that the City consent to certain liens in favor of Healthcare Finance Group, Debtor's proposed postpetition lender, Wells Fargo Bank, National Association, as indenture trustee for Debtor's prepetition tax exempt bonds, and Apollo Health Street, Inc., one of Debtor's prepetition secured creditors. It is Debtor's understanding that such consent would be predicated upon Debtor's formal assumption of the Lease. It is Debtor's further understanding that the Mayor of the City of Downey is supportive of the assumption of the Lease by Debtor. Therefore, Debtor expects to obtain the official approval in due course.

## IV. RELIEF REQUESTED

20. By this Assumption Motion, Debtor seeks entry of an order, pursuant to § 365(a) of the Bankruptcy Code, authorizing Debtor to assume the Lease.

## V. APPLICABLE AUTHORITY

21. Section 365(a) of the Bankruptcy Code provides that a debtor-in-possession may, subject to the Court's approval, assume or reject any executory contract or unexpired lease.

22. In determining whether the assumption of an unexpired lease or executory contract should be authorized, the Court should apply the "business judgment" standard. See In re Food Barn Stores, Inc., 107 F.3d 558, 567 n.16 (8th Cir. 1997); see also In re Orion Pictures Corp., 4 F.3d 1095, 1099 (2d Cir. 1993) ("[A] bankruptcy court reviewing a . . . debtor-in-possession's decision to assume or reject an executory contract should examine the contract and the surrounding circumstances and apply its best 'business judgment' to determine if it would be beneficial or burdensome to the estate to assume it.").

23. The business judgment standard is satisfied when a debtor-in-possession demonstrates that it has made a business judgment that the assumption of a particular unexpired lease or executory contract will be in the beneficial to the bankruptcy estate. See In re Plitt Amusement Co. of Wash., Inc., 233 B.R. 837, 840 (Bankr. C.D. Cal. 1999). A bankruptcy court should approve a debtor's business judgment unless the decision is manifestly unreasonable or based on bad faith, whim, or caprice. See In re Pomona Valley Med. Group, Inc., 476 F.3d 665, 670 (9th Cir. 2007).

24. In Debtor's judgment, it is in the best interests of the estate for Debtor to assume the Lease. The Lease is essential to Debtor's ongoing operations. It is not burdensome: the Base Rent is prepaid; the ongoing tax and other financial obligations under the Lease are minimal. The potential positive impact upon the community from the recommitment to the Hospital's mission that assumption represents is likely to contribute to the success of this reorganization.

25. Section 365(b)(1) of the Bankruptcy Code provides that if there has been a default pursuant to an unexpired lease, a debtor may not assume the lease unless, at the time of assumption, the debtor cures all defaults and provides adequate assurance of future performance under the lease.

Debtor submits that it is not in default of the Lease. Accordingly, compliance with Bankruptcy Code sections 365(b)(1)(A), (B), or (C) is not necessary. Moreover, the City is expected to consent to the assumption of the Lease.

## VI. CONCLUSION

WHEREFORE, Debtor respectfully requests that the Court enter an order, substantially in the form annexed hereto, granting the relief requested in the Assumption Motion and such other and further relief as may be just and proper.

Dated: Los Angeles, California
September 14, 2009

Respectfully Submitted,

 /s/ Lisa Hill Fenning
Lisa Hill Fenning (SBN 89238)
Harry Garner (SBN 254942)
Arnold & Porter LLP
777 South Figueroa Street, 44th Floor
Los Angeles, California 90017
Telephone: 213.243.4000
Facsimile: 213.243.4199

*Proposed Counsel to the Debtor and Debtor-in-Possession*