LISA HILL FENNING (SBN 89238)
HARRY E. GARNER (SBN 254942)
ARNOLD & PORTER LLP
777 South Figueroa Street
44th Floor
Los Angeles, CA 90017-5844
Telephone: (213) 243-4000
Facsimile: (213) 243-4199
Lisa.Fenning@aporter.com
Harry.Garner@aporter.com

*Proposed Counsel to the Debtor and Debtor in Possession*

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## LOS ANGELES DIVISION

| | |
|---|---|
| In re | Case No. 2:09-bk-34714 |
| DOWNEY REGIONAL MEDICAL CENTER-HOSPITAL, INC., a California non-profit, public benefit corporation,<br><br>Debtor. | Chapter 11<br><br>**DECLARATION OF ROBERT E. FULLER IN SUPPORT OF DEBTOR'S CHAPTER 11 PETITION AND FIRST DAY MOTIONS** |
| Tax I.D. 95-1903935 | <u>HEARING</u><br>Date: September __, 2009<br>Time:<br>Place: Courtroom 1475<br>United States Bankruptcy Court<br>255 E. Temple Street<br>Los Angeles, CA 90012 |

# **TABLE OF CONTENTS**

Page

I.   GENERAL BACKGROUND ..................................................................................... 1

   A.   The Chapter 11 Filing .............................................................................. 1

   B.   The Business of the Hospital .................................................................. 2

   C.   Certification and Compliance ................................................................. 3

   D.   Parent and Affiliates ............................................................................... 3

   E.   Principal Assets ....................................................................................... 3

II.  EVENTS LEADING TO THE FILING OF THE CHAPTER 11 CASE ............... 4

   A.   Two Major Factors Precipitated This Filing ......................................... 4

       (1)   The Charge Capture Systems Problems And Related Issues ........... 4

       (2)   The Capitation Program Problems .................................................. 5

       (3)   Fallout from the Capitation Program Problems:  The Capitation Exit
             Consequences .................................................................................. 5

       (4)   Further Fallout from Capitation Program Problems:  The Risk Share
             Claims Litigation ............................................................................ 6

   B.   The History of the Charge Capture System Problems ......................... 6

       (1)   Identification of the Charge Capture Issues:  Divergence of Accrual  and
             Cash Results .................................................................................... 7

       (2)   Identification of Siemens Systems Problems ................................. 8

       (3)   Identification of the Capitation Programs as the Source of Losses ......... 9

       (4)   Continuing Undercollections Lead to Change of Servicer ............. 9

   C.   Termination of the Capitation Program and Transition to Fee-for-Service Model ... 10

       (1)   Transition Advances From The Health Plans .................................. 12

       (2)   Capitation Exit Issues with the Physician Groups .......................... 13

   D.   Financial Result and Projections Support Good Reorganization Prospects ............... 13

       (1)   FYE 6/2009 Accrual Results Through May 2009 ............................ 13

       (2)   January - May 2009 Post-Capitation Results .................................. 14

|     |     | (3) | One-Year Projections .................................................................................. 15 |
|     |     | (4) | Prospects for Reorganization ....................................................................... 15 |

III.     FIRST DAY MOTIONS ................................................................................................ 16

       A.     Administrative and Procedural Matters ...................................................... 16

             (1)     Application for Order Pursuant to 28 U.S.C. § 156(c), Bankruptcy Rule 2002(f), and Local Bankruptcy Rule 5075-1 Authorizing Debtor to Retain Omni Management Group, LLC as Claims Administrator and Noticing Agent of the Bankruptcy Court (the "Claims Agent Application") .............. 16

             (2)     Emergency Motion to Extend Time for Filing of Schedules and Statement of Financial Affairs (the "Schedules Extension Motion") ............................. 18

             (3)     Emergency Motion of Debtor for an Interim Order (I) Establishing (A) Omnibus Hearing Dates, and (B) Certain Noticing, Case Management, and Administrative Procedures, and (II) Scheduling a Final Hearing (the "Case Management Motion") .................................................................................. 19

       B.     Business Operations .................................................................................... 19

             (1)     Emergency Motion for Order Pursuant to Bankruptcy Code Sections 105(a), 363(b), and 507(a) (i) Authorizing Debtor to Pay Prepetition Wages, Compensation, and Employee Benefits and (ii) Authorizing and Directing Financial Institutions to Honor and Process Checks and Transfers Related Thereto (the "Employee Wage Motion") ......................... 19

             (2)     Emergency Motion for Order Authorizing (I) Continued Use of Existing Cash Management System, (II) Continued Use of Existing Bank Accounts, and (III) Continued Use of Existing Business Forms (the "Cash Management Motion") .................................................................................. 24

             (3)     Emergency Motion for Order Prohibiting Utility Companies from Altering or Discontinuing Service on Account of Prepetition Invoices, Approving Deposit as Adequate Assurance of Payment, and Establishing Procedures for Resolving Requests by Utility Companies for Additional Assurance of Payment (the "Utility Motion") .................................................................... 26

             (4)     Emergency Motion for Interim and Final Orders Authorizing Debtors to Utilize Cash Collateral, Granting Adequate Protection to Pre-Petition Secured Lenders, and Scheduling Final Hearing (the "Cash Collateral Motion") .................................................................................................... 27

             (5)     Emergency Motion for Interim and Final Orders Authorizing Debtor to Obtain Post-Petition Financing (the "DIP Financing Motion") .................... 32

             (6)     Emergency Application of Debtor for Order Authorizing Employment of HNB Capital LLC as Investment Banker Effective As Of The Petition Date (the "HNB Capital Application") ........................................................ 36

IV. MOTIONS TO BE HEARD ON REGULAR NOTICE .......................................................39

    A.    Motion of Debtor for Order Authorizing Debtor to Assume Lease Agreement with the City of Downey (the "Assumption Motion")........................................................39

    B.    Motion of Debtor For Order Authorizing Debtor to Reject Agreement With Aetna Health of California, Inc. (the "Aetna Rejection Motion")........................................40

    C.    Motion of Debtor for Order Authorizing Debtor to Reject Agreements with London & Pacific Capital Advisors, LLC and CapitalSource, Inc. (the "L&P/CapitalSource Rejection Motion") ..................................................................41

**DECLARATION OF ROBERT E. FULLER**

I, Robert E. Fuller, declare as follows:

1.     I am the Chief Operating Officer ("**COO**") and Executive Vice President of Downey Regional Medical Center-Hospital, Inc., the debtor in the above-captioned Chapter 11 case (referred to herein as the "**Hospital**" or "**Debtor**").  I have been associated with the Hospital in one form or another since 1998.  Prior to becoming the Hospital's COO, I was the chief operating officer of a health plan brokerage affiliated with the Hospital, and ran my own law firm of which the Hospital was a client.  I have been COO of the Hospital since 2003.  As COO, I am familiar with the Hospital's day-to-day operations, business affairs, and books and records.

2.     I was graduated from Dartmouth College in 1979 and hold a law degree from Fordham Law School.  I am a member of the bars of the States of New York and California, and am admitted to practice before most United States Circuit Courts of Appeal and the United States Supreme Court.

3.     I submit this declaration (the "**Declaration**") in support of the Hospital's Chapter 11 petition and first day motions (collectively, the "**First Day Motions**").  Except as otherwise indicated herein, all facts set forth in this Declaration are based on my personal knowledge, my discussions with other members of the Hospital's senior management, my review of relevant documents, reports and other information provided by the Hospital's senior management, my familiarity with the Hospital's books and records, or my opinion, relying on my experience with and knowledge of the Hospital's operations and financial condition.  If I were called to testify, I could and would testify competently to the facts set forth herein.

## I.     GENERAL BACKGROUND

### A.     The Chapter 11 Filing

4.     On September 14, 2009 (the "**Petition Date**"), the Hospital commenced a case by filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code (the "**Chapter 11 Case**").

5.     The Hospital continues to operate its business and to manage its property as a debtor and debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed.

6.     No creditors' committee has been appointed in this Chapter 11 Case by the United States Trustee.

**B.     The Business of the Hospital**

7.     The Hospital is a nonprofit general acute care and teaching hospital licensed for 199 beds located in Downey, California.  The Hospital currently operates 181 staffed inpatient beds, including an intensive care unit, a neo-natal intensive care unit for newborns with special health issues, a birth center, and definitive observation units, besides general medical-surgical beds.  It services approximately 14,000 inpatients per year in all services.  The Hospital's average length of stay is less than 4 days on a very acute population, making it one of the most efficient in the state.

8.     The Hospital offers a wide variety of clinical services and provides virtually all clinical services of a major tertiary university hospital except for organ transplants.  The Hospital has 11 operating rooms, and a very busy surgical practice.  It offers same day surgeries, and specializes in open heart surgery, general surgery, orthopedic surgery, and neurosurgery.  It operates on over 7,000 patients annually.  The Hospital also has numerous specialty outpatient services, seeing over 80,000 outpatients annually, including non-invasive cardiology, radiology, endoscopy, and physical therapy.

9.     The Hospital also has an emergency room of 22 beds.  The emergency room is not designated as a trauma unit, but it is equipped for and services trauma patients who are regularly brought to the Hospital in extremis or who come in via transportation other than ambulance.  The emergency room services over 50,000 patients annually.  Therefore, at about 2,500 patients per bed annually, it is one of the busiest in the area.  The emergency room is burdened because since 2001 there have been four major emergency rooms closed on the I-105 corridor, including Martin

Luther King Hospital, leaving only three remaining general emergency rooms in the area including the Hospital.[1]

### C. Certification and Compliance

10.    The Hospital is in good standing and in full compliance with all applicable licensing and regulatory requirements.

### D. Parent and Affiliates

11.    Debtor's sole corporate member is Downey Regional Medical Center, Inc. ("**DRMCI**").  DRMCI is also the parent of DRMC Properties, Inc. ("**Properties**"), a non-debtor, for-profit affiliate of the Hospital that owns and operates a 72,000 square foot medical office building on the Hospital's campus.  Another affiliate of which DRMCI is the parent is a fundraising charitable Section 501(c)(3) company.  There are other shell companies held by DRMCI; DRMC Insurance Services, Inc. ("**DRMC Insurance Services**"), the for-profit defunct brokerage, and a senior services company that never became operational.  The Hospital's board consists of volunteers from the Downey community.

### E. Principal Assets

12.    The Hospital owns the hospital building and all personal property associated with it. The hospital is located on land leased from the City of Downey for $1 per annum for 99 years, expiring in 2081.  The Hospital campus also extends to several small parcels adjacent to the City leased land, held in fee simple by Properties.  The Hospital also holds two parcels of unencumbered land for development, one of which is currently used for parking, the other of which is intended for eventual use as an outpatient surgical and imaging center and a community health clinic, including services for indigent.

---

[1] There is also a Kaiser Permanente facility in the area, and although its emergency room is technically open to everyone, paramedic operators tend to take only Kaiser patients to this facility.

## II.   EVENTS LEADING TO THE FILING OF THE CHAPTER 11 CASE

### A.   Two Major Factors Precipitated This Filing

13.   As set forth in more detail below, the Hospital has been forced to commence the Chapter 11 Case as a result of two primary factors that have created an immediate liquidity crisis, requiring the protection of the automatic stay.

14.   First, the Hospital has incurred substantial losses as a result of severe problems on the finance side of its business (now largely corrected) due to defective financial system software and charge capture practices (the "**Charge Capture System Problems**") that resulted in the Hospital not collecting all the revenues to which it would be entitled.

15.   Second, the Hospital was incurring significant losses due to problems with respect to its "capitation" arrangements (the "**Capitation Program**") with certain physician groups and health plans (the "**Capitation Program Problems**").   These losses were so severe that the Hospital concluded it had to terminate the Capitation Program to staunch the long-term hemorrhaging of cash, despite the short term cash flow interruption and claims that would result (the "**Capitation Exit Consequences**").   The Hospital has taken steps to exit the Capitation Program and adopt a fee-for-service model, but the exit costs are substantial.   The combination of the Charge Capture System and Capitation Program Problems has left the Hospital with no cash reserves since March 2008.

### (1)   The Charge Capture Systems Problems And Related Issues

16.   The finance and computing systems that were used to capture patient charges, compile data, and ultimately produce collectible bills, failed to generate accurate data for invoices for significant portions of the Hospital's business.   This resulted in a failure to bill and collect a significant portion of the fees for services rendered, among other problems.   The Charge Capture System Problems also infected the financial reporting systems, so that reliable reports of the Hospital's actual revenues were not being generated.   The complexity of the revenue cycle systems and the embedded nature of the problems has meant that the full extent of the system defects has only recently been discovered and understood.   Solutions to the Charge Capture System Problems were designed and implemented starting in 2008 and are largely completed, but as a result of these

prior problems, the Hospital has experienced significant losses by failing to bill and collect millions of dollars of fees each year for a number of years.

### (2)    The Capitation Program Problems

17.    From 2001 until late 2008, about 25% of the Hospital's total revenue came from the Capitation Program.  That program functioned through five HMOs and provided all of the health care services to 32,000 patients in exchange for fixed monthly payments.  The Hospital and participating physicians were paid on a per member per month basis, whether or not the member received any services.  As with the Charge Capture System Problems, the hospital management recently discovered through extensive research and work with experts that the accounting for the Capitation Program failed, among other things, to take into account the Hospital's costs of providing services, thereby masking an approximate $1 million per month cash loss for the Hospital.  These Capitation Program losses of $12 million or more per year were unsustainable.  To save the Hospital, Debtor had to – and did – negotiate the termination of four of the five capitation contracts in 2008.  It will reject the fifth one in this Case.

### (3)    Fallout from the Capitation Program Problems:  The Capitation Exit Consequences

18.    The exit from the Capitation Program created three distinct cash drains:  (1) the tail of claims for services provided 'out-of-network' by other hospitals and health care providers (the "**Tail Claims**"), (2) the claims by the three physician groups participating in the Capitation Program for risk-sharing profit splits, much of which is disputed by the Hospital (the "**Risk Share Claims,**" and collectively with the Tail Claims, the "**Exit Claims**"), and (3) the transitional loss occasioned by the change in business model out of capitation (where under the Hospital was paid up front, before services were rendered) to fee-for service (where under the Hospital is paid in arrears, typically up to 150 days following the rendering of services) (the "**Cash Flow Interruption**"), some of which was eased by the $8.8 million in advances by the insurers who participated in the program.  However, the Hospital does not have the financial capacity to bridge the costs of exiting capitation within the time frame being demanded by impacted parties.  In short, this reorganization filing has resulted from demands made by parties who greatly benefitted from the Capitation

Program while it was operational (the physicians), but who are now not patient enough to allow the Hospital to implement its new business model and return to financial stability before demanding payment.

**(4) Further Fallout from Capitation Program Problems: The Risk Share Claims Litigation**

19. The immediate problem that forced the Hospital to file this Case arose from an arbitration brought by one of the physician groups and the potential for the other two groups to follow suit. The physician groups are expected to assert claims for over $9 million.

20. Alliance Physicians Medical Group ("**Alliance**"), one of the physician groups, recently proceeded to arbitration in an attempt collect their alleged 'risk share' profits from 2006 to 2008. In its arbitration, Alliance claimed it was owed up to $4.7 million or more. It sought to attach the Hospital's bank accounts in the fall of 2008. The arbitrator's award is imminent, and we believe that Alliance will seek immediate enforcement by attaching the Hospital's bank accounts.

21. The threat of attachments relating to the estimated $9 million of Risk Share Claims has scared off prospective lenders who would not want the loan proceeds intended for critically needed working capital to be diverted to paying historical disputed debts. Such a diversion of funds would shut down the Hospital. The automatic bankruptcy stay will protect the Hospital from the catastrophic interruption of its operations that would result from such an attachment.

**B. The History of the Charge Capture System Problems**

22. During the 1990s, the Hospital first transitioned from a traditional fee-for-service model to a managed-care, integrated healthcare delivery system ("**IDS**"), provided in coordination with the CareMore Medical Group ("**CareMore**") (the "**CareMore Program**"). Although initially financially successful, the CareMore Program led to dissention among the Hospital's physicians. When the arrangements with CareMore were discontinued, CareMore took with it the primary systems and personnel needed to support and run the managed care and accounting systems. The Hospital then entered into a series of arrangements with third party vendors for administrative support of the Capitation Program, including claims adjudication and payment of out-of-network claims.

23.     In the late 1990s, the Hospital's profitability eroded.  By 2002 reported losses from operations were exceeding earnings from reserves, which were diminishing as the Hospital used them to pay current obligations.

24.     I was engaged as chief operating officer in 2003 and given responsibility for implementing a long-term program of changes focused upon hospital operations.  My responsibilities did not, however, include the accounting and financial systems, billings, or collections, for which the chief financial officer remained in charge, reporting directly to the chief executive officer.  By the summer of 2006, the resulting operational changes had stabilized the Hospital and produced strongly improved reported and projected financial results.

### (1)     Identification of the Charge Capture Issues:  Divergence of Accrual and Cash Results

25.     However, despite the considerable improvement in operations systems within the Hospital, the projected financial results continued diverging from actual cash collections.   In October 2006, the Hospital's financial systems produced particularly anomalous results at odds with the financial projections, results that suggested the Hospital was actually incurring substantial cash losses despite having full beds and profits on an accrual basis.  A detailed analysis of the finance systems revealed a fundamental disconnect between accounts receivable data to clinical system data:  the reports from the operational units indicated strong financial performance that was not reflected in the accounts receivables or collections results.

26.     Following the October 2006 financial systems meltdown, the management team at the Hospital struggled to determine the variances between the expected performances and the collections results.  The then CFO was unable to find issues in the systems at the summary levels which he analyzed.  The then CEO was convinced that the problems still existed in the expense side of the organization, despite the demonstrable productivity and efficiency benchmarks to the contrary.  In June 2007 the Hospital Board took action and replaced the long-time CEO with the current CEO Kenneth Strople.  Strople's new team took immediate steps to begin to unravel the issues on the revenue side that had theretofore eluded analysis.

27.     One of Strople's first steps, in July 2007, was to engage an outside business office services vendor (the "**Billing Servicer**") to function as the Hospital's bill issuer and collector. It quickly became apparent that there were issues in the data streams being provided to the Billing Servicer from the Hospital's systems. During this time, the Hospital was losing approximately $2 million per month on a cash basis. Strople directed me to launch a comprehensive review that, over the next year, uncovered numerous deficiencies in the Hospital's various financial accounting systems and processes, most of which turned out to be of long-standing duration.

### (2)     Identification of Siemens Systems Problems

28.     In the fall of 2007, these problems caused the Hospital to outsource information technology support to Siemens Medical Solutions USA ("**Siemens**"), the Hospital's long-time software computer system vendor. Unfortunately, the Hospital has since learned that many of the major problems with its charge capture system are directly related to severe defects in the set-up, maintenance, and operation of software that prior Hospital management had purchased from Siemens and the Hospital's internal processes that were inconsistent with the software. Siemens' efforts to diagnose and resolve software and systems problems have been ineffective and disappointing.

29.     By November 2007, the Hospital retained Medical Development Specialists, a nationally-known healthcare consulting company ("**MDS**"), to assess the financial situation and make recommendations. MDS's analysis identified an almost $27 million shortfall in the prior 22 months – a gap between reported net revenue (less bad debt) and the cash collected (the "**Shortfall**"). In theory, the net revenues less bad debt reflected on the accrual basis financial statements should match the cash eventually collected. A cash shortfall had three possible explanations: (a) collections were lagging what they should be, (b) net revenues were overstated, or (c) bad debt was understated – or it could be some combination of the three.

30.     According to the MDS analysis, the Hospital had very serious short-term financial problems: (a) the Hospital's financial reports required restatement, (b) the Hospital functionally had zero cash reserves, and (c) some as-yet-unidentified factor in addition to the Charge Capture System Problems was contributing to continuing cash losses, even though the Hospital was

seemingly profitable on an accrual basis.  The long run was brighter:  the data supported the conclusion that the Hospital should be self-sustaining on an operational basis, because of its full beds and payor mix.  Armed with this information, the Hospital revised and then met its projections for February and March 2008.

### (3)  Identification of the Capitation Programs as the Source of Losses

31.  In April 2008, MDS's principal consultant, Richard Yardley, stepped in to serve double duty as consultant and interim chief financial officer when the then CFO left, a position he continues to fill.  He and I worked closely together to tighten all procedures, cross-check all systems, and double-check all assumptions in our effort to uncover the reasons for the continuing Shortfall.  By late spring of 2008, we concluded that the Hospital was losing money on the Capitation Program because, among other things, internal encounter charges data had not been captured, the contractual formulas failed to account for the Hospital's own costs of providing services and excess out-of-network cost had been incurred.  On our recommendation, the Hospital negotiated termination of all but one of its capitation contracts by the end of 2008, as described in the next section.

### (4)  Continuing Undercollections Lead to Change of Servicer

32.  Separate from the effort to eliminate the troublesome losses from the Capitation Program, the Hospital remained dissatisfied with the collections results.  In March 2009, unable to reach agreement after months of discussions with the Billing Servicer on either the diagnosis of the problem or the remedial measures to be implemented, the Hospital negotiated a consensual early termination of the Billing Servicer's contract.  The Hospital then retained Cymetrix Corporation ("**Cymetrix**") to provide business office billing and collection services.  Cymetrix's subsequent review of the billing and collection system found, among other problems, that self-pay accounts were not being collected, and that Medi-Cal outpatient accounts and many managed care contracts had not been properly billed.

33.  Cymetrix has also assisted the Hospital in identifying deficiencies in the accounts receivable reporting generated through the Siemens software.  Numerous issues, including inappropriate creation of credit balances, were identified.  Cymetrix is completing the

implementation of its own billing systems, and has issued bills for at least $12 million of recent invoices left unbilled due to defects in the computer applications. Unfortunately, some of the older bills will not be paid and represent unrecoverable losses, due to billing deadlines in the Hospital's contracts with the third party payors.

34. Given its cash flow problems, the Hospital has only been able to break even on a cash basis in the past several years because its eligibility for supplemental grants from the State of California and the County of Los Angeles. The California grants are available to about a dozen safety net hospitals through the Distressed Hospital Fund (the "DHF"). The Hospital received a $1.5 million DHF award in early 2007, a $1.5 million award in early 2008, a $3.5 million award in June 2008, and a $4.0 million award in February 2009. The County of Los Angeles also provides awards under its "Impacted Hospital Program" to certain Los Angeles county hospitals affected by the closing of M. L. King County Hospital. In June 2008, the County awarded the Hospital $1.5 million, and another $0.9 million award in 2009.

**C.** **Termination of the Capitation Program and Transition to Fee-for-Service Model**

35. In mid-2008, having resolved most of the Charge Capture Problems, the Hospital's senior management team concluded that the only major area left for examination, the capitation business, must be the cause of the continuing Shortfall. The Board of Directors and management had been reassured by the Hospital's three prior CFOs that the capitation business was profitable – because it generated $42 million in annual revenues – and therefore could not be the cause of the Hospital's financial losses. Unfortunately, it turned out that the *cost* side of the equation had not been understood in their analyses that underlay these rosy conclusions. This embedded issue had been hidden from view both because of the Charge Capture Problems and because of fundamental cost accounting issues and excessive out-of-network usage. Having a consistent cash flow from the monthly capitation payments is good, but not if the Hospital's costs of providing services for the Capitation Program exceed these revenues.

36. An MDS capitation specialist was brought in to confirm management's suspicions. He reported many issues with the Capitation Program, including the following:

- Out-of-network costs were three times larger than they should be (*i.e.*, too many of the 32,000 capitated patients lived more than seven miles from the Hospital and received treatment at other hospitals, instead of DRMCI), resulting in excessive provider claims.

- The internal charge rates for services to capitation patients at the Hospital were covering less than half the costs of such services.

- The Charge Capture Problems in the fee-for-service system also significantly impacted encounter data of services rendered to capitated members and, therefore, hundreds of patient days of service actually rendered to capitated members were not captured for or charged to capitation risk pools.

- The risk pool calculations were flawed, causing the Hospital to show phantom profits that were required to be shared with the physician groups where in fact there were no such profits in the risk pools.

37. In short, although the Hospital's capitation accounting showed revenues of about $3.5 million per month and capitation service expenses of about $2 million per month, implying a monthly profit of $1.5 million, unfortunately, this implication was wrong. The in-the-hospital expenses for the Hospital's capitation patients were actually allocated into other accounting categories (salaries, supplies, etc.) and were not properly allocated to the capitation expense line item. These "unaccounted" for expenses of the Capitation Program ran between $2 million and $4 million per month, meaning that the actual performance of the Capitation Program was a loss of $0.5 million to $2.5 million per month, not a $1.5 million profit. The Hospital concluded that this structural deficit was so fundamental that it could not be fixed. The Capitation Program had to be ended as quickly as possible, even though the contracts had several years more to run.

38. The Hospital enlisted aid from the health plans, United/PacifiCare, Health Net, SCAN, Blue Shield, and Aetna, to assist the Hospital in connection with new contractual arrangements to smooth the revenue gap in cash flow between the time the $3.5 million in "up front" monthly capitation payments were turned off until the typical 120-150 days or so that those

same patients were billed and paid under the fee-for-service contracts in arrears. If the gap were held to 90 days, then the one-time cash flow loss in the transition would amount to $10.5 million.

39. In addition, the Hospital was aware that, upon exit from capitation, it would be left with approximately $12 million or more of out-of-network claims (also referred to as "**IBNR**" – "incurred but not received"). These Tail Claims are amounts owed by the Hospital for services provided by the out-of-network providers to its capitated patients for which the bills either had not been received or paid by the Hospital at any given time. The Hospital estimated there would be six-to-eight month's worth of such claims in the tail or about $12 million. The Hospital did not have reserves set aside for the Tail Claims.

**(1)     Transition Advances From The Health Plans**

40. Between August 1, 2008 and January 31, 2009, the Hospital through intensive negotiations, was successful in transitioning out of capitation with four of its five participating health plans:

a.     **Blue Shield,** representing about 8% of the Hospital's capitation business, transitioned to fee-for-service on September 1, 2008. Among other assistance, it provided a cash advance to the Hospital to support cash flow interruption and claims payments, since repaid.

b.     **SCAN**, representing about 10%, transitioned on October 1, 2008. It also provided financial support (without repayment obligation) and other aid.

c.     **United/PacifiCare,** about 50% of the Hospital's capitation business, transitioned to fee-for-service on December 31, 2008. United/PacifiCare provided a credit line of $5 million to assist in payment of provider claims. Over $4.5 million remains outstanding, with repayment due to begin January 2010, over a one-year period (the "**PacifiCare Advance**").

d.     **HealthNet**, with 25% of the Hospital's capitation business, transitioned its capitation business to its existing fee-for-service contracts. It offered credit lines of totaling $3.3 million, of which the Hospital borrowed $2.3 million. Of that amount, $800,000 has been repaid and $1.5 million remains outstanding, with repayment due to begin January 2010 (the "**HealthNet Advance**", and collectively with the PacifiCare Advance, the "**Plan Advances**").

e. **Aetna,** with 7% of the Hospital's capitation business, has not participated. Its capitation contract expires on March 31, 2010. The Hospital intends to reject all Aetna contracts immediately.

### (2) Capitation Exit Issues with the Physician Groups

41. Three physician groups were involved in the Hospital's Capitation Programs. One, Pioneer Medical Group ("Pioneer"), is a medical group that hires its physicians as employees. The other two, AppleCare IPA ("AppleCare") and Alliance are independent practice associations ("IPA") whereby the IPA enters into affiliation contracts with physicians, who function largely independent of the IPA. Pioneer and AppleCare each accounted for about 45% of the Hospital's capitation business; Alliance, the other 10%.

42. As of July 2008, due to the Hospital's inability to capture certain internal charges, inability to account for its full cost of providing services to its capitated patients, excessive out-of-network costs, and erroneous calculations of the risk share obligations of the parties, the Hospital carried on its books almost $9 million in aggregate accrued "profit" sharing allegedly due to the three groups for the years 2005 to 2008. The Hospital's current management believes that this accrued "profit' is grossly overstated since, in fact, the Capitation Program lost money for the Hospital. The accrual accounting is being corrected by the Hospital's finance department.

43. Although Pioneer and AppleCare have been patient, Alliance has not. Alliance has aggressively sought to obtain and enforce a judgment against Debtor. The matter has been arbitrated and the arbitrator's award is imminent. Alliance was denied a pre-judgment attachment order, so it can be expected to seek an immediate monetary satisfaction if it wins an arbitration award and confirms it by court judgment. The Hospital is concerned that, if an award is entered for Alliance, other creditors may also try to obtain pre-judgment attachments.

### D. Financial Result and Projections Support Good Reorganization Prospects.

### (1) FYE 6/2009 Accrual Results Through May 2009

44. For the reasons explained above, the Hospital's accrual and cash results differ drastically. The Hospital's internal financial statements of May 2009, including 11 months results for FYE 6/2009, show that on an accrual basis (1) it has healthy ongoing operating results, but that

(2) its balance sheet is weighed down with the impacts of poor collections results and the aftermath of the exit from capitation. The 11-month operating net revenues were reported at $177.5 million, with total operating expenses of $167.0 million. On an accrual basis, the Hospital thus shows a net gain from operations of $10.5 million, most of which occurred following the transition out of the Capitation Program.

### (2) January - May 2009 Post-Capitation Results

45. The improved results from termination of the Capitation Program – and the promise of better results to follow – are reflected in the fact that, for the first five months of calendar 2009 (after termination of four of the five capitation contracts), operating net revenues exceeded operating expenses by an average of $1.5 million per month.

46. Unfortunately for that same five-month period, *cash* collections came up $19.2 million short of the reported net revenues. This gap includes the one time 'hit' of $10.5 million occasioned by the transition out of capitation that the Hospital will never effectively get back – it is simply like the timing of a start up business where you perform for the first few months, accrue expected income, but do not actually collect on the money until sometime later when the customers pay the bills. In health care, the delay in payment of bills post-services is greatly higher than most industries because of the complexity of the services rendered and the required documentation that has to be presented, and the fact that a third party, not the person receiving services, is usually the payor for such services.

47. The remaining $8.7 million shortfall for this time frame represents what management believes was the collections underperformance. Unlike the one-time cash flow hit occasioned by the structural change of the Hospital's business model out of capitation, the collections underperformance can be partially offset by Cymetrix's efforts to re-work the bills produced in January, February and March (*i.e.*, submit or resubmit them for payment). While there will be some push back from health plans and some questions about timeliness, we believe that at least $4-5 million of the shortfall identified above can be collected for the Hospital by the end of the calendar year. Additionally, we were recently informed by Cymetrix that Blue Cross is wrongfully withholding over $3 million in payments due us, based upon Blue Cross' purported internal

computer problems. Blue Cross engaged in similar behavior in 2008, withholding over $2 million from us until we hired insurance fraud counsel and began proceedings.

48. We are hopeful that by October 1, 2009, Cymetrix will be collecting at a rate concomitant with the reported net revenue of the Hospital. We believe that the Hospital has the capacity to sustain positive operating margins of $1.5 million per month, and actually collect the funds sufficient to justify the reported net revenues.

### (3) One-Year Projections

49. Accordingly, I have made short form estimates of the total operating expenses for the Hospital for FY 2010 at $177.5 million, and total revenue of $199.0 million. This would imply an annual operating margin for the Hospital of $21.5 million. This is a baseline estimate and could vary considerably depending upon volumes, acuity, and payor mix, including such factors as a possible epidemic of H1N1 influenza or further California state budgetary crises affecting Medi-Cal reimbursements.

50. A detailed 16-week schedule is submitted herewith as **Exhibit A**. The variability and unpredictability of the patient volume and mix makes it impossible to forecast many of the expense line items with any degree of accuracy on a month-by-month basis, let alone a week-by-week basis. For example, the "Purchased Services" line item includes a dialysis service contracted out by the Hospital. In some months, the dialysis demands can be double that of other months: the variability in patient count will result in fluctuations that cannot be timed with any degree of accuracy. Therefore, many line items are estimated based upon six month averages. Where we know that regularly scheduled contract payments come due at specific dates (such as equipment leases), we have provided for payments in those weeks.

### (4) Prospects for Reorganization

51. If these projections are borne out by performance, the Hospital should be able to generate net revenues and cash collections sufficient to repay the Exit Claims and other debts over a period of time pursuant to a plan of reorganization, while replenishing its working capital reserves to a more comfortable level. Debtor hopes to confirm a plan and emerge in six to twelve months.

## III. FIRST DAY MOTIONS[2]

52.     A critical element in the Hospital's successful restructuring under chapter 11 is approval of each of the First Day Motions submitted herewith.  I have reviewed each First Day Motion (including the exhibits thereto) and can attest to the veracity of the facts set forth therein.  Additionally, I believe that the relief sought in each First Day Motion (a) is necessary to enable the Hospital to operate in chapter 11 with a minimum of disruption to its business or loss of productivity or value and (b) constitutes a critical element in achieving the Hospital's successful restructuring in Chapter 11.  Factual information in support of the First Day Motions is provided below and in the Motions.

### A.     Administrative and Procedural Matters

> **(1)     Application for Order Pursuant to 28 U.S.C. § 156(c), Bankruptcy Rule 2002(f), and Local Bankruptcy Rule 5075-1 Authorizing Debtor to Retain Omni Management Group, LLC as Claims Administrator and Noticing Agent of the Bankruptcy Court (the "Claims Agent Application")**

53.     In preparation for the bankruptcy filing, the Hospital retained Omni Management Group, LLC ("Omni") to handle, among other bankruptcy administration tasks, the preparation of the mailing matrix, 20-largest unsecured creditor list, the statement of affairs, the schedules, the 7-Day Package required by the United States Trustee, the monthly operating reports, noticing, claims management, and the claims data base.  Debtor now asks to continue to retain Omni for these reporting functions and to additionally act as its claims, noticing, soliciting and balloting agent in the Chapter 11 Case.

54.     Debtor has thousands of employees, creditors, potential creditors, and other parties in interest to whom Debtor and/or the office of the Clerk of the Bankruptcy Court for the Central District of California (the "Clerk's Office") must serve various notices, pleadings, and other documents filed in this Chapter 11 Case.  Such parties in interest will produce thousands of proofs of claim that must be docketed and administered.  The size of Debtor's creditor body makes it impracticable for Debtor, without assistance, to undertake the task of sending notices and dealing

---

[2]   Capitalized terms used but not otherwise defined in the description of the various First Day Motions shall have the meanings given to them in the respective First Day Motion described.

with claims. Moreover, upon information and belief, the Clerk's Office is not equipped to efficiently and effectively serve notice on the large number of creditors and other parties in interest and docket claims during Debtor's Chapter 11 Case. Debtor believes that, due to the anticipated number of claimants and other parties in interest, appointing Omni, an independent third party, to act as claims administrator and noticing agent will provide the most effective and efficient means, and relieve Debtor and/or the Clerk's Office of the administrative burden, of noticing and administering claims and soliciting and balloting votes.

55. Debtor also believes that using Omni to provide administrative assistance in completing the reports and forms required by the Court will be the most cost-effective way to assure that Debtor remains in compliance with all reporting requirements.

56. It is critical for the success of this reorganization that the Hospital accounting staff and financial department remain focused upon rectifying any remaining Charge Capture Problems, expediting the re-billing of the invoices that the system failed to generate and bill, and assuring that billings and collections are handled promptly and efficiently. The existing staff does not have sufficient time nor expertise to handle the additional demands for financial analysis and reporting that is required for chapter 11 cases. Nor does it have the capacity to handle notices and billing.

57. This Case will involve substantial noticing. It has approximately 1,300 employees and more than 3,000 creditors who require notice. While the Case is not a General Motors in order of magnitude, it is my understanding that the noticing requirements will be sufficient that, pursuant to Local Rule 5075-1, Debtor would be required to relieve the Clerk's Office of the noticing obligations. Noticing for this Chapter 11 Case would severely tax the Hospital's accounting department, which would be detrimental to achieving its core functions.

58. For the foregoing reasons, I believe that the relief requested in the Claims Agent Application is in the best interest of the Hospital, its estate and its creditors, and therefore should be approved.

**(2)** **Emergency Motion to Extend Time for Filing of Schedules and Statement of Financial Affairs (the "<u>Schedules Extension Motion</u>")**

59.     By the Schedules Extension Motion, the Hospital seeks an order extending the time by which to file its schedules of assets and liabilities and statement of financial affairs (collectively, the "<u>**Schedules and Statement**</u>") for an additional thirty (30) days to and including October 29, 2009.

60.     The Hospital expects to have claims submitted from over 3,000 creditors. Given the size and complexity of its business operations, the Hospital has not had a sufficient opportunity to gather all of the necessary information to prepare and file its Schedules and Statement, although considerable progress has been made. The current deadline to file the Schedules and Statement is September 29, 2009.

61.     The Hospital has worked diligently and has made significant progress towards completing its Schedules and Statement. Nonetheless, the Hospital needs an extension until October 30, 2009 to file the Schedules and Statement. This brief extension is necessitated due to the number of the Hospital's creditors, the size and complexity of the Hospital's business, and the limited staffing available to gather, process and complete the Schedules and Statement during the first few weeks after the Petition Date. Even with Omni's assistance, many tasks must be handled by the Hospital staff that knows the accounting system and relevant data. The task of compiling and preparing accurate schedules and statement of affairs is daunting.

62.     As demonstrated in its First Day Motions, the Hospital has been performing many critical tasks to position itself to maximize value for its creditors. The Hospital and its professionals have devoted a substantial amount of time, energy and resources to, among other things, obtaining DIP financing, negotiating the terms of use cash collateral, preparing financial projections and analyses, preparing first-day motions and filings, preparing the creditor matrix, analyzing its contracts and leases, and otherwise complying with its obligations as debtor in possession. The time required to perform these tasks has necessarily limited the amount of time that the Hospital has been able to commit to preparing the Schedules and Statement.

63. While the Hospital has endeavored to complete and file the Schedules and Statement substantially on time, the Hospital has determined that the extension of time requested in the Schedules Extension Motion is necessary to enhance the accuracy of the Schedules and Statement while not prejudicing the rights of other claimants and parties in interest. Debtor seeks an extension without prejudice to its right to seek further extensions from this Court if necessary.

64. For the foregoing reasons, I believe that the relief requested in the Schedules Extension Motion is in the best interest of the Hospital, its estate and its creditors, and therefore should be approved.

      **(3) Emergency Motion of Debtor for an Interim Order (I) Establishing (A) Omnibus Hearing Dates, and (B) Certain Noticing, Case Management, and Administrative Procedures, and (II) Scheduling a Final Hearing (the "Case Management Motion")**

65. The Hospital has over 1300 employees and approximately 5000 creditors who will be entitled to receive notice in the Chapter 11 Case. Debtor anticipates that a large number of Filings will made in this case and the Case Management Procedures are necessary to efficiently schedule hearings and conduct proceedings before the Court. In addition, providing for limited notice procedures that rely in large part on electronic means will save the estate a significant amount of time and expense that would otherwise be expended to provide notice to Debtor's numerous creditors and other parties-in-interest.

66. For the foregoing reasons, I believe that the relief requested in the Case Management Motion is in the best interest of the Hospital, its estate, and its creditors, and therefore should be approved.

**B.     Business Operations**

      **(1) Emergency Motion for Order Pursuant to Bankruptcy Code Sections 105(a), 363(b), and 507(a) (i) Authorizing Debtor to Pay Prepetition Wages, Compensation, and Employee Benefits and (ii) Authorizing and Directing Financial Institutions to Honor and Process Checks and Transfers Related Thereto (the "Employee Wage Motion")**

67. Among my duties is the oversight of the human resources department at the Hospital. The morale of the employees sets the tone for the entire institution. It is critically important that they be able to focus on the care of the patients and fulfilling their duties, and not be distracted by

concerns over their jobs, pay, or benefit plans. For that reason, I believe that approval of the Employee Wage Motion is absolutely essential to the reorganization prospects for the Hospital.

68. The Hospital is asking for authority to: (i) pay or otherwise honor, as applicable, unpaid prepetition obligations to or for the benefit of current employees (collectively, the "**Employees**"), including accrued prepetition wages, salaries, and other cash and non-cash compensation claims, except as otherwise set forth herein (collectively, the "**Employee Compensation Obligations**"); (ii) continue its various non-working day policies, employee benefit plans, and programs (and to pay all fees and costs in connection therewith), except as otherwise set forth herein (collectively, the "**Employee Benefit Obligations**"), the most significant of which are described below; (iii) reimburse Employees for prepetition expenses Employees incurred on its behalf in the ordinary course of business (the "**Employee Expense Obligations**"); and (iv) pay all related prepetition withholdings and payroll-related taxes (the "**Payroll Taxes and Other Withholding**" and, with the Employee Compensation Obligations, the Employee Benefit Obligations and the Employee Expense Obligations, collectively, the "**Prepetition Employee Obligations**") associated with the Employee Compensation Obligations and the Employee Benefit Obligations. To make sure that such programs are maintained without interruption, Debtor also ask that the order: (x) authorize and direct its banks to receive, process, honor and pay all of its prepetition checks and fund transfers on account of any of the Prepetition Employee Obligations; (y) prohibit its banks from placing any holds on, or attempting to reverse, any automatic transfers to any account of an Employee or other party for Prepetition Employee Obligations; and (z) authorize the Hospital to issue new postpetition checks or effect new postpetition fund transfers on account of the Prepetition Employee Obligations to replace any prepetition checks or fund transfer requests that may be dishonored or rejected.[3]

69. As of the Petition Date, the Hospital employed approximately 1,300 individuals, of which approximately 900 are full time employees (the "**Full-Time Employees**") and 400 are part-

---

[3] Regular payroll checks are issued by a third-party service, so few checks should be affected by this request.

time employees (the "**Part-Time Employees**").  These employees include almost 500 registered nurses.

70.     Prior to the Petition Date and in the ordinary course of business, Debtor typically paid wages, salary, and compensation to the Employees on a biweekly basis, every other Thursday. All payroll disbursements, except for deductions on account of benefits, are pre-funded to Automatic Data Processing, Inc. ("**ADP**") on the Tuesday before each payroll, based upon the biweekly time reported through the prior weekend.

71.     The current estimated biweekly gross payroll for Debtor's Employees is approximately $2.82 million, including payroll taxes.  Debtor's most recent payroll for the period ending September 6, 2009 was pre-funded to ADP on Wednesday, September 9, and paid to Employees on Friday, September 11, a one day delay given the Monday holiday.

72.     As of Petition Date, Debtor estimates that it owes approximately $1.611 million to its Employees, or approximately $1,239 per Employee, on account of accrued, unpaid wages and salaries, including payroll taxes, that have accrued from September 7 through September 14.  No individual Employee is owed in excess of $10,950 for amounts due for biweekly prepetition wages or salary.

73.     In the ordinary course of business, Debtor has established the following categories of benefit plans and policies for its Employees:  (i) a paid time off plan that covers vacation days, sick days, and holidays (the "**PTO Plan**"); (ii) medical insurance, dental insurance, vision insurance, life insurance, and disability insurance (collectively, the "**Health and Welfare Plans**"); (iii) a self-funded workers' compensation plan (the "**Workers' Compensation Plan**"); and (iv) 401(k) and 402(b) plan (the "**Retirement Plans**," and, together with the PTO Plans, Health and Welfare Plans, and the Workers' Compensation Plans, the "**Employee Benefit Plans**").  Debtor deducts specified amounts from eligible Employees' wages to fund certain of the Employee Benefit Plans, such as insurance and retirement contributions.

### a.     Paid Time Off Benefits

74.     Under the PTO Plan, Debtor's Employees accrue vacation time, sick leave, and holiday time (collectively, "**PTO**"), provided that certain conditions are met.  Generally, Employees

accrue vacation and holiday time based on their duration of employment. Employees are eligible to receive full wages for, among other things, vacation and holidays pursuant to the PTO Plan. Debtor does not typically "cash out" any of the PTO benefits, except under its policy where Debtor allows 50% of the hours in each Employee's PTO account to be cashed out once a year (or at other times and amounts in emergency situation as approved by the CEO or his designee). Debtor does not expect any unusual demands for PTO to be cashed out, but it seeks authority to honor such cash-out provisions in its sole discretion.

### b. Health And Welfare Plans

75. Debtor offers a number of Health and Welfare Plans to provide benefits to its Employees, including, without limitation, (i) medical, dental, vision, and other health plans; (ii) life insurance, and (iii) disability benefits. Debtor offers to certain of its Employees various health benefits, including, among others, medical, dental, prescription drug, and rehabilitation services coverage. Debtor offers these plans to all its Full-Time and Part-Time Employees. Debtor offers its Employees CIGNA PPO and HMO medical coverage, CIGNA Life, Employee Assistance, Accidental Death and Disability coverage (with voluntary contributions for extending base coverage), CIGNA long-term disability and business travel accident coverage, Superior Vision coverage, and CIGNA dental coverage. Debtor pays 77% of the costs of those health and welfare plans, with Employees bearing 23% of the global benefits budget through payroll deductions. The total cost of these health and welfare benefits for Debtor's current fiscal year (July 1, 2009 - June 30, 2010) is estimated to amount to $9,430,900. Debtor estimates that pre-petition, unpaid accruals for this coverage amounts to $206,705, although coverage is pre-paid and remains paid in full at the time of filing.

### c. Workers' Compensation Plans

76. California law requires the Debtor to maintain workers' compensation policies and programs to provide Employees with coverage for claims arising from or related to their employment with the Debtor (the "**Workers' Compensation Program**"). Debtor is self-insured under the Workers' Compensation Program, its premiums for excess insurance are paid, its deposits with the State are paid, and its claims payments are current. Debtor is required by law to maintain

its Workers' Compensation Program. To stay in compliance, Debtor needs to pay in the ordinary course of business any amounts arising under the Debtor's Workers' Compensation Program existing prior to the Petition Date.

### d. Retirement Plans

77. Debtor maintains a 401(k) plan administered through Merrill Lynch, to which it contributes 3% of wages to plan participants, as well as a 403(2)(b) annuity plan with Mutual of America, but into which no further contributions are made. It is very important for employee morale that Debtor be allowed to continue to make contributions in the ordinary course to the 401(k) plan.

### e. Employee Expense Obligations

78. Debtor routinely reimburses Employees for certain expenses incurred within the scope of their employment, including expenses for travel, lodging, professional seminars and conventions, ground transportation, meals, supplies, and miscellaneous business expenses (collectively, the "**Reimbursable Expenses**"). Debtor processes expense reports on a rolling basis, with a time lag of approximately 20 days between the submission of a request for reimbursement and payment. It is difficult to determine the amount of outstanding Reimbursable Expenses that have been accrued prior to the Petition Date because of the lag time in the submission of reimbursement requests. However, it is likely that as of the Petition Date, certain Employees may not yet have been reimbursed for Reimbursable Expenses incurred prior to the Petition Date. Approximately $5,000 in the aggregate is paid to Employees with respect to Reimbursable Expenses each month. Debtor seeks authority to reimburse all such expenses as and when reports are submitted by Employees.

### f. Payroll Taxes And Other Withholding

79. Debtor is required by law to withhold from its Employees' wages amounts related to federal, state, and local income taxes as well as social security and Medicare taxes, and to remit these taxes to the appropriate taxing authorities. In addition, Debtor routinely withholds from Employee paychecks other amounts that Debtor is required to transmit to third parties. Examples of such withholding include garnishments, charitable donations, and certain insurance payments

(collectively, "**Withheld Funds**"). Debtor believes that such Withheld Funds, to the extent they remain in Debtor's possession, constitute moneys held in trust and therefore are not property of Debtor's bankruptcy estate. Thus, Debtor believes that it has the authority to direct such funds to the appropriate parties in the ordinary course of business.

80. Debtor also is required to make matching payments from its own funds for social security and Medicare taxes, and to pay, based on a percentage of gross payroll and subject to state-imposed limits, additional amounts to the appropriate taxing authorities for, among other things, state and federal unemployment insurance (collectively, the "**Employer Payroll Taxes**"). As of the Petition Date, Debtor believes that approximately $127,600 in accrued and unpaid Payroll Taxes is outstanding for the period prior to the Petition Date.[4]

81. For the foregoing reasons, the Hospital submits, and I believe, that the relief requested in the Employee Wage Motion is in the best interest of the Hospital, its estate and its creditors, and therefore should be approved.

> **(2) Emergency Motion for Order Authorizing (I) Continued Use of Existing Cash Management System, (II) Continued Use of Existing Bank Accounts, and (III) Continued Use of Existing Business Forms (the "Cash Management Motion")**

82. Prior to the commencement of this Chapter 11 Case, the Hospital maintained a cash management system in the ordinary course of business, which consisted of, among other things, accounts related to disbursements and receipts from Medicare and Medi-Cal, insurance and credit card receipts, and general operating funds (collectively, the "**Bank Accounts**"). As of Petition Date and as required under the DIP Loan, Debtor has also opened with Bank of the West certain lockbox accounts for receipts, which accounts are subject to control agreements with HFG (the "**Lockbox Accounts**"). A true and correct list of the Hospital's Bank Accounts, which include the Lockbox Accounts, is attached as Exhibit A to the Cash Management Motion.

83. Through the Cash Management Motion, the Hospital seeks a waiver of the United States Trustee's requirement that the Bank Accounts be closed and that new post-petition bank

---

[4] Nothing contained herein shall be deemed to be an admission regarding the existence or amount of liability for any obligations described herein.

accounts be opened. If enforced in this case, such requirements would cause significant disruption to the Hospital's business and would impair the Hospital's chapter 11 efforts. As described below, the Hospital's Bank Accounts comprise the established Cash Management System (defined below) that the Hospital needs to maintain in order to ensure smooth collections and disbursements in the ordinary course of its business. Therefore, to avoid delays in receipt of wire transfers of revenues or in paying debts incurred post-petition, and to ensure as smooth a transition into chapter 11 as possible, the Hospital should be permitted to continue to maintain the existing Bank Accounts. Otherwise, transferring the Bank Accounts will be disruptive, time consuming and expensive.

84.     To minimize expense and avoid disruption and delay, the Hospital needs to be able to continue using all correspondence, business forms (including, but not limited to, letterhead, purchase orders, invoices, etc.) and checks remaining from the Hospital's prepetition operations. Most parties doing business with the Hospital will likely be aware of the Hospital's status as debtor-in-possession because of publicity about the filing and official notices sent to all creditors. The Hospital regularly deals with the same parties, so most vendors and others are probably already on the notice list.

85.     To avoid any uncertainty about whether a check is prepetition or post-petition, the Hospital has created a gap of several hundred numbers between those invoices issued pre-petition and those invoices issued post- petition. Changing correspondence and business forms would be unnecessary and burdensome to the Hospital's estate, as well as expensive and disruptive to the Hospital's business operations. For these reasons, the Hospital requests authorization to use existing checks and business forms until the existing stock is depleted without placing the label "debtor-in-possession" on each such form.

86.     In the ordinary course of business prior to the Petition Date, the Hospital utilized a centralized cash management system (the "**Cash Management System**") which involved cash forecasting and reporting, receipts from various sources, disbursement of funds, and the administration of the Bank Accounts required to effect the collection, disbursement, and movement of cash. A true and correct diagram summarizing the Hospital's Cash Management System is attached as Exhibit B to the Cash Management Motion.

87.     The Cash Management System facilitates cash forecasting and reporting, monitors collection and disbursement of funds, reduces the potential fraudulent use of the Hospital's funds, and administers the various Bank Accounts required to effect the collection, disbursement, and movement of cash. It includes the necessary accounting controls to enable the Hospital, as well as creditors and the Court, to trace funds through the system and ensure that all transactions are adequately documented and readily ascertainable. The Hospital will continue to maintain records reflecting all funds transferred.

88.     The operation of the Hospital's business requires that its Cash Management System continue during the pendency of this Chapter 11 Case. Requiring the Hospital to adopt a new cash management system at this early and critical stage of its Chapter 11 Case would be expensive, administratively difficult, and very disruptive to the Hospital's operations. Any such disruption could have a severe and adverse impact upon the Hospital's prospects for a successful disposition of its Chapter 11 Case.

89.     Therefore, I believe it is both essential and in the best interests of the Hospital's estate and creditors that the Cash Management System be maintained. Furthermore, the Hospital's Chapter 11 Case will be facilitated by preserving the "business as usual" atmosphere and avoiding the distractions that would inevitably be associated with a substantial disruption in the Cash Management System.

**(3)     Emergency Motion for Order Prohibiting Utility Companies from Altering or Discontinuing Service on Account of Prepetition Invoices, Approving Deposit as Adequate Assurance of Payment, and Establishing Procedures for Resolving Requests by Utility Companies for Additional Assurance of Payment (the "Utility Motion")**

90.     The utility services provided by the Utilities to the Hospital include, but are not necessarily limited to, electrical power, natural gas, water, telephone services, and internet services (the "**Utility Services**"). The disruption, particularly in the Hospital's electrical power services, could cause irreparable harm to the Hospital's ongoing business operations and estate. Disruption of the utilities would seriously endanger patients on ventilators, in operating rooms, or otherwise dependent upon life support systems. For these reasons, the Hospital must ensure the continued provision of Utility Services.

91.     The Hospital's current monthly average costs for services provided by the Utilities is approximately $150,000 in the aggregate.  The Hospital was current on all of its utility bills through August 2009.  The cash flow available to the Hospital will afford the Hospital more than sufficient liquidity to pay for post-petition Utility Services.

92.     The Hospital has previously deposited approximately $342,000 with its electric utility Southern California Edison (the "**SCE Deposit**").  The SCE Deposit is more than three times the amount of Debtor's estimated monthly consumption of electrical power, which on average has cost approximately $100,000 per month in the months leading up to the Petition Date.  The Hospital proposes to permit Southern California Edison to retain the SCE Deposit, subject to the terms and conditions of any orders entered with respect to the Utility Motion.

93.     The Hospital also proposes to provide an additional $40,000 deposit for the benefit of all other Utilities (the "**Utility Deposit**") into a newly created, segregated, interest-bearing account within 20 days after the Petition Date.  Notwithstanding the monthly costs for Southern California Edison's services, the Hospital spends approximately $50,000 per month on services provided by the other Utilities.  Therefore, the Utility Deposit represents a sum equal to 80% of Debtor's estimated monthly utility consumption for all of the other Utilities.  Moreover, the Utility Deposit is more than twice the amount of Debtor's estimated monthly consumption for its two largest utility expenditures after Southern California Edison.  The Hospital believes that the current SCE Deposit and the proposed Utility Deposit meet or exceed the adequate assurance standards required to satisfy Section 366.

94.     For the foregoing reasons, I believe that the relief requested in the Utility Motion is in the best interest of the Hospital, its estate and its creditors, and therefore should be approved.

>    **(4)     Emergency Motion for Interim and Final Orders Authorizing Debtors to Utilize Cash Collateral, Granting Adequate Protection to Pre-Petition Secured Lenders, and Scheduling Final Hearing (the "<u>Cash Collateral Motion</u>")**

95.     The Hospital seeks an order authorizing continues use of its cash collections and receipts in the ongoing operations of its business during the Chapter 11 Case, which are subject to valid and perfected security interest in favor of Wells Fargo Bank, National Association, as

indenture trustee (the "**Indenture Trustee**") for certain tax exempt bonds as described in this section.

96.     The Hospital's principal secured debt consists of certain tax-exempt bonds were authorized and issued in the aggregate principal amount of $68,485,000 by the California Health Facilities Financing Authority (the "**Authority**"), to fund certain capital projects of the Hospital (the "**Bonds**"), pursuant to an Indenture dated as of August 1, 1993 (the "**Original Indenture**") as amended by, among other things, the First Supplemental Indenture, dated as of February 26, 2004, 1998 (the "**Supplemental Indenture,**" together with the Original Indenture, the "**Indenture**"), entered into between the Authority and the Indenture Trustee.

97.     Simultaneous with the issuance of the Bonds, the Authority loaned proceeds of the Bond issuance to the Hospital pursuant to a Loan Agreement, dated as of August 1, 1993, between the Authority and the Hospital (the "**Original Loan Agreement**").  The Loan Agreement was amended by the First Amendment to Loan Agreement dated as of February 26, 2004 (the "**First Amendment**," together with the Original Loan Agreement, the "**Loan Agreement**" The Indenture and the Loan Agreement with all other documents related thereto are hereinafter referred to as the "**Bond Documents**").  As security for the payment of all amounts due under the Loan Agreement, the Hospital granted to the Authority, inter alia, (i) a first priority security interest (the "**Bond Lien**") on Gross Operating Revenues ("**Gross Receipts**"), consisting of all of its accounts receivables, revenues, income and receipts, and rights to receive the same, as set forth more particularly in the Bond Documents (collectively, the Gross Receipts together with the Bond Funds, the "**Prepetition Bond Collateral**").

98.     It is my understanding that, pursuant to the Bond Documents, the Authority's rights under the Loan Agreement, including all of the security interests and rights and remedies granted by Debtor to the Authority in the Pre-Petition Bond Collateral, were assigned to the Indenture Trustee, subject to the retention of certain rights by the Authority.  The Indenture Trustee has the sole right to exercise the rights and benefits granted to the Authority under the Bond Documents.

99.     As of Petition Date, Debtor was indebted under the Bond Documents in the principal amount of approximately $26 million (including principal and interest), with interest continuing to

accrue at a per diem of about $3,900 (the "**Bond Claim**").  It is my understanding that the Indenture Trustee has also incurred attorneys' fees and expenses that, according to the Bond Documents, would also be includable in the Bond Claim (the "**Prepetition Expense Claim**").

100.    A portion of the initial proceeds of the Bonds was used to create a Bond Reserve Account, and certain other accounts and funds are held by the Indenture Trustee under the terms of the Bond Documents (collectively, the "**Bond Funds**").  As of Petition Date, the balance held in the Bond Funds was approximately $6.8 million.  These funds also constitute security for the Bond Claim.

101.    As of Petition Date, Debtor has net accounts receivable of approximately $43 million that constitute Prepetition Bond Collateral.  This amount is within the typical range for the past four months, as new receivables are generated and old receivables are collected.

102.    To Debtor's knowledge, other than some equipment lease UCC filings, as of Petition Date, the Hopsital's only other secured creditor is Apollo Health Street, Inc. ("**Apollo**"), one of the Hospital's former billing and collections servicers.  In March 2009, the Hospital entered into a settlement agreement that provided for termination of the parties' contract and payment by the Hospital of about $2.3 million to resolve disputes about amounts due to Apollo (the "**Apollo Settlement**").  Approximately $1.2 million remains outstanding.  The Apollo Settlement also granted Apollo a security interest in the Hospital's accounts receivable (the "**Apollo Lien**").  It is my understanding that the Indenture Trustee and HFG contend the Apollo Lien is junior to the Bond Lien and may be invalid, because, inter alia, the Hospital did not obtain the consent of the Indenture Trustee before granting the Apollo Lien.

103.    The Hospital also maintained a secured line of credit with Bank of the West, having a prepetition balance of about $7.1 million.  Bank of the West also guaranteed two equipment leases in the total amount of $2 million, and provided a letter of credit for $100,000.  These obligations totaling about $9.2 million were secured by a lien on the leased equipment and on certain investment securities in brokerage accounts having an estimated market value of more than $10 million (the "**BOTW Lien**"), and liens on the equipment itself.  However, prior to the Petition Date, the Hospital liquidated the investment collateral securing the BOTW Lien, repaid the credit line

obligations owing to Bank of the West, and has obtained a release of the BOTW Lien with respect to the investment collateral. The equipment liens remain in place.

104. As of the Petition Date, the Hospital has about $340,000 in cash on hand, about $43 million in accounts receivable, and no other liquid assets. The Hospital's monthly cash expenses average $12.5 million, including about $5.92 million for payroll and about $1.8 million for other employee-related obligations. Monthly net cash collections have been averaging about $12 million over the past four months, although improvement is expected within a few months, due to the correction of the Charge Capture System Problems and improved cash flow from fee-for-service patients. Without using the cash it collects, the Hospital has no other source of income from which to pay its bills. Use of the Indenture Trustee's collateral – the Hospital's Gross Receipts – is thus critical for the ongoing business of the Hospital.

105. However, because the Hospital has still been experiencing negative cash flow – which is projected to turn positive due to the improvements of the Charge Capture System and other steps implemented by new management – use of the Indenture Trustee's Gross Receipts collateral is not enough to fund operations. The Hospital also requires DIP financing. Without financing, the Hospital would have to close its doors.

106. The proposed DIP Loan by HFG in the amount of up to $15 million (described in detail in the next section) is to be secured by a first priority lien in substantially all of Debtor's assets. The HFG Lien (as defined below) would prime the Bond Lien in the Prepetition Collateral. Persuaded by the urgent need for additional liquidity, the Indenture Trustee has not objected to being subordinated to the new money.

107. Although Debtor's receivables are believed to be approximately $43 million, and Debtor believes that it has made substantial progress to remedy its prior collection issues, hospital receivables are subject to many contingencies that affect ultimate collections. Therefore, additional collateral beyond replacement collateral is reasonable and necessary. In addition to its Gross Receipts, Debtor owns certain hospital facilities and equipment (the "**Facilities**"), the cost basis of which is in excess of $158 million, and the book value of which (after depreciation) exceeds $40 million. Debtor also owns two parcels of unencumbered real property, one of which is used as a

parking lot, the other of which is intended for eventual use for a community clinic or similar facilities (the "**Land**"). Although no recent appraisal has been done, based upon a per-acre average price, Debtor roughly estimates the current fair market value of the Land to be approximately $6.1 million. In addition, the Hospital holds inventory with a book value of about $4 million (the "**Inventory**"), as well as a variety of other assets with a book value of about $21 million (collectively, the Facilities, Land, Inventory and other assets, the "**Non-Accounts Assets**"). Pledging a junior security interest in the more than $71 million of Non-Accounts Assets as additional security constitutes adequate protection sufficient to support the priming of the Bond and Apollo Liens.

108.  However, the Indenture Trustee has asked for additional protection in light of the material increase in its risk profile by yielding its first priority lien, in light of the special nature of the tax-exempt bonds and financial market sensitivity to default risk. Therefore, Debtor's parent and certain of its affiliates have agreed to provide secured guarantees, and Debtor has committed to making the monthly payments on the Bonds. Thus, Debtor and the Indenture Trustee have agreed on adequate protection as set forth more fully in the proposed order attached as Exhibit A to the Cash Collateral Motion, including the following: (a) continued payment of the regularly scheduled payments provided for under the Bond Documents; (b) a replacement lien on Gross Receipts; (c) in addition to the lien on Gross Receipts, a lien in substantially all of Debtor's assets, junior only to existing prepetition encumbrances (if any) and the senior lien to be grant to HFG to secure the DIP Loan; and (d) guarantees of Debtor's parent DRMCI and affiliates Properties and DRMC Insurance Services, with Properties' guarantee to be secured by a lien on the medical office building it owns, subject to existing encumbrances (the "**MOB Lien**"), to be released upon confirmation if the plan of reorganization provides for a Working Capital credit line (as defined in the Bond Documents) of $5 million or less.

109.  The Indenture Trustee and HFG have informed the Hospital that they question the priority and validity of the Apollo Lien, because it was granted without obtaining the Indenture Trustee's consent. They contend that, at most, the Apollo Lien is junior to the Bond Lien with respect to accounts receivables. Under the circumstances, the Hospital believes that it would be

appropriate to grant to Apollo liens junior to the Indenture Trustee as set forth more fully in the

proposed order attached as Exhibit A to the Cash Collateral Motion, subject to Apollo's right to

seek a determination that the Apollo Lien should be senior to the Bond Lien.

110.    It is important to understand that the willingness of the Hospital's parent and

affiliates to provide guarantees and additional collateral to the Indenture Trustee is based upon

factors that do not apply to Apollo, which is why those additional protections are not being

extended to Apollo.  First, the bond facility is a long term obligation that will likely extend beyond

the plan period, whereas the Apollo obligation is short term obligation that would be provided for in

the plan.  Second, the Hospital has a strong business interest in maintaining its relationship with the

California Health Facilities Financing Authority, because it is likely to need to access the tax-

exempt bond market in the future, a market that is relatively unforgiving of bankruptcy risk.  In

contrast, the Hospital's relationship with Apollo has terminated.

111.    The Hospital has had discussions with Apollo about adequate protection and the

replacement liens, which are ongoing.  I do not yet know whether Apollo will consent to these

proposed terms.

112.    For the foregoing reasons, I believe that the relief requested in the Cash Collateral

Motion is in the best interest of the Hospital, its estate and its creditors.

**(5)    Emergency Motion for Interim and Final Orders Authorizing Debtor to Obtain Post-Petition Financing (the "<u>DIP Financing Motion</u>")**

113.    By the DIP Financing Motion, the Hospital seeks an order approving its proposed

$15 million revolving debtor in possession financing  (the "<b><u>DIP Loan</u></b>"), to provide interim funding

of $4 million to meet payroll and other expenses pending a final hearing, with the rest of the

financing to be available upon entry of the final order approving the DIP Loan after the final

hearing.

114.    Due to the Capitation Exit Consequences set forth in detail above, the Hospital needs

$15 million in debtor in possession financing to be able to pay its immediate expenses during this

Case.  As of the Petition Date, the Hospital has about $340,000 in cash on hand, about $43 million

in accounts receivable, and no other liquid assets.  The Hospital's monthly cash expenses average

$12.5 million, including about $5.92 million for payroll and about $1.8 million for other employee-related obligations. Monthly net cash collections have been averaging about $12 million, although improvement is expected within a few months, due to the correction of the Charge Capture System and improved cash flow from fee-for-service patients. Without financing, the Hospital would have to close its doors.

115. Healthcare Finance Group, Inc. ("**HFG**" or "**DIP Lender**") has offered to provide a DIP Loan in the amount of up to $15 million, on a revolving basis, secured by a priming lien in substantially all of Debtor's assets except for leased and purchase money financed equipment. The DIP Loan is essentially structured as an accounts receivable financing in which advances are based upon a formula for eligible accounts, but under all the circumstances, HFG insists upon security in addition to the Hospital's receivables. The terms of the DIP Loan are set forth in the Secured Super-Priority Debtor In Possession Loan and Security Agreement (the "**DIP Credit Agreement**") between Debtor and HFG attached as Exhibit A to the DIP Financing Motion. The Hospital is working with HFG to complete due diligence and documentation of the DIP Loan, which must be finalized before HFG will make any advances.

116. HFG is the only lender ready and willing to make a working capital loan to Debtor – and certainly the only one able to do so in time to fund the Hospital's payroll on September 22, 2009. Due to the specialized nature of Medicare, Medicaid, and third party payor systems and their control over the revenues and cash flow available for hospitals, only a relative handful of lenders are willing to provide medical accounts receivables financing in the $15 million range under the best of circumstances. And these were not the best of circumstances. The global economic crisis that struck in the fall of 2008 and its continuing impact on the availability of financing have stymied all efforts by the Hospital to raise the necessary funds for the past 15 months. With the credit markets still in turmoil, its financial statements under review due to the Charge Capture System Problems, and the Alliance and other parties pressing significant Exit Claims, the Hospital has been unable to obtain other viable offers of financing.

117. Indeed, the Hospital has been seeking financing since May 2008, when it retained London & Pacific Capital Advisers LLC ("**L&P**") as its exclusive investment banker to explore

refinancing alternatives. That search became extremely urgent in August 2008, following its decision to exit the Capitation Program and recognized that the short-term financial impact of the Capitation Exit Consequences could be as much as $30 million. Given our lack of any cash reserves, we began a multi-front process of trying to obtain the financing needed to sustain ourselves during the transition.

118. First, we tried to obtain bank loans. At the time, the Hospital had a secured bank line of credit with BOTW, with a balance of about $6.7 million. That line was collateralized by investment securities, which of course lost considerable face value in the collapse of the stock markets. We sought to increase that line, but lacked additional liquid collateral. BOTW refused to increase the line or provide any other form of financing. Despite talks with numerous banks, no one was interested in extending the credit line following the collapse of the credit markets in October 2008.

119. Second, we tried to obtain mezzanine financing from hedge funds or other non-bank lenders. L&P initially proposed a two level re-capitalization of the Hospital's financing; an intermediate term mezzanine level of $15 million above the bank credit line and a long term $25 million top level. L&P informed us that, although initial talks were held with a variety of lenders, mostly hedge funds, that the October market collapse had caused market paralysis for such loans.

120. Third, we approached its participating health plans for financial help. We were successful in obtaining approximately $8.8 million in temporary bridge loans and other assistance, including offers for the following: $365,000 short term advance from Blue Shield, $1.3 million advance from SCAN, $5 million intermediate term loan from United/Pacificare, and a total of $3.3 million in loans and advances from Health Net. The Hospital received the Blue Shield advance in September 2008, and subsequently repaid it. The SCAN offer expired before we were able to meet one or two of its conditions, but it was replaced with a separate cash flow facility that assisted in speeding up cash flow from them. No repayment was required as it was a one-time resetting of the payment flows that in essence permanently advanced us 45 days of payments from SCAN, which was worth about $600,000. We have borrowed and still owe about $4.5 million on the

United/Pacificare loan. We received and subsequently repaid an $800,000 advance from Health Net, and we have borrowed about another $1.5 million on longer terms that we still owe.

121. The health plan loans and advances enabled the Hospital to keep its doors open. However, they were all very short-term: some have already had to be repaid; others are due to be repaid starting in January 2010. In January 2009, once the extent of the assistance from the health plans became fully known, the Hospital and L&P intensified their efforts to identify a trade accounts lender who would provide a three-year, $15 million line, to assist in meeting our liquidity needs. Six term sheet offers were received in January; five developed by L&P and one by the Hospital. The Hospital initially worked with two of the lenders, but after a couple of weeks exclusivity was demanded and the Hospital began working with CapitalSource, a Maryland-based trade accounts lender.

122. The Hospital and CapitalSource worked from January through June in an effort to agree upon terms of a potential line of credit. When no agreement was forthcoming, the Hospital finally discontinued its efforts with CapitalSource in July, and notified L&P of the termination of its relationship as well.

123. Thereafter, the Hospital reconnected with two of the lenders previously showing interest, and one additional new lender, HFG. One of the prior lenders was willing only to entertain a $5 million line. Negotiations did not progress beyond the expression of interest phase. The Hospital terminated L&P's contract due to the lack of progress toward closure.

124. In early August 2009, in order to meet the diligence and other requirements to complete a financing with HFG, the Hospital had no choice but to seek the assistance of another investment banker to help address its critical funding needs. It retained Howard Brand of HNB Capital LLC, an independent investment banker specializing in healthcare financing ("**HNB Capital**"). A separate application to retain HNB Capital is being filed concurrently.

125. HNB Capital analyzed Debtor's situation, the history of its contacts with potential lenders, the urgent nature of its cash needs, and investigated the overall financial situation. HNB Capital advised senior management that L&P had contacted the appropriate potential lenders, but that most of them do not provide DIP financing. It quickly became apparent that HFG was one of

very few, if not the only lender willing to fund a loan that could satisfy the Hospital's needs. The Hospital decided to proceed with HFG on the exclusive basis that HFG required.

126. The HFG loan was originally intended to be a regular, nonbankruptcy loan. By the middle of August, the Hospital indicated that due to the pressing of contingencies beyond its control, it would need funding in September. However, primarily because of the threatened attachment of the Hospital's bank accounts by Alliance and potentially other physician groups, HFG decided that it was only willing to make the financing available in the form of a DIP Loan in a chapter 11 case, and then only on the basis of a priming lien.

127. While not advantageous in many respects, the terms of the DIP Loan are the best terms that the Hospital could negotiate with HFG, and HFG is the only lender willing to provide this financing. Although CapitalSource's proposed January 2009 term sheet had lower interest rates and fees than the DIP Loan, that lender was never willing to commit to make a loan on the terms it had proposed. In the meantime, the Hospital's cash position has become even more strained. That HFG would insist upon higher rates and fees, and more stringent conditions is, unfortunately, not a surprise, given that the Hospital has no other viable offers left on the table.

128. The DIP Loan will "prime" both the Bond Lien and the Apollo Lien. The proposed replacement and supplemental liens are generally described above, in connection with the Cash Collateral Motion. I believe that the adequate protection negotiated with the Indenture Trustee is both reasonable and necessary in light of the priming nature of the DIP Loan, and that the proposed adequate protection being offered to Apollo is sufficient under all of the circumstances.

129. For the foregoing reasons, I believe the relief requested in the DIP Financing Motion is in the best interest of the Hospital, its estate and its creditors, and therefore should be approved on an interim basis, with a final hearing scheduled on the DIP Financing Motion.

> **(6)** **Emergency Application of Debtor for Order Authorizing Employment of HNB Capital LLC as Investment Banker Effective As Of The Petition Date (the "<u>HNB Capital Application</u>")**

130. By the HNB Capital Application, the Hospital seeks an order authorizing the employment and retention of HNB Capital as Debtor's investment banker in the Chapter 11 Case.

Debtor seeks to employ HNB Capital *nunc pro tunc* to September 14, 2009, with compensation to be paid on a fixed fee and percentage basis without a fee application being required.

131.    In July 2009, HNB Capital undertook to assist the Hospital in its efforts to obtain post-petition financing.  The Hospital signed a consulting agreement with HNB Capital on July 7, 2009 (the "**HNB Capital Engagement Letter**").  A true and correct copy of the HNB Capital Engagement Letter is attached as Exhibit B to the HNB Capital Application.

132.    In providing the Hospital with prepetition services pursuant to the HNB Capital Engagement Letter and other prepetition services, HNB Capital worked closely with the Hospital's management and other professionals and has become familiar with its business, operations, debt structure, and related matters.  HNB Capital has been deeply involved with the negotiations for the DIP Loan.  In the process, HNB Capital has developed expertise regarding the Hospital's business that will aid it in providing effective and efficient services in this Case.  The DIP Loan is still in process.  The full loan will not fund until all conditions precedent have been satisfied and an order has been entered approving the final DIP Loan.  From and after Petition Date, HNB Capital is expected to play a critical role in finalizing all the terms and conditions of the DIP Loan, and pursuant to the HNB Capital Engagement Letter, HNB Capital will provide other specific services.

133.    An experienced investment bank such as HNB Capital fulfills a critical need that complements the services offered by Debtor's other restructuring professionals.  Debtor requires the services of a capable and experienced investment banking firm such as HNB Capital because, among other reasons, its resources and capabilities, together with its prepetition experience advising Debtor, are crucial to Debtor's success in this Case.

134.    HNB Capital's compensation structure, as set forth in the HNB Capital Engagement Letter, is comparable to compensation generally charged by investment bankers of similar stature for comparable engagements, both in and out of court, and reflects a fair balance between monthly fees and fees that are contingent on the consummation and closing of the transactions contemplated by the engagement.  It consists of a monthly retainer of $35,000 for the period from July 7, 2009 to the final approval and closing of the DIP Loan, payable at the beginning of every month, and a success fee of 1.25% of the full approved amount of the DIP Loan (the "**Success Fee**").  HNB

Capital has agreed that the Success Fee will be 50% payable upon funding of the initial advance under the DIP Loan, and 50% payable on the earlier of five business days after entry of the final order approving the DIP Loan or 30 days after entry of the interim order approving the DIP Loan, provided that a failure to obtain entry of the final DIP order by that date is not due to a default or breach of the DIP Loan agreements by HFG.

135.    HNB Capital's strategic and financial expertise as well as its specialized healthcare financing knowledge, financing skills, and restructuring capabilities, some or all of which may be required by Debtor during the term of HNB Capital's engagement, were all important factors in determining HNB Capital's compensation. Debtor believes that the ultimate benefit of HNB Capital's services cannot be measured by reference to the number of hours to be expended by HNB Capital's professionals in the performance of such services. Indeed, Debtor and HNB Capital have agreed upon HNB Capital's compensation in anticipation that a substantial commitment of professional time and effort will be required of HNB Capital and its professionals in connection with this Case and in light of the fact that (a) such commitment may foreclose other opportunities for HNB Capital and (b) the actual time and commitment required of HNB Capital and its professionals to perform its services under the HNB Capital Engagement Letter may vary substantially from week to week and month to month, creating "peak load" issues for HNB Capital.

136.    In determining the level of compensation to be paid to HNB and its reasonableness, Debtor compared HNB Capital's proposed fees with the range of investment banking fees in comparable chapter 11 cases and other complex transactions. In both instances, Debtor found HNB Capital's proposed fees to be reasonable.

137.    For the foregoing reasons, I believe that the relief requested in the HNB Capital Application is in the best interest of the Hospital, its estate and its creditors, and therefore should be approved.

# IV. MOTIONS TO BE HEARD ON REGULAR NOTICE

## A. Motion of Debtor for Order Authorizing Debtor to Assume Lease Agreement with the City of Downey (the "Assumption Motion")

138. In 1968, the City of Downey (the "City") and Downey Community Hospital Foundation (Debtor's former name) entered into a lease agreement whereby the City agreed to lease to Debtor certain real property and provide Debtor with guarantees to support bond funding for construction of a hospital. After construction of the new hospital, disagreements arose between the City and Debtor during the early 1980s that were settled through the execution of a new lease dated February 8, 1983 (the "Lease"), for the 11500 Brookshire Avenue parcel upon which Debtor had constructed the new hospital and other facilities (the "Leased Property"). Under this new lease, all facilities constructed since 1968 (which includes all existing buildings and equipment) belong to Debtor with the City retaining a reversionary interest at the conclusion of the Lease term. A copy of the Lease is attached to the Assumption Motion as Exhibit A.

139. The Lease provides that the Leased Property will be used by Debtor for the operation of a hospital for the primary benefit of the residents of the City of Downey. The term of the Lease is fifty-five (55) years, with an option granted to Debtor to renew the Lease for an additional forty-four (44) year term, for a total of ninety-nine (99) years.

140. The rent payable pursuant to the Lease was initially pegged to the amount of rent required to be paid by the City to a third party pursuant to a leaseback agreement. Upon the termination of the leaseback agreement, Debtor became obligated to pay to the City rent in the amount of one dollar ($1.00) per year ("Base Rent"), plus a sum of money sufficient to reimburse the City each year for all payments required to be made by the City on account of all taxes and assessments in connection with the Leased Property. The Base Rent was prepaid on the initial term and for the forty-four year option. Debtor is current on all obligations under the Lease.

141. The Hospital seeks to assume the Lease at this time to emphasize its strong relationship with and commitment to the City of Downey and the community it serves. The Lease is essential to the continued operations of the Hospital. It imposes no material financial obligations upon the Hospital.

142.     Pursuant to Section 14(A) of the Lease, the Hospital may not encumber the hospital premises without the consent of the City Council of the City of Downey, which consent shall not be unreasonably withheld.  Debtor has requested that the City consent to the liens in favor of HFG, the Indenture Trustee, and Apollo described above.  It is Debtor's understanding that such consent would be predicated upon Debtor's formal assumption of the Lease.  It is Debtor's further understanding that the Mayor of the City of Downey is supportive of the assumption of the Lease by Debtor.  Therefore, Debtor expects to obtain the official approval in due course.

143.     For the foregoing reasons, I believe the relief requested in the Lease Assumption Motion is in the best interest of the Hospital, its estate and its creditors.

**B.     Motion of Debtor For Order Authorizing Debtor to Reject Agreement With Aetna Health of California, Inc. (the "Aetna Rejection Motion")**

144.     As part of the Capitation Program, Debtor entered into a Managed Care Agreement with Aetna Health of California, Inc. ("Aetna"), that became effective on February 1, 2002, and a series of amendments thereto (collectively, the "Aetna Agreement" or "Agreement").  The terms of the Aetna Agreement provides for its expiration on April 1, 2010.

145.     Pursuant to the capitation provisions of the Aetna Agreement, Debtor and participating physicians provide all of the health care services to Aetna's members, and in return, are paid on a per member per month basis, regardless of the amount of services actually provided to Aetna's member.

146.     As discussed in more detail above, Debtor's management recently discovered through extensive research and work with experts that the Capitation Program failed to accurately take into account Debtor's cost of providing services to participating members, thereby masking an approximate $1 million per month cash loss for the Hospital.

147.     To save the Hospital, Debtor was forced to negotiate the termination of the Capitation Program.  Between August 1, 2008 and January 31, 2009, Debtor was successful in transitioning out of the Capitation Program with four of its five participating health plans.  Aetna is the only health plan that did not agree to terminate its capitation relationship with Debtor.

148.     Because the capitation provisions of the Aetna Agreements do not adequately compensate Debtor for the cost of services rendered to Aetna's members, Debtor loses money each time it renders services pursuant to the capitation provisions of the Agreements.

149.     Debtor also provides non-capitated services to certain of Aetna's members pursuant to the Aetna Agreements.  When providing such services, Debtor is paid by Aetna pursuant to compensation rates that are negotiated from time to time as set forth in the Aetna Agreements.  The non-capitation rates are also well below market.  Because Debtor must assume or reject agreements in their entirety, all relationships with Aetna under the Aetna Agreement must therefore be rejected.

150.     For the foregoing reasons, I believe the relief requested in the Aetna Rejection Motion is in the best interest of the Hospital, its estate and its creditors.

**C.     Motion of Debtor for Order Authorizing Debtor to Reject Agreements with London & Pacific Capital Advisors, LLC and CapitalSource, Inc. (the "L&P/CapitalSource Rejection Motion")**

151.     During the year and a half before filing the Chapter 11 Case, the Hospital sought unsuccessfully to refinance its existing debt or otherwise additional working capital outside of a bankruptcy filing.  As part of that effort, in May 2008, Debtor entered into a Letter Agreement (the "**L&P Agreement**") with London & Pacific Capital Advisors, LLC ("**L&P**").  Pursuant to the L&P Agreement, L&P would become Debtor's exclusive investment banker for the duration of the L&P Agreement and would assist Debtor in obtaining financing to solve its liquidity crisis.

152.     L&P did not succeed in arranging financing for the Hospital, and, as a result, on July 22, 2009, the Hospital notified L&P that it was terminating the L&P Agreement.  Accordingly, Debtor believes that the L&P Agreement is no longer in effect.  Because of L&P's failure to secure financing for the Hospital, the L&P Agreement has not provided adequate value to Debtor when compared to its costs.

153.     Further, L&P submitted a bill to the Hospital in August for $250,000 for an alleged success fee with respect to the Plan advances.  L&P had no participation whatsoever in securing the Plan advances, as I personally carried out all negotiations and prepared all documentation on behalf of the Hospital to secure these advances.

154. L&P did introduce Debtor to CapitalSource, Inc. as a potential source of financing but, despite seven months of negotiations, that lender never committed to make a loan. Debtor entered into a term sheet with CapitalSource, Inc. on January 28, 2009, (the "**CapitalSource Term Sheet**"), pursuant which CapitalSource, Inc. informed Debtor that CapitalSource Finance LLC, CapitalSource Bank, or any of their affiliates (collectively, "**CapitalSource**") would consider establishing a revolving credit facility with Debtor and its affiliates in the maximum amount of $15,000,000. The CapitalSource Term Sheet provided that it was not a commitment to extend credit and that it remained subject to due diligence, credit approval, and documentation. CapitalSource repeatedly visited the Hospital, requested volumes of documents and information, and purported to be conducting due diligence until July 2009.

155. In July 2009, the Hospital finally gave up on CapitalSource, having concluded that CapitalSource apparently was never going to reach the point where it was willing to commit to provide financing for the Hospital. Technically, the terms of the CapitalSource Term Sheet provided that it would expire if the credit facility described therein did not close on or before March 31, 2009, although the due diligence efforts and negotiations continued until July. Because the credit facility described in the CapitalSource Term Sheet never came to fruition, I believe that the CapitalSource Term Sheet is no longer in effect, having expired by its terms.

156. Because CapitalSource failed to provide financing pursuant to the CapitalSource Term Sheet and Debtor has arranged for an alternate source of credit pursuant to the proposed debtor-in-possession financing, I believe that the CapitalSource Term Sheet provides no value to the estate and that its rejection will benefit the estate.

157. For the foregoing reasons, I believe the relief requested in the L&P/CapitalSource Rejection Motion is in the best interest of the Hospital, its estate and its creditors.

I declare the under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that this Declaration was executed at Downey, California on September 14, 2009.

Robert E. Fuller

Exhibit A

**Downey Regional Medical Center**
**Analysis of Projected Cash Flow**
**For the 16 Weeks Ending January 1, 2010**

| | 1 18-Sep-09 | 2 25-Sep-09 | 3 02-Oct-09 | 4 09-Oct-29 | 5 16-Oct-09 | 6 23-Oct-09 | 7 30-Oct-09 | 8 06-Nov-09 | 9 13-Nov-09 | 10 20-Nov-09 | 11 27-Nov-09 | 12 04-Dec-09 | 13 11-Dec-09 | 14 18-Dec-09 | 15 25-Dec-09 | 16 01-Jan-10 | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Cash Receipts** | | | | | | | | | | | | | | | | | |
| Medicare | 687,500 | 687,500 | 737,500 | 737,500 | 737,500 | 737,500 | 737,500 | 757,500 | 757,500 | 757,500 | 757,500 | 757,500 | 757,500 | 757,500 | 757,500 | 757,500 | $11,880,000 |
| Medical | 190,000 | 190,000 | 190,000 | 190,000 | 200,000 | 200,000 | 200,000 | 200,000 | 200,000 | 200,000 | 200,000 | 210,000 | 210,000 | 210,000 | 210,000 | 210,000 | $3,210,000 |
| Commercial | 1,504,000 | 1,598,000 | 1,880,000 | 1,880,000 | 1,974,000 | 1,974,000 | 2,068,000 | 2,068,000 | 2,068,000 | 2,362,000 | 2,362,000 | 2,362,000 | 2,362,000 | 2,362,000 | 2,362,000 | 2,068,000 | $33,254,000 |
| Other | 7,500 | 7,500 | 28,500 | 7,500 | 7,500 | 7,500 | 7,500 | 28,500 | 7,500 | 7,500 | 7,500 | 28,500 | 7,500 | 7,500 | 7,500 | 7,500 | $183,000 |
| **Total Cash Receipts** | 2,389,000 | 2,483,000 | 2,836,000 | 2,815,000 | 2,919,000 | 2,919,000 | 3,013,000 | 3,054,000 | 3,033,000 | 3,327,000 | 3,327,000 | 3,358,000 | 3,337,000 | 3,337,000 | 3,337,000 | 3,043,000 | $48,527,000 |
| **Cash Disbursements** | | | | | | | | | | | | | | | | | |
| 401k Contribution | | 66,000 | | 66,000 | | 66,000 | | 66,000 | | 66,000 | | 66,000 | | 66,000 | - | 66,000 | $528,000 |
| Gross Payroll | | 2,820,000 | | 2,820,000 | | 2,820,000 | | 2,820,000 | | 2,820,000 | | 2,820,000 | | 2,820,000 | - | 2,820,000 | $22,560,000 |
| Payroll Taxes - Employer | | 217,000 | | 217,000 | | 217,000 | | 217,000 | | 217,000 | | 217,000 | | 217,000 | - | 217,000 | $1,736,000 |
| Insurance - Health | 800,000 | | | | 800,000 | | | | 800,000 | | | | 800,000 | | | | $3,200,000 |
| Workers Comp Claims | 18,000 | 18,000 | 18,000 | 18,000 | 18,000 | 18,000 | 18,000 | 18,000 | 18,000 | 18,000 | 18,000 | 18,000 | 18,000 | 18,000 | 18,000 | 18,000 | $288,000 |
| **Total Payroll Related Disbursements** | 818,000 | 3,121,000 | 18,000 | 3,121,000 | 818,000 | 3,121,000 | 18,000 | 3,121,000 | 818,000 | 3,121,000 | 18,000 | 3,121,000 | 818,000 | 3,121,000 | 18,000 | 3,121,000 | 28,312,000 |
| Advertising | | | 5,000 | | | | 1,200 | | | | 1,200 | | | | 1,200 | | $8,600 |
| Audit Fees | | | 50,000 | | | | | | | | 40,000 | | | | 20,000 | | $110,000 |
| Ambulance | | | 2,000 | | | | 2,000 | | | | 2,000 | | | | 2,000 | | $8,000 |
| Building Rent | 45,000 | | 21,521 | | 45,000 | | 21,521 | | 45,000 | | | | 21,521 | 45,000 | | | $244,563 |
| Capital Expenditures | | | | | | | | | | | | | | | | | $ |
| Operating Leases | | 53,137 | | | | | 53,137 | | | | | 53,137 | | | 53,137 | | $212,548 |
| Consulting & Mgmt Fees | | | | | 184,000 | | | | 184,000 | | | | 184,000 | | | | $552,000 |
| Contracted Services | | | 130,124 | | | | | 130,124 | | | | | 130,124 | | | | $390,373 |
| Equipment Lease | | | | 3,583 | | | | 3,583 | | | | | 3,583 | | | 3,583 | $14,332 |
| Equipment Rental | | | | 22,054 | | | | 22,054 | | | | 22,054 | | | | 22,054 | $88,216 |
| Food & Beverages | 19,462 | 19,462 | 19,462 | 19,462 | 19,462 | 19,462 | 19,462 | 19,462 | 19,462 | 19,462 | 19,462 | 19,462 | 19,462 | 19,462 | 19,462 | 19,462 | $311,392 |
| Freight | 5,212 | 5,212 | 5,212 | 5,212 | 5,212 | 5,212 | 5,212 | 5,212 | 5,212 | 5,212 | 5,212 | 5,212 | 5,212 | 5,212 | 5,212 | 5,212 | $83,392 |
| Insurance - General | 190,000 | | | | 190,000 | | | | 190,000 | | | | 190,000 | | | | $760,000 |
| Insurance - Workers Comp. | | 100,000 | | | | | | | | | | | | | 200,000 | | $300,000 |
| Cymetrix | | | | 288,372 | | | | 288,372 | | | | | 288,372 | | | - | $865,116 |
| Capital Leases | | 59,500 | | | | | 59,500 | | | | | 59,500 | | | 59,500 | | $238,000 |
| Materials | 534,247 | 534,247 | 534,247 | 523,562 | 523,562 | 523,562 | 523,562 | 512,877 | 512,877 | 512,877 | 512,877 | 502,192 | 502,192 | 502,192 | 502,192 | 502,192 | $8,259,457 |
| Medical Professional Fees | | | | 148,000 | | | | 148,000 | | | | | 148,000 | | | | $444,000 |
| Miscellaneous | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | $800,000 |
| Forms (Office Supplies) | 36,308 | 36,308 | 36,308 | 36,308 | 36,308 | 36,308 | 36,308 | 36,308 | 36,308 | 36,308 | 36,308 | 36,308 | 36,308 | 36,308 | 36,308 | 36,308 | $580,928 |
| Plant Maint & Repairs | 8,201 | 8,201 | 8,201 | 8,201 | 8,201 | 8,201 | 8,201 | 8,201 | 8,201 | 8,201 | 8,201 | 8,201 | 8,201 | 8,201 | 8,201 | 8,201 | $131,216 |
| Postage & Courier | 1,450 | 1,450 | 1,450 | 1,450 | 1,450 | 1,450 | 1,450 | 1,450 | 1,450 | 1,450 | 1,450 | 1,450 | 1,450 | 1,450 | 1,450 | 1,450 | $23,200 |
| Purchased Services | 224,181 | 224,186 | 224,186 | 224,186 | 224,186 | 224,186 | 224,186 | 224,186 | 224,186 | 224,186 | 224,186 | 224,186 | 224,186 | 224,186 | 224,186 | 224,186 | $3,586,971 |
| Sales Taxes | | 24,000 | | | | | 24,000 | | | | 24,000 | | | | 24,000 | | $96,000 |
| Siemens | | | | 315,971 | | | | 315,971 | | | | | 315,971 | | | | $947,913 |
| Taxes/Licenses | | | 15,000 | | | | 15,000 | | | | 15,000 | | | | 15,000 | | $60,000 |
| Telephone | 25,000 | | | | 25,000 | | | | 25,000 | | | | 25,000 | | | | $100,000 |
| Education | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | $19,200 |
| Utilities | 190,000 | | | | 150,000 | | | | 130,000 | | | | 130,000 | | | | $600,000 |
| **Total Non-Payroll Related Disbursements** | 1,330,261 | 1,116,903 | 973,787 | 1,647,561 | 1,593,705 | 893,581 | 1,000,418 | 1,054,054 | 2,167,363 | 882,896 | 1,029,733 | 1,021,848 | 2,133,199 | 893,211 | 1,221,048 | 875,848 | $19,835,417 |
| **TOTAL OPERATING DISBURSEMENTS** | 2,148,261 | 4,237,903 | 991,787 | 4,768,561 | 2,411,705 | 4,014,581 | 1,018,418 | 4,175,054 | 2,985,363 | 4,003,896 | 1,047,733 | 4,142,848 | 2,951,199 | 4,014,211 | 1,239,048 | 3,996,848 | $48,147,417 |
| **Bankruptcy Expenses** | | | | | | | | | | | | | | | | | |
| U.S. Trustee | | | | | | | | 13,000 | | | | | | | | | $13,000 |
| FTI | | | | | 75,000 | | | | | 65,000 | | | | 75,000 | | | $215,000 |
| Committee (Counsel & Financial Ad) | | | | | 75,000 | | | | | 75,000 | | | | 50,000 | | | $200,000 |
| Medical Ombudsman | | | | | 16,000 | | | | 16,000 | | | | 16,000 | | | | $48,000 |
| Lender Interest | | | | 40,000 | | | | 40,000 | | | | | 40,000 | | | | $120,000 |
| Lender Facility Fee | 284,000 | | | | 284,000 | | | | | | | | | | | | $568,000 |
| Legal | | | | | | | 40,000 | | | 75,000 | | | 40,000 | 125,000 | | | $280,000 |
| Omni | | | | | | | | | | | | | | 10,000 | | | $10,000 |
| Adequate Protection-Bonds | 539,695 | - | - | | 494,000 | | | | 494,000 | | | | | 494,000 | - | - | $2,021,695 |
| **TOTAL SPECIAL DISBURSEMENTS** | 823,695 | - | - | 40,000 | 944,000 | - | 40,000 | 53,000 | 510,000 | 215,000 | - | - | 96,000 | 754,000 | - | - | $3,475,695 |
| **TOTAL DISBURSEMENTS** | 2,971,956 | 4,237,903 | 991,787 | 4,808,561 | 3,355,705 | 4,014,581 | 1,058,418 | 4,228,054 | 3,495,363 | 4,218,896 | 1,047,733 | 4,142,848 | 3,047,199 | 4,768,211 | 1,239,048 | 3,996,848 | 51,623,112 |
| **Net Cash Flow** | (582,956) | (1,754,903) | 1,844,213 | (1,993,561) | (436,705) | (1,095,581) | 1,954,582 | (1,174,054) | (462,363) | (891,896) | 2,279,267 | (784,848) | 289,801 | (1,431,211) | 2,097,952 | (953,848) | (3,096,112) |
| **CUMM CASH FLOW** | (582,956) | (2,337,859) | (493,646) | (2,487,207) | (2,923,912) | (4,019,493) | (2,064,911) | (3,238,965) | (3,701,328) | (4,593,224) | (2,313,957) | (3,098,805) | (2,809,005) | (4,240,216) | (2,142,264) | (3,096,112) | |
| **Cash Balances** | | | | | | | | | | | | | | | | | |
| Beginning of Period | 340,000 | 3,757,044 | 2,002,141 | 3,846,354 | 1,852,793 | 2,416,088 | 1,320,507 | 3,275,089 | 2,101,035 | 1,638,672 | 746,776 | 3,026,043 | 2,241,195 | 2,530,995 | 1,099,784 | 3,197,736 | 340,000 |
| LOC Advance | 4,000,000 | | | | 1,000,000 | | | | | | | | | | | | 5,000,000 |
| End of Period | 3,757,044 | 2,002,141 | 3,846,354 | 1,852,793 | 2,416,088 | 1,320,507 | 3,275,089 | 2,101,035 | 1,638,672 | 746,776 | 3,026,043 | 2,241,195 | 2,530,995 | 1,099,784 | 3,197,736 | 2,243,888 | $2,243,888 |